IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

**RECEIVED**

JUL - 2 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| Jesse Ramirez | § | |
|     Plaintiff, | § | |
| | § | |
| vs | § | Civ No. 07-2226(RWR) |
| | § | |
| Department of Justice et. al | § | |
|     Defendants, | § | |
| | § | |

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR LEAVE TO FILE AMENDED PLEADING

Plaintiff requests leave of court to file an amendedpleading, [Motion For
Leave To File Amended Pleading.

1. Plaintiff is Jesse Ramirez; Defendant is Dept. of Justice et. al.

2. Plaintiff sued defendant for [willful/intentional violations of the Privacy
Act ab initio 5 § 552a ; for defendants failure to adhere to the mandates
of Program Statement 5800.11 and for the adverse affects injuries and actual
damages Plaintiff has suffered as a result.

3. Defendants filed an answer on May 30,2008 "Motion to Dismiss and or Summary
Judgement". Plaintiff did not receive this until June 6,2008.

4. Party seeks to amend his Privacy Act claim to include: The Factual Statments,
thhe documents/exhibits, Affidavits, essential elements, Judicial Notice under
F.R.Civ.P. 201(d)and etc. of his response. And anyother jurisdictional elements
encompassed in his response. In order to cure any errors/jurisdictional defects.

ARGUMENT

1. Unless the opposing party can show prejudice, bad faith, or undue delay,
a court should grant leave to file an amended pleading. **Forman v Davis** 371
U.S. 178, 182, 83 S.Ct. 227, 230(1962). Trial court ordinarily should permit
litigant, especially **pro-se** litigant, opportunity to amend complaint before
dismissing complaint for failure to state a claim. **Ingram v Becher** 3 F3d 1050(7th
1993). Pro -se prisoner litigant's pleadings must be construed liberally on
motion for summary judgement. **Frost v Symington** 197 F3d 348(9th 1999).

    2. Leave to amend should be freely given when justice so requires F.R.Civ.P.
15(a); **Froman** 371 U.S. 182, 83 S.Ct. at 230. Plaintiff is pro-se litigant
and is prosecuting this claim himself see **Ingram v Becher** 3 F3d 1050(7th 1993).
Plaintiff is responding to Defendants motion to dismiss and or summary judgment.
the burden has been shifted to Plaintiff as to why dismissal and or summary

judgement should not be granted. In support of his burden, Plaintiff submits these facts, doucments and etc. as his reason why Defendants request for relief should not be granted.

3) The court should allow Plaintiffs amended pleading because it is proof and in support. Of Plaintiffs burden and as to why Defendants motion to dismiss and or summary judgment should not be granted.

4) Defendants will not be prejudiced by Plaintiffs amended pleading because. They have asked PLaintiff to submit proof and more than conclusory allegations. As to why Plaintiffs Privacy Act suit should proceed to trial. And why their motion to dismiss and or summary judgment should not be granted. **Phelps v McCellan** 30 F3d 658, 662-63(6th 1994).

5) Plaintiff is filing his response/amended pleadings along with this motion. In the event that Defendants do not Agree to amended pleading/response.

CONCLUSION

For these reasons Plaintiff asks this court to grant leave to file amended pleading.

Respectfully

Jesse Ramirez # 31805-180                    dated: 6/30/08

CERTIFICATE OF SERVICE

I Jesse Ramirez do swear that I have served Party's a copy of this motion via first class mail and handed such documents to prison officials on June 30 2008.

Defendants                        U.S. District Court
C/O R. Fields                     333 Constitution Ave., N.W.
555 fourth Street N.W.            Washington, D.C. 20001
washington Dc. 20530

Respectfully

Jesse Ramirez

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

Jesse Ramirez                    §
        Plaintiff,               §
                                 §
vs                               §    Civ No. 07-2226(RWR)
                                 §
Department of Justice et. al     §
        Defendants               §
                                 §

PLAINTIFFS MEMORANDUM IN RESPONSE TO DEFENDANTS
MOTION TO DISMISS AND OR SUMMARY JUDGEMENT

## A. INTRODUCTION

**1.** Plaintiff is Jesse Ramirez; Defendant is Dept. of Justice et. al

**2.** On December 11,2007 Plaintiff sued Defendant for "willful failure" to adhere
to the mandates of the Privacy Act 5 § 552a *ab initio*; for defendants "willful
failure" to adhere to Program Statement 5800.11 and for the "adverse affects,
injuries and damages" Plaintiff has suffered a result.

**3.** On April 14,2008 Defendants filed a Motion For An Extension Of Time. And
requested to file a response by June 30,2008.

**4.** On May 30,2008 Defendants filed a Motion To Dismiss Or In The Alternative
For Summary Judgement.

    A Motion To Dismiss and or Summary Judgement is inproper in this case
because there are genuine issues of material facts on each element of Plaintiffs
cause of action for "willfull failure" to adhere to the above mentioned 5
§ 552a(e)(1); (e)(5) and (e)(6) state as follows.

    **(e) Agency Requirements**- each agency that maintains a sustem of records
**shall-**

        (1) maintain in its records only such information about an individual
as is relevant and necessary to accomplish a purpose of the agency required
to be accomplished by statutes or by the executive order of the President;

        (5) maintain **all** records which are used by the agency in making **any** deter-
mination about **any** individual with such **accuracy**, relevance, timeliness and
completeness as is reasonably necessary to assure fairness to the individual
in the determination;

        (6) prior to **disseminating** "any" record about an individual to **any** person
other than an agency, unless the dissemination is made pursuant to sub section

(b)(2) of this section, make reasonable efforts to **assure** that such records are **accurate**, complete, timely and relevant for agency purposes:

  **(d) Access To Records**- each agency that maintains a system of records **shall**-

    (2) permit the individual to request amendment of a record pertaining to him.

      (A) not later than 10 days (excluding saturdays, sundays and legal holidays) after the date of receipt of such

    **(g) Civil Remedies**- (1) Whenever an agency-

      (C) fails to maintain **any** record concerning **any** individual with such **accuracy**, relevance, timeliness and completeness as is necessary to **assure** fairness in **any** determination relating to the qualification, **character, RIGHTS,** or opportunities of, or benefits to the individual that may be made on the basis of such record , and consequently a determination is made which is **adverse** to the individual; or

      (D) **fails** to comply with **any** provision of this section, or **any** rule promogulated thereunder, in such a way as to have an **adverse effect** on an individual.

the individual **may** bring a civil action against the agency and the district courts of the United States **shall** have jurisdiction in the matters under the provisions of this subsection.

      (2)(A) In **any** suit brought under provisions of subsection (g)(1)(A) of this section, the **court** may **order** the agency to **amend** the individuals record in accordance with his request of in such **other way** the court may direct. In such a case the court **shall** determine the matter de novo.

    **Bureau of Prisons Program Statement 5800.11** "Inmate Central File, Privacy Folder, and or Parole Mini-File dated 12/31/97 pg 19 5800.00(15)

    (c) **Inmate Challenge to Information.** An inmate **may** challenge the **accuracy** of the information in his or her Inmate Central File. Unit team staff **shall** take reasonable steps to **ensure** the accuaracy of challenged information, particularly whe that information is capable of being verified. The inmate is **required** to provide staff with sufficient inofrmation in support of a challenge(names of persons to contact, govt. agency, etc...)

    When an inmate **provides** such information, staff **shall** review the alleged error(s) and take reasonable steps to **ensure** the information is correct.

    For example, if an inmate challenges information id the Presentence Investigation REport (PSI), staff should inform the appropriate U.s. Probation

(USPO) in writing of the disputed information, and request that a written response also be provided. **USPO procedures, however, do not allow for changes or addendums to be made to the Presentence Investigation Report after sentencing since it is a court document.**

If the USPO subsequently reports that the challenged informtaion, or some part thereof is not accurate, staff **shall** attach the Bureau's inquiry and the USPO response to the challenged document. Staff **shall** file this information in the applicable section of the Inmate Central File, and also make a notation on the Inmate Activity Record form (BP-381) to ensure that **future** decisions affecting the inmate are **not** based on the discredited information. See also **Brown v BOP 498 F.Supp.2d 298 at 302-303[2]n. 6(D.C. 2007).**

To prevail on an accuracy claim, the Plaintiff must show (1) he has been aggrieved by an adverse determination; (2) the agency failed to maintain records accurately; (3) the reliance on the inaccurate information was the proximate cause of the adverse decision and (4) the agency acted **willfully** or **intentionally** of failing to maintain accurate records. **Deters 85 F3d at 657.** To establish that an agency's actions were willful and intentional, "[t]he plaintiff must show that the defendant acted with something greater than gross negligence" **Tigerina v Walters 821 F2d 789, 799(D.C. 1987)** "An agency acts in a an intentional or willful manner either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others **rights** under the Act" **BAyless v U.S. Parole Comm'n 1996 WL525325 (D.C. 1996((quoting Albright v U.S. 732 F2d 181, 189(D.C. 1984);** see also **Veterans Admin of U.S. 838 F2d 418, 425(10th 1988).,** cert denied 488 US 817(1988) **Laningham v U.S. Navy 813 F3d 1236, 1242(D.C. 1987)**(actions **must** be so patently egrigious and unlawful that **anyone** undertaking the action should have known it was unlawful).

Plaintiff does state for the record. That he is fully aware of the facts that under certain exemptions of the Privacy Act and of 28 CFR (e.g. 28 CFR § 16.81(a)(4) and etc.) that defendant agency's do not have to amend/correct their records. However, defendant agency's are still liable if their willful failure to maintain accurate information in their records and they make an adverse determination against an individual. As a result of this inaccurate/false information. Then agency's decision allows a plaintiff to recover money damages for their willful and intentional conduct. Plaintiff does also want to make it very, very clear. That he is **not** wanting defendants to correct/amend their inaccurate information in the files that they willfully/intentionally maintained against Plaintiff **ab initio** (i.e. as early as June 06,2002 a whole **5 months**

-3-

before defendants willfully relied upon it to arrest Plaintiff at 5:30 am
on November 8,2002 and etc). Plaintiff is also **not** trying to attack his criminal
conviction or sentence. As Plaintiff is fully aware that the Privay Act is
not the proper means to attack/collaterally attack a conviction or sentence.
**Brown v U.S. 498 F.Supp.2d at 303[3,4](D.C. 2007)**. It jsut so happened and
which was no coincidence. That the same "inaccurate/false infromation that
defendants willfully mainatined in their records against Plaintiff. is the
exact same "innacurate/false" information. That defendants relied upon to
arrest Plaintiff on Nov. 8,2002 at 5:30 am, to obtain the arrest warrant and
try to justify with Plaintiffs already unlawful arrest and kidnapping, to
have Plaintiff indicted "any misdirection of a **magistrate** or a **grand jury**
perpetuates the taint of the original impermissible conduct" **Hand v Gary 838
F2d 1420(5th 1988)**; "Therefore, it ws clearly established in the Eleventh
Circuit at the time of when appellant's alleged conduct that officials who
engaged in impermissible conduct prior to securing a **grand jury indictment**
cannot rely in the grand jury indictment to break the chain of causation with
respect to their original misconduct. As matter of policy, it makes little
sense to allow police officers or prosecutors to engage in fraudulent and
deceitful conspiracies in order to secure a grand jury indictment and then
use the indictment to shield them from any possible causes of action for their
tainted behavior" **Barts v Joyner 865 F2d 1187(11th 1989)** see also "The misdirection
of the grand jury **removes** the protection that any pre-grand jury misconduct
would gave enjoyed after an indictment was issued absent any misdirection
of the grand jury" **Buckley 509 US 259, 113 S.Ct. at 2612 n. 5.** Defendants
willful and intentional **dissemination** of this inaccurate/false information.
Is what the magistrate relied upon to make her findings of probable cause,
is what the Grand Jury relied upon to return an indictment against Plaintiff,
is what the other Magistrate Judge relied upon to deny Plaintiff bond, is
what the jury relied upon to find Plaintiff guilty, is what the sentencing
judge relied upon to impose a 3 life sentence on Plaintiff and is what the
BOP has relied upon. In order to Classify and Designate Plaintiff to two very
violent/dangerous United States Penitentiary.

These adverse determinations against Plaintiff. Are the direct result
of Defendants willful failure to maintain accurate information in their records
against Plaintiff. These adverse affects have resulted in Plaintiff being
stripped/deprived of his most basic and fundemetsl rights. Namely the 4th
amend., the 5th amend. It has resulted in Plaintiff losing his freedom, his

right to Life, Liberty, Property, his business', his personal wealth, his home and most important of all these adverse affects. Is that Plaintiff has lost his **FAMILY**. Plaintiff has no type of communication and or relationship with his common-law wife and his two beautiful daughters. Their names are Alexis Nicole Ramirez age (9) and Alyssa Marie Ramirez age (8). This past Fathers day, Plaintiff layed up in bed from 4:00 am and wondered if his Princess and Chiquita (Alexis and Alyssa) were thinking of him. Plaintiff did come to the realization that they weren't. It is currently 6/19/08 and Plaintiff has yet to receive a Father's Day card or anything.

Plaintiff solely brings forth this Privacy Act suit. So that Plaintiff can request/receive an award of actual damages as the result of these defendants/ agency's recordkeeping deficienies 5 § 552(g)(C); (D)and etc. Plaintiff will prove beyond a reasonable doubt that (1) defendants willfully failed to maintain accurate information in their records on Plaintiff **ab initio** (i.e. as early as June 6,2002) (2) Plaintiff has infact been severly aggrieved by these adverse determination (3) defendants reliance on this "inaccurate/false" information was the proximate cause of the adverse decisions/affects Plaintiff has suffered and (4) these agency's/defendants did "willfully/intentionally" fail to maintain accurate records. **Deters 85 F3d 657.** Lastly, the Bureau of Prisons/agency did infact fail to adhere to Program Statement 5800.11 and WILLFULLY. Therefore, warranting an award for damages for their failure to comply with 5800.11. see **Brown v BOP 498 F.Supp.2d 298 at 302-03[2]n. 6(D.C. 2007).** Plaintiff does declare that the foregoing is the truth, the whole truth and nothing but the truth. And that "NO" DEFENDANT/AGENCY will ever be able to rebutt or refute these facts.

## B. STATEMENTS OF FACTS

### Arrest of Plaitiff/Jesse Ramirez

1) Plaintiff was arrested on Nov. 08,2002 at 5:30 am by Defendants. In complete violation of the 4th amend. of the Constitution. And was infact kidnapped by Defendants, taken over to DEA headquarters in San Antonio, Tx, hid out there and while. Defendants took (i.e. disseminated this inaccurate/false info to Magistrate Nowak 552a(e)(6)) the Criminal Complaint to Magistrate Nowak. In order for her to sign off on the arrest/search warrants. So that Defendants could justify/break the chain of causation on Plaitiffs illegal arrest and kidnapping. "Any misdirection of a **magistrate** or grand jury **perpetuates** the taint of the original impermissible conduct" **Hand v Gary 838 F2d 1420(5th**

1988). Plaintiff does declare that the information that defendants relied upon and in order to committ these criminal offenses. Was infact "inaccurate/ false" and known to be such. A whole 5 **months** before defendants relied upon it and **disseminated** it to Magistrate Nowak. In complete violation of 5 § 552a(e)(1); (e)(5) and (e)(6). Plaintiff does submit as **(Att. # 1** Legal Packet sent to Johnny K. Sutton via cert # 7007 0220 0004 5857 and supporting exhibits). Plaintiff does ask that this honorable Judge refer to **(Att. # 1 pg 3 ¶ 1 thru pg 18 ¶ 27)**. Plaintiff does ask this Judge to take Judicial Notice under **F.R. Evid. 201(d)** of the actual criminal conduct Defendants engaged in the course of their "willful/intentional" violations of the Privacy Act. Further, this criminal conduct defendants engaged in. Does prove more than gross negligence this court required in **Tigerina v Walters 821 F2d 789, 799(D.C. 1987)**. "Actions **must** be so 'patently egrigioys and **unlawful'** that anyone undertaking the conduct should have known it was unlawful) **Laningham v U.S. Navy 813 F2d 1236, 1242(D.C. 1987)**. An agency acts in an intentional or willful manner either by committing the act **without** grounds for believing it to be lawful, or by flagrantly disregarding others **rights** under the Act. **Bayless v U.S. Parole Comm'n 1996 WL 525325(D.D.C. 1996)**. It is fair to say that these defendants knew their acts were without lawful grounds and were infact flagrantly disregarding Plaintiffs rights under the Act.

2) Plaintiff does declare that Defendants continued to rely upon this known (inaccurate/false" fnformation. To further deprive/strip Plaintiff of one of his most basic and fundamental rights afforded to him by the Constitution of the United States. That being the protections of the 4th amend. "to be free from unlawful searches and seizures of persons...". The facts that are supported in **(Att. # 1)** are undisputable and prove that. AUSA/Sheraer, AUSA/Cont-reras, DEA Agent/A.B. Castaneda (who are the actual authors of the fraudulent Criminal Complaint) and other Defendants/agency's. Knew that the information they **all** relied upon was infact "inaccurate/false" please refer to **(Att. # 1 exhibits # 1 thru # 9** in support thereof). A whole 5 months (i.e. June of 2002 see DEA-6 reports of Jose Soto July of 2002 also) before they willlfully relied upon and disseminated them 5 § 552a(e)(1); (e)(5) and (e)(6). This willfullness also constitutes a Conspiracy Against Rights 18 § 241 and 242 and many others Plaintiff has outlined in **(Att. # 1)**. Plaintiff asks this honorable Judge to take Judicial Notice of these facts and criminal conduct Defendants did engage in and under **F.R. Evid. 201(d). Rivera v Phillip Morris Inc. 395 F3d at 1258(9th 2005)**. "[A] high degree of indisputability is the

essential prerequisite' to taking judicial notice of adjudicative facts and...
'the tradition [of taking judicial notice] has been one of caution in requiring
that the matter be beyond controversy.' 'Because the effect of judicial notice
is to deprive a party of an opportunity to use rebuttal evidence, caution
must be used in determining that a fact is beyond controversy under [FRE]
201(b ).''' See also **U.S. v Boyd 289 F3d 1254, 1258(10th 2002)**. Plaintiff
asks this Judge to take Judicial Notice and in order. For this honorable Judge
to see for himself. That the "facts" that Plaintiff has and will present.
Are infact "beyond controversy" and Plaintiff has met the "requirement" laⁿunguage
of **Rivera 395 F3d 1142, 1151(9th 2005)**. These facts are "indisputable" and
the "prerequisite" has been met.

    **3)** Not only did this "inaccurate/fasle" information allow Defendants
to strip/deprive Plaintiff of his guaranteed right and protections under the
4th amendment. But Defendants did also strip/deprive Plaintiff of his 5th
amend. right to Life, Liberty and Property. As well as the right to Due Process
of law. Subsequent to all these illegal and constitutional deprivations. And
clear willful failure  to adhere to the mandates of the Privacy Act and Deters
85 F3d 657. Plaintiff was ordered to be detained without bond. Which this
willful **dissemination** to Magistrate Nowak. Further "aggrieved" Plaintiff severly.
These adverse affects were infact the proximate result of Defendants willfaul
failure to adhere to 5 § 552a(e)(1); (e)(5) and (e)(6). Plaintiff has already
met **all** of the essential elements of the Privacy Act and the **4** factors set
forth in **Deters 85 F3d 657**. Just within these few paragraphs.

    **4)** Which now do prove that Defendant's attorney's statements on **pg 17**
of their Motion To Dissmiss and or Summary Judgement "That Plaintiff has failed
to establish an actionable claim under all four elements". Are not only erroneous
but fail to support Defendants request for the relief they are seeking. Summary
judgement is not proper if material issues exist for trial. **Nodine v Shiley
Inc. 240 F3d 1149(9th 2001)**. Plaintiff asks this Judge to take judicial notice
of these factual material issues 201(d). Plaintiff does state for the record
that this is just the "tip of the iceberg" of the burden Plaintiff will meet.

    **5)** The documentation and supporting exhibits that Plaintiff has proven
in (**Att. # 1 pg 1 thru pg 31** and **all** supporting exhibits) do prove "beyond
a reasonable doubt". That Defendants acted in a "willful and intentional manner",
the alleged inaccurate/false information was the proximate cause of teh adverse
determination[s], Defendanst "failed to maintain these records accurately"
**ab inition** and Plaintiff has been "severely aggrieved and adversely affected.

These "adverse affects, injuries and damages. That Plaintiff has suffered
as the direct result of Defendants willful/intentional record keeping deficiencies.
Does allow Plaintiff to bring forth this Privacy Act suit under 552a(g)(1)(C).
Intent or willfullness of govt. is necessary to recovery of damages under
Privacy Act. **Chapman v National Aeronautics & Space Admin. 736 F2d 238(5th
1984)**. Privacy Act provides remedy for "intentional or willful" **creation,
maintenance,** or **dissemination** of F..A..L..S..E.. records. **Downie v City of
Middleberg Heights 301 F3d 688(6th 2002)**. Plaintiff has provided factual proof
and documents (refer to **Att # 1 pg 1 thru pg 31** and **all** the supporting exhibits)
to support he position. And to further support the requirements of money damages.
This (**Att. # 1**) does prove beyond a reasonable doubt. That these Agency/Defendants
did "willfully/intentionally" **create, maintain** and **disseminate** known **false**
information in their records against Plaintiff. The DEA-6 reports and the
testimony of Jose Soto (**Att # 1 exhibits 6 -9**)prove Plaintiffs position. And
further prove, that defendants did willfully engage in **criminal conduct** in
order to violate their duties/mandates of the Privacy Act and Deters 85 F3d
657.

   6) Defendants did rely upon the inaccurate/false information(i.e. that
Plaintiff/Jesse Ramirez was the source of the 5 kilo's Jose Soto was arrested
with on Dec. 7,2001, that Plaintiff did conduct many multi kilo transactions
with Jose Soto at his business off of Basse Rd, and etc.)In order to justify
arresting Plaintiff in violation of his 4th amend. rights, relied upon it
to obtain the arrest warrant and to use the Magistrates finding of probable
cause with thes known inaccurate/false statements. To try to break the "chain
of causation" and justify their illegal/criminal conduct. The Supreme Court
ruled in **Malley v Briggs 475 U.S. 335(1986)**"the police officers may be held
liable for **damages** resulting from an arrest or search under authority of a
warrant when no reasonable officer could have believed that the affidavits
established probable cause, and that the judge's issuance of the warrant does
not break the chain of causation". Any misdirection of a **magistrate** or grand
jury perpetuates the taint of the original impermissible conduct. **Hand v Gary
838 F2d 1420(5th 1988)**.

   7) Plaintiff has infact suffered severe "adverse affects, damages and
injuries". Due to this willful conduct of Defendants. Plaintiff has lost/been
stripped of his protections under the 4th and 5th amendments, he has lost
hisbusiness, his personal wealth, his right to Life. Liberty and Property,
he has even lost the most important thing of all, his **FAMILY**. Plaintiff has

suffered severe "emotional trauma, sever mental trauma, and physical trauma"
as well. Plaintiff has infact suffered and still suffers "sleepness nights,
severe anxiety, severe stress, severe and irrevocable marital problems and
humiliation. see **Salinas v O'Neill 286 F3d 827(5th 2002)** Wondering about his
two little girls and the loss of his Family. Under Illinois Law , loss of
society damages, claim includes loss of affection, care, attention, companionship,
comfort, guidance and protection. **McClain v Owens-Corning Fiberglas Cort.
139 F3d 1124(7th 1998).** Plaintiffs loss of consortium, Family, personal wealth,
business', real property, homestead and etc. Have weighed heavily on Plaintiff
and have almost run him to the brink of mental and emotional breakdown.

    8) Plaintiff does ask defendants Attorney's to take "special notice"
of the criminal conduct that their clients did willfully engage in (refer
to **Att # 1 pg 1 thru 31** and **all** supporting exhibits). That prove that defendants
"Actions were so 'patently egrigious and unlawful' that anyone undertaking
the conduct should have known it was unlawful". **Laningham v U.S. Navy 813
F2d 1236, 1242(D.C. 1987).** Att # 1 does prove that defendants did infact "act
with something more than gorss negligence" **Tigera v Walters 821 F2d 789, 799(D.C.
1987).** "An agency acts in an intentional or willful manner either by committing
the act without grounds for believing it to be unlawful or by flagrantly disregarding
others **rights** under the Act. **Bayless v U.S. Parole Comm'n 1996 WL 525325(D.C.
1996).** Plaintiff did infact act in an intentional and willful manner. Defendants
knew their conduct was unlawful and that they were flagrantly disregarding
Plaintiffs rights under the Privacy Act. Which is why they enlisted the assistance
of Alamo Area Narcotics Taskforce in San Antonio. Please refer to **(Att. #
1 pg 3 ¶ 1 thru pg 7** and **exhibits 1, 2, 3, and 4** ). These documents prove
that the DEA was in charge of this investigation. And merely enlisted the
assistance of AANTF, to commit the 4th amend. violation. So that they/defendants
could claim innocence to the unlawful/criminal conduct. The Silver Platter
Doctrine has been abolished. This conduct of Defendants on NOv. 8,2002 does
infact constitute clear violation of 18 § 1001, 18 § 1201, 18 § 242 & 242
and etc. Plaintiff would like to remind these Attorney's. That they too have
sworn 28 § 544 and still have a duty to discharge their oath/duites under
28 § 547. These attorneys swore to uphold and **defend** the Constitution against
**all** enemies foreign and **domestic.** Failure on their part to as they have sworn
to do. Will not only constitute a "conflict of interest". But will also will
make them (i.e. AUSA/R. Fields and the other 2) criminally liable under 18
§ 2, 3 and 4. Plaintiff also asks this Judge to take Judicial NOtice 210(d).

## Indictment of Plaintiff/Jesse Ramirez

1) Plaintiff will continue to prove beyond a reasonable doubt. That Defendants willfully/intentionally maintained inaccurate/false information in their records against Plaintiff. Plaintiff has infract been severely aggrieved by these adverse determinations, defendants reliance on this inaccurate/false information was the proximate cause of the adverse affects Plaintiff has suffered and that defendants willfully failed to maintain accurate records in violation of the Privacy Act, Deters 85 F3d 657, of 28 § 544, McDade-Murtha Bill, HR 3396 sec. 201(a)(1), (2), (3), (4), (5), (6), (7), 18 § 241 & 242 and etc.,etc.

2) Defendants did in violation of 552a(e)(1); (e)(5) and (e)(6). Did next disseminate this known inaccurate/false information to the Grand Jury. So that defendants could use the Grand Jury. As a tool to "break the chain of causation" of their original impermissible/criminal conduct. The 5th circuit stated in **Hand v Gary** 838 F3d 1420(5th 1988) "any misdirection of a magistrate or a "grand jury" perpetuates the taint of the original impermissible conduct". The Eleventh circuit reiterated this in **Barts v Joyner** 865 1187(11th 1989) Therefore it was clearly established in the 11th circuit at the time of the appellants alleged impermissible conduct  prior to securing a grand jury indictment cannot rely upon the grand jury indictment to  break the chain of causation with respect to their original misconduct. As matter or policy, it makes little sense to allow police officers or prosecutors to engage in fraudulent and deceitful conspiracies in order to secure a grand jury indictment and then use the indictment to shield them from any possible  causes of action for their tainted behavior". The misdirection of the grand jury removes the protection that any pre-grand jury misconduct would have enjoyed after an indictment was issued absent any misdirection of the grand jury. Buckley v Fitzsimmons 509 U.S.  259, 113 S.Ct. at 2612 n. 5. Defendants did infact disseminate the same inaccurate/false information. That they relied upon for their original misconduct and violations of the Privacy Act (i.e. Plaintiffs unlawful arrest and etc). Plaintiff asks this honorable Judge to refer to (Att # 1 pg 1 thru pg 31 and supporting exhibits) and so that. This Judge can see what Plaintiff is alleging is true.

3) Plaintiff does also state for the record. That not only did defendants willfully/intentionally violate the mandates of the Privacy Act. But in order to do so, and in the course of. They had to engage in criminal conduct(i.e. violations of 18 § 1621; 18 § 1622; 18 § 1623; 18 § 1001; 18 § 241 & 242 and etc.) Plaintiff asks this court to review what Plaintiff will make as (Att. # 2 Grand Jury Transcript pg 7 ln 2-7) and compare this to (Att. # 1 pg 10 para 7 thru pg 18 para 27 and supporting documents). This court will see that this alleged crime (i.e. the crime that defendants used to show Plaintiffs involvement, arrest Plaintiff in violation of the 4th amend., to support probable cause and etc.) never ever happened. And this was just the beginning of the "inaccurate/false" information. That defendants were willfully maintaining in their records on Plaintiff. Plaintiff asks this court to take Judicial Notice under 201(d) and since Plaintiff is "supplying this judge with the necessary information". That this crime(i.e. inaccurate/false info) was the same crime that Defendants used. To base the 841(b)(1)(A) conspiracy off of. If this crime never happened and was only created  see **Downie v City of Middleberg Heights** 301 F3d 688(6th 2002) with the use of the known "inaccurate/false" information that Defendants in violation of the Privacy Act. Willfully maintained in Plaintiffs records and willfully disseminated. Can Defendants rely upon it to show Plaintiffs involvement and base an 841(b)(1)(A) conspiracy off of it? This Judge and these attorney's surely know the answer to this question.

4) Defendants committed further violations of the Privacy Act and Deters 85 f3d 657. When they continued to disseminate more "inaccurate/false" information to the grand jury. Pleas refer to ( Att. # 2 pg 7 line 14 -20). Plaintiff had no involvement in this alleged offense. Plaintiff would asks this Judge to take Judicial Notice of the fact. Had Defendants not willfully maintained, willfully relied upon and willfully disseminated this "inaccurate/false" information. To Magistrate Nowak and others. Plaintiff would not even be mentioned in these grand jury proceedings. The DEA-6 reports that Defendants created/generated. Will support Plaintiffs position that he had nothing to do with this alleged criminal offense. The intercepted phone calls will verify this as well as the fraudulent Criminal Complaint. The only way that Defendants could have shown Plaintiffs involvement in this alleged crime. Was by relying upon the "inaccurate/false" information. That

11

Plaintiff dropped off the Mexican national who was arrested 4 hours after, Defendants falsely state. That Plaintiff dropped him off and subsequent to the 4th amend. violation search and seizure. Plaintiff will later set out the actual facts. Plaintiff further states that the Criminal Complaint and intercepted phone calls of this time and day. Prove that it was Reynaldo Hernandez, Rene Campos and Alejandro Castillon. Intercepted talking about this alleged drug transaction. Further, Defendants initially believed and disseminated this to District Court Judges in Title III intercept affidavits, and etc. That it was Plaintiff on the phone and intercepted. Talking about drug shipments and what not. Subsequently it was later determined. But before defendants went to the grand jury and disseminated this "inaccurate/false" information. That it was not Plaintiff after all and that Defendants had made a mistake. Plaintiff will submit as ( Att. # 3 ) a copy of a transcribed phone intercept cover sheet. Wherein, it was determined that it was not Plaintiff after all. Plaintiff asks this honorable Judge to review (exhibit # 8 pg 1 ln 13 thru pg 3 ln 11 in support of Att. # 1). This proves that Defendants knew this information was "inaccurate/false" and months before they willfully relied upon and disseminated it. The misdirection of the grand jury removes the protection that any pre-grand jury misconduct would have enjoyed after an indictment was issued absent any misdirection of the grand jury. **Buckley v Fitzsimmons** 509 U.S. 259, 113 S.Ct. at 2612 n. 5. This constitutes clear violations of the Privacy Act, the mandates of Due Process, the Supreme Courts ruling in **Imbler v Patchman** 47 L.Ed.2d 128(1976).

5) Before Plaintiff could prove that the statements that Defendants were disseminating to the grand jury refer to (Att. # 2 pg 7 ln 14- ln 20). Were infact "inaccurate/false" and in violation of the law. Defendants along with their "unbeatable tag team" team mates (5th circuit court Judge Prado) please refer to (Att. # 1 pg 26 thru pg 30 and supporting exhibits). Willfully and intentionally deported this Mexican national back to Mexico. Plaintiff will swear in a separate affidavit. That there exists evidence/witnesses to prove that Plaintiff was not part of this "inaccurate/false" statements defendants created. This willful and intentional conduct of Defendants. Along with their unbeatable "tag team" team mate. Does infact constitute constitutional violations. The same ones that the Supreme Court ruled in U.S v Valenzuela-Bernal 458 U.S. 858(1982).

12

Those being Due Process and Compulsory Process violations. The gist of
Plaintiff outlining this, is this. Had Defendants not disseminated this
inaccurate/false information to the grand jury willfully and in violation of
the Privacy Act. Plaintiff would not have and could not have been indicted on
this count. In effect, suffered further/more severe adverse affects.
Plaintiff asks this honorable Judge to take Judicial Notice 201(d) of ( Att.
#1 Exhibit # 8 Direct Examination of DEA Stallings by AUSA/Contreras pg 1 ln
13 thru pg 3, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 ln 25). The very first
two pages of this exhibit. Prove "beyond a reasonable doubt" that Defendants
knew that they were willfully disseminating  "inaccurate/false" information
to the grand jury. In complete violation of the Privacy Act 552a(e)(1);
(e)(5); (e)(6) and Deters 85 F3d 657. Which inturn allows Plaintiff to bring
forth this Privacy Act suit under 552a(g)(1)(C) and (g)(2)(A). Plaintiff has
met all 4 elements f the Privacy Act and has infact established an actional
claim under all four elements.

    **6)** Plaintiff does declare that the willful dissemination of this
"inaccurate/false" information to the grand jury. Was the proximate/only
reason why the grand jury returned an indictment against Plaintiff on these
counts. In accordance with our justice system "The Ends Do Not Justify The
Means". Any misdirection of a magistrate or grand jury perpetuates the taint
of the original impermissible conduct. Gary v Hand 838 F2d 1420(5th 1988);
Alleged conduct prior to securing a grand jury indictment cannot rely on the
grand jury indictment to break the chain of causation with respect to their
original misconduct. As a matter of policy, it makes little sense to allow
police officers or prosecutors to engage in fraudulent and deceitful
conspiracies in order to secure a grand jury indictment and then use the
indictment to shield them from any possible causes of action for their
tainted behavior. **Mastroiani v Bowers** 160 F3d 671 at 682 n. 9(11th 1998) The
misdirection of the grand jury removes the protection that any pre-grand jury
misconduct would have enjoyed after an indictment was issued absent any
misdirection of the grand jury. **Buckley v Fitzsimmons** 509 U.S. 259, 113 S.Ct.
at 2612 n. 5. Plaintiff has already proven beyond a reasonable doubt. That
defendants did willfully/intentionally engage in fraudulent and deceitful
conspiracies to secure this grand jury indictment. And therefore are not
shielded from this Privacy Act action.

13

7) Plaintiff does declare that the statements defendants willfully disseminated in (Att # 2  pg 14 ln 23-25) are inaccurate/false as well. And were the proximate reason why the grand jury returned an indictment against Plaintiff. The investigation did not start until June 6,2002 please refer to (Att # 1 pg 8 para 3 thru pg 10 para 6 and supporting exhibits).  Defendants are infact "manufacturing" this conspiracy. With the use of these known "inaccurate/false" information. In Defendants own DEA-6 reports. They acknowledge that Castillon was merely the "supplier" or cocaine for Sixtos. But had removed himself as supplier and fell out of sight. As this honorable Judge and attorneys very well know. That a mere "buyer/seller" relationship does not and cannot constitute a conspiracy. This is just another example of Defendants willful failure to adhere to the mandates of the Privacy Act. These DEA-6 reports do exist. If this court needs Plaintiff to submit them as proof. That will be no problem. Plaintiff figured that he is already supplying this Judge and others. With enough documents that prove his position beyond a reasonable doubt. Plaintiff asks this court to refer to (Att. # 2 pg 20 ln 16 thru pg 21 ln 6) and compare with (Att. # 1 pg 10 para 7 thru pg 18 para 27 and supporting exhibits). Without Defendants creating and using this "inaccurate/false" information and disseminating to the Magistrate and this grand jury. Plaintiff could have never and would have never been dragged into this manufactured conpiracy, arrested, denied bond, indicted, convicted and sentenced. However, they are the exact "adverse affects" Plaintiff has suffered. Due to Defendants willful/intentional failure to adhere to the mandates of the Privacy Act and Deters 85 F3d 657.

8) Plaintiff does ask this Judge to take Judicial Notice under 201(d) of the fact. That this manufactured/falsely created crime of Dec. 7,2001. That Defendants willfully relied upon/disseminated and in order to show Plaintiffs involvement. Is also the crime that Defendants relied upon to base this entire 841(b)(1)(A) conspiracy off of. Plaintiff has already proven "beyond a reasonable doubt" that this crime never happened refer to (Att # 1 pg 10 para 7 thru pg 18 para 27 and supporting exhibits) and that it does not exist. Can anyone say, clear violation's of the Privacy Act, Deters 85 F3d 657, Conspiracy Against Rights 18 § 241 & 242, violations of 18 § 1001, 18 § 1621 and etcetera. This also proves that Defendants acted with something more that gross negligence. **Tigerina v Walters** 821 F2d 789, 799(D.C. 1987).

14

Infact, Defendants conduct was criminal and is in accordance. With this
circuits holdings of **Bayless v United States Parole Comm'n** 1996 WL
525325(D.D.C. 1996); **Albright v U.S.** 732 F2d 181, 189(D.C. 1984); **Andrews v
Veterans Admin. of U.S.** 838 F2d 418, 425(10th 1988); and **Laningham v U.S.
Navy** 813 F2d 1236, 1242(D.C. 1987)(actions must be so 'patently egregious and
unlawful' that anyone undertaking the conduct should have known it was
unlawful). Believe it when Plaintiff tells you. That Defendants knew their
conduct was infact unlawful. They just figured that Plaintiff was going to
lay down for them like 96% of the defendants do. Now that Defendants had
inaccurately/falsely showed Plaintiffs involvement with Count 4. It was that
much easier to show his involvement in other counts as well. Wherein the mere
presence and association inculpated Plaintiff. Plaintiff asks this Judge to
refer to (Att. # 2 pg 27 ln 8 thru pg 28 ln 13). For another clear example of
Defendants willful failure to maintain accurate information on Plaintiff.
Defendants rely upon their "inaccurate/false" statements. That Plaintiff
dropped off Jose Angel Garcia-Arguello. Who was later arrested with 55 kilos
of cocaine. Had Defendant and their unbeatable "tag team" teammate not
intentionally and with malice. Deported Jose Angel Garcia-Arguello back to
Mexico and before Plaintiff. Could secure his sworn declaration as to the
actual facts. Plaintiff would have and could have never been charged with
this count. This willful conduct of Defendants constitutes clear violations
of the Due Process Clause and Compulsory Process. see Valenzuela-Bernal 458
U.S. 858(1982). Defendant's were put on notice that Plaintiff intended to
call Jose Angel Garcia-Arguello as the "only" fact material witness to the
actual events of August 28,2002. Plaintiff put defendants on notice in a July
11,2002 pre-trial hearing and Judge Prado as well. Exactly 4 days later,
Prado/the court ordered him deported immediately. Defendants swore to uphold
and defend the Constitution and under god (28 § 544). Yet, they willfully and
preferably chose to violate it. Which if they were pre-disposed to violate
the Constitution. Willfully violating a statute as the Privacy Act and its
mandates. Would come as second nature to these criminals.

9) Plaintiff does state for the record and in regards to (Att. # 2 pg
28 ln 18 - ln 23). That this is a clear example of Defendants willfully
disseminating "inaccurate/false" information to Magistrate Nowak. In
violation of 552a(e)(6); Deters 85 F3d 657; 18 § 1621; 18 § 1622; 18 § 1623

15

and many other criminal statutes. see **Laningham v U.S. Navy** 813 F2d 1236, 1242(D.D.C 1987). Plaintiff asks this honorable court to refer to and compare ( exhibit # 8 pg 25 ln 10 thru pg 27 ln 25 in support of Att. # 1). This court knows, that had Defendants told Magistrate that they kicked in the door to the Roanoke Apt. in violation of the 4th amendment. The Magistrate off on Jose Angel Garcia-Arguello's arrest warrant and this inaccurate info would have never been used against Plaintiff or others. As this court is aware of the case law on "warrantless entries". Moreso, had Defendants not willfully disseminated this "inaccurate/false" information to the grand jury. The grand jury could have never relied upon it and it's choice to return an indictment against Plaintiff on this count. As a matter of policy, it makes little sense to allow police officers or prosecutors (i.e. DEA Stallings, AUSA/Contreras and others) to engage in fraudulent and deceitful conspiracies in order to secure a grand jury indictment and then use the indictment to shield them from any possible causes of action (i.e. this Privacy Act suit) for their tainted behavior. **Mastroianni v Bowers** 160 F3d 671 at 682 [21] n. 9(11th 1998). Defendants continued to willfully fail to adhere to the mandates of the privacy act. And willfully continue to disseminate 552a(e)(6) known inaccurate/false information to the grand jury. So that the grand jury can return an indictment against Plaintiff and other. In (Att. # 2 pg 42 ln 25 thru pg 43 ln 5) defendants inaccurate/falsely state to the grand jury. That the ATF subsequently determined that some of the weapons were actually "machine guns". The fact is, Defendants never received  any report, video and or proof from the ATF. That proved that anyone of these firearms was fully automatic/machine guns. Plaintiff will submit as (Att. # 4 Letter From AUSA/Contreras dated Jan. 17,2003). That proves that defendants were infact willfully disseminating inaccurate/false information to the grand jury on Nov. 20,2002. AUSA/Contreras clearly states on the date of his letter "that he just received confirmation "today" that two guns at the La Palma address were infact fully automatic". This proves Plaintiffs position on these Privacy Act violations before the grand jury. But, the cold hard truth is this. AUSA/Contreras "never" received any type of confirmation from the ATF. That proved any of these guns were fully automatic. Infact, there exists "no" ATF report, letter, video or other test result. To support DEA Stallings false statements to the grand jury and AUSA/Contreras allowing Stallings to

16

violate the Privacy Act. And disseminate this inaccurate/false information to the grand jury.

10) Plaintiff does lastly state, that defendants statements in (Att. # 2 pg 45 ln 1 - ln 7) are inaccurate/false as well. It was originally believed that Plaintiff was one of the persons. Who had been intercepted on the phones. Talking about drug trafficking and drug "proceeds"(i.e. money laundering violations). However, in Defendants own DEA-6 reports and cover sheets to transcribed phone interceptions. It was determined, that is was "NOT" Plaintiff after all. Please refer to (Att. # 3); (exhibit # 8 pg 1 thru pg 3 ln 11) Quote "we identified that it "wasn't" Jesse Salazar Ramirez/Plaintiff" Plaintiff asks this Judge to take Judicial Notice under 201(d) of the fact. That AUSA/Contreras was the one who had DEA Stallings under "DIRECT EXAMINATION" of these after so called "after acquired facts". Defendants, AUSA/Contreras; DEA Stallings and many, many others. Knew way "before", they willfully disseminated this inaccurate/information to Magistrate Judges, District Court Judges and the Grand Jury. This conduct does infact prove beyond a reasonable doubt. That Defendants willfully and intentionally. Violated the elements of the Privacy Act and Deters 85 f3d 657. Which resulted and was the proximate cause of Plaintiff suffering sever adverse affect, injuries, damages, emotional trauma, mental trauma, the loss of his personal wealth, the loss of his homestead, the loss of his right to Life, Liberty and Property. And most important of all, Plaintiff lost his FAMILY because of these Privacy Act violations. Plaintiff has infact proven all four elements under the Privacy Act and has established an actionable claim under all four elements.

## Denial of Bond for Plaintiff/Jesse Ramirez

1) Plaintiff was subsequently denied bond on Dec. 30,2002. Which was the direct/proximate cause of this adverse determination (i.e. further illegal deprivations of the right to be free from unlawful seizures of person, and deprivations of Life, Liberty and Property 4th and 5th amend. protections) see Deters 85 F3d 657. Plaintiff has infact been (1) aggrieved by this adverse determination of denial of bond; (2) the agency/defendants failed to maintain records accurately; (3) defendants and the Magistrates

17

reliance upon this inaccurate/false information was the proximate cause of this adverse affect (i.e. the denial of bond); and (4) the agency/defendants did willfully and intentionally act to maintain accurate records against Plaintiff. Privacy Act 5 § 552a(e)(1); (e)(5) and (e)(6). Plaintiff does submit as (Att. # 5 Bond hearing Transcript pg 4 ln 15-9) more proof. That defendants willfully disseminated inaccurate/false information to Magistrate Primomo in this bond hearing proceeding. Which was also the proximate cause/reason why Primomo denied Plaintiff bond(i.e. inflicting further adverse affects, injuries and damages of Plaintiff). Plaintiff has already proven beyond a reasonable doubt. That Plaintiff was "not" the source of the 5 kilos that Jose Soto was arrested with on Dec. 7,2001. Plaintiff asks this judge to refer to (Att. # 1 pg 8 para # 1 thru pf 18 para 27 and supporting exhibits). Just more clear examples of the burden Plaintiff must meet under the Privacy Act and Deters 85 F3d at 657. Plaintiff does also submit as (Att. # 5 Bond Hearing Transcript pg 9 ln 1-13)more proof of willful failure to adhere to the Privacy Act. Please refer to (Att. # 1 pg 18 para 28 thru pg 21 para 31). Plaintiff has already stated and will swear in an affidavit. That Jose Angel Garcia-Arguello was "never" with Plaintiff on Aug. 28,2002 and did not get out of the vehicle Plaintiff was driving on that date. When Plaintiff did go by this address, by himself, knock on the door and leave minutes after. Wherein nobody answered the door at this address. Further, had AUSA/Contreras and his unbeatable "tag team" team mate (refer to Att. # 1 pg 26 thru pg 29 para 15 and supporting exhibits) not deported Jose Angel Garcia-Arguello back to Mexico. In complete violation of Due Process, the Compulsory Process Clause and the Supreme Courts ruling of **Valenzuela-Bernal** 458 US 858(1982). Plaintiff also asks this judge to take Judicial Notice 201(d) of the facts that Plaintiff has already proven. In regards to (Att. # 5 pg 9 ln 7 - 13) that AUSA/Contreras is willfully disseminating "inaccurate/false" information to Magistrate Primomo. Because DEA officials and AUSA/Contreras himself. Who admitted in open court that he was present at the 55 kilo seizure. Know that they did "not " just knock and the door to see who answers and to see what was going on. They infact "created exigent circumstances" and the same exigent circumstances. That the 5th circuit ruled in U.S. v Rodea 102 F3d 1401(5th 1996) cannot be manufactured. So that they could then justify their unlawful "warrantless search" at 12:35 am on Aug.

18

29, 2002. Absent probable cause, absent an arrest warrant, absent a search warrant and authorization to enter. The only thing they did have and their DEA-6 reports prove this. Was "suspicion" and suspicion is not enough to support probable cause. Clear violations of the Privacy Act and Deters 85 F3d at 657.

2) There is no denying that Plaintiff has met his burden and the requisite elements of the Privacy Act. Plaintiff has also proven that Defendant actions were so "patently egregious" that they should have known their conduct was unlawful **Laningham v U.S. Navy** 813 F2d 1236, 1242(D.C. 1987). Plaintiff relies upon (Att. # 5 pg 12 ln 24 thru pg 13 ln 1) as more proof of Defendants willfully disseminating inaccurate/false information to a federal Magistrate Judge. Also AUSA/Contreras is engaging in criminal conduct (e.g. 18 § 1001, 18 § 1621, 18 § 1622, 18 § 241 & 242 and etc.). Wherein these are material misrepresentations of fact and material omissions of fact. They are clear examples of perjury and subornation of perjury. Which were intentionally relied upon and in order to Conspire Against Plaintiffs Rights. If this Judge looks at (Att. # 4) he will see that AUSA/Contreras has not even received confirmation of any guns being fully automatic. And will not receive such "confirmation" until 18 days later. The word "shall" as is stated in the Privacy Act 552a is "explicit and mandatory". "It is basic canon of statutory construction that the word "shall" indicates MANDATORY intent" **U.S. v Myers** 106 F3d 936(10th 1999). Yet, AUSA/Contreras is above the law and its mandates.

3) Plaintiff submits (Att # 5 pg 13 ln 22 thru pg 16 ln 6) as more proof of willful dissemination of inaccurate/false information to Magistrate Primomo. This "only" interception of Plaintiff and one of his alleged coconspirators. Has infact been redacted and edited. In violation of Title III Intercepts and **U.S. v Thompson** 130 F3d 676(5th 1997). This conversation is in regards to "bond money" for two other gentlemen. Who were released on $100,000.00 dollar bonds. The math is very simple to do. $100k plus $100K is $200,000.00 dollars. then 20 % of $200k is $40,000.00. Then if you add the two totals together. You get a grand total of $240,000.00 dollars. AUSA/Contreras acknowledged this fact to Plaintiff. When AUSA/Contreras was threatening Plaintiff into testifying "Falsely" about any codefendant who planned to take it to trial. But also stated, that if Plaintiff refused to

19

accept a plea and work/lie for the government. AUSA/Contreras was going to tell the Magistrate, the District Court Judge and even the jury. That it was about drug money and Plaintiff exercising a supervisory role. The testimony adduced at trial proves that this interception. Was infact in regards to "bonds" and that AUSA/Contreras wholly twisted it around and took it out on context. So that he could get Primomo to deny Plaintiff bond. This inaccurate info was relied upon by Primomo to deny Plaintiff bond. Resulting in further adverse affects, injuries and damages.

4) Plaintiff now relies upon (Att. # 5 pg 29 ln 15 - ln 24) as proof of his position. AUSA/Contreras willfully violated all the mandates of the Privacy Act and Deters 85 F3d at 657. Wherein he inaccurately/falsely disseminated the statements about the two Del Rios being in possession of "our" phone number. AUSA/Contreras is misleading Primomo into believing that our home number was in their possession. The only phone number that Jessica Rangel and Plaintiff did share was the home number. However, AUSA/Contreras was in possession of the documentation. That proved beyond a reasonable doubt. That the phone number that he is inaccurately/falsely stating was "our home" number and in the possession of one of these persons arrested with 19 kilos. Was actually the phone number to Plaintiffs business cell phone. Plaintiff will submit as (Att. # 6 Copy of Property Inventory/Business Cards taken from Jose Garza-Zaragosa pg 16 of 18). The business cell phone number "handwritten on torn blue piece of paper" Yesy Ramirez/Plaintiff. Please also read who the phone number was "solely" registered to. As Plaintiff did afford this person with legal/lawful services on his vehicle. Records (i.e. business receipts) in the DEA's and AUSA's possession. That were seized illegally from Plaintiffs business' on 1139 Basse Rd. bldg. # 5. Prove that Plaintiff rendered this man legal/lawful services. This is another example of willful/intentional violations of the Privacy Act, Deters 85 F3d 657 and other criminal statutes. Plaintiff will also submit as (Att. # 7 ) a copy of the phone bill for this phone. That proves this number was not "our" home phone number.

5) Plaintiff would like to submit as (Att. # 5 pg 36 ln 25 thru pg 37 ln 21) as proof. That Plaintiff was (1) aggrieved by Primomo's adverse determination(e.g. his decision to deprive Plaintiff his right to bond and right to be free from unlawful seizures of persons); (2) the DEA in San

20

Antonio and AUSA Office in San Antonio failed to maintain accurate records; (3) Primomo's reliance on "all" this inaccurate information was the proximate cause/reason of his adverse decision and (4) the agency (i.e. the DEA and AUSA's office) and their officials willfully and intentionally failed to maintain accurate records on Plaintiff. see also Deters 85 F3d at 657. Plaintiff has infact met his burden and requirements under the Privacy Act. Has also proved that defendants acted with something more than "gross negligence" **Tigerina v Walters** 821 F2d 789, 799(D.C. 1987) see also **Laningham v U.S. Navy** 813 F2d 1236, 1242(D.C. 1987)( actions must be so 'patently egregious and unlawful' that anyone undertaking the conduct should have known it was unlawful). Defendants conduct was infact unlawful and clear violations of the many, many statutes Plaintiff has cited already. And can now rightfully bring forth this Privacy Act action 552a. Plaintiff has infact estaablished an actionable calim on all four elements of the Privacy Act. And therefore, brings this Privacy Act claim.

### Willful Privacy Act Violations at Trial:

**1)** Plaintiff does state for the record and asks this Judge to take Judicial Notice under F.R.Evid. 201(d) and since this Judge is being "supplied with the necessary information". Of the facts that Plaintiff has set forth in (Att. # 1 pg 1 thru pg 31 and "all" of its supporting exhibits). That prove, that the only way Defendants were able to arrest Plaintiff in Nov. 8,2002; were able to obtain an arrest warrant to justify Plaintiffs already unlawful arrest and kidnapping; to justify the grand jury returning an indictment against Plaintiff; were able to deny Plaintiff bond; were able to have a jury convict Plaintiff and were able to have the Judge give Plaintiff 3 lifes and a 20 year sentence. Was to knowingly, intentionally and willfully. Fail to adhere to the mandates of the Privacy Act, Deters 85 F3d at 657, fail to adhere to their oaths under 28 § 544, fail to adhere to the mandates of Due Process and fail to adhere to everysingle criminal statute that Plaintiff has cited all through these pleadings and supporting documents. In regards to just the unalwful arrest of Plaintiff. The Fourth and Fourteenth Amendments guard against arrest without probable cause. As we said in **Thomas v Sama** 734 F2d 185(5th 1984) "The right to be "free" from

21

illegal arrest plainly enjoys [constitutional] protection." Id at 191. "[A]n
officer who maliciously seeks to obtain a facially valid warrant should not
be absolved of liability simply because he succeeded." **Hand v Gary** 838 F2d
1420 1t 1427{10}(5th 1988). The "(d)" portion of F.R.Evid. 201 is mandatory
"SHALL". It is basic canon of statutory construction that use of word "shall"
indicates mandatory intent. **U.S. v Myers** 106 F3d 936(10th 1997); **Sulahaddin
v Mead** 174 F3d 271(2nd 1999); **Rivera v Phillip Morris Inc.** 395 F3d 1142,
1151(9th 2005)"[A] high degree of indisputability is the essential
prerequisite to taking judicial notice of adjudicative facts... 'the
tradition [of taking judicial notice] has been one of caution in requiring
that the matter be beyond reasonable controversy". Plaintiff has infact
"exceeded the high degree of indisputability and the essential prerequisite.
To this Judge taking Judicial Notice as asked by Plaintiff. Plaintiff has
"supplied this Judge with the necessary information" that puts this matter
"beyond reasonable controversy". Defendants nor their attorneys. Will ever be
able to rebut, refute or controvert" these facts. That  Plaintiff has proven
beyond a reasonable doubt.

    **2)** Plaintiffs attorneys may comment on how the jury believed the
inaccurate/false information and found Plaintiff guilty. Plaintiff would like
to remind these attorney's. That in accord with the mandates of Due Process
in our Justice System **"The Ends Do "NOT" Justify The Means"**. Had their
clients never willfully failed to adhere to the mandates of the Privacy Act
and Deters 85 F3d at 657 "ab initio". And in the course of these willful
violations of the Privacy Act. Willfully and knowingly engaged in criminal
conduct. Plaintiff would have never been dragged into this manufactured
conspiracy. And Plaintiff would have never suffered the "sever" adverse
affects, injuries and damages Plaintiff has infact suffered. Plaintiff began
to suffer these adverse affects as early as Nov. 8,2002 at 5:30 am, again at
about 8:15 am on Nov. 8,2002 and when Magistrate Nowak signed off on the
arrest warrants and etc. The Eleventh Circuit stated in **Mastroainni v Bowers**
160 F3d 671 at 681 [20] n. 9 and 10 "Similarly this circuit has held that the
intervening act of the grand jury indictment breaks the chain of causation
"unless the plaintiff can show that these intervening acts were the results
of deception or undue pressure" relying upon **Malley** 475 U.S. a 344 n. 7.
Plaintiff has proven that the intervening act of the grand jury returning an

indictment. Was the direct result of police, DEA officials and AUSA's deception, fraud, perjury and etc. Any misdirection of a magistrate or a "grand jury" perpetuates the taint of the original impermissible conduct. **Hand v Gary** 838 F2d 1420(5th 1988). Alleged conduct that officials who engage in impermissible conduct prior to securing a grand jury indictment cannot rely on the grand jury indictment to break the chain of causation with respect to their original misconduct. As mater of policy, it make little sense to allow police officers or prosecutors to engage in fraudulent and deceitful conspiracies in order to secure a grand jury indictment and then use the indictment to shield them from any possible causes of action for their tainted behavior. **Barts v Joyner** 865 F2d 1187(11th 1989). The misdirection of the grand jury "removes" any protection that any pre-grand jury misconduct would have enjoyed after an indictment was issued absent any misdirection of the grand jury. **Buckley v Fitzsimmons** 509 U.S. 259, 113 S.Ct. at 2612 n. 5.

3) These severe adverse affects that Plaintiff has suffered. Continued all the way into Plaintiffs trial. Where it was impossible for Plaintiff to properly defend himself. Against defendants willfulness to "disseminate" this inaccurate/false information to the jury itself. It was too much for Plaintiffs defense to contain and ultimately. Plaintiff was convicted and as a direct result of the willful violations of the Privacy Act in these proceedings. Plaintiff has (1) been aggrieved by the jury's adverse determination; (2) the agency's failed to maintain records accurately; (3) the jury's reliance on all this inaccurate information was the proximate/direct result of the adverse determination and (4) the agencies acted willfully and intentionally in failing to maintain accurate records. see Deters 85 F3d at 657. Plaintiff has infact established an actionable claim on all four elements. Being stripped of your most basic and fundamental rights and protections of the 4th amendment, being stripped of the 5th amend protections in the grand jury proceeding, of your Due Process rights under the 5th amendment, being stripped of your 6th amend. right to a fair trial, being stripped of your right to Life, Liberty and Property, being stripped of your personal wealth, and your **FAMILY**. Has resulted in Plaintiff suffering severe emotional trauma, severe mental trauma, suffering sleepless nights, severe anxiety, severe irrevocable marital problems, severe humiliation and

23

the loss of his relationship with his two daughters. Have just about broken Plaintiff physical and mentally. Plaintiff is **"NOTHING"**, without his FAMILY and baby girls. Plaintiff would rather die within these "gray walls". Than to be free and live his life without his FAMILY and his babies. Plaintiff does state for the record. That Plaintiff is "NOT" attacking his sentence or conviction. It just so happened and which was no coincidence. That his conviction and sentence. Were the proximate cause of these adverse affects/events. Plaintiff is "only" seeking money awards from Defendants willful/intentional failure to adhere to the mandates of the Privacy Act. Plaintiff has infact established an actionable claim under all four elements of the Privacy Act. And therefore brings forth this Privacy Act claim.

### Willful Privacy Act Violations at Sentencing:

1) Subsequently to Plaintiff being convicted off of Defendants willful dissemination of this inaccurate/false information at trial. Defendants did infact willfully "disseminate" this same and other inaccurate/false information to the sentencing court. Via the United States Probation Officer Mrs Olivari and her Pre Sentence Investigation Report. Clear violations of the Privacy Act 552a(e)(1); (e)(5) and (e)(6) and Deters 85 F3d at 657. Which inturn (1) has aggrieved Plaintiff by these adverse determinations; (2) the agency defendants failed to maintain records accurately; (3) the USPO's and sentencing courts reliance on "all" this inaccurate/false information was infact the proximate/direct cause of these adverse determination; and (4) the agency's/defendants acted willfully and intentionally in failing to maintain accurate records. Plaintiff has infact already established an actionable claim under all four elements of the Privacy Act and Deters 85 F3d at 657.

2) Plaintiff will submit as (Att. # 8 the Pertinent Parts of the Sentencing Transcript). Plaintiff starts off with (Att. # 8 pg 12-15) to support his position. That Defendants are once again willfully "disseminating" more inaccurate/false information. Please refer to (Att. # 1 pg 8 ¶ 1 thru pg 18 ¶ 27). This not only violates the Privacy Act but also their duties under **Imbler v Patchman** 424 U.S. 409[9a, 9b](1976)."The prosecutor has a duty to bring to the attention of the court or of proper officials "all" significant evidence suggestive of innocence or mitigation;

24

at trial, such duty is enforced by the requirements of Due Process, but after conviction, the prosecutor is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information, that casts doubt upon the correctness of the conviction". Defendants failure to discharge his duties and mandates. In regards to Imbler, Due Process and the ethics owed to this office. Go to prove the extent of Defendant's "willful and intentional mandates of the Privacy Act and Deters 85 f3d t 657.

3) Plaintiff now submits (Att. # 8 pg 9 ln 17 - ln 24) and which proves. That Plaintiff did bring to the attention of these officers of the courts and defendant agency's attention. That the information that the USPO and court were relying upon. Was infact Inaccurate/false and was being willfully disseminated to them by Defendants. Please refer to (Att. # 8 pg 12 ln 21 -25) more proof of what Plaintiff is alleging in regards to the sentencing phase. Clear violations of the Privacy Act and Deters 85 f3d at 657.

4) Plaintiff now submits (Att. # 8 pg 16 ln 14-21) to support his position. There is nothing in the records that was factual and adduced at trial. That would even remotely support that Plaintiff was a "supervisor/manager". It was originally believed that it was Plaintiff on phone intercepts managing drug shipments and proceeds. However, it was later determined to be alleged coconspirator Rene Campos. Please refer to (Att. # 3 and pg 16 ln 17 thru pg 17 ln 10 of Suppression Hearing before Trial) and not Plaintiff. Plaintiff asks this honorable Judge to take Judicial Notice 201(d) of these facts. That prove that Defendants knew that it was "not" Plaintiff on the phone intercepts and as early as mid-October of 2002. **A whole 1 month and 5 days before** they in violation of the Privacy Act 552a(e)(6) "disseminated" this inaccurate/false information to the grand jury and others refer to (Att. # 3 pg 17 ln 7 - 13). Please also refer to ( exhibit # 8 pg 1 ln 13 thru pg 3 ln 11 in support of Att. # 1). Plaintiff is infact establishing his burden under the Privacy Act. Defendant knew they could violate the mandates of the Privacy Act and "disseminate" this inaccurate/false information. To both the USPO and Judge Prado. Because, AUSA/Contreras and others. Knew that Prado (i.e. their unbeatable "tag team" team mate) refer to (Att. # 1 pg 26 thru pg 29 ¶ 15 and supporting exhibits) was going to ignore it was inaccurate/false and bail them out.

25

5) Plaintiff objected to USPO/Olivari willful failure to conduct an
actual investigation refer to (Att. # 8 pg 26 ln 3 thru pg 27 ln 8). The DEA-
6 reports in support of Att. # 1 (exhibits # 6 and 6a) prove this were
violations of the Privacy Act. Defendants willfully and intentionally.
Maintained their records against Plaintiff with inaccurate/false information.
The sentencing court inturn relied upon "all" of this willfully disseminated
inaccurate/false information. Resulting in Plaintiff being severely adversely
affected. When the ;court sentenced him to 3 lives and a 20 yr sentence. Once
again, Plaintiff is "NOT" trying to attack his sentence via this Privacy Act
cause of action. His sentence is merely the proximate adverse affect
Plaintiff suffered. For had the court not relied upon this inaccurate/false
information. The court could not have imposed one day in prison against
Plaintiff. As "Due Process requires that a defendant be sentenced on the
basis of "accurate" information". **U.S. v Nappi** 243 F3d 758(3rd 2001); **U.S. v
Eschman** 227 F3d 886(7th 2000). "Due Process requires that a convicted person
"not" be sentenced on materially "untrue" assumptions or misinformation".
**U.S. v Miller** 263 F3d 1(2nd 2001); **U.S. v Hankton** 432 F3d 779(7th 2005).

6) Plaintiff objects to sentencing court relying upon this relying upon
this inaccurate information in the PSI report. And in accordance with 5th
circuit precedent refer to (Att. # 8 pg 29 ln 6 thru pg 31 ln 25). Plaintiff
asks this honorable Judge to review the rest of (Att. # 8 pg 31 ln 25 thru pg
113 ln 7). As this court can see for itself on (pg 33 ln 13 thru pg 38 ln 21
of this Att. # 8). That defendants did willfully fail to adhere to the
mandates of the Privacy Act. This also proves that USPO Olivari was made
aware that the information she willfully disseminated in the PSI to the
court. Was infact in clear violation of the Privacy Act and Deters 85 F3d at
657. Plaintiff has infact established an actionable claim under "all" four
elements of the Privacy Act. Plaintiff has infact been (1) aggrieved by these
adverse determinations made by the sentencing court; (2) it is clear that
"all" these agency's failed to maintain records accurately; (3) the USPO and
sentencing courts reliance on "all" this inaccurate information was infact
the proximate cause of the adverse decision; and (4) the agency's did infact
act willfully and intentionally in failing to maintain accurate records.
Plaintiff now can bring forth this Privacy Act claim and action. One last
comment to defendants attorneys **"The Ends Do "NOT" Justify The Means"**......

26

**Defendant EOUSA/AUSA Johnny K.Sutton Did Willfully Violate The Mandates Of The Privacy Act:**

1) Plaintiff has already proven "beyond a reasonable doubt" that Defendants had infact willfully/intentionally failed. To adhere to the mandates of the Privacy Act, Deters 85 F3d at 657, the mandates of Due Process under Imbler v Patchman, their duties under 28 § 544 and all the criminal statutes. That Plaintiff has cited to in this pleading and in (Att. # 1 and supporting arguments) "ab initio".

2) Plaintiff will prove that Defendants willfully failed to adhere to the mandates of the Privacy Act. Wherein, if they refused to not maintain their records willfully and with inaccurate/false information. Then, they could have at least "NOTED" it in their records. When Plaintiff asked them to discharge their duties of the Privacy Act. So that, this inaccurate/false information should not/is not relied upon. To ensure future decisions affecting Plaintiff are not based off of this discredited information.

3) Defendant could have even brought this "inaccurate/false" information to the attention of the court. In accordance with the mandates of Due Process, their ethical duty owed to their office and the Supreme Courts ruling of **Imbler v Patchman** 424 U.S. 409(1976). So that "a/any" court could take the necessary Judicial Action. That the court "deems necessary and just". As 552a(g)(2)(A)" The court may order the agency to amend the individuals record in accordance with his request "or" in such other way as the court may direct".

4) Plaintiff did subsequent to his sentencing hearing. Did cause to be served on Defendants via cert. mail # 7004 2510 0004 2934 2256. A Privacy Act request to Defendants Office in San Antonio, Tx. Plintiff will submit this proof as (Att. # 9 Letter and Copy of return receipt).

5) Subsequent to this request to this office/Defendant was received. Defendant did respond by letter dated April 19,2005. Wherein it stated "that this office/Defendant did not have the authority to respond to Plaintiff Privacy Act request and that. The correct office was the EOUSA office in Washington". Plaintiff will make this as (Att. # 10). Plaintiff would like to sate for the record. That he thought is really odd. That Defendant Office in San Antonio could ab initio willfully create, invent this inaccurate/false

27

information and willfully fail to adhere to all the subsections of the Privacy Act. But yet, would willfully fail to take the necessary action when asked and as they could have done in 2005. Plaintiff does again ask this Judge to take Judicial Notice under 201(d) since this judge is being "supplied with the necessary information". That defendants willfully relied upon their very own created inaccurate/fasle information refer to (Att.# 1 pg 1 thru pg 18 ¶ 27 and supporting exhibits). To justify arresting Plaintiff at 5:30 am on Nov. 8,2002 in violation of the 4th amend, to "kidnap" (i.e. violate 18 § 1201) Plaintiff and hide him out at DEA head quarters, to obtain an arrest warrant to try to break the chain of causation of their illegal conduct and to obtain an indictment against Plaintiff and etc. "Any misdirection of a magistrate or a grand jury perpetuates the taint of the original impermissible conduct" **Hand v Gary** 838 F2d 1420(5th 1988). Alleged conduct that officials who engage in impermissible conduct prior to securing a grand jury indictment "cannot" rely upon the grand jury indictment to break the chain of causation with respect to their original misconduct. As a matter of policy, it makes little sense to allow police officers or prosecutors to engage in fraudulent and deceitful conspiracies in order to secure a grand jury indictment to shield them from any possible causes of action" **Barts v Joyner** 865 f2d 1187(11th 1989). Just as defendants have shielded themselves from this Privacy Act action. The misdirection of the grand jury "removes" the protection that any pre-grand jury misconduct would have enjoyed after an indictment was issued absent any misdirection of the grand jury. **Buckley v Fitzsimmons** 509 U.S. 259, 113 S.Ct. at 2612 n. 5. Plaintiff does state that (Att. # 1 and all supporting exhibits) supports Plaintiffs position. That this impermissible conduct. Was the direct result of Defendants willful failure to adhere to the mandates of the Privacy Act. Due to these willful violations and criminal conduct. Plaintiff suffered sever "adverse affects, injuries and damages".

6) Plaintiff did follow up with a letter to Defendant EOUSA sent via cert. mail # 7004 2510 0000 6590 6614. Plaintiff will make this as (Att. # 11 and a copy of the return receipt) Plaintiff did wait patiently for some type of response or notice. Informing Plaintiff that this inaccurate/false information had at least been "NOTED" in Defendants records. That this information is infact inaccurate/false and has been discredited. Due to the

28

fact, that this challenged information was "capable of being verified" (i.e. a Typical case Sellers v BOP). Plaintiff figured that since there were so many documents/records. That contained this willfully maintained inaccurate/false information. That Defendant's would need some time. As Defendants would also have to contact and inform. The other Defendant agencies, that this information has been "discredited" and should no longer be relied upon.

7) During this waiting period. Plaintiff did begin to exhaust his administrative remedies against Defendant/BOP. Defendant will address this Defendants willful failure's to adhere to the mandates of the Privacy Act separately. Subsequently, Plaintiff never heard anything in regards to (Att. # 11) and as a result. Plaintiff did send Defendant EOUSA another "status request" via cert. mail # 7007 0220 0004 4914 1498. Plaintiff will make this letter dated on or about 8/10/07 as (Att. # 12). Plaintiff also sent Defendant/AUSA Johnny K. Sutton, another request to "correct, amend or "NOTE"". That the information that Defendant's willfully maintained in their records on Plaintiff "ab initio". Is infact "inaccurate/false" in accordance with their duties under the Privacy Act. Plaintiff will make this other request dated August 20,2007 as (Att. # 13). Plaintiff would like to direct this Judge to (Att.# 13 pg 2) where it starts off, "Lastly, I want you to correct....". Plaintiff never received any type of response to this Aug. 20,2007 latest request.

8) The record void of any such response. And it was not until May 14,2008 and Plaintiff would like to "stress" May 14,2008. That Plaintiff finally received any type of response in regards to (Att. # 9, 11, 12 and 13). Plaintiff will make this very tardy/late response as (Att. # 14). This notice did state, that since these records are "exempt" from being corrected or amended. That Plaintiffs request was denied. This response came directly from the office/person who is responsible for making the final determination. His name is Dione J Stearns and Plaintiff. Immediately responded to this response.

9) Plaintiff made it very "clear" to Defendant and Mr. Stearns. That Plaintiff was fully aware that these records were exempt from correction and or amendment. But did clearly state, that it can be "NOTED" that this inform-ation is inaccurate/false and should "NOT" be releid upon at all and by any

29

other agency/defendant. So that Plaintiff is no longer "adversely affected" by this inaccurate/false information. Plaintiff also requested that Defendants/ Mr. Stearns notify "all" other agency's/defendants. That this information is infact inaccurate/false and has been discredited. And this information is "NOT" to be relied upon any longer. Plaintiff also requested to be afforded    proof (i.e actual documents that have been redacted of this inaccurate/false information) that this information has been determined to be inaccurate/false. So as to ensure, that no future decisions affecting Plaintiff are "NOT" based on the discredited information. Please refer to what Plaintiff will make as (Att. #15).

10) Plaintiff does state for the record that Plaintiff was finally afforded with a notification as to why. Defendants never respond to his requests and why  it took over 2 years to do so. Plaintiff asks this Judge to refer to (Att.# 9, 10, 11, 12, 13, 14 and 15). But Plaintiff did not become actually aware of the reasons and until. Defendants Attorney's sent Plaintiff this Motion to Dismiss and or Summary Judgment on or about 6/05/08 at about 9:15pm. Wherein, within this response was a Declaration of Dione J. Stearns dated May 24,2008. He stated that "He inadvertently misinterpreted Plaintiff's Privacy Act request and did "not" open a new file". Plaintiff asks this Judge to review this Declaration that is already made part of the record and supports Defendants Motion To Dismiss and or Summary Judgment.

11) Plaintiff does state that due to this alleged inadvertent mistake. Plaintiff should not be penalized for any procedural deficiencies. That are the direct result of Defendants own errors. Defendant in effect could not have guessed what Defendants were going to do. The record clearly shows, that Plaintiff has been more than diligent, he has given Defendants proper notice and ample amount of time/opportunities to adhere to the mandates of the Privacy Act. In order to take the necessary action that they have a duty to take. So that Plaintiff no longer suffers anymore "adverse affects". From this willful failure of Defendants to adhere to their mandates of the Privacy Act, Deters 85 F3d at 657, 28 § 544 & 547, of **Imbler v Patchman** 424 U.S. 409(1976), the mandates of Due Process and their ethical duty owed to their office.

## Defendant BOP's Willful Failure To Adhere to Their Duties Under P.S. 5800.11

1) Plaintiff does state for the record that he is fully aware. That the BOP is exempt from amending/correcting their records under 28 CFR § 16.99(a)(4). Plaintiff is "not" asking them to correct/amend their records and does not care if they don't ever maintain accurate information in their records on Plaintiff. Plaintiff is "not" trying to attack his sentence or conviction either. Plaintiff is "SOLELY" bringing this action against this Defendant. For BOP's staff "failure to verify the accuracy of the challenged information in Plaintiffs PSI as required under Program Statement 5800.11".see Brown V BOP 498 F.Supp.2d at 302-03[2]n.6(D.D.C. 2007).

2) Plaintiff did cause to be served on BOP officials a Sellers Complaint/Privacy Act Request. This was on or about August 1,2006. This was done via an "Inmate Request for Information" (i.e. Cop-Out). Plaintiff will make this as (Att.# 16). Plaintiff was told my Unit Team Members (Leader McGehee; Case Manager Hanks and Counselor Cruz) that they did not have any duty to perform. As the Privacy Act does not pertain to them.

3) Plaintiff then submitted a 2nd Cop-Out and which. Was given to Unit Team Leader McGehee on August 11,2006 at about 10:57 am. Plaintiff will make

this as (Att. # 17). Unit Leader McGehee told Plaintiff that they did not have to follow up on any of these requests or rules. That pertained to the Privacy Act or Sellers.

4) As a result of Unit Team unwillingness to adhere to their duties under 5800.11. Plaintiff submitted a BP-8 on or about August 15,2006 and will make this as (Att. # 18). Program Statement 5800.11 states:

For example, if an inmate challenges information in the PSI, "Staff" should inform the appropriate USPO in writing, of the disputed info, and request that a written response also be provided." Plaintiff will prove beyond a reasonable doubt. That Case Manager Hanks (other team members) never and willfully failed. To adhere to their duties in accord with 5800.11. Also that Case Manager Hanks did infact commit violations of 18 § 1001 and 18 § 1621. In regards to her "bad faith" declaration. Plaintiff will enclose an affidavit of his own and support it with documentation. Plaintiff asks this Judge to take Judicial Notice of these criminal offenses under F.R.Evid. 201(d).

5) Plaintiff does state that when he gave this BP-8 to Counselor Cruz on August 15,2006 at about 11:09 am (Att. # 18). Later on that day at about 4:30 pm. Counselor Cruz told Plaintiff that Case Manager Hanks wanted to speak to Plaintiff. Upon Plaintiff entering her office. She immediately began to verbally assault Plaintiff. It was clearly evident that she was mad at Plaintiff. For filing the BP-8 against her and Leader McGehee. She was requesting the documents in support of Plaintiffs Sellers Complaint/Privacy Act request. Plaintiff told her that she did not have to talk to him in that tine of voice. She told Plaintiff that this is how she talks and that he was no one to tell how to talk. At that time Plaintiff got up and told her. That he has something for (i.e. another BP-8 on her unprofessional conduct) for the way she was talking to her. Plaintiff does ask this Judge to take notice of the facts. That this conduct that Jan Hanks was exhibiting towards Plaintiff. Does infact and under controlling precedent constitute retaliation. Plaintiff then commenced to walk out of her office. Wherein she continued to yell at Plaintiff.

6) Plaintiff did request a BP-8 from Counselor Cruz and at about 8:18pm on August 15,2006. Did submit this BP-8 to Cruz that outlined Mrs. Hanks unprofessional conduct. Plaintiff will make this as (Att. # 19) and asks this Judge to review it.

7) Plaintiff heard nothing in regards to his BP-8 (Att. # 18). But did on or about September 15,2006 Plaintiff did speak with Mrs. Hanks and afforded her about [35 pages of documents and a detailed outline of what I was complaining about] and verbally tried to break things down for her. She told me at this time that she was not familiar nor understood my Sellers Complaint/Privacy Act Request. I told her that if she needed anything else to just ask. She accepted these documents and didn't even bother reviewing them. She just placed them in my file and that was it. Coincidently, this is the same thing that happened to Sellers. It was at that time and in accord with 5800.11. She was to review them; "When an inmate provides such information staff "shall" review the alleged error(s) and take reasonable steps to ensure the information is correct". This factual failure is what Plaintiff is relying upon and in order for him to proceed on this Privacy Act with. see 5800.11 and **Brown v BOP** 498 F.Supp.2d at 302-03[2]n. 6(D.D.C. 2007). Which inturn affords Plaintiff the right to bring this action against Defendant BOP. As the record clearly proves, that BOP staff failed to "verify the accuracy of the challenged information in the PSR as "required" by Program

31

Statement 5800.11 Inmate Central File, Privacy Folder, and Parole Mini-Files (Sept. 8,2997)". see Brown at n.6.

8) Plaintiff would like to stress once again. That he is "NOT" attacking his sentence and conviction. They are infact the "adverse affects" that Plaintiff has suffered. As the proximate cause/ direct result of Defendants willful/intentional failure to adhere to the mandates of the Privacy Act ab initio. And the result of BOP staffs failure to adhere to their duties/requirements under 5800.11. The record is also void of any letter from Plaintiff to the USPO's office. Plaintiff would like to state, that he is not asking to be released or his sentence reduced.

9) Plaintiff does state and will submit as (Att. # 21). Proof that Case Manager Hanks has made false/perjuries statements in her declaration. As this letter/attachment does prove that plaintiff did afford her with specific information as to what parts of the PSI were being challenged. J. Hanks never makes any mention of this letter at all. Plaintiff will submit as (Att. # 22 her Declaration) and proof that she has willfully made material misrepresentations of fact.

10) Plaintiff does state for the record that during this time. Plaintiff did have a 6 month Team Review. I ask this Judge to quickly refer to (Att. 20 pg 2) to support Plaintiffs position. This attachment makes reference to this up and coming Team Review. During this Team Review and Plaintiff states for the record. That Unit Team Leader McGehee told Plaintiff and in front of Hanks and Cruz. That she nor them two (i.e. McGehee and Cruz) had a duty to perform under Plaintiffs Sellers Complaint/Privacy Act Request. And that they were "not" going to do anything. That Plaintiff may just as well file the law suit now. McGehee told her not to worry about anything Plaintiff was going to file. Because there was nothing that Plaintiff could do. Sellers and the Privacy Act did not pertain to them. Which is why, Plaintiff wrote this letter (Att. # 21) to Jan Hanks.

11) Plaintiff will submit the actual [35 documents] and with a portion of a "detailed outline of the specific inaccuracies" that Plaintiff was challenging in his PSI Report. Plaintiff will make this (Att. # 23). Plaintiff does ask this court to forgive him for only submitting the last "2" pages of this detailed explanation. Plaintiff does declare for the record. That when Plaintiff was "FRAUDULENTLY" transferred Administratively from Beaumont. By Beaumont officials (Namely: McGehee, Warden Outlaw and the SIS dept.) in around April of 2007. Beaumont officials confiscated "all" of Plaintiff's legal documents (e.g. his record on this Privacy Act claim and the record on appeal for Plaintiff's criminal case), they permanently confiscated many documents that pertained to this action and intentionally messed up the rest. Months after Plaintiff was transferred to USP/Pollock, he finally received his personal and legal property. Plaintiff became aware that many documents and other property were missing. Plaintiff literally took months too reorganize it all.

12) However this court can clearly see and by what is left of this "detailed outline of the specific inaccuracies" (Att. # 23). That Plaintiff did infact afford Jan Hanks with the "specific documents and a detailed outline of the inaccurate information". Proving not only did she make material misrepresentations of fact in her declaration. But also, that she/BOP staff "failed to verify the accuracy of the challenged information in the PSR as required under Program Statement 5800.11... **see Brown v BOP** 498 F.Supp.2d at 302-03[2]n.6.(D.D.C. 2007). These facts do "distinguish" Plaintiff's case, from Browns case. Wherein, "no one" initiated contact with the USPO's office in San Antonio. Therefore, "WARRANTING" an award for

damages to Plaintiff. Due to Defendant's proven failure to comply with Program Statement 5800.11.

13) Plaintiff does state, that the record also proves that (1) BOP staff at Beaumont failed to adhere to 5800.11; (2) the Warden at Beaumont failed to adhere as well; (3) the Regional office failed as well and (4) the General Counsels office failed as well. And after Plaintiff did his part to afford the BOP/Defendant in accord with 5800.11 "The inmate is "required" to provide staff with sufficient information in support of a challenge (names of persons to contact, government agency, etc.)". the required information. The record does prove that Plaintiff adhered to his requirement/part of 5800.11. Plaintiff has met his burden, Plaintiff has proven BOP staff willfully and intentionally failed to adhere to 5800.11(i.e. failed to verify the challenged info...), Plaintiff has suffered severe adverse affects, and as the proximate cause of Defendant/BOP's faiure to verify. Plaintiff has infact established an actionable claim against Defendant BOP.

## C. STANDARD OF REVIEW

1) Although summary judgement is proper in a case where there is no genuine issue of material facts, this is not a case in which the court should grant summary judgement. See **F.R.Civ.P.** 56(c); **Celotex Corp. v Catrett** 477 US 317, 322, 106 S.Ct. 2548, 2552(1986)

2) A defendant moving for summary judgement on a plaintiff's cause of action must demonstrate the absence of a genuine issue of a material element fact by either (1) submitting summary judgement evidence that negates the existence of a material element of plaintiff's claim or (2) showing there is no evidence to support an essential element of plaintiff's claim. **J. Geils Band Employee Benefit Plan v Smith Barney Shearson, Inc.** 76 F3d 1245, 1251(1st 1996); see **Celotex Corp.,** 477 U.s. at 322-23, !06 S.Ct. at 2552. Defendant cannot rely on conclusory statements to establish that plaintiff has not presented evidence (beyond a reasonable doubt as Plaintiff Ramirez has) on an essential element of his claim. Rather, defendant must demonstrate the absence of a genuine factual dispute. See **Celotex Corp.,** 477 US at 327, 106 S.C.t at 2555. Only if defendant meets its burden is plaintiff required to respond by summary judgement proof to show a genuine issue of material facts. **F.R.Civ.P. 56(e).**

3) In determining whether there is a disputed issue of material fact that prevents summary judgement, the court must consider **all** evidence in light most favorable to plaintiff as the nonmovant. **Garcia v Pueblo Country Club** 299 F3d 1233, 1236-37(10th 2002). The court **must** also resolve **all** reasonable doubt about the facts in favor of the plaintiff as the nonmovant. **Cooper Tire & Rubber v Farese** 423 F3d 446, 456(5th 2005).

4) Plaintiff Ramirez has proven **every** essential element under the Privacy

33

and **Deters 85 F3d at 657.** Plaintiff has also proven every seesntial element
that would allow him to proceed with his claim against Defendant BOP. Due
to the fact that they willfully/intentional failed to verify the challenged
information. Under Program Statement 5800.11 and **Brown v BOP** 498  F.Supp.2d
at 302-03[2]n. 6(D.D.C. 2007). The material facts that Plaintiff has set forth
and supported with documentation. Do prove (1) that Defendants have infact
relied upon "Conclusory" statements to establish that Plaintiff has not presented
evidence on an essential element of his claim and  therefore not meeting their
burden for Dismissal and or Summary Judgement and (2) do prove that Plaintiff
has met **all** of the esential elements of the Privacy act and that. Material
factual issues do exist for trial. see **Nodine v Shiley** 240 F3d 1149(9th 2001)
Summary Judgement is not proper if material factual issues exist for trial.

### D. ARGUMENT

    **1)** Plaintiff must prove the following essential elements to sustain a
claim under the Privacy Act (1) Plaintiff has been aggrieved by an adverse
determination; (2) the agency/Defendant failed to maintain records accurately;
(3) the reliance of the inaccurate information was the proximate cause of
the adverse decision and; (4) the agency acted willfully or intentionally
in failing to maintain accurate records. see **Deters** 85 F3d at 657. In regards
to Defendant BOP Plaintiff had to prove that BOP staff failed to verify the
accuracy of the challenged information and other requiremetns of Program Statement
5800.11 see **Brown** 498 F.Supp.2d at 320-03[2]n. 6(D.D.C. 2007) against Defendant.
Because there exists materail fact issues on **each "4"** elements and in accord
with P.S. 5800.11. Defendat is not entitled to Dismissal and or Summary Judgement
in this case.

    **2)** Plaintiff has proven beyond a reasonable doubt that (1) Plaintiff
has been severely and egregiously aggrieved by all these adverse determinations.
Wherein Plaintiff beginning on Nov. 8,2002 was stripped/deprived of one of
his most basic and fundamental rights afforded to him under the Constitution
of the United States (i.e. the 4th amend). Plaintiff asks this Judge to review
the Statement of Facts and **Att. # 1** in support thereof. Plaintiff has also
been stripped of his protections of the 5th amendment. the right to Life,
Liberty and Property. The Supreme Court has ruled that such deprivations of
guaranteed Constitutional Rights. Do result in adverse determinations, injuries
and damages and are therefore actionalble.

    **3)** Plaintiff has been further aggrieved by the loss of his personal wealth,

his homestead, his business', and most important of all. Plaintiff has lost his FAMILY. As a result, Plaintiff has suffered severe mental and emotional trauma and continues to suffer, continues to suffer sleepness nights, has suffered irrevocable marital problems, anxiety and humiliation. See **Salinas v O'Neill** 286 F3d 827(5th 2002); **Thompson v Opeiu** 74 F3d 1492(6th 1996); **Smith v Berry** 198 F3d 150(5th 1999). Plaintiff will **never** be able to have his FAMILY back and the way it was. Before Plainttiff was severely aggrieved by **all** these adverse determinations.

4) Plaintiff has proven "beyond a reasonable doubt". That (2) Defendants willfully/intentionally failed to maintain accurate records **"ab initio"**. Plaintiff asks this Judge to review the undisputable Statement of Facts and supporting documents (**Att. # 1** and supporting exhibits). That prove that as early as June 6,2002. Defendants started to maintain inaccurate/false records against Plaintiff (i.e. failed to maintain records accurately). Defendants will never be able to rebutt or refute what's in their very own DEA-6 reports and etc. Defendants knew that Jose Soto had recanted his inaccurate/false statements and **20** days after he made them. Defendants knew that Jose Soto never did a "single drug transaction" with Plaintniff at Plaintiff's business off of 11 39 Basse Rd. Bldg # 5. Jose Soto was arrested on Dec. 7,2001, was incarcerated and was never afforded bond. Infact Soto never knew or been to Plaintff's Basse Rd. Bldg #5 business location at all. Defendants knew that Jose Angel Garcia-Arguello was never in any car that Plaintiff was driving on August 28,2002, Defendants knew that Plaintiff was not intercepted on phone calls talking about drug shipments, drug proceeds and exercising asupervisory role (refer to **Att. # 3** in support of this response). Yet, Defendants willfully failed to maintain its records against Plaintiff accurately. Please review the entire statement of fact and **Att # 1 thru Att. # 8**.

5) Plaintiff has proven "beyond a reasonable doubt". That (3) Defendants willful and intentional "reliance" on **all** this inaccurate/false information was infact the proximate cause of these severe advers determination, injuries and damages. Plaintiff asks this Judge to take Judicial Notice under F.R.Evid. **201(d)**. That if this Judge were to excise/remove **all** of this inaccurate/false information. That is **still** maintained in the records that are in Defendants possession. Plaintiffs name would **not** even be in these records. Plaintiff's name would **not** be in the Criminal Complaint, Plaintiffs name would **not** have been mentioned in the Grand Jury Proceedings, Palintiffs name would **not** have been mentioned in any portion of these alleged criminal matters. Defendants

did infact and beyond a reasonable doubt. And their "reliance" on this inaccurate/
false information was the "proximate cause of the severe adverse decision".
see **Deters** 85 F3d at 657.

   6) There is no denying from this record that (4) Defendants acted "willfully
and intentionally" in failing to maintain accurate records. Plaintiff has
infact met all 3 and this 4th element of the Privacy Act. The Statement of
Facts and supporting documents (**Att. # 1** thru **# 7**) prove this "beyond a reasonable
doubt". Plaintiff asks this judge to review (**Att. # 1** pg 1 thru pg 18 ¶ 27)
and take Judicial Notice under F.R.Evid. 201(d) and since this Judge is being
"supplied with the necessary information". Defendants knew on June 6,2002
and a whole 5 months before. Defendants relied upon this inaccurate/false
information. In order to justify arresting Plaintiff at 5:30 am on Nov. 8,2002.
Which infact resulted in the unlawful seizure (i.e. 4th amend. arrest violation)
and **kidnapping** of Plaintiff. The record does also proves that in the course
of willfully violating the mandates of the Privacy Act. Defendants engaged
in "criminal conduct" and clear violaations of **18 § 1201, 18 § 1001, 18 §
241 & 242** and etcetera. Plaintiff has infact proven that Defendants did engage
in "something greater than gross negligence" **Tigerina v Walters** 821 F2d 789,
799(D.C. 1987). " An agency acts in an intentional or willful manner either
by committing the act without grounds for believing it to be lawful, or by
flagrantly disregarding others' **rights** under the act". **BAyless v U.S. Parole
Comm'n** 1996 WL 525325(D.D.C. 1996). Plaintiff has proven that Defendants "flagrantly
disregarded his **rights** under the Privacy Act". Plaintiff has also proven that
Defendants "actions were so 'patently **egregious** and **unlawful**' that Defendants
**knew** their conduct was infact **unlawful**" see **Laningham v U.S. Navy** 813 F2d
1236, 1242(D.C. 1987). Plaintiff has met all the elements and his burden.
Therefore, Defendant is **not** entitled to Dismissal and or Summary Judgement
as material fact issues do exist for trial.

## E. OBJECTIONS

   1) The court should deny defendant's motion for dismissal and or summary
judgement because defendant did **not**serve the motion for summary jusgement
10 days before the submission date. Plaintiff is entitled to 10 days' notice
of the date set for hearing or submission of the motion for summary judgement.
A motion for summary judgement must be served at least **ten** days before the
hearing or submission date. **F.R.CP 56(c); Baria v Reno** 94 F3d 1335, 1341(9th
1996). If the nonmovant is **not** given notice of the motion for summary judgement

, the resulting judgement will  be void as a violation of due process.  **New York Life Ins. Co.**, 84 F3d 137, 142-43(5th 1996). Defendant served the motion of June 6,2008 at about 9:15pm only 5 days **after** the submission deadline. Attached as (**Att.# 24**) is the affidavit of Plaintiff proving when the motion was received. Wherein, Plaintiff does object to not receiving the motion/summary judgment within ten days of the submission date.

2) Plaintiff objects to Defendants motion to dismiss and or summary judgment. As Plaintiff has proven that Defendants request for the relief of dismissal and or summary judgement.  Is not supported by their conclusory statements to establish that Plaintiff has not presented evidence of the essential elements of his claim. Infact Plaintiff has met his burden and proven "beyind a reasonable doubt" that material fact issues exist and that support Plaintiffs request for a jury trial.

3) Plaintiff objects to **all** the legal and procedural shortcomings of defendants motion for disrissal and or summary judgement. As Defendants motion does not meet the requirements of F.R.C.P 56(e) and therefore Plaintiffs objections should be adopted/accepted by this court.

4) Plaintiff objects to Defendants request to dismiss this action against the named individuals. But if this is infact the case law on individuals being precluded from an action for damages. Then Plaintiff does accept its decision on releasing all persons named in this suit.

5) Plaintiff objects to the suit being dismissed as to the U.S. Probation Office. But if this court finds that the USPO is not an agency as defined under the Privacy Act. Plaintiff will accept the dismissal of the complaint as to the USPo's office.

6) Plaintiff does object as to the suit being dismissed for statute of limitations violations. As the Statement of Facts clearly proves. That Plaintiff has been more than diligent. Plaintiff should not be penalized for the "inadvertent" error of the EOUSA/Dione Stearns. In not opening a new file. Plaintiff asks this Judge to refer to the Declaration of Dione J. Stearns dated May 24,2008. This has already been made part of the record of Defendants motion to dismiss and or summary Judgement. Plaintiff did make another request to the AUSA's office of Johnny K.Sutton. this is already part of the record as (**At. # 13**). This request was made on August 20,2007. How was Plaintiff suppose to know what Defendants were going to do and when. Plaintiff was giving Defendants ample enough time. Due to the fact, that their records are full of inaccurate/ false information. Also, Defendants have willfully "disseminated" **all** this

inaccurate/false information to many other agency's. Plaintiff just as recent
as two weeks ago. Viewed DEA-6 report from another criminal case from 2006.
That referenced DEA-6 reports from Plaintiffs criminal case. The same informtaion
that was inaccurate and false. The statute of limitations are tolled. For
"Continuing Violations Doctrine" is sufficient to toll the time limitations.
**Diliberti v U.S.** 817 F2d 1259; **M.K v Tenet** 99 F.Supp.2d 12. The time limits
should be tolled and due to the fact. That Defendants are still "disseminating"
and violating the mandates of the Privacy Act. But as Plaintiff was stating
earlier. Plaintiff did start the action within 1 year of Plaintiff becoming
aware of the inaccurate/false information. It was solely due to the "inadvertent"
error of EOUSA and Dione J. Stearns. Had Defendants adhered to their responsibilities
and in accord with the Privacy Act. This action would have commenced much
earlier. As the record proves, this inadvertent error was the cause for any
tardiness in filing of this complaint. The alleged 3 year tardiness should
not be held against Plaintiff. As PLaintiff was patiently waiting for Defendants
to discharge their duties accordingly. It would be a miscarriage of justice.
To excuse Defendants "inadvertent" errors and despite the fact. That they
are mandated by the Privacy and have time limits. But to then dismiss Plaintiffs
complaint for the errors and reasons for such delay. That are totally the
fault and attributable to Defendants.

   **7)** Plaintiff objects to Defendants stating "Plaintiff may not receive
damages because his conviction has not been overturned". Plaintiff is **not**
bringing this action to obtain money damages under **Bivens**. Plaintiff is solely
bringing forth this action under the provisions of the Privacy Act and due
to the fact that Plaintiff was met **all** the 4 elements of the Privacy Act and
Deters 85 F3d at 657. Plaintiff is not trying to attack his sentence or conviction.
His conviction and sentence are the are the results of the adverse determinations.
That Defendants made when they relied all the inaccurate/false information.
Plaintiff does not care if he dies in Prison. The Privacy Act allows for damages
to be awarded if Plaintiff can prove the agency's conduct was willful and
if Plaintiff has suffered adverse affects. Plaintiff asks this Judge to review
the Statement of Fact and (**Att.# 1 thru 7**) as proof that Plaintiff has met
his burden and should be awarded damages for the adverse affects he has suffered.

   **8)** Plaintiff objects to "BOP and USAO Records are exempt from subsection
(g) Privacy Act Lawsuits. Plaintiff is not bringing this suit and asking for
"amendment/correction" of the records in these agency's possession. Plaintiff
is fully aware of the exemptions under the Privacy Act and CFR. Plaintiff

does not care if these records are continued to be maintained with inaccurate/fasle information and willfully. Plaintiff is solely bringing this suit under the provision 5 **U.S.C. § 552(g)(1)(C)**. Due to the fact that Plaintiff has proven beyond a reasonable doubt. That (1) Plaintiff has suffered adverse determinations as the direct result of Defendants failure to maintain accurate records and (2) Defendants/Agency's have infact "acted in a **willfull** and **intentional** manner. See **Deters v U.S. Parole Comm's** 85 F3d 655(D.C. 1996). Plaintiff asks this Judge to review the Statement of Facts and supporting (**Att. # 1 thru 7**) in support of Plaintiffs position. Plaintiff has infact met all4 elements required of him. Therefore, Plaintiff has infact established an actionable claim under all 4 elements. And has a right to be awarded damages. As Plaintiff has lost his protections of the 4th amend., his protections of the 5th amend., he has lost his business', his homestead, his personal wealth and most important of all. Plaintiff has lost his FAMILY. Plaintiff has infact and as a result of these losses. Has suffered sever mental and emotional trauma, has suffered irrevocable marital problems, has suffered the loss of consortium, he has lost his love of family, he has suffered and still does suffer sleepness nights thinking about his little girls, what they are doing and if they still think of their Daddy Waddy Woeddy/Plaintiff.

    9) Plaintiff objects to " The BOP has not Failed to Maintain Accurate Records". Plaintiff is fully aware that the BOP is exempt from the provisions of the Privacy Act. Plaintiff is not requesting Defendant BOP to correct/amend its records. That are in its records and that are infact inaccurate/false. Plaintiff is seeking an award for damages. Due to Defendant BOP staff "failing to verify the accuracy of the challenged information in the PSI report as **required** under Program Statement 5800.11". Plaintiff has already proven beyond a reasonable doubt that BOP staff failed to verify the accuracy of the information Plaintiff was challenging. Please refer to the Statement of Facts and supporting (**Att. # 16 thru 23**). Which due to this failure of BOP staff. Plaintiff request for money damages for this alleged failure is infact **warranted**" See **Brown v BOP** 498 F.Supp.2d at 320-03[2]n. 6(D.D.C. 2007). Plaintiff has met his burden in regards to this Defendant agency.

    10) Plaintiff also objects to "Plaintiff has also failed to state a cause of action under Sellers". Plaintiff did infact specify what particular information in his PSI was inaccurate/false. Plaitiff's case is just like Sellers. Because Plaintiffs claims were "capable of being verified" refer to (Att. # 16 -23 and Statement of Facts) that Plaintiff has outlined. In regards to Defendant

39

being exempt from the Privacy Act and Sellers Complaint. Plaintiff is fully aware of this and is "NOT" seeking amendment or correction of this inaccurate/false information. That was and still is "capable of being verified" see **Sellers v BOP** 959 F2d 307(D.C. 1992). Defendant USAO in San Antonio is factually/fully aware. That the information that they maintained in their records, that was used against Plaintiff, that their witnesses testified to and etc. Is infact "inaccurate/false" and to prove    "how the inaccuracy/falsity of the statements can easily be verified". Plaintiff will submit as (Att. # 26) a response to one of Plaintiffs FOIA requests. That Plaintiff just received on 6/24/08. That proves that Defendant AUSO in San Antonio has infact received and is in possession. Of (Att. # 1 Letter To AUSA Sutton himself sent cert. # 7007 0220 004 5857) a legal packet and supporting exhibits. That prove how the "inaccuracy/falsity" of the records "can be easily verified". This (Att. # 26) consists of "56" pages that point out exactly/specifically "everything that is in the PSI and USAO files that is infact inaccurate, false and lies". Plaintiff asks this Judge to review (Att. # 1 pg 1 thru pg 31 and  "all" the supporting exhibits) that support Plaintiffs position. That his case is just like Sellers in respect to. There existing information to verify Plaintiffs allegations. Therefore Plaintiffs case is infact a "**TYPICAL**" case like Sellers. And this (Att. # 26) proves that that office/Defendant is currently in possession of (Att. # 1) and has been in possession of this packet since September of 2007. Months before Plaintiff filed his Privacy Act suit with this court. Furthermore, (Att. # 26) proves that Defendant/USAO in San Antonio. Is and has been in possession of information that easily verifies Plaintiffs allegation of this office failing to maintain accurate records and willfully maintaining those records with "inaccurate/false" information.

Therefore, Plaintiffs claims are "NOT" meritless, Plaintiff has infact offered proof beyond a reasonable doubt that the information is false (Att. # 1 and Att. # 26) and was easily capable of being verified. Plaintiff does state that his claims against Defendant BOP are solely for awards of damages. For staffs failure to verify the challenged information in accord with P.S. 5800.11. Plaintiff is not asking the BOP to retry his case or to reassess the credibility determinations of the jury and trial judge. Similarly, the USAO records do prove that the statements were made by the witness. H However, their records (i.e DEA-6 reports of June, July of 2002 and etc.)also prove.

That the information/statements their witness Jose Soto and others made. Were infact, "inaccurate/false and known to be by USAO/Defendant and at least 15 AUSA's in that office. At least "5 months" before they willfully "disseminated" this inaccurate/false information to Magistrate Judges, the Grand Jury, District Court Judges and etcetera. Plaintiff asks for this Judge to refer to (Att. #1 pg 3  1 thru pg 18  27 and all the supporting exhibits). This Judge will see that by reviewing exhibits # 6 and 6a and then compare it to exhibit # 2 and the statements made therein. He will see that the statements Defendants and AUSA's relied upon. In order to justify Plaintiffs unlawful arrest at 5:30 am (exhibit # 1), in order to justify kidnapping Plaintiff (i.e. violating 18 § 1201) and hiding him out at DEA headquarters and while officials took the Criminal Complaint to Magistrate Nowak at about 8:15 am, in order to use Magistrate Nowak as a rubber stamper and have her sign off on the arrest warrants some almost three hours after Plaintiff was already arrested and to get a grand jury to return an indictment against Plaintiff and etc. Were infact known "inaccurate/false" statements and information. Please review the Statements of Fact and supporting attachments. In regards to Plaintiffs arrest, and indictment.

Plaintiff is not trying to attack his conviction or sentence. Plaintiff does not care that he is condemned to die in prison. All Plaintiff cares about is (1) Plaintiff has infact been severely aggrieved by all these adverse determinations (i.e. his arrest, his indictment, his denial of bond, his deprivations of guaranteed right and etc); (2) the agency's (i.e.DEA of San Antonio and other)failed to maintain records accurately; (3) the reliance upon all this inaccurate/false information by the DEA, the USAO, the Magistrate Judges, the Grand Jury, the Jury, the Sentencing Judge and the BOP was the proximate cause of the adverse decisions Plaintiff has infact suffered and (4) these agency's acted willfully and intentionally(i.e. engaged in criminal conduct during the course of these willful violations of the Privacy Act) failed to maintain accurate records on Plaintiff. Please review (Att. # 1 and all supporting exhibits) and to support Plaintiffs position. That he has infact established an actionable claim against all agency/Defendants. Including BOP for staffs failure to adhere to their requirements of 5800.11. Defendants claims are merit less,  conclusory and do not warrant dismissal and or summary judgment.

41

11) Plaintiff objects to defendants stating "Monetary damages should not be awarded, as Plaintiff has not demonstrated any actual harm". Plaintiff does ask this Judge to review the entire Statements of Fact and supporting attachments. In support of Plaintiffs position. That he should be awarded monetary damages. For the actual harm that Plaintiff has proven beyond a reasonable doubt he has suffered severely (refer to Att. # 1 and Statement of Facts). Plaintiff has proven the elements of 5 U.S.C. 552a(g)4) and (g)(1)(C) and any other provision of the Privacy Act. Plaintiff has prove that the agency Defendants has failed to maintain accurate information and as early as June 6,2002; Plaintiff has proven that agency/Defendants did so willfully and intentionally and consequently, that many adverse determinations were made respecting this plaintiff. 5 § 552a(g)(1).

Furthermore, Plaintiff has proven that Defendant BOP's staff "failed to verify the accuracy of the challenged information in the PSR as required by Program Statement 5800.11".Due to the fact (Statements of Fact and supporting Att. # 16 thru 23) staff failed to "inform the appropriate USPO in writing of the disputed information and request a written response be provided". And after Plaintiff infact adhered to his requirements under said. Wherein, Plaintiff did provide staff (Case Manager Hanks) with sufficient information in support of his challenge(names of persons to contact, govt. agency and etc. P.S. 5800.11 (15)(c). Please refer to (Att. # 16-23 and Statements of Facts). The custody and designation of Plaintiff were adverse and did affect Plaintiff. Wherein, being classified and designated to a United States Prison (Bloody Beaumont and USP/Pollock ) has resulted in severe mental, emotional trauma and physical injuries as well. Wherein, Plaintiff has born witness to many savage assaults on human beings, Plaintiff was left to drown and die at USP/Beaumont and when prison officials left him there for Hurricane Rita, Plaintiff has had to endure the mental and emotional trauma of being locked down for weeks and months on end as a result of these savage attacks and Hurricanes.

Had Plaintiff been sentenced on accurate information. Plaintiff would not have been sentenced to one day in prison. Had Plaintiff been classified and designated on accurate information. Plaintiff would "not" have been designated to two of the most dangerous prisons and subsequently. Plaintiff would not have been subjected to such barbaric/savage incidences and conditions. But more so, Plaintiff has infact suffered the most severe actual

damages of all. Plaintiff has lost his protections of the 4th amend., his protections of the 5th amend. and to the right to Life, Liberty and Property, Plaintiff has suffered the loss of his business', his homestead, his personal wealth, and ultimately his Family. As a result of all this above mentioned that Plaintiff has lost and most important his F Family. Plaintiff has suffered/suffers severe mental and emotional trauma, has suffered/suffers severe emotional stress and anxiety, has suffered/suffers the loss of society, the loss of love, the loss of comfort, guidance, protection, Plaintiff has suffered/suffers sleepless nights, has suffered/suffers irrevocable marital problems and has suffered/suffers severe mental/emotional trauma and stress. At the loss of his relationship with he two minor Daughters. Currently Plaintiff has not type of communication, or contact with his Daughters. Which Plaintiff does state that is the direct result of these willful violations by Defendants of the Privacy Act and the criminal conduct the engaged in. During the course of these willful violations of the Privacy Act. These facts do constitute "actual damages" under controlling case precedent. "Under Louisiana Law, "actual damages" includes damages for mental pain and suffering**" Smith v The Berry Co**. 158 F3d 882); "Under Illinois law , loss of society damages claim includes loss of love, affection, care, attention, companionship, comfort, guidance and protection" **McClain v Owens-Corning Fiberglas Corp**. 139 F3d 1142(7th 1998); "Damages for emotional distress may be appropriate where Plaintiff suffers sleeplessness, anxiety, stress, marital problems and humiliation**" Salinas v O'Neill** 286 F3d 827(5th 2002) also **Thomson v Opeiu** 74 F3d 1492(6th 1996).

    Furthermore, under the Privacy Act of U.S.C. Service under damages for 552a. These also constitute "actual damages" and allows for Plaintiff to recover money damages. Defendants argument fails in these regards. As the record clearly proves that (1) the agency failed to maintain accurate records(refer to Att. # 1 and supporting exhibits); (2) that it did so intentionally (and ab initio, as early as June 6,2002 refer to Att. # 1 pg 3 thru g 18) and (3) there have been many adverse determinations made respecting Plaintiff. Plaintiff has met his burden and the Supreme Courts decision in **Doe v Chad** 124 S.Ct 1204, 1212(2004). is not applicable. Because Plaintiff has infact shown he has suffered severe "actual damages". Plaintiff lastly asks Defendants to put a "price/value" on what **their FAMILY is worth**. Have them tell Plaintiff what all their memories and times shared with their

43

Family, daughters and sons is worth. Plaintiff will "never" know what it was like or have the memory of showing his little girls how to ride their bikes, he will never know or have the memory of putting the money under their pillows for the tooth fairy, Plaintiff will never know or have the memory seeing his daughters sing at their first recital or dance recital, he will never know or have the memory of taking his daughters on their first fishing trip, he will never know or have the memory of taking them on his daughters first deer hunting weekend, he will never know or have the memory of taking his daughters on their first camping trip, he will never know or have the memory of taking them to their first baseball or soccer game, he will never know or have the memory of taking them to McDonald's for breakfast every Friday and to Mr. Gattis Pizza on Friday nights, Plaintiff will never know or have the memory anymore of his daughters calling him Daddy Waddy Woeddy and etcetera. You ask why, because Defendants willfully chose to maintain inaccurate information in their records against Plaintiff, then rely upon and disseminate this inaccurate/false information to steal (i.e. unlawfully arrest Plaintiff and drag him into this 5 and one half year nightmare that will never, ever end)their Daddy Waddy Woeddy from them on Nov. 8,2002. The amount of $250 million is not even close to compensate Plaintiff and his FAMILY for these "actual damages" they have all suffered. An award for this and more. Is just and proper in Plaintiffs mind and the jury should be allowed to determine this and whatever else they deem just. Plaintiff could at least "Die" in prison knowing that his FAMILY was compensated for their pain and suffering. As such, the jury and this Judge should be allowed to award just monetary compensation.

12) Plaintiff objects to "Plaintiffs Claims Against Defendants in Their Individual.........". If individually named defendants cannot be named under the provisions of the Privacy Act. The action that Plaintiff is bringing this suit under. Then so be it and Plaintiff does accept the Judge's decision to dismiss "individually named defendants and or unnamed John Doe defendants" from this Privacy Act suit. Plaintiff does declare for the record, that he is "NOT" bringing this action under "BIVENS" at all. Plaintiff asks this Judge "NOT" to construe his action in any way shape or form under the provisions of a Bivens or 1983 claim. As long as the provisions allow this action to continue against the agency/Defendants. Plaintiff does ask that this action continue against those Defendants. As is proven from the record, facts and

44

supporting documents. Plaintiff has infact established an actionable claim under the provisions of the Privacy Act 552a(g)(1)(C) and Deters c U.S. Parole Comm'n 85 f3d 655, 660(D.C. 1996). Plaintiff asks this Judge to review the Entire Statement of Facts and all the Attachments (Att. # 1 and supporting exhibits thru Att. # 23).

13) The evidence submitted in support of defendants motion is conclusory and should not be considered by the court it is neither supported by facts or by good faith declarations. The court should strike all of defendants conclusory statements in support of it request for relief and:

a)Affidavits/Declaration. defendants rely upon defective affidavits/declarations. Due to the fact that Jan hanks has infact submitted a "bad faith" affidavit/declaration. Wherein she has committed perjury and fraud. The documents that Plaintiff has provided (att. # 16 thru 23 and the Statements of Fact) do prove that Jan Hanks has infact submitted a "bad faith" affidavit/declaration and has falsely sworn to it. Plaintiff asks this court to stike the objectionable parts of this affidavit/declaration and impose any other sanctions under the F.R.Civ.Proc. it deems just.

b)Plaintiff objects to defendants not giving 10 days notice prior to submission

c) Plaintiff asks to strike any and all of defendants summary judgment proof that is not admissible at trial, that is not supported by the record(i.e. good faith declarations/affidavits, documentation, and etc.), that is conclusory, that does not support each element of its request for relief.

## F. SUMMARY JUDGEMENT EVIDENCE

1) In support of his response, Plaintiff includes the following evidence in the enclosed attachments.

a)the affidavits of Plaintiff establish that (1) Plaintiff did not receive defendants Motion to Dismiss and or Summary Judgment until 5 days after the submission date Plaintiff will make this as (att. # 25) (2) Plaintiff has infact suffered severe "actual damages" as the direct result of Defendants willful failure to adhere to the mandates of the Privacy Act and Deters 85 F3d at 657. Plaintiff will make this as (att. # 27) (3) Plaintiff

45

has infact sworn to Material Fact Issues existing. Which would prevent
Summary Judgment. Plaintiff will make this as (att. # 28) (4) Plaintiff does
swear that these copies are original copies of the documents that are in his
possession and control. Plaintiff will make this (Att. # 29).

b) Documentary Evidence: Plaintiff does declare that the documentary
evidence has been verified as authentic in Affidavit (at. # 29) which
documents do establish the fact 'beyond a reasonable doubt". These
documents/attachments and etc are (1) attachments (# 1 supporting exhibits
thru Att. # 29) and do establish the facts: (1) Plaintiff has been severely
aggrieved by an adverse determination; (2) the agency's failed to maintain
records accurately ab initio; (3) the reliance of the inaccurate/false
information was the proximate cause of the adverse decision and (4) the
agency's acted willfully. However, in order to prevail, the failure to
maintain the records in this manner must consequently result in a
determination that is adverse to the individual. Additionally, the civil
remedy provided under 552a(g)(1)(C) results in monetary liability only if the
agency acted in a willful and intentional manner. see Deters v U.S. Parole
Comm'n 85 F3d 655, 660(D.c. 1996). Plaintiff has infact met these provisions
under 552a and Deters (refer to Statement of Facts and supporting Att. # 1 -
23). Plaintiff has infact established an actionable claim under all "4"
elements of these Privacy Act provisions and Deters 85 F3d at 657.


H. CONCLUSION


1) Plaintiff has proven beyond a reasonable doubt. That he has met all
"4" elements that would allow Plaintiff to bring forth this action and he has
established an actionable claim. There does exist material fact issues for
trial. Nodine v Shiley Inc. 240 f3d 1149(9th 2001). At summary judgment, all
factual inferences must be resolved in favor of the nonmovant. Danzer v
Norden ystems Ins. 151 F3d 50(2nd 1998); On motion for summary judgment,
court is required to resolve all ambiguities and draw all factual inferences
in favor of party against whom summary judgment is sought. On summary
judgment, all facts and inferences there from are to be construed in favor of
party opposing motion. Adickes v Kress & Co. 398 US 144, 26 L.Ed.2d 142, 90
S.Ct. 1598(1970); Yeardon v Henry 91 F3d 370(2ND 1996) see also Fallen v U.S.

378 U.S. 139(1964). For these reasons that Plaintiff has proven beyond a reasonable doubt. Plaintiff asks this court to deny defendant's conclusory motion to dismiss and or summary judgment. And allow the jury to determine these material fact issues that exist.

Respectfully

Jesse Ramirez # 31805-180                    dated: 6/30/08

## CERTIFICATE OF SERVICE

I Jesse Ramirez, do hereby certify under the penalty of perjury that I have served a true and correct copy of the following documents:

Plaintiffs Response To Defendants Motion To Dismiss And Or
Summary Judgement.

which pursuant to Houston v Lack 487 US 266(1988) is deemed filed at the time it was delivered to prison authorities for forwarding to the court and service upon parties to litigation or their attorneys of record. I have placed the material referenced above in a properly sealed envelope with first-class postage affixed and addressed to:

U.S. District Court                 Defendants Attorney
333 Constitution Ave., N.W.         R. Fields/Civil Division
Washington, D.C. 20001              555 Fourth Stra l, N. W
                                    Washington, D.C. 20530


and deposited said envelope via hand delivered to the mail room staff at the United States Penitentiary Pollock, La on this day 30 of June 2008

Respectfully

Jesse Ramirez

47

Johnny K. Sutton
Assistant U.S. Attorney
601 NW Loop 410, Ste. 600
San Antonio, Tx 78216

Re: To your duties to correct the false statements used to show my involvement,
support probable cause, to justify my already unlawful arrest, to indict me
and to convict me. Also your duties to charge, indict and prosecute. AUSA/Contreras,
AUSA/Shearer, AUSA Durbin, AUSA Cruz-Zapata and others. For the use of known
false statements in the Criminal Complaint(i.e. violationof **18 § 1001**), for
lying knowingly to a Federal Grand Jury(i.e. violation of **18 § 1621; 18 § 1622
and § 1623**); for **Kidnapping** me at 5:30 am on Nov. 8,2002(i.e. arrested me in
violation of my 4th amend right "no arrest warrant", unlawfully seized me,
placed me in a patrol car, took me over to DEA headquarters in S.A. hid me
out, went to the Magistrate with the Complaint that contained **all** of these
known false statements about me and obtained the arrest warrant at 8:15am on
NOv. 8,2007 3 hours after my kidnapping and unlawful arrest; for the **Conspiracy
Against Rights** that they engaged in (i.e. when they all agreed to arrest me
unlawfully, to kidnap me, hide me out at DEA headquarters, use the known false
statements in the Criminal Complaint to justify my already unlawful arrest
and to use these known false statements in the Grand Jury proceeding and in
order to obtain an indictment against me(i.e. they **manufactured jurisdiction**
over me). And other criminal conduct they have engaged in, continue to engage
in and the cover up of a cold blooded killing. Which is the direct result of
these criminal offenses committed by these people mentioned above, the DEA
agents involved in this manufactured conspiracy and etc. The death of Ashley
Villarreal is a violation of **18 § 3559(d)(1)(A); (B)**.

Johnny K. Sutton,

    Maybe you know of me. Or maybe you have just ignored who I am. My name

is Jesse Ramirez and I was the sole defendant who went to trial. On the manufactured

conspiracy that Joey and others manufactured. Better know as case code name

"Operation Alacran". I was the person who your AUSA's lied knowingly about

in teh Criminal Complaint, In Title III affidavits, to Federal Magistrate,

District and Circuit Court Judges, and who they lied knowingly about and in

order to obtain my indictment. I was recently reading a news paper article

about you. This about the "Border Agents" case that received Senate scrutiny.

I couldn't help but notice what you said in regards to what Senator Tom Coburn,

R-Okla asked you; "Why is it wrong to shoot the (trafficker) after he has been

told to stop?". You replied, "The Supreme Court has **ruled** that using deadly

force in that way **is** illegal". The Supreme Court has also ruled that it is

**illegal** to use known false statements in a federal document **18 § 1001(a)(1)

and (a)(2)**. It is also **illegal** to **Kidnap** a person in the U.S. of America, a

violation of **18 § 1201**; it is also illegal to use known false information/statements

before a federal Grand Jury, a violation of **18 § 1621; 1622 and 1623**. It is

also **illegal to Conspire Against** ones **Rights,** a violation of **18 § 241 & 242,**

the Supreme Court has ruled that it is also **illegal** to use deadly force when

1.

federal agents(e.g. DEA agents, FBI agents and etc.) **create** the situation that
is needed. In order for them to use **deadly force** and kill in cold blood 14
year old little girls. I am talking about Ashley Villarreal, the little girl
that DEA agent Sweirc killed in cold blood. The same little girl that AUSA/Contreras,
AUSA/Cruz-Zapata and the rest of the AUSA's in your office. Committed other
crimianl acts in order to cover up their criminal conduct. This is not even
nentioning AUSA/Contreras's other unbeatable **tag team** teamamtes. Magistrate
Nowak, Primomo, Circuit Court Judge Prado, District Judge Biery and others.
That conspired with, aided and abetted the cover up of this cold blooded killing.
In effect, all of these people obstructed justice. The public was **lied** to by
everyone of these people. Now you know more than anyone, that Joey, Prado,
You and even your boss **Albert Gonzalez**. Are not above the law and immune from
prosecution for ( **criminal conduct**). That **all** of these above mentioned people
have infact engaged in. I wonder what Senator Tom Coburn, R-Okla, Dianne Feinstein,
or even **Dana Rohrabacher, R-Calif** would say. If they knew that you will uphold
the law in cases like these two Border Patrol agents. But yet **refuse** to uphold
the law and charge, prosecute and convict your very own. For the criminal conduct
that they have **infact** engaged in. Wherein, it is your **duty** and oath( I will
attach a copy of your oath as **attachment "A"**, just in case you have forgot
what you **swore** to do and who you swore it to). I believe the statute that **mandates**
your **Duties** is 28 § 547(1) and 28 § 544 "shall take an oath to execute faithfully
his duties". I just know that **Dana Rohrabacher** would have a field day with
you. While she had you under direct examination and before the **Senate Judiciary
Committee**. I have asked AUSA/Contreras and others. Even including you, to correct
all of this unlawfulness. Yet, I have not heard one peep from any of you all.
The many, many letters that I have sent certified mail/return receipt. Have
all fallen on deaf ears. How is this, when also under the Supreme Court ruling
of **Imbler v Patchman 47 L.Ed.2d 128(1976)** the Prosecutor (AUSA/Joey Contreras)
is **bound** by the **ethics** of his office to inform the appropriate authority of
**after-acquired** or **other** information that casts **doubt** on the correctness of
the conviction"? In my case, AUSA/Contreras, Shearer and others. Knew from
the very beginning, that the initial information about me. Was **infact** false
and not sufficient to even use to show my involvement in this manufactured
conspiracy. Which I will prove to you in black and white. But let us just say
that AUSA/Contreras, Shearer and other didn't know. They still have a duty
under **Imbler**, because I have proven it to them many times already. All you
have to do is review the record that I have created over these past 4½ years.
Plus, if you review the record and the statements out of AUSA/Contreras's own

mouth. You will see that he had infact abandoned his role as an advocate. And willfully joined the role as police officer. Wherein he participated in the 4th amend. violation/illegal search and seizure of the apartment at Roenoke Condominium Homes. He also was one of the authors of the affidavit for Jose Angel Garcia-Argullo. Plus he was one of the **authors** of the Affidavit from Nov. 8,2002. That contained the known false statements that allowed the govt. to show my involvement, support probable and to justify my already unlawful arrest. The DEA-6 reports that I will submit as exhibits in support of what I am saying. Will prove that AUSA/Shearer knew the statements about me were infact false. A whole **5** months before AUSA/Contreras and case agent A.B. Castaneda/ DEA agent, the two authors of this fraudulent criminal complaint. Used them on Nov. 8,2002 to obtain the arrest/search warrants. You are very well aware that the Supreme Court has **ruled in Mooney v Holohan**. That since the AUSA's office is the attorneyfor the govt., If one AUSA knew of the lies, then they all knew of the lies". But AUSA/Contreras was already in possession of these DEA-6 reports that exculpated me. And that proved that I was not involved with these alleged conspirators. The Supreme Court has also **ruled** that a "prosecutor is charged with knowing of **everything** that is in his file. Whether he has overlooked it or not". These Supreme Court **rulings** also implicate/prove that you were aware of these lies as well and have a duty to correct them. I will start off with the violations/criminal conduct. That AUSA/Shearer, Contreras and others engaged in (i.e. violations of 18 § 1201(a)(1): (a) Whoever **unlawfully seizes, confines**, inveigles, decoys, **kidnaps, abducts,** or **carries away** and holds for ransom or reward or otherwise any person, except in th e case of a minor by the parent thereof; **shall** be punished by imprisonment  for any term of years, or life and. if death of any person results, **shall** be punished by death or life imprisonment".

**The Unlawful Seizure, Kidnapping, Abduction, and Carrying Away of Jesse Ramirez: (i.e. violation of 18 § 1201(a)(1).**

1. I will submit as **exhibit # 1** the DEA-6 report/synopsis of the Arrest of Jesse Ramirez. As you will see, that I was **unlawfully seized** by Alamo Area Narcotics Task Force Officer _Joe Rodriguez_____. Working under the direction/ color of law of Javier Pena/Head DEA agent of San Antonio.  At about **5:30 am**, on November 8,2002.

2. The fact is that there was **never** an issuance of an "arrest warrant" for me at 5:30am. But this documentation proves that I was placed under arrest/ **unlawfully seized**. Which the Supreme Court has **ruled illegal; Beck v Ohio 379 US 89(1964); Terry v Ohio 392 US 1(1968); US v Edwards 242 F3d 928(2001)** "If police learn of information that **destroys** their probable cause to arrest a defendant , the arrest may become illegal". In my case, they already knew that probable cause did not exist to arrest me illegally/unlawfully.

3. Infact, the Criminal Complaint was not even taken to Magistrate Nowak. Until **8:15 am** on November 8,2002. Almost **3 hours** after I was arrested illegally/**unlawfuly seized, kidnapped** and hid out at DEA headquarters. I will submit as **exhibit # 2** a copy of the Criminal Complaint. That proves the time she signed off on it, arrest and search warrants.(please refer to exhibit **# 15 as well)******
******

Special Note:   Rule 1 of the F.R.Crim.Proc. : these rules govern the procedure
                in **all** criminal proceedings.

                Rule 2 of the F.R.Crim.Proc. : these rules **are**  to be interpreted
                for the **just** determination of **every** criminal proceeding, to secure
                simplicity in procedure and **fairness** in administration, and to
                eliminate unjustifiable expense and delay.

                Rule 3 of the F.R.Crim.Proc. : The **Complaint** is a written statement
                of the **essential facts** "not known lies" constituting the offense
                charged. It **must** be made under **oath** before a magistrate judge
                or, if none is reasonably available, before a state of local
                judicial officer. " you will see in black and white. That these
                rules were all violated and not adhered to. As these officers
                of the court chose to defraud the court, commit fraud in these
                documents knowingly 18§ 1001, and in effect conspire against
                my rights 18 § 241 & 242 and etc."

                Rule 4 of the F.R.Crim.Proc. : of the Complaint or one or more
                affidavits filed with the complaint establish probable cause
                "without using known **false/fraudulent** statements" to believe
                that an offense has been committed and that the defendant comm-
                itted it, the judge must issue an arrest warrant to an officer
                authorized to execute it. "**not after** the defendant has already
                been illegally arrested/**unlawfully seized**".

4. You are very well aware that the Supreme Court in **Elkins v U.S. 364 US 206(1960) RULED** that it was **illegal** for govt. agents to stand by and allow State police officers to commit the 4th amend. violation and then claim innocence to the violation. In order for them to use this unlawfully obtained evidence against a defendant in a federal trial. The **Silver Platter Doctrine** is **illegal** and no longer accepted.

5. In my case/situation, Javier Pena/head of DEA in San Antonio, A.B Castaneda, AUSA/Contreras and others. Enlisted the assistance of the State Police (namely

Alamo Area Narcotics Officers, Joe Rodriguez and Johnny Gray). Just so that
they could order these state police offciers. To arrest my illegally/**unlawfully
seize** me. While they stood by and could later claim innocence to the violations.
6. I will submit as **exhibit # 3** a copy of a response from Jesse L. Jones/Captain
of the Alamo Area Narcotics Task Force herein **AANTF**. This proves that these
state police officers. Were not just driving aound San Antonio at 5:30am and
just decided to have me pulled over illegally. This documentation **proves** that
Javier Pena, A.B Castaneda "case agent", AUSA/Contreras and others. Enlisted
their assistance and for the sole purpose of arresting me illegally/**unlawfullyy
seizing** me. In complete violation of what the Supreme Court has **ruled illegal.**
7. Further, these DEA agents, AUSA/Contreras and others are infact committing
**FRAUD** a violation of **18 § 1001.** In their DEA-6 report of my arrest **exhibit
# 1.** Because I was **not** arrested pursuant to a federal arrest warrant. As these
documents prove, that it hadn't been issued yet. Also I was not arrested by
officer Kline of Hollywood Park Police Department herein **HPPD.** I was placed
under arrest per Miranda by AANTF .Joe Rodriguez. Officer Kline of HPPD merely
made the illegal traffic stop for the above mentioned govt. agents. Something
else that the Supreme Court has ruled **illegal.**
8. To further support my allegations of the above mentioned govt. agents committing
violations of **18 § 1001** and **18 § 241 & 241 and etc.** I will submit as **exhibit
# 4** a copy of the police report from HPPD officer Robert Kline. Please make
note of the **Date** and **Time** of my illegal arrest/**unlawful seizure.** This report
clearly proves who infact arrested me per Miranda and at who's orders. These
above mentioned govt. officials infact **stood by** and allowed this constitutional
violation to take place. Knowing that the Supreme Court has **ruled** this type
of conduct **illegal; Terry v Ohio 392 US 1(1968);**
9. Further, this intentional **FRAUD** that these govt. agents/officers of the
court. Constitutes collusion and FRAUD on the court. This is something else
that the Supreme Court has **ruled illegal; U.S. v Throckmorton 98 US 61(1878)
and Hazel-Atlas.** The **extrinsic** fraud that these officers of the court perpetrated
on the court. Did infact **infect the entire judicial process; Fiero v Johnson
197 F3d 147 at 155 [2](5th 1999).** I am sure had these agents told Magistrate
Nowak that I was already arrested, had been so since 5:30 am and they violated
my 4th amend. right by this unlawful arrest/seizure. She would have **never** signed
off on those fraudulent statements about me in the Criminal Complaint.
10. These intentional misrepresentations of material facts and omissions of
material facts as well to magistrate Nowak. Just go to prove that I was infact
**Kidnapped** a violation of **18 § 1201(a)(1);** whoever **unlawfully seizes**, contrives,

inveigles, **decoys, kidnaps, abducts,** or **carries away...** <u>shall</u> be punished
by imprisonment for any terms of years or for life..."

    To sum up what I am saying/proving to you. I was infact **kidnapped** and
you know it now. If my arrest were legal. Then why did they arrest me at 5:30am
without an arrest warrant? Why did the DEA, AUSA/Contreras and others enlist
the assistance of AANTF? Why did AANTF/Joe Rodriguez **lie** to officer Kline and
others about having a federal arrest warrant for my arrest? Why did the DEA,
AUSA/Contreras and others hide me out at DEA headquarters. While they took
the Criminal Complaint that contained known false statements to Magistrate
Nowak. The Supreme Court has **ruled** that this type of arrest is **illegal.** F.R.
Crim.Proc rule 4 and 5 was **violated** as well. They should have taken me before
Magistrate Nowak As Soon As Possible rule 5(a)(1) and 5(b). Instead, they drug
me over to my house, executed the search warrant and then brought me before
her later on in the afternoon. And made it seem like they had just executed
the warrant and were bringing me promptly before her. This conduct on their
part was infact criminal and further proves/support. The Conspiracy Against
Rights a violation of **18 § 241 & 242.** Wherein **all** of the above mentioned people
**agreed** to commit these criminal offenses/civil rights vioaltions. Blacks Law
defines Conspiracy as :" An **agreement** by two or more persons to commit an unlawful
act; a combination for an unlawful purpose". These documents/exhibits prove
that there was more than a tacit **agreement** amongst them. For these officers,
DEA agents, AUSA/Contreras and others. Knew that probable cause never existed
for my unlawful arrest/seizure. I never committed one crime in front of any
of these people(DEA-6 reports prove this as does trial testimony from these
agents). To this day, probable cause does not exist for my arrest. What these
people DEA agents, AUSA/Shearer, Contreras, the rest of the AUSA's in you office,
including you and others knew. Was that Jose Soto lied about me. They knew
they had already used those lies and others. In order to obtain Title III intercepts
at the State level. And that this crime that **never** happened( that allowed them
to show my involvement) also is the basis for this **841(b)(1)(A)** manufactured
conspiracy. I know your not stupid and you can see exactly what they did and
what you have allowed to happen. Since the buck will stop at you. Which brings
me back to this article that I will send you a copy of. Now, you **allude** to
Senator Coburn in your response. That it is your **duty** to charge, prosecute
and convict **any one.** Regardless if they are U.S. Border Patrol Agents. Especially
if they have engaged in conduct that the Supreme Court has **ruled illegal.** Well
here it is in black and white. Proof, that your very own AUSA's, DEA agents,

and other officers of the courts. Have infact engaged in criminal conduct and conduct that the Supreme Court has **ruled illegal**. This is just the beginning of their criminal conduct and conduct that the Supreme Court has **ruled illegal**. Which therefore, you have a **duty** to charge, prosecute and convict these criminals. And regardless if they are your very own. All of this was done in order for the govt. to make this manufactured conspiracy work and to cover up their criminal conduct. But moreso, it was to **manufacture jurisdiction** over me and others. The Supreme Court has also **ruled** that it is **illegal** to manufacture/create jurisdiction. Also that jurisdiction **cannot** be judicially created. Just as Prado did in my case and just for his **tag team** team mate members. This is another issue(i.e. criminal offense that Joey, DEA agents and Prado committed. In all actuality it is a violation of the**Seperation of Powers Act). I will** outline this and I think you will find it real interesting. That is if you are not a member of this unbeatable **tag team**. As you are further aware or should be. The Criminal Complaint, arrest warrant and indictment. Are all prerequisites to the court having subject matter and personal jurisdiction over me. If there is a **fatal defect** in these prerequisites. Then the court never had jurisdiction over me and jurisdiction does not exist. I will outline all of this in this next part. But my question to you is this. What are you going to do Johnny K. Sutton, now that I proved to you your very own have infact commited criminal offenses/engaged in conduct rule illegal by the Supreme Court? Are you going to uphold you Duty and oath (**attachment "A"**)? If you are, when are you going to initiate charges against them all, when are you going to convene a Grand Jury to Indict all of them and others? After all, the DEA, AUSA/Contreras and others **unlawfully seizing me**. Constitutes a crime in the United States of America. And it is called a violation of **18 § 1201(a)(1)**. This is not even mentioning the cover up of this violation of **18 § 1201(a)(1)**.

**The Violations Of Title 18 § 1001; 18 § 1621; 18 § 1622; 18 § 241 & 242 and etc. By AUSA/Shearer, Contreras, DEA agents and others.**

1. We will start off with **exhibit # 2** the Criminal Complaint. The very first paragraph is a violation of **18 § 1001.** Wherein agent Stallings admits in a pre-trial hearing on January 23,2004. That he knew nothing about this case and had only read **some of** the DEA-6 reports. Before he took it to the Grand Jury(i.e before he lied/used known false statements violation of **18 § 1623**)and presented the case for AUSA/Durbin, Contreras and others.

2. I will submit as **exhibit # 5** a copy of the transcript from the January 23,2004 hearing. Which will **prove** that he knew **"nothing"** about this case before he went to the Grand Jury. Nor was he "personally familiar with **all** the **facts** with this case". As he fraudulently(i.e. committed  violation of **18 § 1001, 18 § 1621, 18 § 1623, 18 § 241 & 242 and others**)stated in the Criminal Complaint **exhibit # 2**. The Supreme Court has **ruled** that it is **illegal** to use known false/fraudulent statements in an Affidavit/Complaint in support of probable cause; **Franks v Delaware 438 US 154(1999).**

**Special Note:** I would like for you to refer back to my first special note and see for yourself. That these rules of Federal Criminal Procedure were **not** adhered to. And infact they were **circumvented** in order to get around their strict requirements.

Further this circuit in **U.S. v Richardson 943 F2d 547(5th 1991)** has held that a warrant/complaint is held infirm, since **rule 41** relevant language rests on the Fourth Amendment's **Oath & Affirm-ation "requirement"**. In effect, Stallings falsely swears to Oath and Affirmation of this known to be **False/Fraudulent** Complaint/ Affidavit. Proving, that there is already a **FATAL DEFECT** in the Federally mandated rules of Criminal Procedure. Which of course you can already see that **jurisdition** was **infact** being **manufactured.**

3. The very next paragraph is a violation of the above mentioned **statutes**. Wherein, the DEA-6 reports that AUSA/Shearer, Contreras and others were in possession of. Prove that this investigation did **not** begin/ nor was initiated. Until Jose Soto began to **lie**/ make false statements to all of the above mentioned. On **June 6,2002**, 5 months **before** they used these known false statements in this Criminal Complaint. The govt. knew nothing as they allege in this Criminal Complaint. This was **all** put together after the fact and in cronological order. To support their position in this fraudulent Complaint. There are known material misrepres-entations and omissions of material facts in this Complaint. If you closely review the DEA-6 reports that I will make as **exhibits 6 & 6(a)** 2nd and 3rd debriefings of Jose G. Soto on June 26,2002 and July 17,2002. You will see when they actually became aware of these alleged offenses.

4.  I am sorry that I could not afford you a copy and the chance to see. The
very first DEA-6 report of Jose G. Soto **lying** about me and certain events.
But your boy AUSA/Contreras, Shearer and others. **Suppressed** this initial DEA-6
report from me. Something else that the Supreme Court has **ruled** is **illegal**
and that violates my Due Process rights to the law(i.e. a Conspiracy Against
Rights violation of **18 § 241 & 242**). But I am sure that AUSA/Contreras and
Shearer could let you see this initial report that they **suppressed** from me.
By the way, this non-compliance with Discovery is called a **Brady** violation
also. This was intentionally done, because it proves that this investigation
was initiated **after** Jose Soto leid to them initially on June 6,2002.

5. I am not going to press this issue too much. As I am giving you and AUSA/Contreras
the chance to shoot yourselves in the foot and put you foot in your mouth.
I have figured out exactly how AUSA/Contreras, Shearer and others. Were able
to **manufacture** this conspiracy. With an alleged conspiracy that had already
**ended,** which their very own DEA-6 reports will prove this and how. They committed
more fraud(violations of **18 § 1001, 18 § 241 & 242 and** others)when they fraudulently
and misrepresented material facts. In order to say that Castillon and a certain
individual. Were engaged in a conspiracy. When **infact,** Castillon was merely
a **supplier** of the drugs for this certain individual and that. Castillon had
removed himself from **that** position. You know that a **buyer/seller** relationship
does **not** constitute a conspiracy. But when You or AUSA/Contreras and others.
Try to commit more fraud. I will break it **all** down for you. They all had to
do this, because (1) Jose Soto was **not** a member of this alleged conspiracy
wiith Castillon (2) for he had **removed** himself from this alleged conspiracy
days before his arrest on Dec. 7,2001; **U.S. v Fox 189  F3d 1115(1999)**(refer
to the trial testimony of Jose G. Soto,  Alejandro Castillon and Rene  Campos).
Wherein, the record proves that Jose Soto was **not** a member of this alleged
conspiracy with Castillon and Campos. Because he took definite, decisive and
positive steps to disassociate himself from the conspiracy. And (3) these
means that not only did Jose Sotos statements fail tomeet the **exception** to
the Hearsay Rule, Rule **801(d)(2)(E).** They were also inadmissable against anyone
of us. But once again, only through the violations of **18 § 1001, § 241, §
242, §1621 and 1622.** The above mentioned were able to make it all work out.

6. Back to **exhibit # 6 & 6(a),** if you turn to pg 3 of 4 ¶ 14. That the investigation
did **not** start until June 6,2002 and that he lied about **me** being the **source**
of the 5 **kilos** he was arrested with(refer to **exhibit # 2 ¶ 4).** Plus the very
next paragraph of this **exhibit # 6 pg 3 0f 4 ¶15.** Proves that the govt. did
**not** know that the drug seizure of Dec. 6,2001 involving Lydia De Alba. Was

even remotely related to Alejandro Castillon and his alleged drug trafficking.
Until once again, June 6,2002 Jose Soto's **Initial** debriefing/**Initial lies.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This part is **very, very** important. Because this next Paragraph **# 4** of **exhibit
#2. Is** what allowed the govt to show my involvement, support probable cause,
to justify my already unlawful arrest and to obtain my indictment. Despite
the **fact[s]** that AUSA/Shearer, DEA **Case** agent A.B. Castaneda, Cal Fowler, AUSA/
Contreras and **many, many** others. **KNEW** these statements that Jose Soto said
against me were **false/lies.** Without these lies, the govt. would have **never**
been able to show my involvement and drag me **unlawfully** into this manufactured
conspiracy and destroy my/myfamilies life.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

7. **Para 4** of **exhibit # 2,** is what allows the govt. to show my involvement,
support probable cause, to justify my already **unlawful arrest/seizure** and
to get me indicted. First off and in regards to the violation of **18 § 1001,
1621, 1622, 18 § 241 & 241** and etc. That AUSA/Shearer, Contreras, DEA agent
Castaneda/Case Agent, Cal Fowler and the entire offices of these agencies.
Jose Soto **never** made "was interviewed and Identified his source of supply as
Rene Campos" (please refer to Jose Soto's initial debriefing and statements
**exhibit # 6 & 6(a)**) at the time of his arrest December 7,2001. Soto **never** said
"Rene Campos gets his supply of cocaine from Jesse Ramirez" on December 7,2001.
As the above mentioned people knowingly misrepresent these material facts.
Infact, they knew that they were all lies(refer to **exhibit 6 & 6(a)**). These
material misrepresentations of facts and omissions of material facts. Just
go to prove the violations of **18 § 1001, 1621, 1622, 241 & 242 and others).**
But wait, it is fixing to get a whole lot better.
8. I will submit as **exhibit # 7** copies of the DEA-6 reports of the Arrest of
Jose G. Soto and Jaime Martins-Olvera. From the date of their arrest December
7,2001. Jose Soto **never** made **any** statements to the DEA, AUSA/Shearer or others.
He didn't even make **any** false statements about me or others at that time either.
If you compare **exhibit # 2, exhibits 6 & 6(a)** and **exhibit # 7** with/against
each other. You will see that what AUSA/Shearer,Contreras,The DEA agents involved
in all of these debriefings have engaged in. The Supreme Court has **ruled** is
**illegal; Franks v Delaware 438 U.S. 154(1978).** Here it is in black and white.
Proof beyond a reasonable doubt. You can **never say** that they didn't know. These
DEA-6 reports were in their very own possession. Plus not only is the prosecutor
charged with knowing of **everything that** is in his file, whether he has overlooked
it or not. The entire office of the AUSA office, including you knew of these
false statments. As the Supreme Court has also **ruled** "if **one** AUSA knew of the
lie

false statements/promise and etc., **all** of the AUSAs in the office knew of them;
**Mooney v Holohan 294 US 103(1935)**. As you know, these **rulings** were handed down
by the Supreme Court. As you are further aware under **Franks v Delaware 438
US 154(1978)**you and the above mentioned **must** excise/take out these known false
statements. If AUSA/Shearer and Contreras had done this. My name would not
even be in this Fraudulent Criminal Complaint. This is just more proof of the
vilations that Ihave alleged/proven they have committed.

9. If you look at **exhibit # 6(a) Debriefing of Jose Soto on 7/16/02; pg 2 of
7**. Jose Soto is **now** supplying me with drugs. This is on ¶ 4 "Soto delivered
**one** kilogram of cocaine from CAstillon to Ramirez and observed Campos deliver
several kilograms of cocaine to Ramirez at the Performance Tint and Detail
shop **located** on Everest St". Also, now CAmpos is my supplier of cocaine. These
is also false statements about me. But these DEA-6 reports **exhibits 6 & 6(a)**
prove that what the Authors of the Criminal Complaint "A.B. Castaneda, AUSA/Contreras
and others". **Knew** a whole 5 months before they used these lies about me. Were
**infact** just that, L..I..E..S.., known false statements. **Five** kilos sure does
sound better than **one** kilo. They would have never been able to charge us with
an **841(b)(1)(A)** conspiracy as they did. **Infact**, they should have never charged
us with this 841(b)(1)(A) conspiracyt at all. Because, the crime that these
Criminal coconspirators (i.e. the DEA agents, AUSA/Shearer, Contreras and many
others) used to make this all work. Is a crime that **never** happened and does
not exist. Proof that I am not only innocent of this crime that never happened
(Dec. 7th,2001). But so is everyone else on this manufactured conspiracy. These
**are** the five kilos that the **whole** conspiracy is based off of. Can you say,
**violation** of 18 § 1001, 18 § 241, 18 § 242, 18§ 1621, 18 § 1622 and other criminal
conduct. That the Supreme Court has **ruled** is **illegal.**

10. Can you say **FRAUD, FRAUD, FRAUD** on the court as well; **Fiero v Johnson 197
F3d 147 at 155[2](5th 1999)**. I never had a chance at what justice should really
be about. AUSA/Contreras told me that he knew they screwed up with me. And
that they were willing to give me a **good** deal. All I had to do was accept respo-
sibility for a lesser charge. I will **never** accept responsibility for a crime
that I **never** committed or **never** happened. This is also more proof of how they
**manufactured jurisdiction** over me. That is subjuect matter and personal matter.
Which the Supreme Court has **ruled** is **illegal** as ewll.

11. If these documents are not good enough for you. And to prove that your
very own cohorts/subordinates committed criminal offenses. I will submit as
**exhibit # 8** a copy of some pretrial transcripts. Wherein DEA agent Stallings
admits to these statements about me. Ended up **not** being true. Please compare

to the false statements that AUSA/Shea⌐er, Contreras, DEA case agent A.B Castaneda and others used knowingly in the Criminal Complaint **exhibit # 2**. This starts on pre-trial hearing of January 23,2004 transcript **1b pg 24 1n 6 thru pg 28 1n 20.** That they  originally believed these statements to be true at the time. Has no bearing on their **duty** to correct all of them. Once they all knew they ended up being false/untrue statements.

12. I will submit as **exhibit # 9** actual trial transcripts of **Jose Soto** admitting that he **lied** about his initial statements that he made and about me. In his initial debriefing of June 6,2002 in front of Cal Fowler, other DEA agents and AUSA/Shearer. He tells Judge Prado, who I had been  telling the whole time. That the govt. used known false statements about me and in order to  show my involvement. That he lied, because he was scared for his and his families life. But something that I really want to point out to you  in this **exhibit # 9,** Jose Soto **never** made any initial false statements about some guy named **Juan.** All you have to do is look at **exhibits 6 & 6(a)** to see whats wrong. What has happened here, is the govt. (AUSA/Contreras, DEA agents and others) have **tampered with evidence, altered the record on appeal** and have changed my name to some guy named **Juan.** I bet you, if you were to get the actual audio cassette tape and have it analyzed. You will see that the **trial record** has infact been **altered/ tampered** with. I have asked the court reporter for a copy  of these audio cassette tapes. So that I could support my  issue's on appeal with them. He has refused to afford me a copy of them. And instead wants to charge me thousands of dollars he knows I don't have. Before he will afford me a copy of them. This alteration of the record just proves what I am allegging/proving to you is **true.** Jose Soto said he got the keys from Rene Campos and Rene gets them from me, Jesse Ramirez. **NOt** some guy named **Juan.** Can you say violation of all of the statutes that I have already cited they have violated. The conspiracy  against my rights is still ongoing. This clear proof of Obstruction of Justice, more FRUAD has been **ruled illegal** by the Supreme Court. Yet, your subordinates and others have  commited these criminal offenses and others. Prado, AUSA/Contreras' **tag team** teammate was instrumental in smoothing this over for the DEA agents and AUSA/Contreras at trail. The word he used to describe the initial statements that JOse Soto made. **"incorrect".** Is a real nice way of saying they were **false/ perjured statements.** The proof is unfolding right in front of you and you **cannot** deny it. The question is, what are you  going to do about it and when?

13. This is not good enough for you. Ok, I will show and prove to you that these statements used to show my involvement and ect. Were **false/lies** and other

Dea agents and AUSA/Shearer knew them to be false. And **5 months** before A.B.
Castaneda/Case Agent and AUSA/Contreras (authors of this fraudulent criminal
complaint) used them on November 8,2002. Then used them again knowingly before
the Grand Jury itself and to obtain an indictment against me.

14. I will make as **exhibit # 10** a copy of Trial Testimony of JOe Dubois/DEA
agent. This is just one of the DEA agents that knew Jose Soto lied to him about
me. About who was the source for the 5 kilos Joso Soto was arrested for(please
refer to exhibits **6 & 6(a) and exhibit # 2**). On pg **1919 ln 20-22** proves the
DEA was investigating and targeting another group of people. **Not** related to
Jose Soto himself, Rene Campos, Alejandro Castillon and others. They had **no
idea** about Jose Soto or the above mentioned others on December7,2001(please
refer to **exhibit # 7 Dea-6 reports of the Arrest of Jaime Martins Olvera and
Jose Soto**). They **stumbled** over Jose Soto and these reports prove it. Also proving
that the statements in **exhibit #2** are false and fraudulent.

15. **pg 1920 ln 15-24** Jaime Martins was the target again. **Not,** Jose Soto, Rene
Campos, Alejandro Castillon of Jesse Ramirez. Plus, if JOse Soto told these
DEA agents on December 7,2001 that I, Jesse Ramirez was the source of those
5 kilos he was arrested for. Then why didn't Joe Dubois or other DEA agnets
who went to my shop arrest me on the spot? Joe Dubois personally spoke with
me and in regards to Jose Soto's truck.   Because the statements that A.B. Castaneda
and AUSA/Contreras (authors of this fraundulent complaint) used in the Criminal
Complaint. Are **infact** false/fraudulent and known to be(please refer to **exhibit
# 2 ¶ 4** and **exhibits 6 and 6(a) and this exhibit # 10**). This proves that the
govt. did use known false statement in the affidavit/Complaint. Something that
the Supreme Court **rule illegal** in **Franks v Delaware 438 US 154(1978)**. Plus
this constitutes violations of 18 § 1001, 1621, 1622, 241, 242 and many others.

16. Now I will submit as **exhibit # 11** Trial Testimony of Cal Fowler. Another
DEA agent who personally knew that Jose Soto lied about me and made known false
statemnts in his initial debriefing on JUne 6,2002. Gn **pg 1925 ln 24-25**, "they
could **not** get any information out of Jose Soto". This is a lie and known false
statement. In effect, AUSA/Contreras is allowing Cal Fowler to testify falsely
and has failed to correct it. The Supreme Court in **Giglio v U.S. 405 US 150(1972);
Napue v Illinois 360 US 264(1959)** has **ruled illegal. As** this constitutes a
Due Process violation and **mandates** an automatic reversal. "Due Process Clause
**forbids** the government from knowingly using or failing to correct false testimony"
**U. S. v Mason 293 F3d 826(5th 2002)**. They did infact get information out of
Jose Soto on his initial debriefing June 6,2002. Except, it was **all** false and
lies about me. Which then allowed the govt. to show my involvement. AUSA/Contreras

not only allowed this false testimony, he failed to correct it, suborned it
and through his line of questioning. Brought this false testimony out of **all**
of the govts./his witnesses. On **pg 1926 ln 6-10**, all 4 of these people mentioned.
Knew that Jose Soto made false statements about me and failed to correct them.
Which officers of the court, they have a duty to correct all of these known
false statements. That Jose Soto made against me on June 6,2002. On **pg 1927
ln 9-10.** These DEA agents made notes of this initial debriefing. Yet failed
to disclose them to me. Which the Supreme Court has **ruled illegal** in **Brady
v Maryland 373 US 83(1963).** This intentional suppression of these DEA agents
notes. Violated my Due Process rights. As these notes would prove for a fact.
That (1) Jose Soto made false statemtns about me in his initial debriefing
on June 6,2002; (2) All of these Agents and AUSA/Shearer knew of these false
statments; (3) these Agents and AUSA's then used them knowingly 5 months later
and did so with reckless disregard for the truth. This conduct (actions and
inactions) on the agents and AUSA's part. Constitutes criminal conduct and
a conspiracy against my rights. Violations of all of the statutes that I ahve
cited to. Your AUSA's are criminals, the DEA agents are also and so are many
others. That knowingly and willingly joined this conspiracy against rights.
17. On **pg 1927 ln 15-27.**Then how did these false statments get in the Criminal
Complaint? If they knew Joso Soto was **not** telling the truth. AUSA/Contreras,
Cruz-Zapata and the rest of the AUSA's in your office. Had/have a duty to correct
all of these known false statements. Right when they came to light. Surely
these false statements did not just fall from the heavens and land on this
criminal complaint by themselves. AUSA/Shearer knew Jose Soto made false statments
ablut me just as **exhibit # 6 pg 3 Of 4 ¶ 14** proves and this exhibit as well.
Jose Soto in **exhibit # 9 (**which this transcript has infact been altered/tampered
with by AUSA/Contreras and others) proves that Jose made false initila statments
about **me, Jesse Ramirez not** some guy named **Juan.**
18. On **pg 1929 ln 16-23.** This is how the govt was able to get Title III intercepts
at the State level. By using known **false** statements that Cal Fowler k owingly
gave to A.B Castaneda/Case agent. And whom Case agent/Castaned used knowingly
in the affidavit for State Intercepts. Without all of these lies/criminal offenses
that were used/committed knowingly. They could have **never** manufactured a conspiracy
nor jurisdiction over anyone of us. This conduct has been **ruled illegal** by
the Supreme Court.
19. On **pg 1933 ln 3-16** proof that Cal Fowler knew Soto lied about me initially
and **noted** this in **exhibit # 6** DEA-6 report of Jose Soto June 26,2002 **pg 3 of
4 ¶ 14.** HOw did this lie/false statment get in **exhibit # 2 ¶ 4?** If they all

knew these statements were false. But Cal Fowler is testifying falsely as well. AUSA/Contreras is allowing him to give known perjured testimony, he is illiciting it through his questioning and he is failing to correct it. The Supreme Court in **Giglio v U.S.** 405 US 150(1972) has **ruled** this conduct **illegal.** As it violates my Due Process right under the 5th amendment. Because Jose Soto **did** make false statements about me. That inculpated me and that I was involved with them in the drug business. Proof of this is in **exhibit # 2 ¶ 4 Criminal Complaint.** The conduct of Cal Fowler and AUSA/Contreras. Constitutes violations of 18 § 1621, 1622, 1001, 241, 242 **and others.** You Johnny Sutton have a duty under 28 § 544 & 547 to charge, indict, prosecute, convict and sentence these 2 people and many others. For the conduct they have engaged in rule illegal by the Supreme Court. Just as you did to those 2 Border Patrol Agents.

20. On **pg 1934 ln 6-15.** In the Doug Davis report **exhibit # 6(a) pg 2 of 7 ¶ 4.** Soto is now falsely stating that he has delivered 1 **kilo** of cocainne to me and at the order of Castillon. 5 kilos sure does sound better than 1 **kilo.** This should have never been an 841(b)(1)(A) conspiracy. Not only due to these lies. But due to the 1 **kilo** drug amount that Jose Soto is now falsely stating. Surely, the govt. using **half** truths should not be able to charge an 841(b)(1)(A) conspiracy. On pf 1936 ln 7-16 **more** lies/prejured testimony. Jose Soto **did** falsely tell the DEA agents who were debriefing him. That Campos did get his supply of cocaine from Jesse Ramirez(refer to **exhibit # 2 ¶ 4; exhibit # 9** altered/tampered **with Transcript of Soto's Trial Testimony.** On **ln 19-24 of pg 1936.** Soto did say initially that Campos got his supply of cacaine from me (refer to **exhibit # 2 ¶ 4; exhibit # 9.** AUSA/Contreras and A.B Castaneda/Case agent. Used these lies in **exhibit # 2** when they both **authored** this known fraudulent Criminal Complaint. **Exhibit # 6 Debriefing of Jose Soto on June 26,2002.** Proves that he made these false statements agisnt me initially on June 6,2002 (refer to **exhibit # 6 pg 3 Of 4 ¶ 14).** Because he recants those initial false statements on June 26,2002. The bottomline is this Johnny. Joe Dubois, CAl Fowler, A.B. Castaneda, Doug Davis, Javier Pena, Ken Peterson, and AUSA/Shearer. Knew that Jose Sotos initial statements about me were infact false. Becuase they were **all** present when Soto made these false statements. And a whole **5 months** before the authors of this fraudulent Complaint, A.B. Castaned and AUSA/Contreras. Used them knowingly in this fraudulent complaint on November 8,2002. Which allowed the govt. to show my involvement, to support probable cause, to justify my already unlawful arrest/**seizure** and to get me indicted. Their conduct constitutes violations of 18 § 1001, 1621, 1622, 1623,

241 **and** 242.

21. On **pg 1938 ln 20-25** is proof that the govt. had not initiated an investigation into Alejandro Castillon, Rene Campos, Myself and others. Or initiated "Operation Alacran" itself. As the Criminal Complaint **exhibit # 2 ¶ 2** falsely states that this case started in Sept. of 2001. As this further proves, this case is distinct from even Jose Soto's arrest and case with Jaime Martins-Olvera. Just as Cal Fowler correctly states this on **pg 1938 ln 23-25**. Their case involved his initial arrest.Since he had **never** made any statments to these DEA agents on Dec. 7,2001. As is falsely stated in **exhibit # 2 ¶ 4**. The **other** case that Cal Fowler is referring to. Is our manufactured case "Operation Alacran". This is when the investigation was initiated and Operation Alacran came into existence. In June of 2002. I told you your AUSA's and DEA agents have committed criminal offenses.

22. Now Cal Fowler is telling the **truth** again and on **pg 1940 ln 18-25**. This is correct, the DEA and AUSA/Shearer did **not** know about the Lydia De Alba drug seizure or that it was allegedly related to Alejandro CAstillon. **Until,** Jose Soto Told the DEA agents and AUSA/Shearer about her arrest and it being related to Castillon. On June 26,2002 and just as Fowler states on **ln 22**. Jose Soto's **First** debriefing took place on June 6,2002(refer to **exhibit # 6 pg 3 of 4 ¶ 14**). It was the second debriefing that Soto told the DEA and AUSA/Shearer about his knowledge about Lydia De Alba on Dec.62001(refer to **exhibit # 6 pg 3 of 4 ¶ 15**). **Yet,** the govt. knowingly and materially misrepresents (i.e. commits FRAUD, violations of **18 § 1001, 1621,1622, 241, 242 and others**) this in the Criminal Complaint **exhibit # 2 ¶ 3**. They are making it seem that they knew this all along and was a result of an investigation that revealed this. Why didn't they tell Magistrate Nowak the truth and how/when they found this out. Everything comes together real nice in hindsight and **after** the fact.

23. On **pg 1941 ln 7-10** " We had extensive surveillance on his buyer, Jaime Martins Olvera, **and** thats where we ran into Jose Soto". This is because the DEA and AUSA/Shearer. Were **not** investigating Jose Soto,Alejandro Castillon,Rene Campos or Jesse Ramirez. They were investigating Jaime Matrins Olvera. Further proof that Operation Alacran had not even come into existence. As these criminals falsely lead the Magistrate to believe. They just **stumbled** over Jose Soto and 6 months later after his arrest. He decided to **lie** about people and in order to lessen his culpability. the Supreme Court has **ruled** this **illegal** in **Lily, Lee,Bruton** and other circuit case law as well. I will let AUSA/Contreras put his foot in his mouth. When he tries to get out of his criminal conduct. The proof you willneed. Is in the DEA-6 reports that are in your possession.

16.

But , my question to you is this. How does AUSA/Contreras know that Jose Soto lied in his initial debriefing. If there was never a DEA-6 report generated. Due to the fact that they knew Jose Soto was lying? And how did AUSA/Contreras that Jose Soto falsely/lied stated that "he was driving frim Mexico"(ln 12). If they never generated a DEA-6 report and they didn't take much notes? Because, they did take notes, they did generate a DEA-6 report of Jose Soto's initial debriefing where he lied. It's just AUSA/Contreras illegall suppressed it from me and my defense. Something that the Supreme Court has ruled illegal. On ln 22-25 AUSA/Contreras illicits the truth. "But at that time , the investigation was moving quickly in the direction of Castillon and Mr. Campos, correct". This time being June of 2002. Not Sept. of 2001, not Dec. 6,2001, and not Dec. 7,2001. As exhibit # 2 fraudulently misrepresents.

24. On pg 1942 ln 19 thru pg 1943 ln 5. Cal Fowler proves that the statement in exhibit # 2 ¶ 4. Is infact a known false statement. But in the same moment he is committing perjury, AUSA/Contreras is suborning it and AUSA/Contreras is failing to correct it. Jose Soto never said on Dec. 7,2001 one word/false statement about Castillon, Campos or me(refer to exhibit # 6, 6(a) and exhibit # 7). Which prove that the conduct of Cal Fowler and AUSA/Contreras is criminal (i.e. violations of 18 § 1621, 1622, 241, 242 and others). Plus they are engaged in conduct that the Supreme Court has ruled illegal. Because this false, perjured testimony, the suborning of it and the AUSA's failure to correc it. Constitutes a Due Process Clause violation see Giglio v U.S. 405 US 150(1972); U.S. v Mason 293 F3d 826(5th 2002).

25. I will make the Trial Testimony of Doug Davis exhibit # 12. On pg 1951 ln 4-8. If Jose Soto never told him. Thenhow did that lie get into exhibit # 2 ¶ 4 Criminal Complaint. On pg 1952 7-17, Yet Jose Soto falsely testified at trial. That he took 40 kilos to my shop. AUSA/Contreras allowed this perjury from Jose Soto. Because he illicited it, suborned it and then failed to correct it. The Supreme Court has ruled this illegal and has called it a Giglio violation. Congress has also enacted a federal statute. That makes the conduct of Jose Soto and AUSA/Contreras criminal(i.e. violation of 18 § 1621, 1622, 241, 241 and others). On this same page ln 18 thru pg 1953 ln 23. Doug Davis proves that Jose Soto gave perjured testimony at trial. Jose Soto falsely stated that he had sold me many kilos of cacaine. Yet he never told this to Doug Davis at his 3rd and later debriefings(refer to exhibit # 6(a). This also proves that Jose Soto and AUSA/Contreras did engage in criminal conduct and violated all the criminal statutes cited above.

26 I have proven toyou in black and white. That they lied about me just to

show my involvement, support probable cause, to justify my already unlawful arrest/**seizure**, to obtain an indictment against me and to prove that an **841(b)(1)(A)** conspiracy existed. I have also proved to you that they were only able to obtain all of this. Through criminal conduct that they all knowingly engaged in. The ends does **not** justify the means. Our system is an **adversary** system. **Not** an inquisatory system. Not, lets arrest this guy onknown false statements, get caught red handed using them and then change up the lies with new ones to obtain an unlawful conviction against him.

27. I will make as **exhibit # 13** Trial Transcript Testimony of Jose Soto's attorney Collis White. Wherein he admits that Jose Soto **lied** in his initial debriefing and finally told the truth in his second debriefing on June 26,2002(refer to **exhibit # 6 pg 3 Of 4 ¶14 and exhibit # 6(a) pg 2 of 7 ¶ 4**). On **pg 2761 ln 7- 12.** He infact did **not** tell the truth. He **lied, lied** and **lied** again. On **pg 2762 ln 13-20.** MOre proof that he lied and his lies were about me being the source/supply of the cocaine he was arrested with on Dec. 7,2001. These lies were what allowed the govt. to show my involvement and nothing else. Without these false statments used knowingly in **exhibit # 2 ¶ 4.** I wouldn't have been dragged into this manufactured conspiracy.

*********************************************************************************

**This next part of this exhibit on pg 2763 ln 18-22 is something that one day real soon will be very important and is real important anyway. Due to the fact that Operation Alacran and the Joey Villarreal case. Are one in the same.**

*********************************************************************************

28. On this page and lines 18-22 mentioned above. Is proof that these cases are one in the same. Except, when your DEA agents and AUSA/Contreras **killed** 14 year old Ashley Villarreal in cold blood. And the fact that I was going to trial. Your AUSA/Contreras split/severed them. So that no one would know. That the result of **all** of this criminal conduct that your DEA agents and AUSA's Shearer, Contreras, Durbin, Cruz-Zapata others and **yourself** engaged in. Was Ashley Villarreals senseless death. Had it not been for these DEA agents and AUSA's using known false statements in the State Affidavit for Title III intercepts. They would have **never** made that July 2002 seizure from the Del Rio's. Then they would have **never** been able to obtain federal intercept authorization with these and more new lies in that affidavit. Then they would have **never** obtained the unlawful search and seizure of the 55 kilos at Roanoke on August 29,2002 at 12:35 am. Plus and more importantly. They would have **never** found the ledger books that had Joey Villarreals street name in them. Further, had your DEA agents and AUSA/Contreras not **lied** knowingly to Magistrate Nowak. In regards

to how they seized **all** of this evidence on August 29,2002 at Roanoke Apts.
and at 12:35am **without** a search warrant, probable cause or exigent circumstances.
Magistrate Nowak would have **never** signed off on the arrest warrant for Jose
Angel Garcia-Arguello on August 29,2002.And she would have **never** signed off
on the Criminal Complaint **exhibit # 2** that was used to obtian arrest/search
warrants on myself and others on November 8,2002. But moreso, the Supreme Court
has **ruled** that it is **illegal** for govt. officials to use evidence. That was
obtained **unlawfully**(with the use of known false statements), was obtained through
an unlawful search and seizure(kicking in a door at 12:35am, **absent** probable
cause, arrest warrant, search warrant and absent exigent circumstances). The
"fruit of the poisonous tree doctrine" prevents the use of this evidence. Had
your AUSA/Contreras who admitted in open court. To being personally present
when your DEA agents **unlawfully seized** those 55 kilos and ledger books that
had Joey Villarreals street name in them. **NOt** allowed others and himself to
make violations of **18 § 1001, 1621, 1622, 241, 242** and manyothers. Wherein
they lied to Magistrate Nowak about how this evidence was seized. Joey Villarreal
would have **never** been under anyinvestigation and Ashley Villarreal his **14** year
old daughter. Would have **never** been killed incold blood by your DEA agents.
29. As you are aware and in the same context of this Border Patrol case you
prosecuted. Govt. officials **cannot** use deadly force ina situation that **they**
have **created.** And then claim they were justified inusing deadly force. YOur
DEA agents and AUSA's **created** this whole situation that led to Ashley's cold
blooded death. Then, they committed more crimes(i.e. violations of **18 § 1001,
1621, 1622, 241, 241**and others)in order to cover up their initial crimes. Which
infact, makes you **entirely** responsible for all of these crimes they committed
and her negligent cold blooded killing. If youtry to say that you knew nothing
of this. Once you read this, you can **no** longer say that you are innocent. Because
when you fail to discharge your duites under **28 § 547** which **28 § 544** binds
you to. **You** will then be a co-conspirator, an aider and abettor, an accessory
after the fact, guiltyof misprison of felon and other criminal statutes.
30. As I have told AUSA/Contreras in a letter that he has received. The fact
that **death** has resulted from this criminal conduct. The least he is looking
at is a **life** sentence. That is if he doesn't get what he and the others deserve,
the **DEATH PENALTY.** Its on you Johnny Sutton and this is just the tip of the
iceberg. I hope that you do nothing as you are charged to do. It would be sweet
release, to see the **entire AUSA's** office in San Antonio. Meet the fate of your
late boss and be punished with life sentences for the criminal conduct you
all have engaged in. I hope that you even fail to initiate an investigation

into these **factual** allegations. That can and will be proven to you soon. If you do, do as you are charged and initiate an investigation. I ask that you call upon me. So that I can break their criminal conduct all down to you. In regards to how they made this criminal conduct work for them.

31. I am going to jump over to **pg 3-4 of exhibit # 2 Criminal Complaint/Defendant's Roles.** On **og 3** it starts off with the govt. observing me at the Roanoke address at about 9:55 pm. Yes, this is true and the trial testimony of myself, Castillon and Campos will substantiate this. However, the govt. (authors of this affidavit A.B. Castaneda/Case Agent and AUSA/Contreras). Have used know false statements here as well. On **pg 4 ¶ 2** in regards to the events on August 28,2002. I did go by the Roanoke address at about 8:42pm.And my cell phone records will prove this. However, I did not pull up to this address with Jose Angel Garcia-Arguello at any time. This is a known false statement. And had not Judge Prodo assisted AUSA/Contreras deporting Jose Angel out of this coutry. In July of 2003 and before I could get a sworn decleration from him. I would have prove that he was **never** with me, he **never** was in any vehicle I was driving, he **never** got out of themustang I was driving on that date and time. And that as a matter of fact. We did not even know each other. Jose Angel **was** going to testify on my behalf and to the **truth.** Which is why Prado and AUSA/Contreras(thegovt.). **Illegally** deported Jose Angel Garcia-Arguello back to Mexico. Before I would at least get a sworn decleration from him. The Supreme Court in **U.S. v Valenzuela-Bernal 458 US 858(1982).** ruled it was illegal for the govt. to deport a witness if the witnesses testimony is both material and favorable. There was no problem in me proving these Due Process vioaltion and Compulsory Process Violation(5th and 6th amend. violations). Jose Angel Garcia-Arguello was infact a fact material witness. (1) he was the only witness who could and would have testified to the **truth.** And prove that the statements that CAstaneda and AUSA/Contreras. Used knowingly in the Criminal Complaint **exhibit # 2 pg 4 ¶ 2.** Were infact false and known to be. (2) His testimony would not have been cumulative to anyone elses testimony for my defense.And he would have testified to him **not** ever being a passenger in any car that I drove before August 28,2002, on August 28,2002 or after August 28,2002. He also would have testified to the fact[s] that DEA agents and AUSA/Contreras **kicked** in the door to the Roanoke Apartment. **Absent** an arrest warrant, search warrant, probable cause and absent exigent circumstances. In effect committing a 4th Amend violation and then holding him a gun point(i.e. coerced, threatened and intimidated him into signing a consent for. After they had already unlawfully kicked in the door) and invol-untarily signed the consent form. The govt. using these lies allowed them to

> Exhibit #18 pg 16

show my involvement in this **illegal/unlawful** 55 kilo seizure. As you are more than aware "mere presence" or "hanging around" persons involved in an alleged conspiracy. Does not establish participation on a conspiracy; "evidence of **association** or **aquaintance** , though relevant, is **not** enough by itself to establish a conspiracy; mere presence and nervousness are **insufficient** to establish voluntary participation in a conspiracy to distribute narcotice; **U.S. v Herrera 263 F3d 1092(9th 2001); U.S. v Espino 317 F3d 788(8th 2003) and U.s. v Arnold 416 F3d 349(5th 2005)**. If you take all of these lies/false statements out of this Criminal Complaint **exhibit # 2**. It will show that I associated with these persons. As I had a lawful and legal **business** relationship with them(i.e. my business afforded them serives for their vehicles, farms, and other legal needs). It will also show that I was merely present at these location. However, I was **not** around when the govt. **illegally/unlawfully** seized these 55 kilos. Some **4 hours after** I had stopped by the Roanoke Apartment, knocked on the door, and left. Since **no** one answered the door whenI knocked on it.

32. The govt. (A.B.Castaneda/Case Agent and AUSA/Contreras authors of this Criminal Complaint) used know false statements in **exhibit # 2 pg 4 ¶ 3**. First off, agents had **never** determined that I had owned a business off of Basse Rd. If you refer to the Search Warrant. That was **not** for my Business on Basse Rd. But was **used** to inlafully enter my business. You will see that the **Address, location, description, type of business and described particular zone curtilage.** Was **not** even for my business at all. Ask AUSA/Contreras toshow you all of this documentation. And to tell you the truth. How due to all the lies of Jose Soto. They had no idea what my business name was, if my business was located off of Basse Rd and what kind of business I did. Infact, Jose Soto had **no** idea that I had **moved** my business to Basse Rd. He was already arrested and sitting in jail. By the time I moved to the Basse Rd. location. These false statements that the Authors of this Criminal Complaint are making. In regards to my business. Are inregards to my **old** 602 Everest business location. Are being made to intentionally misrepresent the facts and to use Magistrate Nowak as a **rubber stamper.** These material misrepresentations of the facts and omissions of material facts. Constitute violations of **18 § 1001, 1621, 1622, 241, 242** and others. This conduct has been **ruled illegal** by the Supreme Court see **Franks v Delaware 438 US 154(1978).**

33. The next use of known false statements is on the same pg and same paragraph. It states that Campos came by my shop in **my** BMW and then we drove off to a residence at 1326 White Rock. This is false and perjured statments. Also, AUSA/ Contreras allowed DEA agent Stallings. To testify falsely to this. Which constitute more violation of the statutes that Ihave cited to. First off, I was not even

in communication with Castillon or Campos. In September of 2002 and until we saw each other in Wackenhut in late November or early December 2002. Your DEA agents investigation will prove this, AUSA/Contreras could tell you the truth if he wanted to, phone records and intercepts prove we were not communicating, testimony at trialof Castillon and CAmpos will prove this and other evidence in your possession. Secondly, I had already **traded** that BMW to an Edward Leal (friend of mine who did not know Rene Campos). Who inturn gave that BMW to his ex- common law wife, Jackie Enriquez. Who infact lived at the 1326 White Rock address. Thirdly, I had not even been to that address at that time and had no idea that that address or house existed. It was not until almost 2 weeks before my unlawful arrest. Did I go by that address and with Edward Leal. Fourthly, I would **never** had loaned my BMW to Rene Capmos nor could have. Rene had his own **318i** BMW that was white like mine. Which is why they are lying and saying that it was Rene in my BMW. Plus, Edward Leal Had possession of this car already and had to my knowledge. Already given it to his ex wife. AUSA/Contreras allowed DEA agent Stallings to testify falsely to this. He also suborned it, illicited it and failed to correct it. Making the conduct of Stallings and AUSA/Contreras criminal violation of **18 § 1001, 1621, 1622, 241, 241** and others. Moreso, the Supreme Court has ruled in **Giglio v U.S. 405 US 150(1972) that** these constitute Due Process violations and therefore are illegal. As well as the **5th circuit** has ruled this conduct that AUSA/Contreras and Stallings engaged in. Is illeagl as it violates Due Process and **mandates** an automatic Reversal of the Conviction and Remand for a New Trial; **U.s. v Mason 293 F3d 826(5th 2002).**
34. **This is real important as well and proves the reckless disregard for the truth:**

On **pg 4 ¶ 4 of exhibit # 2 Criminal Complaint.** You will see how these AUSA's of your and your DEA agents. Were mindful and with willful **intent.** Falsely swore and made Jose Soto reliable and credible. Despite the **fact** that all of these person[s] DEA agent Joe DuBois, Cal Fowler, A.B. castaneda, Ken Peterson, Doug Davis,AUSA Shearer,Contreras,Cruz-Zapata and the Rest/entire office of Johnny K. Sutton, attorney Collis White and many others. Knew these statements about me, drug transactions at my **old** shop location, me being the source of the cocaine and other false allegations. Were **infact** false and known to be **5 months** before they used them. The record that I have just got done outlining. Proves that Jose Soto was/is still a liar.And that he was **not** credible and reliable. Please, please refer to and compare against each other **exhibit # 2, exhibit # 6 & 6(a).** Wherein Jose soto makes false statements about me initially on June 6,2002. Then he comes back on his 2nd debriefing June 26,2002 and recants

his initial false statements about me being the source(refer to **exhibit 6 pg 3 of 4 ¶ 14.** then on his 3rd debriefing on July 16,2001 **exhibit 6(a) pg 2 of 7 ¶ 4.** He states that he has delivered 1 **kilo** of cocaine to me at Castillons orders. When did he tell them lie to them about doing many multi kilo transactions with me? These reports prove that he **never** said that. Yet, these false statements are in this Criminal Complaint **exhibit # 2.** Where did these statements come from? I know exactly where they came for. they came from your DEA agent A.B. Castaneda and AUSA/Contreras(authors of this Complaint). Since Jose Soto lied about me initially and they used those lies in the Affidavit for State Title III intercepts(refer to **exhibit # 2 ¶ 5,** used them again in the Federal Affidavit for Title III intercepts and had already gotten away withusing these false statements. They figured, they have worked for us a few times already. Why not just use them some more/again. The bottom line is this Johnny Sutton. Without Jesse Ramirez and the false statements that they used about me knowingly/willfully. There would be **no** Operation Alacran at all. I was the piece that made it all work for them. This is only thanks to Jose Soto and his lies.

## AMENDMENT TO PARAGRAPH 34

The Supreme Court in **Franks v Delaware 438 US 154(1978) "Franks"** mandates the suppression of evidence obtained on the basis of an affidavit containing **knowingly false** information, and of evidence obtaied as a result of **material omissions."** This **entire** affidavit is nothing but known false statements and intentional material omissions.

"There must be a **nexus between the place to be searched and the evidence sought;** see **U.S. v Frazier 423 F3d 526 at 532[9,10](5th 2005).** In **exhibit # 2 pg 4 ¶ 4.** There was **no** nexus between Jose Soto's **false** statements and my **new** shop location. Jose Soto had **no** personal knowledge that I had moved my shop to the Basse Rd location. The false statements that he is making are in regards to my **old** shop location off of Everest Rd. Your AUSA's and DEA agents **KNEW** this and which is why. They **materially misrepresented** this in this Criminal Complaint and **omitted material facts** as well. Jose Soto was arrested on Dec.7,2001. I had moved my shop to 1139 Basse Rd. Bldg. # 5. In the beginning of January **2002.** "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought"; **Zurcher v Stanford Daily 436 US 547(1978).** Why do you think it is so, that your AUSA's & DEA agents. **Never** mention the **correct address** in this Complaint or the **name[s]** of my business'? Cause they knew that Jose Soto had lied to them and that he was **not** relieble. Which is why they committed this **FRAUD** and vouched for his credibility.Despite the fact that they knew he was **not** credible. Probable Cause did **not** exist in the Complaint on NEVEMBER OF 2002. And does **not** exist to this day, without these false statements.

I ask that you please refer to **exhibits 6 pg 1 of 4 ¶ 2.** Soto clearly states that he had taken his truck to my shop **"known to be 602 Everest".** This is the only shop location that Soto has ever been to or knows of.
I ask you to now look at **exhibit # 6(a) pg 1 of 7 ¶ 3** "Ramirez owns an auto window Tintingand Detail Shop in San Antonio, Tx which is **located** at **602 Everest Street,** San Antonio,Texas. **Not,** at **1139 Basse Rd. Bldg. # 5.** On pg 2 Of 7 ¶ 4. "The Performance Tint and Detail Shop **located** on Everest Street". A "nuetral and detached magistrate must review a search warrant before it can be executed". **Coolidge v New Hampshire 403 US 443, 450(1971).** In determining whether a warrant is supported by probable cause, "the courts **must....insist** that the magistrate

purport to perform his nuetral and detached function and **not** serve merely as a **rubber stamp for the police**! Leon, 468 US at 914(quotation omitted). The **defendant** carries the burden of proving that the issuing magistrate acted as a rubber stamp. U.S v Rodriguez-Sauzo 346 F3d 637, 649(6th 2003) cited in **U.S. v Frazier 423 F3d 526 at 537[18](5th 2005).** I ask that you take notice , that this Criminal Complaint **exhibit # 2** does not support probable cause. Without these known false statements. Next I ask that you **excise** all of these known false statements that I have proven are false and supported by these **exhibits.** As **Franks v Delaware 438 US 154(1978)** mandate be done. I next ask that once you have done that. That you take notice of the burden that I needed to prove. That the magistrate (Magistrate Nowak) was **infact,** used as a **rubber stamp. Lastly,** I ask that now that you have run accross evidence, **after the fact,** that cast doubt on my conviction(i.e. without these known false statements in this Complaint. I would have **never** been dragged into this or indicted) and probable cause to justify my already **unlawful seizure**/arrest. That you come under **Imbler v Patchman 424 US 409(1976)** which binds you ethically to your office. And move to correct this unlawfulness. By taking this directly to Magistrate Nowak. So that she can **correct** her erroneous finding of probable cause. As she to is **bound** under her duties and supporting case law to do and correct. So that **justice** may be **finally** served.

**Special Note:** 16A Am Jur 2d Constitutional Law § 246  **Principle of Seperation;**
One of the fundamental principles of the Amenrican constitutional
system is that the governmental powers are divided among the
three departments of government·-the legislative, executive; and
judicial~ and that each of these is seperate from the others.
The principle of seperation of the powers of government operates
in a broad manner to confine legislative powers to the legislature,
executive powers to the executive department, and those which are
judicial in character to the judiciary. The Constitution's central
mechanism of separation of powers depends largely upon a common
understanding of what activities are appropriate to legislatures,
to executives and to courts, and this separation of powers doctrine
**requires** the courts to leave intact the respective roles and regions
of independence of the coordinate branches of government. It is for
example, up to the legislatures, not the courts to decide on the
wisdom and utility of legislation: and federal courts rather than
administrative agencies, have the responsibility to resolve issues
of statutory construction.

**Article 1 § 1:** All legislative Powers herein grnated shall be vested in a Congress
of the United States, which shall consist of a Senate and House
of Representatives.

**Article II § 1:** The executive Power shall be vested in a President of the United
States of America. He shall hold his Office during the Term of
four Years, and. together with the Vice President, chosen for the
same Term, be elected as follows.

**Article 111 § 1:** The judicial Power of the United States, shall be vested in one
supreme Court, and in such inferior Courts as the Congress may
from time to time ordain and establish. The Judges, both of the
supreme and inferior Courts, shall hold their Offices during
good Behaviour, and shall, at stated Times, receive for their
Services, a Compensation, which shall not be diminished during
their Continuance in Office.

**16A Am Jur § 268:** The judiciary may **not** encroach upon, **share,** or usurp the executive
function, because the separation of powers doctrine **mandates** that
the judiciary remain independent of executive affairs, and **vice
versa.**

### The Violation[s] of the Seperation of Powers Act/Doctrine:

I Jesse Salazar Ramirez do swear under penalty of perjury. That AUSA/Contreras

did tell me, Jesse Ramirez. When he was trying to threaten me into taking

a deal/plea agreement. That AUSA/Contreras along with the rest of the AUSA's

from the Office of Johnny K. Sutton, the **entire** agency of the DEA in San

Antonio and its agents(A.B. Castaneda, Jason Stallings, Javier Pena, Cal

Fowler and etc.), along with the Federal Magistrates of that court(Magistrate

Nowak, Magistrate Primomo, and Magistrate Mathy), also the Federal District

Court Judges for that Court( Judge Biery, Judge Garcia, Judge Ferguson and

Judge Edward C. Prado a **Fifth Circuit Court Judge** to be). Were all his un-

beatable **tag team** team mates. He further said " You will **never** beat us Jesse,
we are **unbeatable**. Look how Primomo is going to deny you bond when we go
to your bond hearing. Judge Prado, he is on our side and he will **not** let
us lose this case. You don't believe me/us. Watch how we will convict you
and give you life."   . that this is all true to the best of my recollection.

dated: 9-17-07

Jesse Ramirez # 31805-180

1. There was no denying that I believed every word that he said and that
he meant it. I knew what they said about me in the Complaint was all lies
and yet. I was still being held without bond and illegally. However, as
true as this was. I was still not going to lay down for him, his DEA agents,
his Magistrates, his District Court Judges and his ace in the hole Circuit
Court Judge to be, Edward C. Prado( his unbeatable **tag team** team mates).
2. I always alleged it to Judge Prado and put it o the record as much as
I could. I just couldn't figure out a way to prove it, to get Prado to admit
to it or to have AUSA/Contreras admit to it either. And have them do it on the
record. So that the record will support what I was alleging.
3. I just knew that one day. AUSA/Contreras' **arrogance** would get the best
of him and it would finally come out. And sure enough it did and is on the
record. AUSA/Contreras refers to Circuit Court Judge Edward as just that.
His unbeatable "**tag team**" team mate.
4. I will submit as **exhibit # 14** a copy of the Trail Transcript. Of my co-defendant,
Alejandro Castillon. Wherein AUSA/Contreras admits that Circuit Court Judge
Edward C. Prado is his **tag team** team mate. And Prado through his **silence**
ratified what AUSA/Contreras stated on the record.
5. First off, AUSA/Contreras was wanting to make an impermissable inference
to the jury. Wherein, he was trying to use the fact that my codefendant
pleaing guilty. Was proof of my guilt as well. The Supreme Court in **Taylor v
Commonwealth of Kentucky 436 US 478(1978) ruled** this is **illegal**. But AUSA/Con-
treras was confident that his **tag team** tam mate, Judge Prado. Was going to let
him get away with it. Just as he told me that Prado was **not** going to let the
govt. lose this case. Because they were **all** part of the same unbeatable team.
6. Judge Prado was already a Circuit Court Judge. As well, he knew that this
was an **impermissable** inference. That his **tag team** team mate AUSA/Contreras was
trying to make. On **pg 2108 ln 6-15 exhibit # 14** is all the proof **anyone** would
need to see. In order to verify that Judge Prado had infact **tag teamed** up with

27.

AUSA/Contreras. In effect, Circuit Court Judge Prado. Abandoned his judicial role, and combined his judicial power with that of the executive power. Of the Asst. United States Attorney's office in San Antonio. Namely, the Office of **Johnny K. Sutton** and his assistants.

7. On **pg 2108 ln 15 of exhibit # 14.** Says it all "T..A..G..  T..E..A..M..". This is exactly what it was. If you were to review the **entire** record. You will see that judge Prado ruled in favor of AUSA/Contreras every time. Wherein he ruled **contrary** to the facts and ruled **contrary** to controlling circuit, Supreme Court and contrary to his very own decisions he was writing.

8. On **pg 2109 ln 4-16 of exhibit # 14.** You will see that AUSA/Contreras is preparing to make this impermissable inference to the jury. The impermissable inference that the Supreme Court has ruled illegal. Prado overrules my lawyer Alex Scharf again, **ln 8.** Alex Scharf requests a jury instruction in accordance with **Taylor, ln 9-10.** AUSA/Contreras, Prado's **tag team** team mate reminds Prado that Alex Scharf has aready objected and that Prado sustained his objection, **ln 11-12.** Prado denies Alex Scharfs request for a jury instruction. Which is in direct contradiction/non compliance with **Taylor.** And then clears the way for his **tag team** team mate to continue, **ln 16.**

9. Judge Prado even went as far as **altering** the record and **tampering** with evidence for his **tag team** team mate AUSA/Contreras. I will attachas **exhibit # 15** a copy of the search warrant. That was **not** for my business on Basse Road. But that the govt. used anyway to enter my business unlawfully. If you view this exhibit, you will see that the search warrant clearly states "Auto Sports E.C., 1139 Basse Rd., a used car dealership and it clearly describes the location and the protective zone curtilage. Which are requirements of the 4th amendment.

10. Now, I will submit as **exhibit # 16** documentation that proves that the name's of my business's are **not** Auto Sports E.C., that I do **not** own a used car dealership, that, that the description of my business is **"not"** what is described with particularity on the search warrant and the protective zone curtilage that is described withim the fence and cinder block wall. Is not for my business's at all.

11. You will see that the names of my business's are clearly documented/registered with the City of San Antonio, the County of Bexar and that are clearly located at **1139 Basse** "BLDG. # 5". **Not,** 1139 Basse Road or 1131 Basse Road. Which is the correct address for Auto Sports E.C..

12. I will submit a copy of Judge Prado's ruling on my suppression motion. Wherein, Prado **alters/changes** the address on the search warrant that is not for my business' at all. Through his Order and Ruling and for his **tag team** team mates. So that they could be able to use **unlawfully seized** items against me at trial. Items

that were not illegal, were not used for drug trafficking or any other illegal
activity. But the govt. twisting things around. Made them seem like they were
tools of a drug dealer.

13. If you look onthe **1st pg** of what I will make **exhibit # 17 Order & Ruling
On Suppression MOtion.** You will see that Prado's ruling is totally erroneous.
Because, there were and are infact. Known false statements in this Criminal
Complaint Affidavit. They were also used **knowingly, intentionally and willfully.**
Please refer to **exhibits # 2, # 6, 6(a)** and the rest of them. That prove that
your AUSA/Contreras and Case Agent/A.B. Castaneda(authors of this Complaint)
used these lies in this Complaint.

14. On **pg 2** of this exhibit. You will see on the top of this page. Where Prado
**altered/changed** the address for his **tag team** team mate. The address is now
1139 Basse Rd., **Bldg. # 5.** Wherein Prado states that the govt. can use the evidence
that was seized at 1139 Basse Rd., **Bldg. # 5.** He relied on the good faith exception
under Leon. This address is **not** the address on the actual search warrant(refer
to **exhibit # 15**).

15. To further support that this **tag team** existed. And that Prado was going
to bail out his **tag team** team mate AUSA/Contreras. Every chance he had and as
AUSA/Contreras told me he would. I will submit as **exhibit # 18** copies of a pre-trial
hearing on September 17,2003. Wherein, I proved to Judge Prado that the search
warrant that was used to enter my business' unlawfully. Were **not** for either
of my business' and that the warrant did **not** meet the requirements of the **4th**
amendment. He said he could do something about it. If what I was telling him
was true. I proved it to him and he ended up ignoring the proof in black and
white. That I presented to him on that day. Just like AUSA/Contreras told me
he would do. AUSA/Contreras was 100% right and Prado bailed his **tag team** team
mates out of a big one. I will let you read this documentation. That also proves
that your AUSA/Contreras sat by in silence and infact. Presented this fraudulent
evidence to the court.

Honestly Johnny K. Sutoon, I don't expect you to anything about these criminal
offenses. Committed by your very own AUSA's, DEA agents and Prado himself. I
suspect that you will turn a deaf ear to the truth. So that you can protect
your Office and name. As you are the one who is **entirely responsible** for their
conduct. Which the Supreme Court has ruled is so. You want to sit up there in
front of these Senators. And make it seem that you have a duty to enforce the
law. As the Supreme Court has ruled and as the statutes mandate. Well, here
is another opportunity for you to discharge your duties under **28 § 547 and 28**

544. What is it going to be Johnny? Are you going to sit there and ignore these facts that I have proven to you in black and white? This is just the tip of the ice berg. Unfortunately, I have spent my time incarcerated in prison unjustly. Combing over all these DEA-6 reports and other documents. In order to figure out how your AUSA's and DEA agents. **Manufactured** a conspiracy adn **Jurisdiction** out of their criminal conduct. And that, I have managed to do. Therefore I ask you to initiate an investigation into these criminal offenses by your very own AUSA's, DEA agents and Judges you have worked with for many years. I ask that you then charge these criminals accordingly, indict them for their criminal conduct, prosecute them fully and punish/sentence them to the fullest application of the law and statutes. Due to the **fact,** that **death** has resulted from their criminal conduct(i.e. when the DEA shot and killed poor 14 year old Ashley Villarreal in the beginning of 2003). I ask that you seek the **death penalty** for the Principles of this conspiracy against our rights and criminal conduct used against us. In order to deprive us (Ashley included) of **life, liberty** and **justice.** As you are more than aware. Operation Alacran and the Joey Villarreal case. Are **infact, One** in the **Same** case. These Principles would be AUSA/Contreras,Shearer,Cruz-Zapata, Durbin, DEA agents A.B.Castaneda, Joe Dubois,CalFowler, Ken Peterson, Jason Stallings, Javier Pena, Magistrate Judge Nowak, Primomo, District Judge/Circuit Judge Prado, Biery and others to be named. This is your duty Johnny K. Sutton (please refer to **attachment A** to remind yourself so). I would also like to inform you. That I will be more than willing and available. To assist you in this inve- stigation. As there is **nobody** who knows more of their criminal conduct and this case but me. I don't think that AUSA/Contreras and the others. Will be willing to  incriminate themsleves and their coconspirators. Look how much time has passed. That not one of them has come clean and upheld their oath and duty.

9-17-07

Sincerely

Jesse Ramirez # 31805-180

P.S. I want to give you a copy of a letter that I sent you AUSA/Contreras recently, I will make **exhibit # 19.** This letter informs him that I have not forgotten. How he and his unbeatable **tag team** team mates  Destroyed my and my families life, With all of the lies they used about me  And the criminal conduct that they had to engage in, In order to make it all work for them  I told him that since **death** resulted from his/their criminal conduct. That they are looking at **life** if not the **death penalty** sentences. This was since, I planned on charging him/them under the **RICO** statutes. This next exhibit that I will make **exhibit # 20.** Will prove how his **guilty** conscience got the best of him  And proves that what I am saying/alleging is **true**  He called up here to USP/Pollock and

30.

spoke with my case manager/Mrs. Deville. He also faxed up herelegal and lawful documents. That he misrepresented to her as being threats and extortion. Wherein AUSA/Contreras is fully aware. That these documents that I sent to the Bauerleins in October of 2006. While I was designated to USP/Beaumont. Are infact legal and lawful. And that are in accordance with Texas Civil/Contract/and Criminal law. He asked and **ordered**. Case Manager/Deville and other USPP/Pollock officials. To issue me an Incident Report based off of these known material misrepresentation and omissions of material facts(i.e. FRAUD ). In an attempt to deny me access to the court(please refer to **exhibit # 19**, where I am telling him that we are fixing to get to a courtroom where I will finally have my chance to expose his and others criminal conduct). Whereby  he was hoping that these BOP officials would lock me up in the SHU(hole), confiscate all of the legal documents I will need to obtain access to the courts and expose him/others. and get me transferred to another facility. The whole time disrupting my access to the courts and in all actuality. Depriving me of my Constitutional rights to access to the courts for a redress of grievence **1st amend. right**. Which will then prove to you: That AUSA/Contreras/others and new accomplices. Are still conspiring against my rights. Clear violations of **18 § 241 and 242**. The reason[s] why he doesn't even think about filing charges against me and obtaining an indictment as well. Is because he knows that I am within the laws of Texas, he knows that the Bauerleins have only obtained ownership of my house. Through **Conversion/Theft/ Fraud** and etc. He also knows that he **cannot** afford to even think about getting me in **any** courtroom. Because **all** of his criminal conduct and the truth will finally come out. If you look at **exhibit # 20** you will see that his name is all over it. And that this fraudulent Incident Report. Was initiated at AUSA/ Contreras' request/orders. Why would AUSA/Contreras ask BOP officials to do his dirty work for him? Yournot stupid or blind Johnny K. Sutton. You see exactly what is happenning here. As I am in the process of filing civil/criminal complaints against your AUSA/Contreras. He knows he can't allow me to file these civil/criminal complaints. In effect, he is **Obstructig Justice,/Tampering with Witness aganist him/others/** he is committing **FRAUD 18 §1001 through his electronic fax/** Wire Communication offense as well and other criminal conduct. As the record will prove. I have already filed one of my civil complaints. I am in the process of sending out this week. The first of my criminal complaints and will follow up with another civil complaint. How much more proof do you need of your AUSA/ Contreras engaging in criminal conduct? This is nothing and I can show that their criminal conduct is still on-going. Through this very day and time. I want you to ask AUSA/Contreras. When he will initiate criminal charges. Against Jessica Renee Rangel, Steve Aycock, Lori Charles, Mrs. Reyes and others. For their **Conversion** of the property that legally/lawfully belongs to me and my two minor daughters. Which they were only able to do through the **FRAUD** they committed to the banks, mortgage companies and others. Tell him to show you the documents that prove this and that he is/has been knowledgeable. That these people have engaged in criminal conduct. Conduct that he has a duty to prosecute under **28 § 544 and 28 § 547. He** knows that they have fraudulently deprived me of **life/liberty and "proprerty"**..In effect, conspired agaisnt my rights as well. Through his intentional failure to charge themand assist me/the girls in obtaining what is rightfully/legally ours. He has committed offenses of **18 § 2, § 3, § 4** and others. As it has been alleged that **he** AUSA/Contreras. Is the one who has **counseled** and given these criminals advice. On how they can get away with **not** returning this property to its rightfulowner[s].

3l.

STANDARD FORM 61
Revised June 1986
U.S. Office of Personnel Management
FPM Chapter 296
61-108

ATTACH. A

FILED
NOV 1 9 2001
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

# APPOINTMENT AFFIDAVITS

| UNITED STATES ATTORNEY | 11-14-2001 |
|---|---|
| *(Position to which appointed)* | *(Date of appointment)* |

| DEPARTMENT OF JUSTICE | US ATTORNEY'S OFFICE | WDTX, SAN ANTONIO TX |
|---|---|---|
| *(Department or agency)* | *(Bureau or Division)* | *(Place of employment)* |

I, _____ JOHNNY K. SUTTON _____ , do solemnly swear (or affirm) that----

## A. OATH OF OFFICE

I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God.

## B. AFFIDAVIT AS TO STRIKING AGAINST THE FEDERAL GOVERNMENT

I am not participating in any strike against the Government of the United States or any agency thereof, and I will not so participate while an employee of the Government of the United States or any agency thereof.

## C. AFFIDAVIT AS TO PURCHASE AND SALE OF OFFICE

I have not, nor has anyone acting in my behalf, given, transferred, promised or paid any consideration for or in expectation or hope of receiving assistance in securing this appointment.

_____
*(Signature of appointee)*

Subscribed and sworn (or affirmed) before me this ___19th___ day of ___NOVEMBER___ , 2001 ,

at ___AUSTIN___ ~~SAN ANTONIO~~
*(City)*

TEXAS
*(State)*

LINDA D. MIZELL
[SEAL]
Notary Public, State of Texas
My Comm. Exp. 02/14/03

_Linda D. Mizell_
*(Signature of officer)*

_Notary Public, State of Texas_
*(Title)*

Commission expires ___2/14/08___

*(If by a Notary Public, the date of expiration of his/her Commission should be shown)*

NOTE.- *The oath of office must be administered by a person specified in 5 U.S.C. 2903. The words "So help me God" in the oath and the word "swear" wherever it appears above should be stricken out when the appointee elects to affirm rather than swear to the affidavits; only these words may be stricken and only when the appointee elects to affirm the affidavits.*

Prior Edition Usable

This form was electronically produced by Elite Federal Forms, Inc.

Exh. #1

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 2

| Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| XW295  #ID-100 | | | M2-02-0005 | YNC1A |

| 5. By: S/A NANCY SANFORD | 6. File Title |
|---|---|
| At: SAN ANTONIO DO | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |

| 7. ☐ Closed   ☐ Requested Action Completed | 8. Date Prepared |
|---|---|
| ☐ Action Requested By: | 11/12/02 |

9. Other Officers: ASAC JAVIER PENA, S/A JOE DUBOIS, AANTS TFO'S JOHNNY GRAY AND JOE RODRIGUEZ, HOLLYWOOD PARK OFFICER ROBERT CLINE, BADGE#976

10. Report Re: ARREST OF JESSE SALAZAR RAMIREZ

## SYNOPSIS

On November 8, 2002 Officers and Agents of the San Antonio District Office of the Drug Enforcement Administration arrested Defendant Jesse Salazar RAMIREZ pursuant to the issuance of a Federal Arrest Warrant charging him with violation of Title 21 United States Code, Section 841(a)(1).

## DETAILS

1. On November 8, 2002, at approximately 5:30am, Defendant Jesse Salazar RAMIREZ was arrested at Highway 281 and Donnela Drive, San Antonio, Texas by Hollywood Park Officer Robert Cline pursuant to the issuance of a Federal Complaint and Arrest Warrant, charging him with violations of Title 21 United States Code, Section 841(a)(1), Possession of a Controlled Substance with Intent to Distribute same.

2. At the time of his arrest, RAMIREZ was driving a 2000 Ford F-150 pickup, Texas License Plate 4GP-G65 and in possession of a loaded Kimber semi-automatic .45 caliber handgun, serial #21536, and a Browning 300 Mag. Rifle, serial #40737MM351. AANTS Task Force Officer Joe Lopez seized these weapons from RAMIREZ, along with $431.00 in US currency, a Rolex watch, keys, cell phone, and other miscellaneous documentation. Task Force Officer Joe Lopez subsequently released the above described weapons and other Potential Non Drug Evidence to S/A

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division HOUSTON | Nancy Sanford | 11-26-02 |
| | NANCY J. SANFORD, S/A | |
| District | 14. Approved (Name and Title) | 15. Date |
| | MIKE MCDANIELS | 12-3-02 |
| Other   EAGLE PASS RO, EPIC, SA | GROUP SUPERVISOR | |

A Form   - 6
. 1996)

NJS
1 - Prosecutor

### DEA SENSITIVE
Drug Enforcement Administration

AUSA

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No.<br>M2-02-0005 | 2. G-DEP Identifier<br>YNC1A |
|---|---|---|
| *(Continuation)* | 3. File Title<br>SIXTOS, SALVADOR | |
| 4.<br>Page  2  of  2 | | |
| 5. Program Code<br>H1D-100       SWTXW295 | 6. Date Prepared<br>11/12/02 | |

Nancy Sanford for safekeeping. Task Force Officer Joe Lopez advised
RAMIREZ of his constitutional rights as witnessed by Officer Cline.

3. On this same date RAMIREZ appeared before a Federal Magistrate in the
Western District of Texas for an initial appearance. United States
Magistrate Nancy Nowak held RAMIREZ without bond pending a detention
hearing.

4. S/A Sanford maintained care, control, and custody of the .45 caliber
handgun and the 300 Mag Rifle until releasing to AANTS Officer Johnny
Gray for processing on 11-12-02 . In addition, S/A Sanford maintained
custody of the above-described Potential Non Drug Evidence until
releasing to S/A Jason Stallings for processing and safekeeping on 11-
22-02.

## INDEXING

..RAMIREZ, Jesse Salazar – Naddis 4894158



DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**1 - Prosecutor**

AO 91 (Rev. 5/85) Criminal Complaint

*Exh. 12* *Filed* *11-8-02*

Clerk, U. S. District Court
Western District of Texas

By _____
Deputy

# United States District Court

WESTERN **DISTRICT OF** TEXAS

UNITED STATES OF AMERICA

**V.**

ALEJANDRO NOE CASTILLON, ~~ETAL~~ *Rene Campos*
*Charles Cruz*          *Salvador Castillon*
*Edward Scot Lopez*      *Reynaldo Hernandez*
*Jesse Salazar Ramirez*  *Lori Ann Hernandez*
(Name and Address of Defendant) *Hector Del Rio - Rodriguez*
            *Jose Zaragoza Garza-Del Rio*

**CRIMINAL COMPLAINT**

CASE NUMBER:    SA 02-570M

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____ August 28, 2002 _____ in _____ Bexar _____ county, in the

_____ Western _____ District of _____ Texas _____ defendant(s) did, (Track Statutory Language of Offense)

conspire to distribute and possess with intent to distribute more than five kilograms of cocaine

in violation of Title _____ 21 _____ United States Code, Section(s) _____ 841(a)(1) and 846 _____.

I further state that I am a(n) _____ Special Agent, D.E.A. _____ and that this complaint is based on the following
                                        Official Title
facts:

SEE ATTACHMENT A

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

11-08-2002                                    at    San Antonio, Texas
Date                                                  City and State

NANCY STEIN NOWAK, UNITED STATES
MAGISTRATE JUDGE                              _____
Name & Title of Judicial Officer             Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

000001

**ATTACHMENT A**

OVERVIEW

Affiant is a Special Agent with the Drug Enforcement Administration (DEA). Affiant is presently assigned to an investigation code-named Operation Alacran and is personally familiar with all of the facts in this affidavit. The details of the investigation are as follows:

In September 2001, a confidential informant provided information to D.E.A. agents that identified Alejandro Noe Castillon as a cocaine trafficker who headed an organization that smuggled cocaine from Eagle Pass to San Antonio, and on to Dallas, Missouri, Wisconsin, and Illinois. "Operation Alacran" was initiated as a investigation focusing on this drug organization.

On December 6, 2001, Border Patrol agents stopped a Ford Explorer driven by Lidia E. De Alba, at the Eagle Pass checkpoint. Approximately twenty-four kilograms of cocaine were seized from a false compartment in the gas tank. De Alba was interviewed and said that she had been asked to drive the Explorer to San Antonio by her boyfriend Reynaldo Hernandez. Reynaldo Hernandez is the registered owner of the Explorer. A receipt found in the Explorer showed that Rene Campos had sold the Explorer to Hernandez. Agents also recovered handwritten notes with the name of Alejandro Noe Castillon and Castillon's cell and home telephone numbers.

On December 7, 2001, undercover D.E.A. agents posing as cocaine buyers, bought five kilograms of cocaine from someone who was arrested and identified his source as Jose G. Soto. Soto was lured into meeting the agents to pick up the payment for the cocaine and was arrested. Soto was interviewed and identified his source of supply as Rene Campos. Soto said that Campos got his supply of cocaine from Jesse Salazar Ramirez. At the time that Soto was arrested attempting to pick up payment for the cocaine, he was driving a vehicle registered to Alejandro Noe Castillon, and had left his own vehicle at the business of Jesse Salazar Ramirez.

On June 14, 2002, a state wire interception was begun on a telephone used by Castillon. The interceptions showed a pattern of smuggling to Missouri and Chicago, and return trips with cash proceeds. On July 1, 2002, Castillon was intercepted speaking to Jose Zaragoza Garza-Del Rio and Hector Del Rio-Rodriguez about nineteen kilograms that Garza-Del Rio and Del Rio-Rodriguez were transporting. As a result of this interception, local police in San Antonio stopped Garza-Del Rio and Del Rio-Rodriguez as they drove a vehicle; nineteen kilograms of cocaine were seized. Garza-Del Rio and Del Rio-Rodriguez were arrested on state drug charges, released on bail, and promptly fled to Mexico. During the state interception, Castillon was intercepted numerous times discussing the distribution of cocaine and the collection of cash proceeds.

On August 21, 2002, a United States District Court for the Western District of Texas authorized interception of cellular phones associated with the Castillon organization. Since that date, authorization for seven cellular telephones used by this organization has been granted at various times from August 21 to the present. Affiant has reviewed transcripts of the calls intercepted and a pattern of calls was identified. Alejandro Noe Castillon or Rene Campos would direct Reynaldo Hernandez to make a trip to San Antonio. Hernandez would drive to San Antonio, making calls to Castillon, Rene Campos, and his wife, Lori Ann Hernandez, as he traveled. When he arrived in San Antonio he would call Rene Campos and let him know he had arrived.

On August 26-27, 2002, Reynaldo Hernandez, Alejandro Noe Castillon, and Rene Campos

1

made a series of calls to each other that indicated that Hernandez was transporting eighteen kilograms of cocaine from Eagle Pass to San Antonio on August 27. Hernandez was observed by agents as he traveled from Eagle Pass to San Antonio on August 27. Hernandez and Lori Ann Hernandez spoke several times as he was traveling. During one call Lori Ann asked Reynaldo if he had sprayed to hide the odor. She also asked if he had used the "red" one. Hernandez was under surveillance and was observed as he pulled his pickup into a garage at the Roanoke Apartments, Apartment 401, 7930 Roanoke, San Antonio, Texas, at about 9:00 PM. Jesse Salazar Ramirez was observed arriving at and entering the apartment at about 9:55 PM. Rene Campos was also observed arriving at the location.

On August 28, 2002, intercepted calls indicated that Reynaldo Hernandez was transporting cocaine to San Antonio. On August 28, agents observed Jesse Salazar Ramirez arrive at the Roanoke location and drop off Jose Garcia-Arguello at Apartment 401. Later that day, agents saw Reynaldo Hernandez drive a pickup from Eagle Pass to the Roanoke location. Rene Campos then arrived at the apartment and Reynaldo Hernandez was heard making a call to Lori Ann Hernandez telling her that they were going to put the "thing" in the house. Rene Campos and Reynaldo Hernandez then drove away from the location, leaving the pickup in the garage.

A short time after Campos and Hernandez left the Roanoke apartment, police officers obtained written permission to search the apartment from the sole occupant of the apartment, Jose Garcia-Arguello. The officers recovered an electronic money counter, several vacuum sealers, drug ledgers, fifty-five kilograms of cocaine, and four assault rifles in the apartment. A search of the pickup truck Reynaldo Hernandez had driven from Eagle Pass and parked in the garage, revealed a red bottle of deodorizer.

On September 17, 2002, Alejandro Noe Castillon was intercepted asking "Martha" if "Chava" was finished with the count. A short time later Alejandro Noe Castillon was intercepted telling his brother, Salvador Castillon-Saucedo (Chava) to go to Mexico. Local Eagle Pass were asked to conduct a stop of a car Chava was driving and a consensual search resulted in the seizure of approximately $201,000.

Interceptions between Lori Ann Castillon and Alejandro Noe Castillon indicate that on September 28, 2002, Reynaldo Hernandez and Lori Ann Hernandez drove a load of cocaine from Eagle Pass to San Antonio.

On October 1, 2002, Alejandro Noe Castillon was intercepted directing Reynaldo Hernandez to go to San Antonio and meet with Rene Campos. Surveillance units observed Hernandez leave his house in Eagle Pass and drive to San Antonio. During the trip, Hernandez was intercepted asking Alejandro Noe Castillon if there was any problem with meeting Rene Campos in Seguin. Hernandez then called Campos and asked Campos to meet him at Hernandez' sister's house in Seguin. Hernandez drove near his sister's house and waited. Hernandez was picked up by his sister's husband who drove him to the husband's house in Seguin. Rene Campos arrived at the residence, met with Hernandez, and left a short time later. Rene Campos was followed by agents and a traffic stop was conducted in which Campos was positively identified. As Hernandez drove back to Eagle Pass, on October 2, 2002, he was overheard talking to Lori Ann Hernandez. The conversation indicated that Hernandez was transporting something small. A traffic stop was conducted in Eagle Pass and $83,260 was seized from Hernandez' car. Hernandez claimed he knew nothing about the money and was released.

2

On October 28, 2002, surveillance of Alejandro Noe Castillon's Eagle Pass home showed a large pickup truck there. Previous conversations had been intercepted in which Castillon and Estbeban G. Garza, Jr, a/k/a "Charro," has discussed buying a new pickup. This pickup seemed to match their description of it. Garza was followed as he drove the pickup from Eagle Pass to San Antonio. A state trooper stopped the truck in Frio County. A consensual search revealed approximately ten kilograms of cocaine hidden under the back seat.

On October 31, 2002, agents observed Rene Campos meet with someone in a parking lot. The agents followed the person with whom Campos had met to at 1139 Highland, in San Antonio, Texas. Agents went to 1139 Highland and Rene Cota answered the door and gave agents consent to search the residence. Ramiro Rabago-Figeroa was also present at the house and he gave consent to search also. The agents found approximately two kilograms of cocaine, a pound of methamphetamine, and an ounce of heroin in the house.

## THE DEFENDANTS

### ALEJANDRO NOE CASTILLON

This Defendant has been intercepted numerous times discussing cocaine shipments. The Defendant was intercepted as he directed Reynaldo Hernandez to transport shipments of cocaine from Eagle Pass to Texas on three occasions in August 2002. The Defendant was observed meeting with Reynaldo Hernandez shortly after Hernandez arrived in San Antonio on August 28, outside the organization stash house at Apartment 401 of the Roanoke Apartment. The apartment was searched a short time later and fifty-five kilograms of cocaine were seized.

### RENE CAMPOS

This Defendant was intercepted assisting Reynaldo Hernandez make three trips from Eagle Pass to San Antonio in August, 2002. Affiant read the translated transcripts of the calls and heard Hernandez and this Defendant speak as Hernandez arrived in San Antonio. Hernandez would instruct this Defendant to open the gate or let him in. Agents observed that the stash house at the Roanoke apartments was protected by a gate that required the entry of code to enter the apartment complex. Upon entering the complex and approaching Apartment 401, the garage door to the apartment was be opened by someone in the apartment. This Defendant allowed Hernandez to enter the complex and then the garage with the vehicle loaded with cocaine. Agents also observed Hernandez meeting with ~~Hernandez, Jesse Salazar Ramirez, and Alejandro Noe Castillon~~ Campos outside of Apartment 401 shortly before the apartment was searched and fifty-five kilograms of cocaine were recovered.

### JESSE SALAZAR RAMIREZ

On August 27, 2002, in the evening, agents intercepted calls between Reynaldo Hernandez and Rene Campos as Hernandez traveled from Eagle Pass to San Antonio. Hernandez kept Campos informed of Hernandez' location and called Campos to say that he had arrived at the Roanoke stash house. Hernandez was observed by agents when he arrived at the stash house at approximately 9:00 PM. Hernandez parked his pickup in the garage to Apartment 401. Hernandez and Campos were seen leaving in the same pickup at about 9:15 PM. This Defendant was observed by agents as he

3

arrived at the stash at about 9:55 PM in the Defendant's white Ford Mustang. The Defendant then entered Apartment 401. Alejandro Noe Castillon was intercepted as he called Reynaldo Hernandez and Rene Campos at about 10:03 PM. Castillon asked Campos if Campos was ready and Campos replied yes. Hernandez and Campos returned to Apartment at approximately 10:15 PM and went inside. At 10:40 PM Hernandez and Campos were seen putting something into the cab of the pickup and driving off together in the pickup. This Defendant drove from the location in the Mustang at the same time as Hernandez and Campos.

On August 28, 2002, at about 8:16 PM, agents intercepted a call between Reynaldo Hernandez and Alejandro Noe Castillon in which Hernandez told Castillon that Hernandez was on his way from Eagle Pass to San Antonio. At about 8:42 PM, agents observed this Defendant drive up to Apartment 401 of the Roanoke Apartments in his Mustang. The Defendant parked in front of the garage of Apartment 401. Jose Garcia-Arguello, who was a passenger in the Mustang, got out to the Mustang and entered Apartment 401 through the front door. The Defendant then got out of the Mustang and was seen talking on his cell phone. The Defendant then got back into his Mustang and drove away. Reynaldo Hernandez arrived at the apartment at approximately 11:05 PM and called Rene Campos to ask that someone let him in the apartment. At about 12:37 AM police entered Apartment 401 and subsequently seized about fifty-five kilograms of cocaine.

On September 26, 2002, at about 2:00 PM Castillon was intercepted as he called Campos and told Campos to gather everything he had and bring it to Castillon. Based on a review of the hundreds of intercepted calls, Affiant believes this was a reference to cash drug proceeds. Agents had previously determined this Defendant was the operator of some sort of business located on Basse Road in San Antonio. Agents were watching the Basse business when Castillon called Campos on September 26. Shortly after the call, agents observed Rene Campos and the Defendant drive away from the Basse business and drive to a residence at 1326 Whiterock in San Antonio. Campos and the Defendant were then intercepted stating that they were being followed by police. Either Campos or the Defendant then followed an agent's vehicle away from the location and surveillance ended.

Agents have interviewed someone who was arrested in connection with the seizure of several kilograms of cocaine. This informant provided a great deal of information regarding drug trafficking which proved to be correct. The informant stated that he personally conducted multi-kilogram cocaine transactions with this Defendant at the Defendant's business in San Antonio. The information provided by this informant about this Defendant seems credible to Affiant because it is consistent with the information developed independent of the informant by the investigators on this case.

## SALVADOR CASTILLON

This Defendant is the brother of Alejandro Noe Castillon. This Defendant has intercepted numerous times discussing cocaine and cash shipments with Alejandro Noe Castillon throughout the federally authorized interception. On September 17, 2002, this Defendant was intercepted discussing the Defendant's counting of money; the Defendant was talking to Alejandro Noe Castillon. The Defendant told Alejandro Noe Castillon to come over so the Defendant could leave. Later that evening the Defendant was observed by agents as he drove from a location in Eagle Pass that is associated with this organization. Local police stopped the Defendant's vehicle and $201,852 was seized from the Defendant's vehicle. Alejandro Noe Castillon was intercepted stating that the

cash was bound for Mexico and that it had been seized.

REYNALDO HERNANDEZ

This Defendant was intercepted as he discussed his transporting shipments of cocaine from Eagle Pass to San Antonio on August 27 and 28, 2002. Surveillance was conducted and the Defendant was observed as he drove from Eagle Pass. The Defendant was intercepted as he discussed the possibility of being followed by police. The Defendant was observed conducting counter-surveillance "heat runs" in his vehicle. (Heat runs are erratic driving measures commonly taken by those transporting drugs by vehicle. Examples of heat runs are sudden and inexplicable acceleration/deceleration, repeated U-turns, driving into commercial parking lots and stopping for short periods of time, and suddenly pulling the vehicle to the side of the road.). The Defendant was observed driving a load vehicle on August 28, 2002 from Eagle Pass to San Antonio. The Defendant drove to the stash house at the Roanoke Apartments. The stash house in Apartment 401 was under surveillance at this time and was searched a short time later; fifty-five kilograms were seized from the apartment. The Defendant was intercepted after the seizure discussing his filing a false report to distance himself from the vehicle that was used to transport the cocaine and was seized by police on August 28.

LORI ANN HERNANDEZ

This Defendant is the wife of Reynaldo Hernandez. During the trips that Reynaldo Hernandez made from Eagle Pass to San Antonio during August, 2002, Reynaldo Hernandez maintained contain with this Defendant by telephone; these calls were intercepted. Reynaldo Hernandez kept the Defendant posted on his progress. The Defendant was intercepted telling Reynaldo Hernandez to watch out for police. During the August 27, 2002 trip the Defendant was intercepted asking Reynaldo Hernandez if he had used a deodorizer for the trip. The Defendant asked if he had used the "red" one. On August 28, 2002, an organization stash house in San Antonio was searched and fifty-five kilograms of cocaine were seized. The vehicle that agents had observed the Defendant transport the cocaine to San Antonio was also searched. A red bottle of deodorizer was recovered in the vehicle. Affiant knows that drug traffickers often use various deodorants to mask the smell of drugs and to thwart drug-sniffing dogs.

After the seizure of fifty-five kilograms of cocaine on August 28, 2002, and after the seizure of $83,260 from Reynaldo Hernandez on October 2, 2002, Reynaldo Hernandez was intercepted telling this Defendant about the seizures. On both occasions the Defendant reacted in a way that suggested she knew about the existence of the contraband before it was seized by police.

HECTOR DEL RIO-RODRIGUEZ
JOSE ZARAGOZA GARZA-DEL RIO

On June 14, 2002, a state wire interception was begun on two telephones used by Salvador Sixtos, Jr. and Alejandro Noe Castillon. The interceptions showed a pattern of smuggling to Missouri and Chicago, and return trips with cash proceeds. On July 1, 2002, Castillon was intercepted speaking to Jose Zaragoza Garza-Del Rio and Hector Del Rio-Rodriguez about nineteen kilograms that Garza-Del Rio and Del Rio-Rodriguez were transporting. As a result of this interception, San Antonio police stopped Garza-Del Rio and Del Rio-Rodriguez as they drove a

000006

vehicle; nineteen kilograms of cocaine were seized from their vehicle. Garza-Del Rio and Del Rio-Rodriguez were arrested on state drug charges, released on bail, and promptly fled to Mexico.

## EDWARD SCOT LOPEZ

This Defendant has been intercepted discussing drug transactions with Rene Campos. In these intercepted conversations the two make references to Alejandro Noe Castillon and the drug-related instructions issued by Castillon. On November 4, 2002, Campos relayed instructions from Alejandro Noe Castillon to this Defendant that directed this Defendant to make a drug-related trip to Dallas. Affiant is aware that Dallas is a major destination for cocaine distribution for this organization.

The investigation has revealed that the Castillon organization has a stash house located at 3315 Sueno in Eagle Pass, Texas. Agents have conducted near constant surveillance of this location for several weeks and there is no doubt that this is a stash house based on traffic that takes place there and the presence there of individuals who are known to be associated criminally with this organization. A recent interview of a known co-conspirator by agents confirmed that this location is used as a stash house. On October 14, 2002, agents observed this Defendant at the Sueno stash house. The Defendant was seen working on the trunk lining to a Cadillac parked in the front yard of 3315 Sueno. The Defendant then drove away from the location in the Cadillac in a northerly direction. Agents conducting surveillance of the Cadillac lost sight of the Cadillac as it traveled north.

## CHARLES CRUZ

On November 7, 2002, agents observed this Defendant meet with Rene Campos in San Antonio, Texas. Rene Campos was seen handing a package to the Defendant. The Defendant then drove off and agents followed him. The Defendant began to flee from agents at a high rate of speed and a chase followed. The Defendant crashed his vehicle into a tree and his vehicle was partially disabled. The Defendant was ultimately captured several miles from the crash. A kilogram of cocaine was recovered from the crash site, which is a very rural area. The Defendant's vehicle had a hidden compartment that had been opened. The cocaine was contained in packaging identical to other kilograms of cocaine seized from the Castillon organization. A cell phone was recovered from the Defendant's car that had the same phone number that had been in contact with Rene Campos several minutes before the Defendant met with Campos. The two were intercepted discussing the meeting observed by agents.

Wherefore based on the foregoing facts and my training and experience, I submit That probable cause exist to believe the above named individuals have committed the offense of Conspiracy to Distribute Cocaine over 5 Kilograms.

Sworn to subscribed to me on November 8, 2002

6

000007

Exh. #3



# REGIONAL NARCOTICS TASK FORCE

### JESSE L. JONES – Captain
P.O. Box 47046
San Antonio, TX 78265
Phone: 210.590.1297    Fax: 210.590.8924

Jesse Ramirez #31805-180
USP/P.O. Box 26030
Beaumont, Tx 77720

Dear Mr. Ramirez,

The case you are acquiring about was a Drug Enforcement Administration (DEA) case and complete operation. My Task Force assisted in manpower for surveillance and search warrant operations and because of this all documentation used for criminal prosecution for the case was completed by DEA personnel.

What I do have on hand is my agent's case report that was filed with the seizure affidavit that you should already have discovery on. In addition, I have some miscellaneous papers which I am including. Our case file is small as Task Force personnel played a limited role in this federal case.

Sincerely,

Jesse L. Jones
Commander, RNTF

```
| ADMINISTRATIVE
| Date Reported      : 11/8/2002   532 Hours    Day of Week: FRI      CFS#: 2002501477
| Location           : 300 MUSTANG CIRCLE                             District: N
| Occurance From     : 11/8/2002  @ 0532        To       @ 0000
| Status Date        : 11/8/2002                Status: CLEARED BY OTHER MEANS
| Type               : 13    Description:
```

| OFFICER INFORMATION
| Reporting Officer(s) : CLINE, ROBERT ARTHUR  #33
| Investigating Officer:   #

| REPORTING PERSON
| Reportee: RODRIGUEZ, J #8784                  Race: U  Sex: U  DOB:           Age:
| Address : ALAMO AREA NARC TASK FORC           Home Phone:
|                     ,                         Work Phone:
|                                               Misc Phone:

| PROPERTY
|   VEHICLE(s)
|   Type: NONE
|         License Number : 4LHJ70      Year : 2001              Make : FORD
|         License State  : TX          Model: F150              Color: BLU
|         License Year   : 2003        VIN  : 1FTRW07L01KE37797  Loss Value   :
|   Recovered Date : Null    Recovered Local:                   Recovered Value: $0.00
|   Recovered From  :
|   Stored at       :                                           Impound #      :
|   Date Released   : Null    Released To   :
| ..........................................................................................
|  Property Totals:        Stolen $0.00      Recovered $0.00     Damaged $0.00

| INVOLVED
|   Code  : SUBJECT 1
|   Name  : RAMIREZ, JESSE SALAZAR
|   Address: 344 MUSTANG CIRCLE             Home Phone: (210)495-0176
|            HOLLYWOOD PARK, TX 78232       Work Phone: (210)828-2739
|                                           Misc Phone: (201)846-3780
|   Employer:                               Occupation:
|   DL#: 11414667      DL State: TX         Race: W  Sex: M  DOB: 12/25/1969  Age: 33
| ..........................................................................................

| NARRATIVE:
| DATE: 11/08/2002
|
| CASE #: 2002501477
|
| INCIDENT: ASSIST OTHER AGENCY - ALAMO AREA NARC TASK FORCE
|
| LOCATION: 344 MUSTANG CIRCLE
|
| OFFICER: R. CLINE #976
|
|
|    ON THE LISTED DATE RO WAS ADVISED BY DISPATCH TO CONTACT RP VIA TELEPHONE.  RO CALLED RP
| WHO STATED THAT THE ALAMO AREA NARCOTICS TASKFORCE AND THE DRUG ENFORCEMENT AGENCY (DEA)
| HAD A FEDERAL WARRANT FOR S1 WHO RESIDES AT THE LISTED ADDRESS.  RP FURTHER STATED THAT
| THEY WERE WAITING TO GET THE SEARCH WARRANT FOR THE RESIDENCE SIGNED IN ORDER TO SERVE
| BOTH THE ARREST AND THE SEARCH WARRANT AT THE SAME TIME.  RP ADVISED RO THAT HE WILL BE
| WATCHING THE RESIDENCE AND IF S1 HAPPENS TO LEAVE REQUESTED RO TO CONDUCT A TRAFFIC STOP
| ON S1 IN ORDER TO SERVE THE ARREST WARRANT TO PREVENT S1 FROM PREVENTING CAPTURE.  AT THE
| LISTED TIME RO RECEIVED A CALL FROM RP STATING THAT S1 WAS LEAVING THE RESIDENCE IN V1.
| RO STAYED ON THE PHONE WITH RP WHO WAS ADVISING WHICH WAY S1 WAS HEADING.  RO CAUGHT UP
| WITH S1 AT DONELLA AND SAN PEDRO.  RO ACTIVATED THE OVERHEAD LIGHTS ON RO'S PATROL VEHICLE
| TO PULL S1 OVER.  RO GOT OUT OF THE PATROL VEHICLE AND TOLD S1 TO EXIT THE TRUCK AND STEP

                                    Page 1
```

TO THE REAR OF THE TRUCK WITH HIS HANDS ON HIS HEAD.  RP WAS BEHIND RO AS A COVER OFFICER.
S1 STEPPED OUT OF THE TRUCK AND ATTEMPTED TO HAND SOMETHING IN HIS HANDS TO RO.  AT THIS
POINT RO OBSERVED A SILVER SEMI-AUTOMATIC HANDGUN ON S1'S RIGHT HIP.  RO PLACED S1 INTO
HANDCUFFS WITHOUT INCIDENT AND THE GUN WAS REMOVED FROM S1'S POSSESSION AND GIVEN TO RP.
RP THEN ADVISED S1 THAT HE WAS UNDER ARREST AND READ S1 HIS RIGHTS PER MIRANDA.  RO PLACED
S1 IN THE BACK OF RO'S PATROL VEHICLE UNTIL THE ARRIVAL OF THE D.E.A. AGENTS AT WHICH
POINT S1 WAS TURNED OVER TO THEIR CUSTODY.  ONCE NO FURTHER ASSISTANCE WAS NEEDED RO
ADVISED DISPATCH AND RETURNED TO SERVICE.  AT APPROXIMATELY 0830 RO WAS AGAIN CONTACTED BY
RP WHO STATED HE WAS GOING TO BE GOING BACK TO THE ABOVE LOCATION WITH THE D.E.A. IN ORDER
TO SERVE THE SEARCH WARRANT.  RO WENT BY TO STAND WHILE THE SEARCH WAS CONDUCTED.  AFTER
THE ARRIVAL OF RO'S RELIEF OFFICER J. CHEATHAM #866 RO ADVISED DISPATCH AND DEPARTED THE
AREA.  NO FURTHER ACTION TAKEN BY RO.

Officers Signature:_____ Date:_____

salazar1b

17        Did you personally debrief Mr. Soto?

18    A.  No, I did not.

19    Q.  Okay.  What was the basis of your information when you

20    went to testify before the grand jury?

21    A.  My information was the initial report that was provided to

22    me.

23    Q.  Would you be more specific?  What report --

24    A.  The initial -- there was one initial arrest report that I

25    read.  I don't have it in front of me.  I don't remember the
                                        128


1     dates.  There is one report that had the basis for the arrest

2     and what happened and just the undercover operation.

3     Q.  All right.  Would it refresh your recollection if you were

4     provided a copy of that report?

5     A.  Yes.

6         MR. SCHARFF:  Your Honor, I would ask that the

7     government provide a copy of the report to the witness so he

8     can have his memory refreshed.

9         MR. CONTRERAS:  Which report?

10        MR. SCHARFF:  He said the one that -- the arrest

11    report --

salazar1b

12    THE WITNESS:  The initial arrest report that shows,

13  talks about the undercover operation.

14    MR. SCHARFF:  May I approach the witness, Your

15  Honor?

16    THE COURT:  Yes, sir.

17  BY MR. SCHARFF:

18  Q.  Okay.  Is that the only report that you reviewed before

19  you went and testified to the grand jury?

20  A.  Yes.  That was the only report I was aware of at the time,

21  yes.

22  Q.  Okay.  And how did you become aware of that report?

23  A.  It was given to me by -- well, I am not really sure how it

24  came about.  It was just either myself and Agent Castaneda and

25  the U.S. Attorney's Office, somebody made me aware that this

129

1  report was out there, because I didn't know anything about

2  this case before I went to the grand jury.

3  Q.  Okay.  When you say you didn't know anything about this

4  case, you mean the arrest of Jose Soto?

5  A.  Yes.

6  Q.  Okay.  All right.  And so the report that you were

7  reviewing was done by Agent Cal Fowler; is that correct?

Page 16

Exh. #6

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

| 1. Program Code | | | | | Page 1 of 4 |
|---|---|---|---|---|---|
| | 2. Cross File | Related Files | 3. File No. M2-02-0021 | | |
| 5. By: Cal Fowler | | | | | 4. G-DEP Identifier WGC1D |
| At Group 3 San Antonio District Office | ☐ ☐ ☐ | | 6. File Title   SOTO, Jose | | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | ☐ ☐ | | | | |
| 9. Other Officers: S/A Joseph DuBois, A U S A David Shearer | | | 8. Date Prepared 07/01/02 | | |

10. Report Re:  Debriefing of Jose SOTO on 6-26-02

## 1. SYNOPSIS

On 6-26-02, TFO Cal Fowler, S/A Joe Dubois, and A U S A David Shearer debriefed Jose SOTO at the U S Marshals' Office in the presence of his attorney, Collis White.  During the debriefing, SOTO mentioned his involvement with Alejandro CASTILLON, Rene CAMPOS, and Jesse RAMIREZ.

## DETAILS

1.  On 6-26-02, Jose SOTO was debriefed in relation to his participation in the delivery of five kilograms of cocaine to Jaime MARTINS-Olvera on 12-7-01 at 7226 Blanco, San Antonio, Texas.

2.  SOTO said he had taken his black Ford truck to "Jesse", later identified as Jesse RAMIREZ-SALAZAR, at a detail shop on Everest, known to be 602 Everest, San Antonio, Texas, to have it cleaned after he had delivered five kilos of cocaine to MARTINS-Olvera earlier in the day.

3.  At the time of his arrest, SOTO was driving a 1992 Ford Thunderbird, Texas License N96 LFH.  This vehicle was registered to Alejandro CASTILLON, Eagle Pass, Texas, at the time of the arrest.  SOTO said he had borrowed this car from a friend and was in the process of buying it.  It has subsequently been transferred to Jesse RAMIREZ-SALAZAR, 344 Mustang Circle, San Antonio, Texas, on 5-30-02 and the plate changed to Texas R94 MKN.  This car was seized at the time of arrest and later released to SOTO's Step-Father, H Pete Sosa.

| 11. Distribution: | 12. Signature (Agent) | |
|---|---|---|
| Division  SARI, HFD | Cal Fowler | 13. Date 7-4-02 |
| District | 14. Approved (Name and Title) Ken Peterson Group Supervisor | 15. Date 07-18-2002 |
| Other | | |

DEA Form   • 6
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

55

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No.<br>M2-02-0021 | 2. G-DEP Identifier<br>WGC1D |
|---|---|---|
| 4. | 3. File Title  SOTO, Jose | |
| Page  2  of  4 | | |
| 5. Program Code | 6. Date Prepared<br>07/01/02 | |

4.  SOTO said he had been in contact with Alejandro CASTILLON in Eagle Pass, Texas.  SOTO said he had been to CASTILLON's house in Eagle Pass several times before his arrest on 12-7-01.

5.  SOTO said CASTILLON never keeps any dope at his house, and has been told by CASTILLON that he has a large ranch in Mexico that he uses to launder money and appear to be legitimately in business.  SOTO said CASTILLON also owns some apartments in Eagle Pass, Texas, but did not know the location or name of the apartments.

6.  SOTO said Rene CAMPOS distributes cocaine for CASTILLON in San Antonio.  SOTO drew a map to show where CAMPOS lives.  TFO Fowler and S/A DuBois later found the house at 1641 W Summit, San Antonio, Texas. SOTO said CAMPOS lives with his Mother at this address.  SOTO said he had known CAMPOS for a long time from Eagle Pass.

7.  SOTO said CAMPOS drives a 1997 red Ford Pick Up truck.  A check of SAPD citation files shows CAMPOS driving a 1997 maroon Ford truck, Texas License 6MW S27, and a 2000 red Ford truck, Texas License 4FM Z47.

8.  SOTO said CAMPOS and Alejandro CASTILLON use Ford Explorers to move loads of cocaine from Eagle Pass to San Antonio.  The Explorers have compartments in the gas tanks, and SOTO said they can hold 30 to 60 kilos per trip.  SOTO said the kilos were from Alejandro CASTILLON.

9.  SOTO said CAMPOS uses three Explorers, one white, one blue, and the other was an unknown color.  SOTO said one of the drivers was named "Chago" but did not know his full name.

10.  SOTO said CAMPOS had an apartment on Babcock just North of Medical Drive, San Antonio, that he used to store the cocaine.  SOTO said noone lived in the apartment, it was for storage only.  SOTO thinks CAMPOS moved from the apartment after his (SOTO'S) arrest thinking SOTO would talk.

---

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| (Continuation) | M2-02-0021 | WGC1D |
| | 3. File Title  SOTO, Jose | |

| 4. | | |
|---|---|---|
| Page  3  of  4 | | |
| 5. Program Code | | 6. Date Prepared |
| | | 07/01/02 |

11. SOTO said on the day of his arrest, 12-7-01, he had met Rene CAMPOS in the parking lot of the Blockbuster Video Store, Blanco and West Avenue, San Antonio, Texas, to get the five kilograms of cocaine.

12. SOTO said this meeting place was where he always met CAMPOS to pick up cocaine and deliver money to CAMPOS after the deals.  SOTO said his only customer for cocaine was Jaime MARTINS-Olvera, also arrested on 12-7-01.  SOTO had delivered one kilo per week to MARTINS-Olvera for the previous two months, and one kilo to him the day before the arrest.  SOTO said MARTINS-Olvera had always paid cash for the cocaine.  SOTO would then meet CAMPOS and deliver the money at the Blockbuster.  The current price per kilo to MARTINS-Olvera was $13,500.00.

13. SOTO said he was getting $100.00 per kilo from CAMPOS for each transaction.

14. SOTO said on his initial debriefing on 6-6-02, he was not telling the truth about his source.  SOTO said his original attorney, Eddie Garcia, knew Alejandro CASTILLON, and might tell CASTILLON he was cooperating.

15. SOTO said he knew that on the day prior to his arrest, 12-06-01, a female had been arrested at or near the Eagle Pass Checkpoint with 30 kilos of cocaine.  SOTO said that Eddie Garcia was also representing this female.  AUSA David Shearer found that on 12-6-01, Lidia DE ALBA had been arrested driving a white Ford Explorer containing 22 kilos of cocaine.  The investigating agents found a purchase agreement in the Explorer indicating Rene CAMPOS was purchasing the vehicle.

16. SOTO will be debriefed at a future date with more information.

INDEXING

1.  Rene CAMPOS
                        NADDIS # 5375980

2.  Alejandro Noe CASTILLON   NADDIS # 5136210

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|---|
| *(Continuation)* | | 3. File Title   SOTO, Jose | |
| 4. | | | |
| Page   4   of   4 | | | |
| 5. Program Code | | 6. Date Prepared   07/01/02 | |

3.   Jesse RAMIREZ-SALAZAR       NADDIS # 4894158

4.   Lidia Elena DE ALBA         NADDIS # 5310087.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

Exh. #6(a)

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 7

| Program Code SW-TXW-295-HID 100 | 2. Cross File | Related Files | 3. File No. M2-02-0005 | 4. G-DEP Identifier YNC1A |
|---|---|---|---|---|
| 5. By: G/S Doug Davis | ☒ | M2-02-0021 | 6. File Title ▮▮▮▮▮▮▮ | |
| At: San Antonio DO | ☒ | MD-02-0030 | | |
| 7. ☐ Closed  ☐ Requested Action Completed  ☐ Action Requested By: | ☐ | | | |
| 9. Other Officers: S/A A.B. Castaneda, TFO Cal Fowler | | | 8. Date Prepared 07/22/02 | |

10. Report Re: Debriefing of Jose Guadalupe SOTO on 7/16/02

### SYNOPSIS

On 12/7/01, Jose Guadalupe SOTO was arrested by members of the San Antonio DO agents for his involvement in the delivery of five (5) kilogram of cocaine to a DEA undercover agent (M2-02-0021). On 7/16/2002, SOTO was debriefed about his involvement in this transaction and his involvement with the Alejandro CASTILLON drug trafficking organization.

### DETAILS

1.  Reference is directed to all reports of investigation under this case file name and number. Special reference is directed to a report of investigation (ROI) dated 7/1/02 by TFO Cal Fowler which outlines the arrest and initial debriefing of Jose Guadalupe SOTO during the delivery of five (5) kilograms of cocaine to a DEA undercover agent on 12/7/01.

2.  On 7/16/02 & 9/24/02, TFO Cal Fowler, S/A A.B. Castaneda, G/S Doug Davis and Asst. United States Attorney David Shearer debriefed Jose SOTO in the presence of his Attorney, Collis White about his involvement in the Alejandro CASTILLON drug trafficking organization.

3.  According to SOTO, he was introduced to Alejandro CASTILLON and Jesse RAMIREZ by Ricardo ENRIQUEZ approximately two years ago. RAMIREZ owns an auto window Tinting and Detail shop in San Antonio, TX which is located at 602 Everest Street, San Antonio, Texas. SOTO said CASTILLON is from Eagle Pass, TX and owns three Ranches in Mexico. One of these ranches is

| 11. Distribution: Division  Houston FD, DIU | 12. Signature (Agent) *Doug Davis* Doug Davis | 13. Date 9/30/02 |
|---|---|---|
| District  OSA, OSB | 14. Approved (Name and Title) Javier F. Pena  ASAC | 15. Date 10/3/02 |
| Other  SARI | | |

EA Form     - 6
ul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

AUSA

59

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0005 | 2. G-DEP Identifier YNC1A |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4. | | |
| Page 2 of 7 | | |
| 5. Program Code SW-TXW-295-HID 100 | 6. Date Prepared 07/22/02 | |

located in Guerrero, Coahilla, Mexico and is named "LAS PALAMAS". SOTO claimed CASTILLON's brother "Chava" LNU, who has one hand takes care of CASTILLON's ranches in Mexico.

4.   SOTO claimed he learned that CASTILLON and RAMIREZ were involved in cocaine trafficking while assisting CASTILLON with small tasks. CASTILLON later asked SOTO to transport cocaine to San Antonio for him. In addition, CASTILLON told SOTO that RAMIREZ owed CASTILLON money for drugs that RAMIREZ had purchased from him. SOTO delivered one kilogram of cocaine from CASTILLON to RAMIREZ and observed CAMPOS deliver several kilograms of cocaine to RAMIREZ at the PERFORMANCE TINT & DETAIL SHOP located on Everest Street. RAMIREZ gave SOTO a cellular telephone 210-573-8103 so he could stay in touch with RAMIREZ.

5.   According to SOTO, during April of 2001, he needed money for his truck payment and agreed to transport cocaine to San Antonio for CASTILLON. SOTO claimed between approximately April and July of 2001, he made approximately eight (8) trips from Eagle Pass to San Antonio TX in which he transported cocaine to an apartment located at Formosa & Flores Street in San Antonio, TX.   SOTO learned from CAMPOS that the stash apartment was rented in Ricardo ENRIQUEZ name. On SOTO's first trip he met CASTILLON and Rene CAMPOS in Eagle Pass, TX. SOTO and CAMPOS drove to CASTILLON's rental house which is close to Route 577 and the Border Patrol Office in Eagle Pass. Upon arrival at the stash location CAMPOS had a key to the rental house and they entered followed by CASTILLON. SOTO and CAMPOS removed five (5) kilograms of cocaine from a closet in the house and placed it behind the front seat of SOTO's pickup truck and SOTO and CAMPOS drove to the apartment located at Formosa and Flores in San Antonio. SOTO claimed the apartment is located in Section #3 of the complex and the apartment is the first apartment on the left corner. They stashed the cocaine in the central air conditioning unit in the apartment. SOTO was later paid $500.00 by CASTILLON for transporting the cocaine. SOTO claimed CAMPOS sold the cocaine in San Antonio.

6.   On the second trip SOTO called CASTILLON who told SOTO he had kilograms of cocaine in Eagle Pass and asked SOTO to transport them to San Antonio.   SOTO drove alone to Eagle Pass to the stash house and met CASTILLON.   There was only one kilogram of cocaine which SOTO transported

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

AUSA

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0005 | 2. G-DEP Identifier YNC1A |
|---|---|---|
| *(Continuation)* | 3. File Title ▓▓▓▓▓▓ | |

| 4. | |
|---|---|
| Page  3  of  7 | |
| 5. Program Code SW-TXW-295-HID 100 | 6. Date Prepared 07/22/02 |

back to the stash apartment located at Formosa and Flores. Upon arrival SOTO called CAMPOS who met SOTO at the apartment located at Formosa and Flores where they stashed the cocaine in the central air conditioning unit.

7.  According to SOTO, CASTILLON had him transport five (5) kilograms of cocaine on four additional occasions in the same manner as previously mentioned.  On one of these trips he drove the cocaine in CASTILLON's green Ford pick up truck.  SOTO claimed that one kilogram of cocaine was missing from the stash house in San Antonio and CASTILLON accused SOTO of stealing it.  SOTO denied the allegation and told CASTILLON that he quit and for CASTILLON to stay away from him.

8.  SOTO claimed he was at the apartment located at Formosa and Flores sometime between April and May of 2001, and assisted CAMPOS in counting and vacuum sealing of over $300,000.00 in U.S. currency.  The currency was vacuum sealed in $10,000.00 packets.  The currency was transported to Eagle Pass or Mexico to CASTILLON.

9.  Allegedly, SOTO received a telephone call from CASTILLON who said that he found out who had taken the kilogram of cocaine.  CASTILLON asked SOTO to come back to work.  SOTO agreed and continued to take 1-5 kilograms from Eagle Pass to San Antonio.

10.  Around June of 2001, Rene CAMPOS rented a new stash apartment near Medical Drive in San Antonio.  SOTO was selling kilogram amounts of cocaine in the San Antonio area which he received from CAMPOS.  In addition, SOTO was given a key to the new stash location and would assist CAMPOS count and seal money for shipment to CASTILLON.  According to SOTO, he observed large amounts of currency in the apartment on several occasions.  SOTO claimed the drugs and money were kept in a gun safe inside of the apartment which also contained several guns to include an AK-47.

11.  During the fall of 2001, CASTILLON called SOTO and accused him of stealing $27,000.00 from the stash apartment.  SOTO denied the allegation and CAMPOS took the keys to the apartment away from SOTO.  CASTILLON told SOTO he had to pay back this amount by transporting cocaine to Chicago for

EA Form      - 6a
Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| (Continuation) | M2-02-0005 | YNC1A |
| | 3. File Title | |

| 4. | |
|---|---|
| Page 4 of 7 | |

| 5. Program Code | |
|---|---|
| SW-TXW-295-HID 100 | 6. Date Prepared |
| | 07/22/02 |

him. SOTO later learned that the $27,000.00 was located in "CHAGO's" (Identified as Reynaldo HERNANDEZ) house by his wife and returned to CASTILLON.

12. On December 1, 2001, SOTO received a call from CASTILLON, who told him to come to the apartment near Medical Drive. SOTO arrived at the apartment and told SOTO and "CHAGO" to drive two white Ford Explorers which contained 20 kilograms each in the gas tanks to Chicago. SOTO followed "CHAGO" and they departed for Chicago. SOTO said they had to stop for gas often because of the cocaine in the gas tanks. SOTO and "CHAGO" stayed over night in different motels just across the Oklahoma State line. SOTO spent the night at a Motel 6 and "CHAGO" was in a different motel at the same exit. SOTO claimed he called CASTILLON from Oklahoma, Missouri and the Chicago area during this trip. Upon arrival in the Chicago area they registered at the Hampton Inn by the airport off of IH-55. SOTO rented his room in his name and paid cash for the room. CHAGO told SOTO to leave the keys to the Explorer inside. SOTO claimed CHAGO and an unidentified person took the Explorers to an unknown location and removed the cocaine. The Explorer that SOTO drove broke down and "CHAGO" called CASTILLON who told SOTO to leave it with the people who got the cocaine. "CHAGO" told SOTO not to say anything to anybody about the transaction. SOTO rode back to San Antonio with "CHAGO" who stopped somewhere in Kansas to spend the night. On December 5, 2001, "CHAGO" dropped SOTO off at his residence.

13. According to SOTO, "CHAGO" was supposed to bring 30 kilograms of cocaine to San Antonio from Eagle Pass the next day. SOTO learned from CAMPOS that CASTILLON had 30 kilograms of cocaine seized at the checkpoint in Eagle Pass, TX on December 6, 2001. (Note: On 12/6/01 Lidia Elena De ALBA was arrested by U.S. Border Patrol Agents after the discovery of approximately 24 kilograms were located in the gas tank of a white Ford Explorer Texas Registration L28GZC, registered to Reynaldo HERNANDEZ, 1641 W. Summit, San Antonio, Texas MD-02-0030).

14. On December 7, 2001, SOTO was arrested for the delivery of 5 kilograms of cocaine to a DEA undercover agent (see synopsis section above). After the delivery of cocaine to the undercover agent surveillance was led by SOTO to PERFORMANCE TINT & DETAIL SHOP, 602

| EA Form 6a (Jul. 1996) | DEA SENSITIVE |
|---|---|
| | Drug Enforcement Administration |

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

AUSA

103

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0005 | 2. G-DEP Identifier YNC1A |
|---|---|---|
| *(Continuation)* | 3. File Title ▆▆▆▆▆▆▆ | |

| 4. | |
|---|---|
| Page 5 of 7 | |
| 5. Program Code SW-TXW-295-HID 100 | 6. Date Prepared 07/22/02 |

Everest. SOTO said he was having his truck detailed when he received a call to pick up the money for the cocaine he had delivered. When SOTO returned he was arrested driving a Ford Thunder Bird. SOTO stated that CASTILLON had given him the Thunder Bird to CASTILLON. SOTO stated that CASTILLON had given him the Thunder Bird to have repaired and painted so that they could use it. Agents returned to PERFORMANCE TINT & DETAIL and spoke with RAMIREZ about SOTO's truck which was seized. At the time agents were unaware of RAMIREZ' involvement with CASTILLON.

15. According to SOTO, RAMIREZ called CASTILLON about SOTO's arrest for drug trafficking. The next day Attorney Eddie GARCIA visited SOTO at The Wackenhut Detention Center and told SOTO that RAMIREZ had called him to represent SOTO and had paid GARCIA $15,000.00 to do so. GARCIA said he would do the best he could to get him out of jail and told him to keep his mouth shut. GARCIA said DEA people do not want to talk to him and are not interested in him.

.6. SOTO claimed he called a friend from Wackenhut who made a three party call to RAMIREZ at PERFORMANCE TINT & DETAIL SHOP and spoke with RAMIREZ. RAMIREZ told SOTO that Eddie GARCIA was a good attorney and would fix it for SOTO. RAMIREZ advised SOTO that he would take care of his payment to GARCIA.

17. SOTO said he observed several markings on the kilograms of cocaine to include a fish, M for Motorola and a scorpion. SOTO was present in CASTILLON's stash apartment in Eagle Pass and assisted CASTILLON, CAMPOS and Roberto LNU cut the cocaine with vitamins and lactose. SOTO claimed he puchased 20 bottles of the cut from the GNC Health Food Store located in the North Star Mall in San Antonio on several occasions. SOTO said they would mix three (3) kilograms of cocaine with the cut and make (5) kilograms out of it. SOTO said the cut cocaine was sold in San Antonio and the pure cocaine would be transported to Chicago. According to SOTO, CASTILLON sells numerous kilograms of cocaine to a subject in San Antonio by the name of Gabriel LNU. A review of the case data base revealed a Gabriel Christopher GARCIA, 7200 S. Presa Street, Apt. 1702 and 3315 Stephen Foster, San Antonio, Texas, Texas DL#19181865, Social Security #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. In addition, GARCIA is the subscriber to Verizon Cellular

EA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

-1 - Prosecutor

AUSA

63

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
| *(Continuation)* | M2-02-0005 | YNC1A |
| | 3. File Title | |
| 4. | | |
| Page 6 of 7 | | |
| 5. Program Code | | |
| SW-TXW-295-HID 100 | 6. Date Prepared | |
| | 07/22/02 | |

telephone numbers 210-347-0827 and 210-347-0830 and these phone are
utilized by CASTILLON and RAMIREZ.

18. At the time of SOTO's arrest he had cellular telephone number 210-573-8103 in his possession. After debriefing SOTO it was learned that
SOTO received the telephone from Jesse RAMIREZ. SOTO in the presence of
his attorney, gave permission to retrieve the phone list from the
telephone seized from him at the time of his arrest. The following is a
list of names and telephone numbers retrieved from SOTO's cellular
telephone:

| | | | | | |
|---|---|---|---|---|---|
| 1. | Palomo | 830-325-2651 | 13. | Mingo | 872-6723 |
| 2. | Jac | 830-352-0830 | 14. | Chag | 214-921-9290 |
| 3. | Cha | 382-1634 | 15. | Mecah | 921-9290 |
| 4. | Gil | 274-4590 | 16. | | 830-757-3315 |
| 5. | Jo | 382-3070 | 17. | | 316-2082 |
| 6. | GGA | 535-6554 | 18. | RRR | 325-7927 |
| 7. | J | 889-5885 | 19. | | 210-771-2844 |
| 8. | JE | 826-4633 | 20. | | 923-9239 |
| 9. | Blank | | 21. | | 832-594-6268 |
| 10. | TA | 210-385-6815 | 22. | G | 722-8191 |
| 11. | Palomo | 923-4969 | 23. | Comp | 573-4741 |
| 12. | P Cha | 210-382-1511 | 24. | Jac | 708-870-4040 |

INDEXING

1. Jose Guadalupe SOTO, Naddis #5310655
2. Alejandro CASTILLON, Naddis #5136210
3. Jesse RAMIREZ, Naddis #4894158
4. Ricardo ENRIQUEZ, Naddis #5316745
5. "Chava" LNU, brother of Alejandro CASTILLON, Naddis negative
6. PERFORMANCE TINT & DETAIL SHOP, Naddis pending
7. Rene CAMPOS, Naddis #5375980
8. Reynaldo HERNANDEZ, AKA "CHAGO", Naddis #5310078
9. Lidia Elena De ALBA, Naddis #5310087
10. Eddie GARCIA, Naddis negative, Attorney hired by Jesse Ramirez
11. Roberto LNU, Naddis negative

| :A Form - 6a | DEA SENSITIVE | |
| (Jul. 1996) | Drug Enforcement Administration | |

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

1 - Prosecutor

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | M2-02-0005 | YNC1A |
| *(Continuation)* | 3. File Title ███████████████ | |

| 4. | |
|---|---|
| Page 7 of 7 | |
| 5. Program Code | |
| SW-TXW-295-HID 100 | 6. Date Prepared |
| | 07/22/02 |

12. Gabriel C. GARCIA, Naddis Negative, H/M, DOB: 8/02/80, 7200 S. Presa,
Apt. 1702, San Antonio, TX, TX DL#19181865, Social Security #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.

EA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

65

Exh. #7

**U.S. Department of Justice**
Drug Enforcement Administration

OTHER DEA-6 reports

| REPORT OF INVESTIGATION | | | Page 1 of 2 | |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File | Related Files | 3. File No. M2-02-0021 | 4. G-DEP Identifier WGCID |
| 5. By: S/A Jaime Garza  At: San Antonio DO Group #3 | ☒ CS-00-101073 ☐ ☐ ☐ | | 6. File Title SOTO, Jose Guadalupe | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | ☐ ☐ | | 8. Date Prepared 12/10/02 | |
| 9. Other Officers: | | | | |

10. Report Re: UC Negotiations with Jaime MARTINS-Olvera in San Antonio, Texas on 12-03-01.

**DETAILS**

1. Reference is made to a DEA-6, written to this case file by TFO Cal Fowler, dated 12/11/01, regarding the surveillance of undercover meeting at Whataburger, Ramsy and San Pedro, San Antonio, Texas.

2. On 12/03/01, at approximately 4:00 PM, CS-00-101073 (CS) was directed by S/A Jaime Garza to place a telephone call to Jaime MARTINS-Olvera via MARTINS-Olvera's cellular #210/643-4593 for the purpose of confirming a time frame to meet with S/A Garza and CS at Whataburger, San Antonio, Texas to negotiate the purchase of one kilogram of cocaine. (This telephone conversation was inaudible.)

3. On the same date, plans were made for S/A Garza (acting in an undercover capacity as a cocaine buyer) and CS to meet with MARTINS-Olvera at Whataburger.

4. At approximately 4:42 PM, S/A Garza and CS entered the Whataburger. Minutes later, CS received a cellular telephone call from MARTINS-Olvera. According to CS, MARTINS-Olvera advised CS that MARTINS-Olvera was driving his green pick-up (TX Lic: #LJ2805) within the Whataburger parking lot searching for CS and S/A Garza. S/A Garza then observed MARTINS-Olvera park next to S/A Garza's undercover vehicle. S/A Garza advised CS to advise MARTINS-Olvera that S/A Garza and CS would be exiting the Whataburger to meet with MARTINS-Olvera; MARTINS-Olvera agreed.

| 11. Distribution: Division HFD  District San Antonio  Other EPIC, SARI | 12. Signature (Agent)  Jaime Garza, S/A | 13. Date 12-13-01 |
|---|---|---|
| | 14. Approved (Name and Title)  Ken Peterson  Group Supervisor | 15. Date 12-14-01 |

DEA Form   - 6
(Jul. 1996)
    JG

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| (Continuation) | 3. File Title SOTO, Jose Guadalupe | |

4.
Page 2 of 2

5. Program Code

6. Date Prepared
12/10/02

5. At approximately 4:54 PM, S/A Garza and CS exited the Whataburger and walked towards MARTINS-Olvera. Upon introducing S/A Garza to MARTINS-Olvera, the discussion of purchasing approximately one kilogram of cocaine from MARTINS-Olvera ensued.

6. During the negotiations, it was confirmed by MARTINS-Olvera that the purchase price for the one kilogram of cocaine would be approximately $15,500.00 US currency; S/A Garza disagreed on the price. S/A Garza advised MARTINS-Olvera that S/A Garza would be interested in purchasing approximately five kilograms of cocaine at a price of $14,500.00 per kilogram. S/A Garza advised MARTINS-Olvera that S/A Garza was interested in first purchasing the one kilogram of cocaine followed by purchasing the remaining four kilograms of cocaine from MARTINS-Olvera within the hour. MARTINS-Olvera advised S/A Garza that MARTINS-Olvera would be willing to sell S/A Garza all five kilograms of cocaine in one sale; S/A Garza agreed. MARTINS-Olvera advised S/A Garza that MARTINS-Olvera would need to confirm the final price for the five kilograms of cocaine. MARTINS-Olvera stated that each kilogram of cocaine could be purchased at a price of no more than $15,000.00 per kilogram, but no less than $14,500.00 per kilogram. S/A Garza advised MARTINS-Olvera that S/A Garza wanted to purchase five kilograms of cocaine on a bi-weekly basis; MARTINS-Olvera agreed.

7. It was agreed that MARTINS-Olvera would deliver the five kilograms of cocaine to the Whataburger via MARTINS-Olvera's vehicle. MARTINS-Olvera stated that he could arrange the five kilograms of cocaine to be consummated within one week; S/A Garza agreed.

8. At approximately 5:14 PM, the meeting was terminated.

INDEXING

1. MARTINS-Olvera, Jaime – NADDIS #2862937.

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code | 2. Cross File | Related Files | 3. File No. M2-02-0021 | 4. G-DEP Identifier WGC1D |
|---|---|---|---|---|
| 5. By: Jaime Garza, S/A  At: San Antonio DO Group #3 | ☒ | CS-00-101073 ☐ ☐ ☐ ☐ | 6. File Title SOTO, Jose Guadalupe | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | | | 8. Date Prepared 12-11-01 | |
| 9. Other Officers: | | | | |

10. Report Re: UC Neogtiations/Arrest of Jaime MARTINS-Olvera in San Antonio, Texas on 12-07-01; Acquisition of Exhibit N-2.

## DETAILS

1. Reference is made to a DEA-6, written to this case file by TFO Cal Fowler, dated 12/11/01, regarding the surveillance/arrest of Jaime MARTINS-Olvera, Wash-A-Teria at Sahara and San Pedro, San Antonio, Texas; Acquisition of Drug Exhibit #1.

2. On 12/07/01, at approximately 9:50 AM, CS-00-101073 (CS) was directed by S/A Jaime Garza to place a telephone call to Jaime MARTINS-Olvera via MARTINS-Olvera's cellular #210/643-4593. This call was arranged for the purpose of confirming a time frame (12:00 PM) to meet with S/A Garza and CS at the Whataburger, Ramsey and San Pedro, San Antonio, Texas to consummate the purchase of approximately five kilograms of cocaine. (This telephone conversation was recorded – Exhibit N-2.)

3. On the same date, at approximately 2:53 PM, plans were made for S/A Garza (acting in an undercover capacity as a cocaine buyer) and CS to meet with MARTINS-Olvera at the Whataburger. Minutes prior to S/A Garza and CS's arrival, MARTINS-Olvera called CS's cellular and stated that MARTINS-Olvera was parked at Wash-A-Teria, Sahara and San Pedro. (This telephone conversation was not recorded.). Upon arriving, S/A Garza observed MARTINS-Olvera sitting in his green pickup (TX Lic: #LJ2805).

4. S/A Garza and CS exited their undercover vehicle and walked over to MARTINS-Olvera. S/A Garza then entered the passenger side of MARTINS-

| 11. Distribution: Division HFD  District San Antonio  Other EPIC, SARI | 12. Signature (Agent)  Jaime Garza, S/A | 13. Date 12-13-01 |
|---|---|---|
| | 14. Approved (Name and Title) Ken Peterson Group Supervisor | 15. Date 12-13-01 |

DEA Form - 6
(Jul. 1996)
JG

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| *(Continuation)* | 3. File Title SOTO, Jose Guadalupe | |

| 4. Page 2 of 2 | |
|---|---|
| 5. Program Code | 6. Date Prepared 12-11-01 |

Olvera's vehicle. MARTINS-Olvera then advised S/A Garza that MARTINS-Olvera had five kilograms of cocaine in a green and black backpack. At this time, S/A Garza advised CS to walk over to the Whataburger; thus leaving S/A Garza and MARTINS-Olvera alone in MARTINS-Olvera's truck. S/A Garza then proceeded to unzip the backpack and observed five kilogram packages of suspected cocaine. According to MARTINS-Olvera, MARTINS-Olvera stated that he had seen an open package of one kilogram of cocaine from the same batch earlier that day and assured that the quality of the cocaine was excellent.

5. S/A Garza then exited MARTINS-Olvera's vehicle and gave the arrest signal.

## CUSTODY OF EVIDENCE

1.  Exhibit N-2 - is an original cassette tape, which contains a recording of an undercover conversation between CS-00-101073 and Jaime MARTINS-Olvera on 12-07-01 at approximately 9:50 AM. S/A Jaime Garza maintained custody of the Exhibit N-2 until it was turned over to the SADO Non-drug Evidence Custodian for safekeeping.

## INDEXING

1. MARTINS-Olvera, Jiame - NADDIS #2862937.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration                                                    *over* ➤

| **REPORT OF INVESTIGATION** | | | Page 1 of 5 | |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File | Related Files | 3. File No. M2-02-0021 | 4. G-DEP Identifier WGC1D |
| 5. By: Cal Fowler  At Group 3  San Antonio District Office | ☒ ☐ ☐ | CS-00-101073 | 6. File Title SOTO, Jose Guadalupe | |
| 7. ☐ Closed  ☐ Requested Action Completed  ☐ Action Requested By: | ☐ ☐ ☐ | | 8. Date Prepared 12/11/01 | |

9. Other Officers: S/A Jaime Garza, Jud Spring, Joe Dubois, Tom DeSantis, G/S Ken Peterson, TFOs Gilbert Villarreal, Ronald Jimenez, Willie Guerra, David Davila, Frank Perez

10. Report Re: Surveillance and Arrest of Jaime MARTINS-Olvera and Jose Guadalupe SOTO on 12-07-01 and Acquisition of Exhibit 1

## SYNOPSIS

On 12-03-01, S/A Jaime Garza, acting in an undercover capacity, negotiated with Jaime MARTINS-Olvera for the delivery of five kilograms of cocaine. On 12-07-01, MARTINS-Olvera delivered the cocaine to S/A Garza at San Pedro and Sahara, San Antonio, Texas. MARTINS-Olvera then telephoned his source for the cocaine, Jose SOTO, who arrived at MARTINS-Olvera's apartment and was arrested also. Both were charged with Conspiracy to Distribute Cocaine.

## DETAILS

1.  On 12-03-01, at 4:52 pm, S/A Jaime Garza met with Jaime MARTINS-Olvera in the Whataburger parking lot, San Pedro and Ramsey, San Antonio, Texas to negotiate the delivery of a quantity of cocaine in the upcoming week. This meeting lasted until 5:14 pm, at which time MARTINS-Olvera was observed by TFO Fowler to leave the location and drive to 7226 Blanco Rd, The Spanish Trace Apartments, where MARTINS-Olvera lives. On this date MARTINS-Olvera parked near the 2500 building and entered apartment 2502. Surveillance was terminated.

2.  On 12-7-01, at approximately 9:50 am, CS-00-101073(CS) called Jaime MARTINS-Olvera on MARTINS-Olvera's cell phone, 210-643-4593 to arrange a time of around 12:00 noon to meet CS and deliver the five kilograms of cocaine. This call was recorded by S/A Garza and was later retrieved as Exhibit N-2.

| 11. Distribution: Division SARI; HFD District Other HFD/CSC | 12. Signature (Agent)  Cal Fowler | 13. Date 12-11-01 |
|---|---|---|
| | 14. Approved (Name and Title)  Ken Peterson  Group Supervisor | 15. Date 01-02-2002 |

DEA Form    - 6
(Jul. 1996)
        CF

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| *(Continuation)* | 3. File Title  SOTO, Jose Guadalupe | |

| 4. Page  2  of  5 | |
|---|---|
| 5. Program Code | 6. Date Prepared  12/11/01 |

3. On 12-07-01, Jaime MARTINS-Olvera called CS-00-101073 (CS) and said he would have the cocaine later in the day (Friday).  CS agreed to meet MARTINS-Olvera with U/C Agent Garza at the Whataburger again on San Pedro and Ramsey at a time later in the day when MARTINS-Olvera had the cocaine.

4. On 12-07-01, surveillance was established on MARTINS-Olvera's apartment and vehicle at 7226 Blanco Rd, San Antonio, Texas, near the 3000 building.  The truck is described as a 1994 Chevrolet Pick Up, Texas license LJ 2805.

5. At approximately 2:15 pm, 12-07-01, the CS received a phone call from MARTINS-Olvera saying he would bring the cocaine to the CS and U/C Agent Garza at the Whataburger, San Pedro and Ramsey in the next few minutes.

6. At 2:38 pm, 12-07-01, TFO Fowler observed MARTINS-Olvera walk out of his apartment and meet with the driver of a black Ford Pick Up truck, Texas license 5CNJ92 that parked next to MARTINS-Olvera's truck.  It is believed that the driver of the black truck, Jose SOTO, delivered a backpack containing five kilograms of cocaine to MARTINS-Olvera at this time.  The black truck then drove off and went North on Blanco. MARTINS-Olvera entered his green truck and was followed by surveillance to the Whataburger parking lot at Ramsey and San Pedro, arriving at 2:42 pm.  MARTINS-Olvera then moved his truck to the Wash-a-teria parking lot at Sahara and San Pedro, next to Whataburger and waited for U/C Agent Garza and the CS.

7. At 2:53 pm, U/C Agent Garza and the CS drove into the parking lot of the Wash-a-teria and parked a few spaces away from MARTINS-Olvera. All then met near MARTINS-Olvera's truck.  At this time, U/C Agent Garza got inside MARTINS-Olvera's truck with MARTINS-Olvera and the CS walked to the Whataburger.  U/C Agent Garza observed five kilograms of cocaine inside a backpack and told MARTINS-Olvera he would go to his truck and get the money for the cocaine.  S/A Garza then made a phone call to TFO Jimenez and gave him the prearranged arrest signal.

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| *(Continuation)* | 3. File Title SOTO, Jose Guadalupe | |
| 4. Page 3 of 5 | | |
| 5. Program Code | 6. Date Prepared 12/11/01 | |

8. MARTINS-Olvera was arrested inside his truck, removed and TFO Fowler found Exhibit 1, a backpack containing five kilograms of cocaine on the floorboard of the driver's side of the truck where MARTINS-Olvera had been sitting. MARTINS-Olvera was advised of his rights by TFO Frank Perez in the presence of other Agents and TFOs. Note: An attempt to record the transaction was made but the equipment was inoperable.

9. MARTINS-Olvera was transported to the SADO for processing. During the processing, MARTINS-Olvera agreed to call his source for the cocaine and attempt to get him to meet at MARTINS-Olvera's apartment on Blanco.

10. MARTINS-Olvera called the alleged source, Jose Guadalupe SOTO on cell phone number 210-573-8103. SOTO agreed to meet MARTINS-Olvera at the apartments on Blanco. Surveillance was set up again on the Spanish Trace Apartment, 7226 Blanco, near building 3000. During the surveillance, TFO Frank Perez recorded cell phone calls from Jose SOTO to Jaime MARTINS-Olvera arranging the meetings. This recording was later retrieved as Exhibit N-3.

11. At 5:40 pm, 12-07-01, U/C Agent Garza, who was sitting in MARTINS-Olvera's truck, notified surveillance units that SOTO had arrived at the apartments and was parked next to MARTINS-Olvera's truck. SOTO was driving a 1992 Ford Thunderbird, Texas license N96 LFH. SOTO was arrested at this time.

12. MARTINS-Olvera signed a Consent To Search for his apartment, number 3006, and then pointed out the location of some cocaine and marijuana that was in his apartment. Refer to DEA 6, Consent To Search of MARTINS-Olvera's apartment by S/A Joseph DuBois.

13. Jose SOTO signed a Consent To Search for his apartment at 11721 Parliament, #1813, San Antonio, Texas. No narcotics were found at this location.

14. SOTO told TFO Fowler the location of his black Ford truck, which was at 500 Everest, Performance Auto, for service. The truck was seized

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| (Continuation) | 3. File Title SOTO, Jose Guadalupe | |
| 4. Page 4 of 5 | | |
| 5. Program Code | 6. Date Prepared 12/11/01 | |

and returned to the SADO for seizure, as it was used to deliver the five kilograms of cocaine earlier in the day.

15. SOTO's 1992 Ford Thunderbird and MARTINS-Olvera's 1994 Chevrolet truck were also seized and returned to the SADO.

## CUSTODY OF EVIDENCE

1. On 12-07-01, TFO Fowler seized one backpack containing five kilograms of cocaine, referred to as Exhibit 1, from a 1994 Chevrolet Pick Up truck, Texas license LJ 2805, that was driven by Jaime MARTINS-Olvera. TFO Fowler maintained custody of Exhibit 1 until it was turned over to G/S Ken Peterson for safekeeping. On 12-10-01, G/S Peterson released Exhibit 1 to TFO Ron Jimenez, who processed the exhibit and mailed same to the DEA South Central Lab, Dallas Texas, for processing.

2. Exhibits 2 through 7 were collected at Jaime MARTINS-Olvera's apartment, 7226 Blanco, #3006, San Antonio, Texas, pursuant to a Consent To Search. Exhibits 2 through 7 were later processed by TFO Ron Jimenez and mailed to the DEA South Central Lab, Dallas, Texas, for processing. Refer to DEA 6, Consent To Search of MARTINS-Olvera's apartment by S/A Joseph DuBois, for details of exhibits 2 through 7.

3. Exhibit N-1, one backpack which contained Exhibit 1, was submitted by TFO Ron Jimenez to the DEA South Central Lab, Dallas, Texas for fingerprint processing.

4. Exhibit N-2, one cassette tape of CS-00-101073 talking to Jaime MARTINS-Olvera on 12-07-01 on MARTINS-Olvera's cell phone. This exhibit was recorded by S/A Garza and later placed in the SADO Non-Drug Evidence Vault for safekeeping.

5. Exhibit N-3, one cassette tape of conversations between Jaime MARTINS-Olvera and Jose SOTO on cell phones, recorded by TFO Frank Perez. This cassette recording was processed by TFO Perez and placed in the SADO Non-Drug Vault for safekeeping.

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No.<br>M2-02-0021 | 2. G-DEP Identifier<br>WGC1D |
|---|---|---|
| (Continuation) | 3. File Title SOTO, Jose Guadalupe | |
| 4.<br>Page 5 of 5 | | |
| 5. Program Code | 6. Date Prepared<br>12/11/01 | |

6.  Exhibit N-4 is one 1994 Chevrolet Pick Up truck, Texas license LJ 2805, driven by Jaime MARTINS-Olvera.  This exhibit was seized pursuant to MARTINS-Olvera's arrest and held for seizure at the SADO.

7.  Exhibit N-5 is one 1999 Ford Pick Up truck, Texas license 5CNJ92, driven by Jose SOTO to deliver five kilograms of cocaine to MARTINS-Olvera.  This exhibit was seized pursuant to SOTO's arrest and held for seizure at the SADO.

8.  Exhibit N-6 is one 1992 Ford Thunderbird, Texas license J72 HFD, driven by Jose SOTO at the time of his arrest to collect money from MARTINS-Olvera.  This exhibit was seized pursuant to SOTO's arrest and held at the SADO for seizure.


## INDEXING

1.  Jaime MARTINS-Olvera        NADDIS # 2862937

2.  Jose Guadalupe SOTO.        NADDIS # Pending

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code | 2. Cross File | Related Files | 3. File No. M2-02-0021 | 4. G-DEP Identifier WGC1D |
|---|---|---|---|---|
| 5. By: Frank Perez, TFO At San Antonio, Texas | | | 6. File Title SOTO, Jose Guadalupe | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 12/21/01 | |
| 9. Other Officers: | | | | |

10. Report Re: Arrests of Jaime MARTINS-Olvera and Jose Guadalupe SOTO; Acquisition of Exhibit #N-3.

## SYNOPSIS

On 12-07-01, Task Force I-San Antonio District Office conducted an investigation into the illegal drug-trafficking activities of Jose Guadalupe SOTO and Jaime MARTINS-Olvera, which concluded in their arrests for conspiracy to distribute approximately 5 kilograms of cocaine.

## DETAILS

1. Reference is made to DEA-6, written to this case file by TFO Cal Fowler, dated: 12-11-01, regarding the surveillance/arrest of Jaime MARTINS-Olvera and Jose Guadalupe SOTO, as well as DEA-6s, also written to this case file by S/A Jaime Garza, dated: 12-10-01 and 12-11-01, regarding negotiations with Jaime MARTINS-Olvera.

2. On 12-03-01 and 12-07-01, S/A Garza (acting in an undercover capacity) negotiated with MARTINS-Olvera for the delivery of approximately 5 kilograms of cocaine (see DEA-6s by S/A Garza, dated: 12-10-01 and 12-11-01 for details).

3. On 12-07-01, S/A Garza agreed to meet with MARTINS-Olvera at a local wash-a-teria parking lot located at Sahara and San Pedro, San Antonio, Texas and consumated the pre-arranged delivery.

4. After viewing the cocaine, S/A Garza gave the pre-determined arrest signal, thus effecting MARTINS-Olvera's arrest.

5. Immediately after the arrest by S/A Denise Stone and TFO Frank Perez, MARTINS-Olvera was advised of his rights as per the Miranda warning by TFO Perez at approximately 3:00 p.m.

| 11. Distribution: Division Houston | 12. Signature (Agent) Frank Perez, TFO | 13. Date 12-21-01 |
|---|---|---|
| District San Antonio | 14. Approved (Name and Title) Joe Dubois Acting Group Supervisor | 15. Date |
| Other EPIC, SARI | | |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | M2-02-0021 | WGC1D |
| (Continuation) | 3. File Title | |
| | SOTO, Jose Guadalupe | |

| 4. | |
|---|---|
| Page 2 of 2 | |
| 5. Program Code | 6. Date Prepared |
| | 12/21/01 |

6. After acknowledging his constitutional rights to both S/A Stone and TFO Perez, S/A Stone asked "what was in the truck", to which MARTINS-Olvera responded "just the 5 keys".

7. When S/A Stone asked "what keys", MARTINS-Olvera replied "he didn't know".

8. During this interview, MARTINS-Olvera expressed a desire to cooperate fully and to assist in effecting the arrest of his cocaine source.

9. TFO Fowler was made aware of MARTINS-Olvera's statements and further discussions were carried out at the San Antonio District Office.

10. At approximately 5:00 p.m., MARTINS-Olvera, S/A Garza, and TFO Perez returned to MARTINS-Olvera's apartment complex parking lot, to await the delivery of 5 additional kilograms of cocaine from the source.

11. While waiting inside MARTINS-Olvera's pickup, two cellular telephone conversations to #210/573-8103 were recorded on to one cassette tape, which was later labeled as Exhibit #N-3. These conversations were between MARTINS-Olvera and his cocaine source, Jose Guadalupe SOTO.

12. At approximately 5:40 p.m., SOTO arrived in a grey Ford Thunderbird (rather than in the black Ford pickup as claimed during the recorded conversations) and parked next to MARTINS-Olvera's pickup.

13. At this time, SOTO was arrested for conspiracy to distribute approximately 5 kilograms of cocaine and transported to the San Antonio District Office for processing.

## CUSTODY OF EVIDENCE

1. Exhibit #N-3=is an original cassette tape, which contains two recordings of conversations between Jaime MARTINS-Olvera and Jose Guadalupe SOTO on 12-07-01. TFO Frank Perez maintained custody of Exhibit #N-3 until it was turned over to the San Antonio District Office Non-Drug Evidence Custodian for safekeeping.

## INDEXING

1. MARTINS-Olvera, Jaime=NADDIS #2862937.
2. SOTO, Jose Guadalupe=NADDIS Pending.

---

DEA Form   - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Exh. #8

1        THE COURT:  Okay.  Let's take a short break.

2        (Brief recess.)

3        THE COURT:  Be seated.  Mr. Contreras, do you want

4   to go ahead and call the witness?

5        MR. CONTRERAS:  Yes, sir.

6        THE COURT:  And I will let you start off with --

7        MR. CONTRERAS:  Okay.  We will call Agent Jason

8   Stallings, Your Honor.

9        COURTROOM DEPUTY:  Please raise your right hand.

10        (Oath administered to the witness.)

11        *-*-*-*-*-*-*-*

12        DIRECT EXAMINATION

13   BY MR. CONTRERAS:

14   Q.  Agent Stallings --

15   A.  Yes.

16   Q.  -- you presented this case before the Court -- to the

17   grand jury, the original indictment, on November 20th, 2002,

18   correct?

19   A.  Yes.

20   Q.  And you were the witness who testified in front of the

salazar1b

17      MR. CONTRERAS:  I am sorry.

18   BY MR. CONTRERAS:

19   Q.  -- Alejandro Castillon and Rene Campos; Jesse Salazar

20   Ramirez, talking about loads coming up.

21        At the time you testified in front of the grand

22   jury, obviously, you intended to testify truthfully?

23   A.  Yes.

24   Q.  What was your understanding about who had been intercepted

25   at the time you testified?

                              118


1    A.  At the time I testified, it was my understanding that it

2    was Jesse Ramirez that was intercepted.

3    Q.  Just Jesse?

4    A.  No.  It was Jesse, Noe Castillon, Reynaldo Hernandez, Lori

5    Hernandez.  There were multiple subjects, and we had some

6    other ones that we hadn't identified yet.

7    Q.  Okay.  After that, your testimony, did you later change

8    your opinion about who had been intercepted and who had not?

9    A.  Yes.  It had been probably at least six months later that

10   by the time we had to go back and relisten to all of the

11   calls, and we identified that it wasn't Jesse Salazar Ramirez

                              Page 3

salazar1b

21    Okay?

22        And your answer was -- or the question is:  He was

23    driving Castillon's vehicle?

24        And you said:  Yes.

25        Question:  Okay.  And he got the cocaine from

132

1    Ramirez and Campos?

2        Answer:  Yes.

3        All right.  Now, do you remember when you were

4    testifying about all of that stuff about Jose Soto?

5    A.  Yes.

6    Q.  Isn't it -- is it true that Jose Soto was cooperating from

7    the time of his arrest to the time that you testified before

8    the grand jury?

9    A.  I can't say the amount of time, no.  I don't know when

10    that started, his cooperation started, no.

11    Q.  Then why did you tell the grand jury that he had been

12    cooperating since then?

13    A.  I can't tell you the exact date it started.  I know it was

14    some time after that, but I am not going to say since the day

15    of his arrest, when they put handcuffs on him.  I don't know

16    the exact date, no, sir.

Page 20

salazar1b

17  Q.  Okay.

18  A.  But, yes, he has been cooperating.

19  Q.  All right.  So when you told the grand jury Mr. Soto has

20  been cooperating since then, that is not a true statement?

21  A.  That is a true statement, because he -- when you asked

22  me -- from the date of his arrest.  Okay?

23  Q.  Yes.

24  A.  Okay.  I am not going to say -- I don't know if it goes on

25  the date of his arrest or shortly thereafter.  Yes, he is

133

1  cooperating.  I knew that.  Okay?

2  Q.  Do you recognize there is a difference when you say that

3  someone has been cooperating since the day of their arrest

4  versus someone who has cooperated several months after their

5  arrest?

6       Is there a difference in your mind?

7  A.  Yes, sir.  Yes, sir.  Yes, sir.  Yes, sir.  There is.

8  Q.  And -- but so when you made that statement to the grand

9  jury, you did not know when he had started cooperating?

10  A.  I didn't know the exact date, but I know it was around

11  that time, yes.

Page 21

salazar1b

12  Q. Around what time?

13  A. Around the time of his arrest. I don't know the exact

14  date. I wasn't involved in that.

15  Q. Okay. Would it surprise you that he didn't start

16  cooperating until six months later, June 2002?

17  A. No. Like I said, I wasn't involved with that situation.

18  I just was told that it was around the time of his arrest.

19  That's what was relayed to me.

20  Q. Who relayed that to you?

21  A. I believe it was -- I talked to the undercover agent. I

22  talked to Agent Cal Fowler, and I might have talk to Agent

23  Castaneda.

24  Q. Okay. Are you familiar with another report that Agent

25  Fowler did regarding Jose Soto, debriefing Jose Soto?

134

1  A. No, sir.

2  Q. Let me hand you what has been marked as Defendant's

3  Exhibit A and ask you if you recognize that report at all.

4  A. No, sir. I have never seen this report before.

5  Q. Never during the course of your investigation, in this

6  case, have you seen this report?

7  A. No, sir.

Page 22

salazar1b

8  Q. Not once?

9  A. No, sir.

10  Q. All right. So on Defendant's Exhibit A, who is the agent

11  who prepared this report?

12  A. Cal Fowler.

13  Q. Okay. And he is the same one who did the report that

14  was -- that you used to look at before you went to the grand

15  jury?

16  A. Yes.

17  Q. Okay. Now, let me refer you to page 3 of Defense Exhibit

18  A, where it states: Soto said on his initial debriefing on

19  6/6/02, he was not telling the truth about his source.

20      Had you ever seen that statement before?

21  A. No, sir.

22  Q. All right. When you talked to Agent Fowler -- let me ask

23  you this. When Agent Fowler wrote that statement in his

24  report that Soto told him he had been untrue about his source,

25  did you have any reason to doubt the truth of that statement

135

1  by Agent Fowler?

2  A. No.

Page 23

salazar1b

3    Q. Okay. So Agent Fowler never showed you, told you --

4    A. No, sir.

5    Q. -- about him recanting and saying that his original

6    debriefing, the source was not the truth?

7    A. No.

8    Q. Okay. You stated that -- one of the questions was that

9    you believed that Jose Soto's testimony was truthful,

10   something along those lines.

11        Do you remember that question by the prosecutor?

12   A. Yes.

13   Q. You personally talked to Jose Soto?

14   A. No, because he -- no, I have not personally talked to him,

15   no.

16   Q. Okay. You were about to say, he doesn't speak English?

17   A. Right.

18   Q. You have been there when he has talked, and there have

19   been interpreters interpreting for you?

20   A. I never been there when someone has interpreted, no.

21   Q. So you have never been in the same room when he was

22   debriefing?

23   A. I have been there during the debriefing, but I have never

24   been there where somebody has interpreted what he is saying

25   directly, no.

Page 24

salazar1b
136

1  Q. When were you there when the debriefing took place?

2  A. I don't remember.

3  Q. Well, let me ask you this.  Were you in any debriefings

4  with Jose Soto before you went to the grand jury?

5  A. No.

6      MR. SCHARFF:  Your Honor, I would move for admission

7  of Defendant's Exhibit A into evidence, which is --

8      THE COURT:  Admitted.

9  BY MR. SCHARFF:

10  Q. Okay.  Now, also in the grand jury, you stated that when

11  you went to the Roanoke Apartments that you performed a quote,

12  unquote, knock and talk; is that correct?

13  A. As far as what was in the testimony, I would have to

14  review the transcript to find out exactly what I said in that,

15  because I believe I misspoke exactly what happened out there.

16  Q. Let me find out what page that is.

17      THE COURT:  What did you have to review?

18      THE WITNESS:  I just wanted to find out exactly what

19  was said because I --

20  BY MR. SCHARFF:

Page 25

salazar1b

21  Q. On page 28 of the transcript, from November 20th, later in

22  the evening, on the 28th, is when we police officers did a

23  knock and talk at that town house and saw Mr. Garcia-Arguello

24  running around inside, because we knew what was going on

25  inside. We knew there was narcotics inside, and he let us in.

137

1   We did a consensual --

2       Do you remember saying that to the grand jury?

3   A. Yes.

4   Q. All right. You were just saying something like you

5   misspoke about that?

6   A. Yeah. The last line where he let us in, we did a knock

7   and talk, yes, and once we saw that he was running around

8   inside at the time, I misspoke on the method that we entered.

9   I knew that we received a consensual signed once we got on the

10  inside, but I wasn't there when it happened and I misspoke

11  when I said he let us in. We had the consensual, but, yes.

12  Q. What is the truth, then? What really happened?

13  A. Well, what happened was, once we were there, we saw him

14  running inside, it was relayed that we believed he was

15  destroying evidence, and we made forced entry to secure the

16  residence. Once we secured the residence, we obtained a

Page 26

salazar1b

17   consent to search.

18   Q.  Okay.  When Mr. Arguello gave you that consent to search,

19   was he in handcuffs?

20   A.  I have no idea.

21   Q.  You weren't there when that happened?

22   A.  No.

23   Q.  Okay.  And so you don't know if there were guns pointed at

24   him or anything like that?

25   A.  No.  I was not there.

                                138


1        MR. SCHARFF:  Pass the witness.

2        MR. CONTRERAS:  Very briefly.  May I approach?

3        *-*-*-*-*-*-*-*

4        REDIRECT EXAMINATION

5   BY MR. CONTRERAS:

6   Q.  When Mr. Scharff was saying, referring to a report where

7   Soto went and changed his original version of what he told the

8   agents, Mr. Scharff, for some reason, didn't allow you to

9   finish exactly what the report said.

10        It said he admitted in his initial debriefing that

11   he had not told the truth about his source, and he says he

salazar1b

12  didn't talk about his original source, Castillon, because he

13  was afraid of the attorney problem; is that right?

14  A.  Yes.

15  Q.  So initially, he referred to that man right there and Rene

16  Campos as his source.  Later, when he retracted anything, it

17  had nothing to do with him?  It was Castillon that he wanted

18  to change his story on; is that right?

19  A.  Yes.

20  Q.  And that was because he was afraid his lawyer had been

21  compromised?

22  A.  Yes.

23       MR. CONTRERAS:  That's all we have.

24       MR. SCHARFF:  Briefly, Your Honor.

25       *-*-*-*-*-*-*-*

139

1       RECROSS EXAMINATION

2  BY MR. SCHARFF:

3  Q.  So he lied, basically?  Told a lie to you, lied to DEA,

4  lied to Detective Fowler, Agent Fowler when he said that the

5  source was Rene Campos and Jesse Ramirez.  That's a lie.  He

6  said that, correct?

7  A.  No.  I don't think he is saying the whole thing -- no.

Page 28

salazar1b

8    What you are saying there is not true, because what he is

9    saying is that, yes, at that time, during that meeting, he

10    received his narcotics from Rene Campos and Jesse Salazar

11    Ramirez.  But later on -- I am not going to say -- there are

12    details in there that I am not familiar with, sir.

13    Q.  Fair enough.

14    A.  I know there are parts of it, but I am not going to get in

15    here and say he lied, because I don't know all of the details

16    of all of the reports.

17    Q.  Basically, what you are saying is, before you went to the

18    grand jury, you had no details about what he had told in his

19    debriefing?

20    A.  No.

21    Q.  The different statements to Detective Fowler or

22    Detective -- I mean, Agent Fowler Or Agent Doug Davis or

23    anything like that?  All you had was an arrest report of when

24    he was arrested?

25    A.  Yes, sir.

140

1    Q.  And some hearsay knowledge that he had been cooperating?

2    A.  Yes, sir.

Page 29

Exh. #9

1445

my first lawyer, I said to Eddie: Eddie, I need to talk to the agents. And Eddie said: You know what? They don't care about you. They don't need to talk to you. Just go through the trial. And then I figure out, so something is wrong, and I hire Mr. Collis White.

And I told Mr. Collis White: I need to talk to the agents. But at the same time, when I lied to the agents, I lied because of one thing. By that time, Jesse and Castillon, they know I want to try to talk to the agents. That's why I lied, and I was scared for my life and my family.

THE COURT: Okay. So you told the agents the first time around, when you had the first lawyer, you told them something different from what you are saying today?

THE WITNESS: Yes.

THE COURT: Like what did you tell them the first time?

THE WITNESS: About the keys, where I got the keys, my keys, the five keys I sell to Jaime.

THE COURT: The kilos?

THE WITNESS: The kilos.

THE COURT: And what did you tell them the first time?

THE WITNESS: I got it from somebody else, Juan, some other name.

THE COURT: You made up a name?

1    THE WITNESS:  The name, yes.

2         THE COURT:  Okay.  Was there something else you told

3    them at that time?

4         THE WITNESS:  I get it for -- for Juan, and gave him

5    some address, I give --

6         THE COURT:  But did you give them any other

7    information or by then it stopped?

8         THE WITNESS:  Nothing.

9         THE COURT:  But the first time you told them --

10        THE WITNESS:  It was from Juan.

11        THE COURT:  -- that it was from Juan?

12        THE WITNESS:  That it was from Juan.  I never

13   mentioned -- I never say Alejandro or I never say nothing.

14   The second time I talked to the agents and I told -- I told

15   everything.

16        THE COURT:  Okay.

17        THE WITNESS:  Because Mr. Collis White told me to go

18   straight.  Because my first lawyer, they don't want me to talk

19   to the agents.

20        THE COURT:  Okay.  Well, I guess there is no report,

21   but that gives you some indication of what took place, Mr.

22   Scharff.  We will take it at that.  I am satisfied by the

23   government's representation, and we have got some indication

24   of some of the incorrect statements that he might have made

25   during his initial interview.

Exh. #10

```
 1   Q.  This work that the defendant had done at that shop, would
 2   you agree that that was pretty extensive and expensive work he
 3   had done?
 4   A.  I was with the understanding that the spray booth was
 5   rather expensive, yes, sir.
 6   Q.  Would you agree that it was especially expensive for
 7   somebody with zero income that year?
 8   A.  That, I don't know.
 9            MR. SCHARFF:  Object to him assuming facts not in
10   evidence.  There is no testimony --
11            MR. CONTRERAS:  Pass the witness.
12            THE COURT:  That's all.  Thank you.
13            THE WITNESS:  Okay.
14            MR. SCHARFF:  Call Agent DuBois.
15            (Oath administered to the witness.)
16            THE COURT:  Have a seat.
17            THE WITNESS:  Thank you.
18            *-*-*-*-*-*-*-*
19            DIRECT EXAMINATION
20   BY MR. SCHARFF:
21   Q.  Would you please introduce yourself to the ladies and
22   gentlemen of the jury?
23   A.  My name is Joe DuBois.
24   Q.  All right.  And what is your occupation, sir?
25   A.  I am a DEA agent.
```

1    Q.   All right.  How long have you been with the DEA?

2    A.   About 13 years.

3    Q.   All right.  How long have you been stationed here in San

4    Antonio?

5    A.   About four years.

6    Q.   All right.  Do you remember helping effectuate an arrest

7    on a Jose Soto on December the 7th, 2001?

8    A.   Very vaguely, yes.

9    Q.   Okay.  And do you remember what your role was in that

10   particular --

11   A.   I was just an extra body.

12   Q.   All right.  Do you remember having been asked to go pick

13   up, to go get a vehicle that belonged to Jose Soto at a

14   certain place?

15   A.   Hmmm.

16   Q.   Let me see if I can be more specific.  On Government's

17   Exhibit No. 2, were you told to go pick up a vehicle at the

18   Performance Tint & Detail on 602 Everest Street, this picture

19   right here?

20   A.   I don't recall picking up -- this -- we went to that tint

21   place on another case that we were working that involved

22   a whole different group, as far as I know.  We were at that --

23   I think it is that tint and detail place.

24   Q.   I am just specifically asking for December the 7th, 2001.

25   D-day.

1    A.  D-day, yes.  Uh-huh.  Yes.  Or, actually, it was Pearl

2    Harbor, wasn't it?

3    Q.  Did I -- what did I say?  D-day?

4    A.  D-day.

5    Q.  Pearl Harbor.

6    A.  Yes.

7    Q.  Excuse me.  Pearl Harbor.  And does the name Jose Soto

8    mean anything to you?

9    A.  No.  No, it doesn't.

10   Q.  Okay.  Well, do you remember, do you know an agent by the

11   name of Jaime Garza?

12   A.  Yes, sir.

13   Q.  Works as an undercover agent?

14   A.  As we all do, yes, sir.

15   Q.  All right.  And, now, he had arrested someone named Jaime

16   Martins?

17   A.  Yes.  I remember that case.

18   Q.  Okay.  Five kilos of cocaine?

19   A.  Yes, sir.

20   Q.  And there were some consensual phone calls made that led

21   to Jose Soto?

22   A.  Okay.  All right.

23   Q.  Does that refresh your memory?

24   A.  Yes, yes.  Uh-huh.

25   Q.  All right.  Now, do you remember either deciding or being

Exh. #11

Copy

```
 1              MR. CONTRERAS:  No questions, Your H
 2              THE COURT:  That's all, sir.  You can step down.
 3              THE WITNESS:  Thank you.  May I be excused, Your
 4    Honor?
 5              THE COURT:  Yes, sir.
 6              THE WITNESS:  Thank you.
 7              MR. SCHARFF:  Cal Fowler.
 8              THE WITNESS:  I will get him for you.
 9              MR. SCHARFF:  Thanks.
10              THE COURT:  Would you raise your right hand, sir?
11              (Oath administered to the witness.)
12              THE COURT:  Have a seat.
13              MR. SCHARFF:  May I proceed, Your Honor?
14              THE COURT:  Yes, sir.
15              *-*-*-*-*-*-*-*
16              DIRECT EXAMINATION
17    BY MR. SCHARFF:
18    Q.  Sir, could you please introduce yourself to the ladies and
19    gentlemen of the jury?
20    A.  I am Cal Fowler from the San Antonio Police Department,
21    assigned to the Drug Enforcement Administration Task Force.
22    Q.  Okay.
23    A.  San Antonio.
24    Q.  How long have you been in law enforcement?
25    A.  35 years.
```

1    arrested someone and they are in jail and they have a lawyer

2    and they decide they want to cooperate with the DEA.  All

3    right?

4    A.  Okay.

5    Q.  Is the next thing that happens is, if they are in jail,

6    they are brought over to the courthouse, correct, federal

7    courthouse?

8    A.  That's right.

9    Q.  All right.  Let's say it is a federal -- and then there is

10   a meeting; you are there, correct?

11   A.  Yes, sir.

12   Q.  All right.  And those would be called debriefings?

13   A.  Right.

14   Q.  And can you venture to guess how many debriefings you have

15   done over the last 22 years?

16   A.  Several hundred.

17   Q.  Hundreds.  All right.  Now, do you remember specifically

18   debriefing a man by the name of Jose Soto?

19   A.  Yes, sir.

20   Q.  All right.  Tell us how it came to be that a debriefing

21   was set up with Jose Soto.

22   A.  We arrested Jose Soto on December of 2002, and later,

23   during his prosecution, one of his first attorneys set up a

24   debriefing, and we talked to him that time and couldn't get

25   any information out of him.  He switched attorneys, and his

1    next attorney set up another debriefing where he gave us some

2    information.

3    Q.  Okay.  Do you remember -- now, you say he was arrested

4    December of 2002 or 2001?

5    A.  I think it was December 7th of '01.  That's right.

6    Q.  Okay.  And then the first debriefing was in June of 2002,

7    correct?

8    A.  That's the first one I attended.

9    Q.  Okay.  And who else was present when you were there?

10   A.  It was Agent DuBois and U.S. Attorney David Shearer, and I

11   think his attorney at that time was Collis White.  The first

12   attorney was Eddie Garcia.

13   Q.  Okay.

14   A.  The second attorney was Collis White.

15   Q.  Okay.  You are sure about that?

16   A.  That's what he told us.  That's who was present at the

17   debriefing.

18   Q.  All right.  The first -- do you remember if the first

19   debriefing took place on June the 6th of 2002?

20   A.  I think it did.

21   Q.  All right.  Do you remember -- I mean, do you actually

22   remember that debriefing and how it went and --

23   A.  Yes, I do.

24   Q.  Okay.  And when you started talking to Jose Soto, did he

25   tell you who -- where he is getting the cocaine and his source

1    of cocaine, that first meeting?

2    A.   Not at the first meeting.

3    Q.   What was he telling you at the first meeting?

4    A.   He said that -- I believe he said this was the only time

5    he had done it, and he met a guy in Mexico, and he was told to

6    drive this truck or car up to San Antonio.

7    Q.   All right.  And you didn't believe him?

8    A.   No.

9    Q.   Okay.  So after -- did you take any notes of that meeting?

10   A.   We probably did.

11   Q.   All right.  What do you do -- after you take notes during

12   a debriefing, what do you do with those notes?

13   A.   If we make a debriefing report, we reduce it to a report

14   of investigation.

15   Q.   Okay.  Do you remember doing a report for that debriefing

16   on June the 6th?

17   A.   There wasn't one on that debriefing, because he wasn't

18   telling us anything.

19   Q.   All right.  So you -- the meeting was ended, correct?

20   A.   That's right.

21   Q.   And you believed he was lying to you?

22   A.   He later told us he was.

23   Q.   And then on June the 26th, you met with him again, did you

24   not?

25   A.   That's right.

1   then do you know if there were any more debriefings subsequent

2   to July 16th?

3   A.   The two that I was at with Doug Davis, and then the one

4   with Joe DuBois are the ones that I know about.

5   Q.   Okay.  So, then, you have never talked to Jose Soto since

6   that time?  Or you were not involved in any debriefings since

7   that time?

8   A.   Not that I remember.

9   Q.   Okay.

10  A.   You mean actual debriefings?

11  Q.   Yes.  Or questioning of him or anything like --

12  A.   That's right.

13  Q.   Okay.  So since those two debriefings, you haven't seen

14  nor talked to him or anything, have you?

15  A.   No, sir.

16  Q.   Okay.  Now, the information that you got from Jose Soto on

17  that day, did you pass that -- did you pass that information

18  along to Agent Castaneda?

19  A.   Yes, we did.

20  Q.   All right.  And do you remember if he was needing

21  information because he was getting an affidavit ready for a

22  wiretap affidavit?

23  A.   Yes, sir.  That's what he was getting the information for.

24  Q.   Okay.  So do you remember -- do you remember having a

25  conversation with him about what Jose Soto had told you?

1  A.  Yes.  It was up in the synopsis.  It talks about the

2  involvement with Jesse Ramirez.

3  Q.  Okay.  But as far as anything specific in your report, did

4  he tell you anything specific about Jesse Ramirez in the drug

5  business at that first debriefing?

6  A.  I think on this first debriefing, we zeroed in mainly on

7  Alejandro Castillon and Rene Campos.  That's who he was

8  dealing with during our involvement with him.

9  Q.  All right.  Did he -- but did he say anything during that

10  debriefing to implicate Jesse Ramirez in the drug business?

11  A.  No.  During this debriefing, he mentioned him briefly at

12  the start, and then --

13  Q.  What did he say?

14  A.  That he was familiar with him; I believe that Ramirez had

15  given him a cellphone to stay in contact with him.

16  Q.  Okay.  Anything else?

17  A.  That he had been to the shop there on Everest Road a

18  couple of times for different deliveries or pickups.

19  Q.  And is that reflected in your report?

20  A.  In this report, I don't think it is.  That may be in the

21  Doug Davis report.

22  Q.  Okay.  Now, how can -- are you talking about when he was

23  talking in the next debriefing that he was saying these things

24  or at the first debriefing, or the one that you wrote the

25  report on?

1    A.   On this report here, or the first one, it mainly covers

2    the Castillon and Campos involvement.

3    Q.   Okay.  In that session, did Jose Soto tell you anything

4    specific about Jesse Ramirez being in the drug business?

5    A.   No.  Not in the first debriefing.

6    Q.   All right.  The first debriefing where he was actually

7    giving you information, correct?

8    A.   The first one, where he told us he was being truthful.

9    Q.   All right.  Now, were you involved in any other -- well,

10   let me ask you this.  You stated that, at some point, Jose

11   Soto told you that he had gotten the drugs from Rene Campos

12   and that Rene had gotten the drugs from Jesse Ramirez,

13   correct?

14   A.   Yes.  I believe that was covered in the Doug Davis

15   debriefing.

16   Q.   Okay.  And when he gave you that information, did you

17   believe it?

18   A.   Yes, sir.

19   Q.   Okay.  And, in fact, when Agent Castaneda was drawing up

20   the affidavit, that was something that you told him that Jose

21   Soto had said?

22   A.   I supplied Agent Castaneda with a copy of the report.

23   Q.   All right.

24   A.   And I think he mainly worked with the intel bureau, Doug

25   Davis --

1  you?

2  A.  I wrote in the report what he told us on that date.

3  Q.  All right.  So those are exact opposite statements, are

4  they not?

5  A.  I am not sure of what he said.  What is in the report is

6  what he told us on that date.

7  Q.  All right.  Now, I had asked you earlier if you had told

8  Agent Castaneda, Jose Soto had told you that he got the

9  cocaine from Rene Campos and that Rene got it from Jesse

10  Ramirez; do you remember that part of the questioning?

11  A.  That's right.

12  Q.  All right.  And he told you that?

13  A.  Did Soto tell us?

14  Q.  Yes.

15  A.  No.  He told us that, on that date, it had come from

16  Campos.

17  Q.  Okay.

18  A.  Who got it from Castillon.

19  Q.  So Soto never said to you that he got the drugs from

20  Campos and that Campos got them from Jesse Salazar Ramirez?

21  A.  On that first day, he didn't say that.

22  Q.  When did he say that, he got -- it came from Jesse

23  Ramirez?

24  A.  That was probably on one of the subsequent debriefings.

25  Q.  Okay.  Now, if Jose Soto testifies differently --

1   Q.   What kind of proceedings are DEA 6 -- the information in

2   DEA 6's relied upon?

3   A.   Prosecution.

4   Q.   For instance, a wiretap affidavit would be based on

5   information from the DEA 6?

6   A.   Yes, they are.

7   Q.   Okay.  What about grand jury testimony?

8   A.   Probably.

9   Q.   An indictment?

10  A.   Yes, sir.

11  Q.   Search warrant?

12  A.   That's right.

13  Q.   And if the testimony that was used to get affidavits,

14  search warrant, indictment turns out to be false, then what

15  happens?

16        MR. CONTRERAS:  Object to the relevance of that.  He

17  is not qualified to answer that question.

18        THE COURT:  Sustained.

19  BY MR. SCHARFF:

20  Q.   So after your involvement with Jose Soto on those two

21  dates, do you have any idea why you were not -- never

22  debriefed him again?

23  A.   No.  That -- our case involved his initial arrest, Soto.

24  Once he was going to be of value in another case, I didn't

25  feel that I had to be there.

1  the organization?

2  A.   It has happened before.

3  Q.   And in this case, Mr. Soto was originally represented by a

4  lawyer named Eddie Garcia?

5  A.   That's right.

6  Q.   And have you learned that Mr. Garcia was hired by the

7  organization and not Mr. Soto?

8  A.   Yes.  Mr. Soto told us that in a later debriefing.

9  Q.   And had he told on Mr. Castillon in the presence of his

10  lawyer, Mr. Garcia, who was being paid by Mr. Castillon, it

11  could have been dangerous for Mr. Soto?

12  A.   That was one of his concerns.  He told us on the second

13  debriefing that he knew Eddie Garcia was either working with

14  or employed by Mr. Ramirez.

15  Q.   Mr. Ramirez and Mr. Castillon?

16  A.   Right.  And he also had involvement with another female, I

17  believe, that had been arrested with some kilos of cocaine.

18  Q.   Does Lydia De Alba sound familiar?

19  A.   That's right.

20  Q.   Okay.  And in that context, that's when he first spoke to

21  you?

22  A.   That was on the second debriefing.

23  Q.   The one where he was lying?

24  A.   That was the first one, but he admitted that in the second

25  debriefing.

1  Q. Right.  But the first meeting, he said -- he told a big

2  lie and said:  I was hired by somebody in Mexico and I have

3  never done this before?

4  A. Right.

5  Q. You knew that wasn't true?

6  A. That is correct.

7  Q. You had done extensive surveillance of him and knew that

8  wasn't true?

9  A. We had surveillance on his -- his buyer, Jaime Martens

10 Olivera, and that's where we ran into José Soto.

11 Q. You saw him and knew they met up beforehand, so his story

12 of driving from Mexico wasn't exactly the truth?

13 A. Right.

14 Q. Okay.  So that was the end of that debriefing?

15 A. That is correct.

16 Q. And the second time around, he came clean, and did you

17 believe him?

18 A. Yes, I did.

19 Q. And at that debriefing, he said this defendant is in the

20 drug business; is that right?

21 A. That's what he said.

22 Q. But at that time, the investigation was moving very

23 quickly in the direction of Castillon and Mr. Campos, correct?

24 A. That's who he pointed the finger at on this particular

25 case.

1  Q.  And that was the focus of the investigation at that point?

2  A.  That's right.

3  Q.  And later, the investigation into Mr. Ramirez caught up to

4  the rest of the investigation?

5  A.  Yeah.  We had no idea at the time that there was anything

6  going on with Mr. Ramirez.

7  Q.  And regarding whether Jesse gave it to Rene, who gave it

8  to Soto or Castillon gave it to Rene, if this defendant stored

9  kilos of cocaine in his shop for the entire organization, it

10  would be correct that he, in fact, would give it to Rene, who

11  would then distribute it further, right?

12  A.  That's right.

13  Q.  So that's not a misstatement?

14  A.  No.

15          MR. CONTRERAS:  Pass the witness.

16          *-*-*-*-*-*-*-*

17          REDIRECT EXAMINATION

18  BY MR. SCHARFF:

19  Q.  Now, are you intimately familiar with the facts of Jose

20  Soto's case?

21  A.  With the initial arrest, right.

22  Q.  Did he tell you, did he ever tell you that when he was

23  arrested on the December 7th, 2001 with those five kilos that

24  those came from Jesse Ramirez's shop?  Did he ever tell you

25  that?

1    A.   Not on the 7th of December.

2    Q.   Okay.  So on the 7th -- on that day, the case that he was

3    arrested on, five kilos, he told you he got them from Rene

4    Campos, who got them from Jesse Ramirez, correct?

5    A.   No.  On that day, he said it came from Alejandro Castillon

6    to Rene Campos.

7    Q.   Okay.  When did he say -- but he said at a later date that

8    Rene got it from Jesse Ramirez?

9    A.   That was covered in this Doug Davis debriefing.  I was

10   just present at that one.

11   Q.   But that's what he said?

12   A.   I believe that is what is reflected in the report.

13   Q.   And you weren't here for Jose Soto's testimony, right?

14   A.   No, sir.

15   Q.   And nobody has told you about what he said at the trial,

16   correct?

17   A.   No, they haven't.

18   Q.   Okay.  So if he stated --

19        MR. CONTRERAS:  Object.  He doesn't know what he

20   said, so there is no point of getting into it.

21        THE COURT:  Sustained.

22        MR. SCHARFF:  Well, Your Honor, it is used for

23   impeachment and cross-examination.  Joey just gave him a

24   scenario where if it came from the defendant's shop, and this

25   and that; I want to give him a scenario that is actually

Exh. #12

1    debriefing happen?

2    A.   I don't know who initiated it.

3    Q.   Okay.  Well, typically, does the lawyer call the U.S.

4    Attorney or does the defendant call the U.S. Attorney?

5    A.   We were notified by the U.S. Attorney, David Shearer, that

6    Soto would debrief.

7    Q.   Okay.  And anything unusual about Eddie Garcia's

8    involvement in that debriefing, that first debriefing that

9    raised your suspicion?

10   A.   Not at that time.

11   Q.   Do you know Eddie Garcia to be an honorable lawyer?

12   A.   I think he is.

13   Q.   Do you think Eddie Garcia would ever try to keep someone

14   quiet for the sake of somebody else?

15   A.   I don't know.

16            MR. SCHARFF:  Pass the witness.

17            MR. CONTRERAS:  No questions, Your Honor.

18            THE COURT:  That's all.  Thank you.

19            MR. SCHARFF:  Call Doug Davis.

20            THE COURT:  Raise your right hand, sir.

21            (Oath administered to the witness

22            (by the Court.

23            THE COURT:  Have a seat.

24            *-*-*-*-*-*-*-*

25

```
 1              THE WITNESS:  Yes, sir.  (Reading document.)
 2              No, sir.
 3    BY MR. SCHARFF:
 4    Q.  All right.  So, then, Jose Soto never told you that on the
 5    five kilos that he received on December 7, 2001 that he got
 6    those from Rene Campos and that Rene got them from Jesse
 7    Ramirez?  He never told you that?
 8    A.  No.  Never told me that.  Not to my recollection.
 9    Q.  Okay.  Do you remember -- did you ever -- and you said
10    that Agent Castaneda was at both debriefings?
11    A.  No.
12    Q.  Okay.  He was at the one in September?
13    A.  No.  The one in July, the initial debriefing that I was
14    on.
15    Q.  Okay.  If Agent Castaneda swore under oath to a judge that
16    Jose Soto --
17              MR. CONTRERAS:  Objection.
18              MR. SCHARFF:  -- had told him that --
19              MR. CONTRERAS:  Objection.  He is commenting on
20    statements made by some other witness, Your Honor.  That's
21    improper.
22              MR. SCHARFF:  I am not commenting.  I am asking him
23    a question if it is true or not, Your Honor.
24              THE COURT:  Sustained.
25              MR. SCHARFF:  I wanted to --
```

1    ever say he was dealing drugs to Jesse Ramirez?

2    A.  He was delivering them for Castillon to Jesse Ramirez.

3    Q.  All right.  And where would he tell you that he was

4    delivering them, where he would get them from and deliver

5    them?

6    A.  Eagle Pass.

7    Q.  That he would come straight from Eagle Pass and deliver to

8    Jesse?

9    A.  I don't know if it was straight, but he came to San

10   Antonio and eventually delivered it to him.

11   Q.  Okay.  And how many times did he say he did that?

12   A.  He would -- I think he delivered it one time personally

13   himself, one kilo, and he was with Rene Campos when he made

14   several other deliveries of cocaine.

15   Q.  Okay.  Do you remember the dates that he was saying that

16   he was doing this?

17   A.  No, I don't.

18   Q.  Did you have any other involvement as far as surveillance

19   or anything in Jesse Ramirez's case?

20   A.  No.

21   Q.  Did you do any analysis of any evidence or anything like

22   that?

23   A.  No.

24              MR. SCHARFF:  Pass the witness.

25              MR. CONTRERAS:  No questions, Your Honor.

Exh. #13

```
 1    months; does that sound right?
 2    A.   Approximately.
 3              MR. SCHARFF:  Pass the witness.
 4              MR. CONTRERAS:  No further questions, Your Honor.
 5              THE COURT:  That's all.  Thank you.
 6              THE WITNESS:  Thank you, Judge.
 7              MR. CONTRERAS:  Government calls Collis White.
 8              THE WITNESS:  Good afternoon, Your Honor.
 9              MR. SCHARFF:  Your Honor, may I step outside just
10    for one second?  I have a potential witness that I need to ask
11    to --
12              THE COURT:  Yes.  That's fine.
13              (Oath administered to the witness by the Court.)
14              THE COURT:  And do you swear to keep your answers
15    short?
16              THE WITNESS:  Yes, sir.  And not break the
17    equipment.
18              MR. SCHARFF:  May I?  Thank you, Your Honor.
19              MR. CONTRERAS:  May I proceed, Your Honor?
20              THE COURT:  Yes, sir.
21              *-*-*-*-*-*-*-*
22              DIRECT EXAMINATION
23    BY MR. CONTRERAS:
24    Q.   Tell us your name, sir.
25    A.   Collis White.
```

1    disgusted with him and they said that they were leaving.  It

2    was over.

3    Q.  All right.  So on that day, are you saying that you did

4    not provide him with effective assistance of counsel?

5    A.  I did my best.  That would be for somebody else to

6    determine.

7    Q.  Okay.  I mean, you went over the rules with him, you

8    explained to him that he needed to tell the truth, that if he

9    told the truth that he could get some time off --

10   A.  Yes, sir.

11   Q.  -- right?  And yet he didn't tell the truth, right?

12   A.  That is correct.

13   Q.  And did you tell Mr. Garcia that Mr. Soto was going to go

14   do the debriefing --

15   A.  No, sir.

16   Q.  -- before that?

17   A.  (Witness shakes head.)

18   Q.  All right.  You stated that at that debriefing that Mr.

19   Soto refused to disclose his source of supply, and you said

20   that that's because he was afraid of Noe Castillon; is that

21   correct?

22   A.  I don't -- I don't think those are my exact words.  I

23   don't think -- I don't recall who he said he got the dope from

24   or where it was going.  It has been too long ago and,

25   factually, I am not involved in this case that much anymore.

1  It is more procedurally. I don't recall that, but I know that
2  he was definitely afraid of telling the truth about where it
3  really came from.
4  Q.  Okay.  He was afraid of disclosing the source of supply?
5  A.  Yes.
6  Q.  Which was Noe Castillon?
7  A.  Noe Castillon.  My understanding was that it was really a
8  group of three who controlled the operation.
9  Q.  All right.  Well, did he tell you that he was -- that
10 Jesse Ramirez had made threats against him or against his
11 family or anything like that?
12 A.  No.  At that time, I don't believe so.
13 Q.  So after he lied to the agents the first time and they
14 walked out on him, you were able to get another debriefing set
15 up, correct?
16 A.  Uh-huh.
17 Q.  And one of the reasons that you told the agents or that
18 Mr. Soto told the agents that he lied at that meeting was
19 because he was afraid, correct?
20 A.  Yes.
21 Q.  All right.  Can you think of any danger that he would be
22 in for telling the truth on that first meeting when he had the
23 golden opportunity?
24 A.  I think that he believed that if it got back to Mr.
25 Castillon, Mr. Campos, to Mr. Ramirez, that, yes, he would be

1    in danger, and I believe he was trying to protect them,

2    protect his own family, and the reason he didn't want Mr.

3    Garcia there was because he was in hopes no one would find out

4    that he was doing what he was doing, but was still afraid to

5    do it correctly.

6    Q.  Even though Mr. Garcia was out of the picture and you were

7    his only lawyer and he was meeting in secret with agents in a

8    courthouse, he still felt afraid?

9    A.  Yes, sir.

10   Q.  All right.  Now, you said that there have been several

11   debriefings between the government and Mr. Soto throughout the

12   course of the last two years, correct?

13   A.  Yes, sir.

14   Q.  And I know you can't -- you don't know the exact number?

15   A.  No, I don't.

16   Q.  But can you tell us if it is in the nature of tens,

17   twenties, five?

18   A.  I attended probably at least half a dozen.  They would

19   normally call me when they were going to see him just to touch

20   base and let me know that they were going to do that.  In my

21   estimation, given -- there were other cases, and this thing

22   broadened out into the Joey Villarreal case and other issues,

23   and so I would say they probably talked to him at least 20

24   times.

25   Q.  All right.  And so there have been at least ten times

TRANSCRIPT OF Alejandro Castillon

1   you know, fell from the truck or that was stolen from me.  And

2   I was complaining to him, very, very upset at him on the

3   phone.  That is true.  That is not a lie.

4   Q.  You grossed $22 million in one year and you were angry

5   over $8,000?

6   A.  In all of the kilos, you could say you earn that, but the

7   law doesn't know that you can -- depending on where you get

8   the kilos, what percentage you can make on it.  It could be

9   500 or, you know, it could be 1,000.

10  Q.  Thank you, Mr. Castillon.

11  A.  And it depends on the arrangement you have with the person

12  that gives it to you.

13  Q.  You stood before this judge and you pled guilty to

14  conspiracy to distribute cocaine, didn't you?

15  A.  Yes, yes.  Exactly.  Guilty for conspiracy.

16  Q.  And you swore that the allegations in the indictment were

17  true and correct, didn't you?

18        MR. SCHARFF:  Your Honor, I object.  May we

19  approach?

20        THE COURT:  Yes.

21        (Bench conference, as follows:)

22        MR. SCHARFF:  I know where he is going with this.

23  He is going to say that because Jesse was on the indictment

24  with all of the other people that he pled guilty to that,

25  meaning that he is guilty with him.

Karl H. Myers, CSR, RMR, CRR - (210) 212-8114

He knows and we all know that you can be a conspirator with one person and still be guilty of a conspiracy, all of those other people. By him doing that, it is going to be misleading the jury on the law of conspiracy. And so --

MR. CONTRERAS: He swore the indictment was true, and he's part of the indictment, Your Honor.

MR. SCHARFF: Right. That he conspired, but just because Jesse's name is in there doesn't mean he conspired with him, so that is misleading and it will confuse the jury under Rule 403.

THE COURT: I will overrule the objection.

(End of bench conference.)

THE COURT: Help from the peanut gallery.

MR. CONTRERAS: Tag team.

Mr. Castillon --

Interpreter, are you ready?

THE INTERPRETER: Ready.

BY MR. CONTRERAS:

Q. Mr. Castillon, you swore that the allegations in the indictment were true, didn't you?

A. What is that about the indictment? I don't understand.

Q. You pled guilty and you said the indictment was true, didn't you?

A. For what they were accusing me of, yes. I didn't answer

1    for anybody else.

2    Q.   You were accused of conspiring with this defendant and

3    others to distribute cocaine, weren't you?

4              MR. SCHARFF:   Your Honor, I object.   I object.   That

5    is a confusing statement to the jury.   It is misleading

6    insofar as the law of conspiracy, and it is in violation of

7    Rule 403 of the Rules of Evidence.

8              THE COURT:   Overruled.

9              MR. SCHARFF:   And in the alternative, Your Honor, I

10   would ask that you give them an instruction on the law.

11             MR. CONTRERAS:   Your Honor, he has already raised

12   his objection and you ruled previously.   May I proceed?

13             THE COURT:   Request for an instruction is denied.

14   We will take that up at the end of the case when the Court

15   instructs the jury.   And the objection is overruled.

16             Go ahead, Mr. Contreras.

17   BY MR. CONTRERAS:

18   Q.   Mr. Castillon, you know you were accused of conspiring

19   with this defendant and others to distribute cocaine, weren't

20   you?

21             MR. SCHARFF:   Your Honor, I have to object every

22   time he makes this question.   May I have a running objection,

23   so I don't have to stand and object every time he asks this

24   question?

25             THE COURT:   Yes, sir.   The record will so reflect.

Karl H. Myers, CSR, RMR, CRR - (210) 212-8114

1  BY MR. CONTRERAS:

2  Q.  Can you answer the question?

3  A.  Yes.

4  Q.  And you stood up and said:  That is true.  I did conspire

5  with this defendant and others to distribute cocaine, didn't

6  you.

7  A.  No.  I pled guilty, and the attorney said they are

8  offering you so much for that, and I didn't plead guilty so

9  that they could offer so much and so much and so much for each

10  of anybody else.

11  Q.  And now you are doing 25 years in a prison you don't like;

12  isn't that correct?  And you are very angry and you just don't

13  care about what will happen to you?  You just want to get back

14  at the government, don't you?

15  A.  That is not true, because --

16  Q.  Didn't your lawyer even tell you not to get on that stand

17  because you would be lying?

18        MR. SCHARFF:  Your Honor, that is absolutely

19  argumentative, assumes facts not in evidence.

20        THE COURT:  Sustained.

21        MR. SCHARFF:  And I would ask you to instruct the

22  jury to disregard that last statement.

23        MR. CONTRERAS:  I have a basis for asking that

24  question, Your Honor.

25        THE COURT:  Members of the jury, you are asked to

5/85) Search Warrant                                                    Exh #15

# United States District Court

_____ WESTERN _____ DISTRICT OF _____ TEXAS _____

In the Matter of the Search of
(Name, address or brief description of property or person to be searched)

A BEIGE, ONE-STORY USED AUTOMOTIVE BUSINESS
BUILDING, NAMED AUTO SPORTS E.C., LOCATED AT
1139 BASSE ROAD, SAN ANTONIO, TEXAS 78212,
INCLUDING ALL BUILDINGS/STRUCTURES AND
CONVEYANCES LOCATED WITHIN THE CURTILAGE.

**SEARCH WARRANT**

CASE NUMBER: SA 02-582M

TO: ANY SPECIAL AGENT _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by DEA SA Jason Stallings _____ who has reason to
                                                                    Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)
AUTO SPORTS E.C.,1139 BASSE ROAD, SAN ANTONIO, TX: DESCRIBED AS A USED AUTOMOTIVE
BUSINESS. A BEIGE BUILDING WITH A BROWN SHINGLED OVERHANG ACROSS THE FRONT OF THE
BUILDING. THE FRONT LOT IS ENCLOSED WITH A RED PIPE FENCE WHERE NUMEROUS CONVEYANCES
ARE PARKED. THE FRONT DOOR FACES SOUTH AND IS LOCATED ON THE FRONT, EAST END OF THE
BUILDING. THE SAID ADDRESS IS DISPLAYED ON A SIGN WITH RED LETTERS IN THE FRONT LOT.
in the _____ WESTERN _____ District of _____ TEXAS _____ there is now
concealed a certain person or property, namely: (describe the person or property)

SEE ATTACHMENT # 1

A true copy of the original. I certify.
Clerk, U. S. District Court

By: _____
                    Deputy

I am satisfied that the affidavit(s) which is attached hereto and incorporates herein by reference and any recorded
testimony establish probable cause to believe that the person or property so described is now concealed on the person
or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before ___ 11-18-02 ___
                                                                              Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find
reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy
of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or
property seized and promptly return this warrant to _any US marshall_ Nancy Nowak
as required by law.                                                   _____ U.S. Judge or Magistrate

_11-8-02_  _at_  _8:15 am_  at  San Antonio, Texas
Date and Time Issued                                    City and State

Nancy Nowak, U.S. Magistrate Judge          _____
Name and Title of Judicial Officer                      Signature of Judicial Officer

000336

NO. 467980

CITY OF SAN ANTONIO, TEXAS

DATE: 2/15/2002

DEVELOPMENT SERVICES DEPARTMENT

CERTIFICATE OF OCCUPANCY

THIS IS TO CERTIFY that the building located at:

Address of Location   1139   BASSE RD      Bldg:   5    Suite:

Lot: 26               Block:  000 NCB: 10115 Zone: C3

has been inspected and the following occupancy thereof is hereby authorized:

Occupancy Group: B            Occupant Load:   16

Occupant: JESSE RAMIREZ

DBA: PERFORMANCE TINT & DETAIL

Use of Premises:
AUTO DETAILING, TINT, AUDIO/ALARM, PAINT AND AUTO REPAIR

INTERIM
DIRECTOR

Director of Development Services

The Certificate of Occupancy shall be posted in a conspicuous place on the
premises and shall not be removed except by the Building Official.


01-300
(Rev.12-01/14)

# TEXAS SALES AND USE TAX PERMIT

*This permit is not transferable, and this side must be prominently displayed in your place of business.*

in place of a resale or exemption certificate. You will be
ve a valid resale/exemption certificate on file.

You must obtain a new permit if there is a change of
ownership, location, or business location name.

CATION NAME, and PHYSICAL LOCATION

| | |
|---|---|
| Type of permit | SALES AND USE TAX |
| Taxpayer number | 3-20075-1742-1 |
| Outlet number | 00002 |
| First business date | 01/01/2002 |

U
1135 BASSE RD
SAN ANTONIO

TX    78212-1004

SIC COD
General Au
HOW THI
SAN
AN

TION ON NEXT LINE:

ING LOCAL SALES TAX AUTHORITIES:
EFF  01/01/2002
EFF  01/01/2002

*Carole Keeton Rylander*
**CAROLE KEETON RYLANDER**
Comptroller of Public Accounts

YOU MAY NEED TO COLLECT SALES AND/OR USE TAX FOR OTHER LOCAL TAXING AUTHORITIES DEPENDING ON YOUR TYPE OF BUSINESS.

If you have any questions regarding sales tax, you may contact the Texas State Comptroller's field office in your area or call 1-800-252-5555, toll free, nationwide. The Austin number is 512/463-4600. If you are calling from a Telecommunications Device for the Deaf (TDD), the toll free number is 1-800-248-4099, or in Austin, 512/463-4621.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*Detach here and display your permit only.*

**IS THE INFORMATION PRINTED ON THIS PERMIT CORRECT?**

If your permit is correct, DO NOT return this form.
**If your permit contains incorrect information, you may use this form to:**
- correct your business location name, location address (if not a location change), taxpayer name, and/or mailing address;
- provide us with your new Federal Employer's Identification Number (FEIN);
- notify us that this location is no longer in business and provide the date of your last business transaction.

01-300-P-1

**To notify us of a change of ownership or business location, to correct the description of your business, or to correct the local taxing authority(ies) in which this outlet is located, call us toll free at 1-800-252-5555. The Austin number is 512/463-4600.**

**For more information on determining if the local taxing authorities listed above are correct, please see information printed on the back of this form.**

**COMPLETION INSTRUCTIONS**

To make corrections to your permit information using this form:
- enter the taxpayer name, taxpayer number and outlet number shown on the permit;
- indicate the required corrections by entering ONLY the information that has changed in the appropriate item(s);
- enter the date of your last business transaction if the location is out of business;
- sign and date the form;
- mail the form to COMPTROLLER OF PUBLIC ACCOUNTS, 111 E. 17th Street, Austin, TX 78774-0100.

*If a new permit is required due to your corrections, you will receive the new permit by mail after your information is processed. Refer to the back of this form and the back of your permit for more information.*

**You have certain rights** under Ch. 559, Government Code, to review, request, and correct information we have on file about you. Contact us at the address or toll-free number listed on this form.

## TEXAS SALES AND USE TAX PERMIT

Taxpayer name shown on the permit
JESSE S RAMIREZ

| Taxpayer number shown on the permit | Outlet number shown on the permit |
|---|---|
| 32007517421 | 00002 |

Correct business location name

Correct business location address

City | State | ZIP Code

Correct taxpayer name | Phone number (Area code and number)

Correct mailing address

City | State | ZIP Code | Federal Employer Identification Number

If you are no longer in business,
enter the date of your last business transaction.

**GOVERNMENT
EXHIBIT**

Comptroller use only

JOB NAME: MISCAPP
microfilm
☐ ■ 00991
■ 2601

Reference number
■ |__|__|__|__|__|__|__|__|__|__|

Destin
• |__|

**Taxpayer number change**
☐ NENTRY • 01000• 0

**XUMAST**
☐ Master name correction
☐ Master mailing address change
County code
• |__|__|
☐ Master phone number add/change

**XULOCA**
☐ Outlet/location name change
☐ Outlet/location address change
County code
• |__|__|
City indicator
• |__|

**XUSTAT**
☐ OOB sales tax permit
OOB date

01-300
(Rev.12-01/14)

# TEXAS SALES AND USE TAX PERMIT
*This permit is not transferable, and this side must be prominently displayed in your place of business.*

in place of a resale or exemption certificate. You will be ... ave a valid resale/exemption certificate on file. ...OCATION NAME, and PHYSICAL LOCATION

You must obtain a new permit if there is a change of ownership, location, or business location name.

**Type of permit**
SALES AND USE TAX

**Taxpayer number**
3-20075-1742-1

**Outlet number**
00003

**First business date**
01/01/2002

PE...  
1159 BASSE RD...  
SAN ANTONIO    TX    78212-1004

SIC COD...  ...PTION ON NEXT LINE:
General Au...  
...SHOW TH...  
SA...  
...AN ...

...WING LOCAL SALES TAX AUTHORITIES:
EFF: 01/01/2002
EFF: 01/01/2002

*Carole Keeton Rylander*
**CAROLE KEETON RYLANDER**
**Comptroller of Public Accounts**

YOU MAY NEED TO COLLECT SALES AND/OR USE TAX FOR OTHER LOCAL TAXING AUTHORITIES DEPENDING ON YOUR TYPE OF BUSINESS.

If you have any questions regarding sales tax, you may contact the Texas State Comptroller's field office in your area or call 1-800-252-5555, toll free, nationwide. The Austin number is 512/463-4600. If you are calling from a Telecommunications Device for the Deaf (TDD), the toll free number is 1-800-248-4099, or in Austin, 512/463-4621.

*Detach here and display your permit only.*

**IS THE INFORMATION PRINTED ON THIS PERMIT CORRECT?**

If your permit is correct, DO NOT return this form.
**If your permit contains incorrect information, you may use this form to:**
- correct your business location name, location address (if not a location change), taxpayer name, and/or mailing address;
- provide us with your new Federal Employer's Identification Number (FEIN);
- notify us that this location is no longer in business and provide the date of your last business transaction.

**To notify us of a change of ownership or business location, to correct the description of your business, or to correct the local taxing authority(ies) in which this outlet is located, call us toll free at 1-800-252-5555. The Austin number is 512/463-4600.**

**For more information on determining if the local taxing authorities listed above are correct, please see information printed on the back of this form.**

**COMPLETION INSTRUCTIONS**
To make corrections to your permit information using this form:
- enter the taxpayer name, taxpayer number and outlet number shown on the permit;
- indicate the required corrections by entering ONLY the information that has changed in the appropriate item(s);
- enter the date of your last business transaction if the location is out of business;
- sign and date the form;
- mail the form to COMPTROLLER OF PUBLIC ACCOUNTS, 111 E. 17th Street, Austin, TX 78774-0100.

If a new permit is required due to your corrections, you will receive the new permit by mail after your information is processed. Refer to the back of this form and the back of your permit for more information.

**You have certain rights** under Ch. 559, Government Code, to review, request, and correct information we have on file about you. Contact us at the address or toll-free number listed on this form.

## TEXAS SALES AND USE TAX PERMIT

Taxpayer name shown on the permit
JESSE S RAMIREZ

Taxpayer number shown on the permit
32007517421

Outlet number shown on the permit
00003

Correct business location name

Correct business location address

| City | State | ZIP Code |
|---|---|---|

Correct taxpayer name

Phone number (Area code and number)

Correct mailing address

| City | State | ZIP Code | Federal Employer Identification Number |
|---|---|---|---|

If you are no longer in business, enter the date of your last business transaction.

GOVERNMENT EXHIBIT

Comptroller use only
JOB NAME: MISCAPP microfilm
☐ ■ 00991
■ 2601
Reference number
Destin
Taxpayer number change
☐ NENTRY • 01000• 0
XUMAST
☐ Master name correction
☐ Master mailing address change
County code
☐ Master phone number add/change
XULOCA
☐ Outlet/location name change
☐ Outlet/location address change
County code
City indicator
XUSTAT
☐ OOB sales tax permit

Doc# 20020200938

NAME OF BUSINESS

U SHOOT EM

1139 Basse Rd., #5

San Antonio, Tx 78212

CERTIFICATE OF
ASSUMED NAME

FILED IN THE OFFICE OF THE BEXAR

COUNTY CLERK THIS _____ DAY

OF _____ A.D., 20 ___ .

AT _____ O'CLOCK. _____ M.

GERRY RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY: _____ DEPUTY

Doc# 20020200938
# Pages 2
07/07/2002 12:15:53 PM
Filed & Recorded in
Official Records of
BEXAR COUNTY
GERRY RICKHOFF
COUNTY CLERK
Fees $15.00

---

...ese last 3 Documents, will show you the real name, location & Description
...my business. All these people had to do was call "1411" info. Give the name
...street my business is located on. And the would have given them the Phone # and
...rrect Address, That simple. But why when all the DEA has to do is cover up
...eir mistakes. After all they are The DEA. "We can Get Away with Anything,
...lawful Search & Seizures", That violate our Constitutional Rights, Murdering 14 year
...d little Girls And other things, All Because no body wants to stand up to them.

...can prove all of my Allegation I have made Against them. I Just need some Help. Its Hard
...do from in Here, cause, they won't give me a bond. I have never been in any real trouble
...y Concealed hand gun license And my Class III Application is proof. They Just know
...can throw a wrench in this case, And mess it all up for them. That's why
...ey have me in here. And will not let me get Discovery And Grand Jury minutes.
Please Help some body

OVER

Doc# 20020200938

## ASSUMED NAME CERTIFICATE

FOR AN UNINCORPORATED BUSINESS OR PROFESSION OTHER THAN A
LIMITED PARTNERSHIP, REGISTERED LIMITED LIABILITY PARTNERSHIP, OR LIMITED LIABILITY COMPANY

PURSUANT TO THE PROVISIONS OF CHAPTER 36, TITLE 4, BUSINESS AND COMMERCE CODE OF THE
STATE OF TEXAS, THE UNDERSIGNED CERTIFIES THE FOLLOWING:

1. THE ASSUMED NAME AND ITS BUSINESS ADDRESS UNDER WHICH THE BUSINESS IS NOW OR IS TO BE
CONDUCTED IS:

**ASSUMED NAME**

U SHOOT EM

**BUSINESS ADDRESS**

1139 Bange Rd., #5
San Antonio, Tx 78212

2. THE BUSINESS OR PROFESSIONAL SERVICE IS BEING OR WILL BE CONDUCTED OR RENDERED
AS A:

A. X PROPRIETORSHIP   B.___ SOLE PRACTITIONER   C.___ PARTNERSHIP

D.___ REAL ESTATE INVESTMENT TRUST   E.___ JOINT STOCK COMPANY

F.___ OTHER FORM OF UNINCORPORATED BUSINESS OR PROFESSIONAL ASSOCIATION
OR ENTITY OTHER THAN LIMITED PARTNERSHIP, A LIMITED LIABILITY COMPANY OR REGISTERED
LIMITED LIABILITY PARTNERSHIP (SPECIFY):

**REGISTRANT'S NAME(S)**

Jesse Salazar Ramirez

**RESIDENCE ADDRESS(ES)**

884  Mustang Cir
San Antonio, Tx  78232

3. THE PERIOD, NOT TO EXCEED TEN YEARS, DURING WHICH THE ASSUMED NAME WILL BE USED
IS FROM THE DATE FILED WITH THE COUNTY CLERK.   FEB 2 7 2002

IN TESTIMONY WHERE OF, ___ HAVE HEREUNTO SET ___ HAND (S) THIS THE ___ DAY
OF ___ A.D. 20 ___

**SIGNATURE(S)**

TDL# 11414547

STATE OF TEXAS §
COUNTY OF BEXAR §

BEFORE ME THE UNDERSIGNED AUTHORITY, ON THIS DAY PERSONALLY APPEARED
Jesse S. Ramirez
KNOWN TO ME TO BE THE PERSON(S) WHOSE NAME(S) IS/ARE SUBSCRIBED TO THE FOREGOING
CERTIFICATE AND ACKNOWLEDGED TO ME THAT ___ HE(Y) EXECUTED THE SAME FOR THE PURPOSE AND
CONSIDERATION THEREIN EXPRESSED.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS THE ___ DAY OF FEB 2 7 2002 ___ A.D. 20 ___

CORINE CASAS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 01-09-2004

NOTARY PUBLIC, STATE OF TEXAS
OR
GERRY RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY:___
DEPUTY

NOTE: A CERTIFICATE EXECUTED AND ACKNOWLEDGED BY AN ATTORNEY-IN-FACT SHALL INCLUDE A STATEMENT THAT
THE ATTORNEY-IN-FACT HAS BEEN DULY AUTHORIZED IN WRITING BY HIS PRINCIPAL TO EXECUTE AND
ACKNOWLEDGE THE SAME.
Rev. Dec. '99

Oct 04 02 05:32a    ESPINO TIRE & WHEEL    210-828-7222    p.1

01-339
(Rev. 11-95/3)

# TEXAS RESALE CERTIFICATE

| Name of purchaser, firm or agency | Phone (Area code and number) |
|---|---|
| JESSE RAMIREZ | (210) 732-5553 |

Address (Street & number, P.O. Box or Route number)

1139 BASSE RD #5

City, State, ZIP code

SAN ANTONIO TX 78212

Texas Sales or Use Tax Permit Number (or out-of-state retailer's registration number or date applied for Texas Permit – must contain 11 digits if from a Texas permit)

3.2 0 0 7 5 1 7 4 2 1 1    (Mexican retailer's must show their Federal Taxpayers Registry (RFC) number on the certificate and give a copy of their Mexican registration form to the seller.)

I, the purchaser named above, claim the right to make a non-taxable purchase for resale of the taxable items described below or on the attached order or invoice form:

Seller: _____

Street address: _____

City, State, ZIP code: _____

Description of items to be purchased on the attached order or invoice:

_____

_____

_____

Description of the type of business activity generally engaged in or type of items normally sold by the purchaser:

_____

_____

The taxable items described above, or on the attached order or invoice, will be resold, rented, or leased by me within the geographical limits of the United States of America, its territories and possessions, or within the geographical limits of the United Mexican States, in their present form or attached to other taxable items to be sold.

I understand that if I make any use of the items other than retention, demonstration or display while holding them for sale, lease or rental, I must pay sales tax on the items at the time of use based upon either the purchase price or the fair market rental value for the period

*Sign Here* criminal offense to give a resale certificate to the seller for taxable items that I know, at the time of purchase, are ... r than for the purpose of resale, lease, or rental and, depending on the amount of tax evaded, the offense may ... isdemeaner to a felony of the second degree.

| sign here | Purchaser | Title OWNER | Date 10/10/02 |
|---|---|---|---|

This certificate should be furnished to the supplier. Do not send the completed certificate to the Comptroller of Public Accounts

**FILED**

SEP 1 0 2003

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JESSE SALAZAR RAMIREZ (3),

    Defendant.

CRIMINAL NO. SA-02-CR-621EP

### ORDER AND RULING ON DEFENDANT'S
### MOTION TO SUPPRESS EVIDENCE

Came on this day to be considered the Defendant's Motion to Suppress and the Government's Response thereto. After careful consideration, the Court finds:

1. All of the Defendant's claims can be decided by examining the "four corners" of the challenged affidavits which have been made a part of the record in this cause;

2. The challenged affidavits did in fact provide the reviewing magistrate probable cause and were lawful in all respects;

3. The Defendant has not made an adequate preliminary showing that he is entitled to a *Franks v. Delaware* hearing because the challenged statements are not false, the alleged falsehoods are not material, and even if the statements were found to be false, there is no reason to believe that they were made intentionally or recklessly;

4. The Good Faith Exception to the exclusionary rule is applicable to the affidavits in this case and the exclusionary rule will not be applied;

000379

5.  The Government may offer in evidence all items seized pursuant to the search warrant of November 8, 2002 naming 1139 Basse Road, #5, San Antonio, Texas; and the search warrant of November 8, 2002 naming 344 Mustang Circle, San Antonio, Texas.

It is so **ORDERED**, and entered on this the _____ day of September, 2003

EDWARD C. PRADO,
UNITED STATES DISTRICT JUDGE

2

000389

1    before the grand jury.

2           Anything else?  Now, you filed a motion about your

3    lawyer and --

4           THE DEFENDANT:  Yes, I did.

5           THE COURT:  -- and possibly wanting to go pro se.

6    What do you want to do with that?

7           THE DEFENDANT:  I just feel that nobody is listening

8    to the things that I want.  I know he has submitted a motion

9    to suppress some evidence.  I don't feel that he backed it up

10    with any documentation that I have told him that I have, like

11    as far as the search warrant on 1139 Basse Road; that business

12    was not even my business, and it is in black and white.  Auto

13    Sports, Et cetera, is a used car dealership.

14           I have my certificate of occupancy, my d/b/a from

15    the courthouse that I am registered as Performance Tint &

16    Detail, 1139 Basse Road, Building 5.

17           Now, I know that a search warrant has to be

18    particular, and this search warrant is not even my business.

19    Not only that, the DEA agent had to call Xavier Pena, which

20    was the DEA agent at my house, to ask further directions to

21    where my business was at.

22           And, you know, these are just things that I wanted

23    to go ahead and show in an evidentiary hearing to get them

24    suppressed.  I know he made a good attempt at it, but I don't

25    feel that he backed it up with documentation like I have that

```
 1    I want to show the Court, and other things that were said in

 2    my bond hearing, and that's why I am really upset with the way

 3    things are going.

 4          I feel like he has just done things -- I know he is

 5    a lawyer and he is trying to look after my best interests, but

 6    I know what is going on with this case.  I know what was said

 7    about me, and I know where I was at, and I know what I was

 8    doing, and there are things in these affidavits, in the

 9    complaint, namely, that I can show you in documentation, black

10    and white, that they are lies.  They are lies.

11          If the government was watching my business for a

12    year and a half, like they said, it would have been

13    Performance Tint & Detail, 1139 Basse Road, Building 5, not

14    1139 Basse Road, Auto Sports, Et Cetera, used automotive

15    business.

16          That's not my business, but yet when he submitted

17    this order and wording on defendant's motion to suppress that

18    you just gave him, Number 5, it says:  The government may

19    offer in evidence all items seized pursuant to the search

20    warrant of November 8, naming 1139 Basse Road, Number 5, San

21    Antonio, Texas, and the search warrant.

22          The search warrant wasn't for 1139 Basse Road,

23    Building 5.  It was for 1139 Basse Road.  Now, that's a

24    business park.  If I was living in an apartment complex and

25    the address was 1700 Jackson Keller, I feel that the search
```

1    warrant has to be particularized in which apartment.  It

2    doesn't give the government the right to go search every

3    single apartment in there, and that's what I wanted to bring

4    up.  And here it is in black and white.  This business is not

5    my business.  It was unlawful search and seizure.  And I feel

6    that everything that they said that they found, which was

7    nothing --

8              THE COURT:  Are you saying that's not your business?

9              THE DEFENDANT:  This business right here on the

10   search warrant is a beige one-story used automotive business

11   named Auto Sports, EC, located at 1139 Basse Road, San

12   Antonio, Texas.  That's not my business.  This is the business

13   that was named on the search warrant.  This is not my

14   business.  My business is Performance Tint & Detail, 1139

15   Basse Road, Building 5.  The DEA had no idea --

16             THE COURT:  Okay.  So what did they search?

17             THE DEFENDANT:  Well, they said they found some

18   ledgers --

19             THE COURT:  No.  What did they search?  That place

20   or your place?

21             THE DEFENDANT:  They searched this place and my

22   place.

23             THE COURT:  Okay.  So are you complaining because

24   they searched that place?

25             THE DEFENDANT:  I don't care that they searched that

1    place.

2         THE COURT:  Okay.

3         THE DEFENDANT:  But they went and seized cars from

4    me and some other things that they are wanting to admit as

5    evidence that I want suppressed because, first of all, they

6    have -- they didn't even know where my business was at.  They

7    didn't have permission to enter my business.

8         THE COURT:  So what?  Are you complaining and saying

9    that the search warrant wasn't specific enough as to the

10   location that was searched?

11        THE DEFENDANT:  It wasn't -- the location, the

12   description, what I did, it was -- this warrant isn't even for

13   my business.

14        THE COURT:  Okay.

15        THE DEFENDANT:  And those are the things that I

16   wasn't allowed --

17        THE COURT:  Well, okay.  Well, talk to him and see

18   if there is a motion -- if you want a new motion to suppress

19   filed saying that the motion to suppress was not particular

20   enough as to the location and we will --

21        THE DEFENDANT:  I have expressed about a bond

22   hearing, that you have given me permission, if I bring up new

23   evidence, there is new evidence.

24        THE COURT:  Okay.  Well --

25        THE DEFENDANT:  Some of the stuff that I have

Karl H. Myers, CSR, RMR, CRR - (210) 212-8114

1    already said in a package showing that Joey lied about having

2    phone taps for certain phones that were never -- he never had,

3    but those statements Primomo used to base his decision to not

4    give me bond.  He used those, and I can show them.

5              THE COURT:  Okay.

6              THE DEFENDANT:  Joey --

7              THE COURT:  Just one thing at a time.  We will talk

8    about the bond situation later.  I don't know at this stage if

9    the Court is in a position to reevaluate the situation.  But

10   as far as if you think that search warrant wasn't particular

11   enough because it had the wrong address or the wrong

12   location --

13             THE DEFENDANT:  Wrong everything.

14             THE COURT:  -- you know, I can review that matter.

15   Anything else?

16             THE DEFENDANT:  Well, these are just things that I

17   don't feel that Mr. Aristotelidis is wanting to do things in

18   my favor.  He is wanting to do things the way he is.  We are

19   supposed to be a team and talk about all of this stuff.  Like

20   I said, I wanted a bond hearing to begin with and an

21   evidentiary hearing.  I have nothing.  I can show you in black

22   and white where the government has lied just to show my

23   involvement in this conspiracy.

24             THE COURT:  Well --

25             THE DEFENDANT:  There is no factual evidence --

Exh # 19

Joey Contreras/Asst. U.S. attorney
601 NW Loop 410, Suite 600
San Antonio, Tx 78216-5512 ____ 7007 0220 0004 4914 1689

Re: The criminal conduct of You, David Shearer, Diana Cruz-Zapata, Johnny K.
Sutton and the rest of the AUSA's in the office of the United States Attorney's
Office in the Western District of Texas.

Joey,

    Well it has been a while. I hope you are doing fine and all is well. I
wanted to take this opportunity and remind you. That I have **not** forgotten how
you, the DEA agents, other AUSA's, Magistrate Nowak, Magistrate Primomo, Judge
Prado and the rest of your unbeatable **TAG TEAM** teammates. Lied about me know-
ingly and destroyed my life and families life. Just so that you could put
another notch on your belts. I must admit, that it has been real tough. There
were times that I just wanted to lay it down. But that was before I finally got
someone to listen to me. I just knew, that if I kept on making noise. That
someone was going to hear me and want to help. It's a big plus that these
people have just as much if not more. Than your boy and **TAG TEAM** teammate Prado.
The record that I have developed over these 2 years has been well worth the
lost time in this Hell Hole. I want to send you and the rest of you teammates.
A copy of a news artice that I think you'd find interesting. Although it has to
do with a State Prosecutor. It's just proof of what happens to **SCUM** like him
"Mike Nifong". The day is coming and soon enough. We will meet again and in a
courtroom. But the only difference this time. Is that I will be ready and I won't
have some lame lawyer get in my way. I've learned enough of this law and of
this "manufactured conspiracy". That you all created with the use of known
false statements.
    I finally figured out why it was so important for you to convict me at all
cost's. Without Jesse Ramirez **nothing** would have worked. I was the piece of the
puzzle that made your "manufactured conspiracy" work. Had I known back then what
I know now. I would have beat you all in that September 17,2003 pre-trial hea-
ring. Man I was close and you knew it. Your other **TAG TEAM** teammate Jorge Arist-
otelidis. Begged me to take a plea from you. He told me that all of you all in
that courtroom knew I was right. But that Prado "your tag team teammate" was not
going to let me win. I have just a few more things to do and develope the record
just a little bit more. I've already set the hook. In regards to Magistrate Nowak,
Prado, Magistrate Primomo, Judge Garcia, Judge Furgeson, Judge Biery and even.
Chief Judge Edith H. Jones, Higginbothom and soon enough. The rest of the circuit
court judges. This is what these powerful people are really wanting me to develope.
I can tip my hand cause it's already over. Those people have enogh of the record
that proves what I am saying about You and the rest of your **TAG TEAM** teammates.
Soon enough, Ashley and I are going to receive the justice. That we are both due
and deserve. I just want you to kow. That I have given You and your **TAG TEAM**
teammates. Many, many opportunities to squash all of this. I'm telling you Joey,
Prison sucks. You know very well. That when people are engaged in **criminal conduct.**
And **death** has resulted from this criminal conduct. It is automatically a **life** or
**death penalty** sentence **18 § 3559(d)(1).** Remember how you all committed Perjury,
Obstructed Justice, Conspired Against Our Rights **18 § 241 & 242** and etc. When you
**ALL** lied to Magistrate Nowak "your **TAG TEAM** teammate". About how you **ALL** obtained
the evidence at Roanoke. But that is just one instance of you all's criminal
conduct. The other lies to the grand jury, in the complaint and etc.(i.e. Conspiracy
Against Rights 18 § 241 & 241). Especially when you All knew that they were lies
to begin with. Knowledge and Intent are nothing to prove. Since I will come under

the RICO ACT. All I have to do is pick the 2 crimes that you **All** commited in a
ten year period. I can't believe that you sat by and allowed all of your **TAG
TEAM** teammates lives to be destroyed. I guess it is true after all "**Nothing
Lasts Forever and All Things Must Come To An End**". I just have one thing to ask
of you. Just as **You** were man enough to use all these lies and have your **TAG TEAM**
teammates help you make all these criminal offenses work against us. Stand up
like a **man** would and take responsibility for your conduct(i.e. criminal actions
and criminal inactions). I want you to pay real close attention to the packets
that Nowak, Primomo and other District Court and Circuit Court Judges are going
to receive.

This is going to be the icing on the cake. Make sure to call your boy Prado.
Tell him to look out for his packet and the Motions to the circuit court. These
motions are going to solidify the roles/participation of his brothers and sisters.
They already abandoned their judicial roles(i.e. violated the Seperation of Powers
Act) and came to his rescue one time already. This next time that they do it. Is
just going to prove to these powerful people. That what I have been telling them
about the AUSA's Office, the DEA's Office, the Magistrates, the Judges of the
WesternDistrict of Texas San Antonio Division. As well as **All** the judges of the
Fifth Circuit Court of appeals. Is **ALL** true and nothing will be left to what
you call Speculation/Circumstantial Evidence. It is all in Black and White for
all to see. Your boss caught some slack for firing all those other AUSA's. This
time, he will be praised as a hero and man of Justice.


                              Respectfully

        7-31-07              _____
                              Jesse Ramirez # 31805-180

P.S. I'm almost there and I will se you soon in a courtroom. The same place where
you destroyed my life. Will be the same place where you will finally have to stand
up for what you have done. Tell Diana, that I said I hope she has a nice day. The
fact that she is a beautiful woman. Will have no bearing on what the jury will
decide. Or what a Congressional Committee will have to say. I must say, that if
the circumstances were different. I might have even asked her out to lunch or dinner.
She is definately my type of woman.


P.S.S. Your Buddies here at the BOP tried to keep me from turning in my Appeal.
However, they only succeeded in Developing the Record in my favor. Plus, they
involved themselves in the Conspiracy Against Rights that you started.
Lastly, you thinking of sending someone in here to "keep me Quiet", will
come a little Late. You should have done that in the beginning. Now, they
Are Just waiting to see how the Justice Dept. will React (e.g. The BOP, AUSA's
office, DEA, And others).

# End of legal road for Duke lacrosse DA

Even the veteran prosecutor
says being disbarred is
appropriate punishment.



LANE WILLIAMSON
chairman of the North Carolina State Bar disciplinary committee,
in deciding to disbar Raleigh District Attorney Mike Nifong (left)

> "At the time he was facing a primary, and yes, he was politically naive.
> But we can draw no other conclusion that those initial statements he made were to further his political ambitions."

BY AARON BEARD
ASSOCIATED PRESS

RALEIGH, N.C. — District Attorney Mike Nifong will be disbarred for his disastrous prosecution of three Duke University lacrosse players falsely accused of rape, a disciplinary committee decided Saturday.

The punishment was appropriate, the prosecutor said the punishment was appropriate.

"This matter has been a fiasco. There's no doubt about it," committee chairman Lane Williamson said.

Nifong sat motionless, one hand resting over his mouth, as Williamson read over his initial handling of the case and decried his conduct.

Williamson said Nifong's early comments about the case — which in included a confident proclamation that he wouldn't allow Durham to become known for "a bunch of lacrosse players" from Duke raping a black girl" were purposefully designed to boost his campaign for district attorney.

"At the time he was facing a primary, and yes, he was politically naive," Williamson said. "But we can draw no other conclusion that those initial statements he made were to further his political ambitions."

Even the veteran prosecutor, his lawyer said, won't appeal the punishment.

"He hopes this helps restore some of the confidence in the criminal justice system of North Carolina," attorney David Freedman said.

"On one hand, it's very devastating. On the other hand, he's been putting through this process for a long time, so you always have some semblance of relief when the process is over with re-

lief when the process is over with re- most every charge. — including the

Chatting with other former Duke lacrosse players during a break in Mike Nifong's North Carolina State Bar trial, Reade Seligmann (left) holds a book about the case called 'A Rush to Injustice.' With Seligmann are Collin Finnerty and Dave Evans (right).

gardless of the outcome."

The North Carolina State Bar charged Nifong with breaking several rules of professional conduct, including lying to both the court and bar investigators and withholding critical DNA test results from the players' defense attorneys.

The committee, after deliberating for a little more than an hour Saturday, unanimously agreed with the bar on almost every charge — including the continued up through this hearing."

most serious allegations — that Nifong's actions involved "dishonesty, fraud, deceit and misrepresentation."

State Bar prosecutor Douglas Brocker told the committee that as Nifong investigated the allegations that a stripper was raped and beaten at a March 2006 party thrown by Duke's lacrosse team, he charged "forward toward condemnation and injustice," weaving a "web of deception that has continued up through this hearing."

"Mr. Nifong did not act as a minister of justice, but as a minister of injustice," Brocker said.

The verdicts and the punishment didn't appear to surprise Nifong, who acknowledged during sometimes tearful testimony Friday that he likely would be punished for getting "carried away a little bit" when talking about the case.

During Saturday's closing arguments, Nifong repeatedly interrupted Nifong attorney Dudley Witt as he discussed the DNA testing.

Williamson questioned why it took several months for the defense to get DNA test results that found genetic material from several men in the accuser's underwear and body but none from any lacrosse player.

"It wasn't just one little oversight," Williamson said later. "This was conduct over an extended period in a very high-profile case."

Aware of those test results, Nifong pressed ahead with the case anyway and won indictments against Dave Evans, Reade Seligmann and Collin Finnerty. State prosecutors later concluded the three players were "innocent" victims of a rogue prosecutor's "tragic rush to accuse."

Nifong made "multiple, egregious mistakes" as he pursued the charges, but not intentionally, his attorney said in closing statements.

"With 20-20 hindsight," Witt said as he tried to explain one of his client's errors. "His mind is just like that. That's the way it works. It just didn't click."

Brocker said Nifong had to have known he was making improper commitments to reporters Nifong said he remembered some of his statements. Brocker also focused on when Nifong learned about the full extent of the DNA test results and when he shared that information with the defense.

Nifong gave defense attorneys an initial report on the DNA testing in May 2006 that said a private lab, DNA Security Inc., had been unable to find a conclusive match between the accuser and any lacrosse players.

But lab director Brian Meehan testified this week that he told Nifong as early as April 10, 2006 — a week before Seligmann and Finnerty were indicted — that the more detailed test results showed that the accuser had the DNA of multiple men but not the players.

The players' attorneys have pledged to seek criminal contempt charges next week in Durham.

GERRY BROOME/ASSOCIATED PRESS

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

7007 0220 0004 4914 1689

| | | |
|---|---|---|
| Postage | $ | .58 |
| Certified Fee | | 2.65 |
| Return Receipt Fee (Endorsement Required) | | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 5.38 |

Jesse Ramirez
#31805-180     A 3

Postmark
Here

Sent To Attn: Joey Contreras/Asst. United States Attorney
Street, Apt. No.; or PO Box No. 601 NW Loop 410, Suite 600
City, State, ZIP+4 San Antonio, TX 78216-5512

PS Form 3800, August 2006     See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Attn: Joey Contreras/AUSA
Asst. United States Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, TX 78216-5512

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Laura S Molina     ☐ Agent     ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
Laura S Molina     8-6-07

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☒ Certified Mail     ☐ Express Mail
☐ Registered     ☒ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

2. Article Number
(Transfer from service label)   7007 0220 0004 4914 1689

PS Form 3811, August 2001     Domestic Return Receipt     102595-01-M-2509

BP-A288.052
SEP 05

**INCIDENT REPORT** CDFRM    *Exh. #20*

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

## Part I - Incident Report

1. Institution: USP Pollock

| 2. Inmate's Name RAMIREZ, Jesse Salazar | 3. Register Number 31805-180 | 4. Date of Incident 08/14/2007 | 5. Time 3:00 pm |
|---|---|---|---|
| 6. Place of Incident A03-354U | 7. Assignment REC AM-1 | 8. Unit A Unit | |
| 9. Incident Extortion | | 10. Prohibited Act Code(s) 204 | |

11. Description Of Incident (Date: 08/14/2007 Time: 10:00 am Staff became aware of incident)
On 08/13/07 a letter was faxed to my attention by Joey Contreras, Asst. United States Attorney W:TX which I reviewed 8/14/07 at 3:00 PM. The letter was authored by Jesse Ramirez and contains a copy of his inmate identification card on page 4. The letter is to Peter and Rhonda Bauerlein. In the body of the letter, inmate Ramirez threatens to inform authorities of criminal and civil misconduct on the part of the Bauerleins if they do not return possession of what he claims is his property which the Bauerlein's purchased. Inmate Ramirez has clearly demanded something in value under "threat of informing" as outlined in PS 5270.07, Inmate Discipline & Special Housing Units.

| 12. Typed Name/Signature of Reporting Employee Jenna Epplin Deville, Case Manager/ | 13. Date And Time 8/15/2007 1:10 pm |
|---|---|

| 14. Incident Report Delivered to Above Inmate By (Type Name/Signature) | 15. Date Incident Report Delivered 8-15-07 | 16. Time Incident Report Delivered 55 |
|---|---|---|

## Part II - Committee Action

17. Comments of Inmate to Committee Regarding Above Incident

_____

_____

_____

_____

| 18. A. It is the finding of the committee that you: ____ Committed the Prohibited Act as charged. ____ Did not Commit a Prohibited Act. ____ Committed Prohibited Act Code(s)_____ | B. ____ The Committee is referring the Charge(s) to the DHO for further Hearing. C. ____ The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days. |
|---|---|

19. Committee Decision is Based on Specific Evidence as Follows:

_____

_____

20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act)

_____

_____

21. Date And Time Of Action _____ (The UDC Chairman's signature certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings.)

_____    _____    _____
Chairman (Typed Name/Signature)    Member (Typed Name)    Member (Typed Name)

Original - Central File Record; Yellow - DHO; Blue - Inmate After UDC Action;
Pink - Inmate within 24 Hours Of Part I Preparation

This Form May Be Replicated via WP    Replaces BP-S288.052 Of MAY 94

AH. #2

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TEXAS
2            SAN ANTONIO DIVISION

3    UNITED STATES OF AMERICA,        ) NO. SA-02-CR-621-EP
                                      )
4        Plaintiff                    )
                                      )
5    VS.                              ) BEFORE THE
                                      )
6    (1) ALEJANDRO NOE CASTILLON,     )
         a/k/a PRIMO,                 )
7    (2) SALVADOR CASTILLON-SAUCEDO,  ) FEDERAL GRAND JURY
         a/k/a CHAVA,                 )
8    (3) JESSE SALAZAR RAMIREZ,       )
     (4) RENE CAMPOS,                 )
9    (5) REYNALDO HERNANDEZ,          )
     (6) LORI ANN HERNANDEZ,          )
10       a/k/a MARIA LUISA RODRIGUEZ, )
     (7) HECTOR DEL RIO-RODRIGUEZ,    )
11   (8) JOSE ZARAGOZA GARZA-DEL RIO, )
         a/k/a ROCHA,                 )
12   (9) JOSE ANGEL GARCIA-ARGUELLO,  )
     (10) EDWARD SCOTT LOPEZ,         )
13   (11) ESTEBAN G. GARZA, JR.,      )
     (12) RENE COTA,                  )
14   (13) RAMIRO RABAGO-FIGEROA,      )
     (14) CHARLES CRUZ,               )
15   (15) GUSTAVO CEDILLO,            )
                                      )
16       DEFENDANTS                   )

17

18

19

20    ***********************************
21       TESTIMONY BEFORE THE GRAND JURY
            Witness:  JASON STALLINGS
22    ***********************************

23

24

25

1              BE IT REMEMBERED, that heretofore, to-wit:  On the

2   20th day of November, 2002, the above-entitled matter came on

3   for hearing before the Federal Grand Jury sitting in

4   San Antonio, Texas, being presented by JOEY CONTRERAS,

5   Assistant United States Attorney, for the consideration by the

6   members thereof.

7                 * − * − * − * − *

8            WHEREUPON, ARLINDA RODRIGUEZ, the Court Reporter,

9   was duly sworn, the following evidence was introduced, and

10  proceedings were had, to wit:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    substance containing cocaine.

2                    Count 4 alleges that on or about December

3    7th, 2001, Alejandro Noe Castillon, Rene Campos, and

4    Jesse Salazar Ramirez, aided and abetted by each other,

5    unlawfully distributed and possessed with intent to

6    distribute a controlled substance involving five

7    kilograms or more of cocaine.

8                    Count 5 alleges that on or about July 1,

9    2002, Alejandro Noe Castillon, Jose Zaragoza Garza-Del

10   Rio, and Hector Del Rio-Rodriguez, aided and abetted by

11   each other, possessed with intent to distribute a

12   controlled substance involving five kilograms or more of

13   cocaine.

14                   Count 6 alleges that on our about

15   August 28th, 2000, Alejandro Noe Castillon, Rene Campos,

16   Jesse Salazar Ramirez, Hernandez, Lori Ann Hernandez,

17   also known as Maria Luisa Rodriguez, and Jose Angel

18   Garcia-Arguello aided and abetted each other to possess

19   intent to distribute a controlled substance involving

20   five kilograms or more of cocaine.

21                   Count 7 alleges that on or about

22   October 28th, 2002 in this district, Alejandro Noe

23   Castillon and Esteban G. Garza, Jr., aided and abetted

24   by each other, possessed with intent to distribute five

25   kilograms or more of cocaine.

1  had a pole camera on Mr. Castillon's house and the known

2  stash location.

3          And he called Mr. Castillon and said, I

4  need some money.  He shows up in a vehicle, and not to

5  get bogged down with conversation, they were just

6  talking about -- they were always changing vehicles.

7  They were very specific about what kind of trucks and

8  vehicles they used.  They specifically liked large

9  king-cab trucks with the back seats that flipped up

10  because they could use the back seats to conceal

11  narcotics.

12          And we saw this vehicle show up at

13  Mr. Castillon's apartment in Eagle Pass.  They met; he

14  left.  As soon as he crossed the checkpoint, he called

15  him and said, I'm through.  It's done.  From that we

16  made a traffic stop, and we made a seizure of 10

17  kilograms of cocaine.  And we linked that back to

18  Mr. Castillon.

19      Q.   Let me interrupt you and see if I can get you

20  to go through this in a chronological order.

21      A.   Yes.

22      Q.   I'll try to give some structure to it.  The

23  investigation started sometime in about September 2001;

24  is that right?

25      A.   Yes, sir.

1    phone numbers and possibly identify what numbers he had

2    at that particular time that he was using to

3    communication with parties of his organization.

4         Q.    Okay.  And so that's the proposed Count 3, and

5    that's who the players are.  And then Mr. Castillon's

6    role is he aided and abetted it by basically causing it

7    to come about?

8         A.    Yes.

9         Q.    And Hernandez was working on his behalf, and

10   Mr. De Alba was the one who happened to be agent, or the

11   one actually doing the transporting on that day.

12        A.    Yes, sir.

13        Q.    And she's been charged separately and is not

14   charged here.

15        A.    Yes, sir.

16        Q.    Okay.  And then the next event that's the

17   subject of a proposed Count 4 involving Noe Castillon,

18   Rene Campos and Jesse Salazar Ramirez is an event that

19   occurred on December 7th, of 2001; is that right?

20        A.    Yes.

21        Q.    And that's an undercover transaction?

22        A.    Yes, it is.

23        Q.    Tell us about that.

24        A.    It was undercover where cocaine was bought

25   from an individual who identified his source of supply

1  as a Jose Soto.  And Mr. Soto has been cooperating since

2  then and advised that his supplier was Rene Campos.  But

3  he went further to say that he routinely got this

4  particular cocaine from Jesse Salazar.

5            So he was supplied by -- He identified

6  Rene Campos as a supplier and Jesse Ramirez Salazar.  He

7  also said that he left his vehicle at a place of

8  business that he was very well aware of that was

9  Jesse Salazar's.  It's a detail shop.  And the vehicle

10 he was driving was registered to Mr. Castillon.

11       Q.    He was driving Castillon's vehicle?

12       A.    Yes.

13       Q.    Okay.  And he got the cocaine from Ramirez and

14 Campos?

15       A.    Yes.

16       Q.    Which he was selling to an undercover

17 officer?

18       A.    Yeah.  He actually -- He gave it to somebody

19 else who identified Soto as the supplier.  We bought

20 from somebody who identified Soto.  It was kind of like

21 it was a multiple chain of events that led us to who's

22 the ultimate supplier.

23       Q.    Okay.  So the guy who did the delivery led you

24 to Soto, and then Soto led you to Campos and Hernandez,

25 who are connected to Castillon because it turns out it

1  federal wire intercept begin?

2      A.    August 21st of this year.

3      Q.    Which?

4      A.    August 21st of this year.

5      Q.    August 21st.  Okay.  Thank you.  So there's

6  about a month where there's a gap?

7      A.    Yes.

8      Q.    The next count, Count 6 alleges on or about

9  August 28th, 2002, Castillon, Rene Campos, Jesse Salazar

10  Ramirez, Reynaldo Hernandez, Lori Ann Hernandez, and

11  Jose Angel Garcia-Arguello possessed with intent to

12  distribute more than five kilograms of cocaine.  Tell us

13  about that one.

14      A.    It actually started on the 27th where

15  Mr. Hernandez made a trip up to San Antonio.  We

16  surveilled him all the way to a known stash location on

17  Roanoke here in San Antonio.  It was a townhouse.  And

18  surveillance watched Mr. Hernandez pull into the

19  complex.  And to be specific, and through the telephone

20  conversation we were intercepting, he made a phone call,

21  the garage was opened, he pulled in, they closed the

22  garage, and did their business.

23          And then the next day on the 28th, we

24  intercepted earlier in the day because Mr. Castillon was

25  really upset with Mr. Hernandez because he hadn't left

1    yet.  He was just -- Like I said, he was lazy.  He

2    didn't really leave when Mr. Castillon wanted him to.

3    He wasn't as punctual.  And there was bickering back and

4    forth.  He made it clear and basically ordered him to

5    leave.

6              We followed him up to San Antonio again

7    where he brought some more product in the vehicle, went

8    to the same location, the same townhouse, and dropped

9    off some more product.  And during this time, we had

10   some other people showing up.  We had Jesse Ramirez

11   showing up at the location on the 27th.  He showed up

12   again on the 28th and drooped off the individual

13   identified as Jose Angel Garcia-Arguello.  And

14   Mr. Campos was also seen during this time.  Actually,

15   Mr. Campos was the person he contacted on the 27th and

16   28th in order to get the garage open at the townhouse so

17   that he could pull the truck inside.

18             And later in the evening on the 28th is

19   when we police officers did a knock and talk at that

20   townhouse and saw Mr. Garcia-Arguello running around

21   inside.  Because we knew what was going on inside.  We

22   knew there was narcotics inside.  And he let us in.  We

23   did a consensual.

24             Once we got inside, we observed a loaded

25   assault rifle.  We recovered 55 kilograms of cocaine.

1    November?

2        A.    They were seized down in the apartments down

3    where Mr. Castillon lived, the residence.  Specifically,

4    the apartment where Mr. Campos and Mr. Cedillo were

5    running out of.

6        Q.    Okay.  So there were firearms in there?

7        A.    Yes.

8        Q.    And that's the basis for Cedillo's involvement

9    in that.  And then the others, Ramirez, Campos,

10   Hernandez, and Garcia-Arguello, there were firearms

11   seized on November 8th near them; but they were also at

12   that location on August 28th where all those firearms

13   were seized?

14       A.    Yes.  They were seen in and around residence

15   where assault rifles and that style rifles were

16   seized -- and handguns.  And they were seen in and about

17   those locations.

18       Q.    And these were weapons, at least some of which

19   were in ready proximity so they could be used to protect

20   the drugs?

21       A.    Yes.

22       Q.    And the firearms included a Bushmaster .223

23   caliber; the Hungary 7.62; the Romania 7.62; The China

24   7.62.  Those are basically AK-47s; is that correct?

25       A.    Yes.  And we just found out yesterday that

1    ATF -- We subsequently turned all the weapons over to

2    ATF.  They subsequently said some of these firearms had

3    been made where they're actually machine guns.

4        Q.    They're actually automatic?

5        A.    Yes.

6        Q.    Then there's a Ruger 9 millimeter pistol;

7    another SKS semiautomatic rifle; a Lorcin 9 millimeter;

8    a Crossfire 12 gauge; a High Point 9 millimeter pistol;

9    a Mosburg 12 gauge shotgun; an Antonio Zoli 12 gauge

10   shotgun; an AMT .22 Mag handgun; a Cobray 9 millimeter

11   pistol; an Intra Tec 9 millimeter pistol; a Cobray 9

12   millimeter pistol; a Mosburg pistol grip shotgun, 12

13   gauge; a Custom CDP Kimber .45 caliber pistol; a

14   Browning rifle with Lopold scope; a stainless Colt

15   semiautomatic pistol; an HWM .38 Special revolver; a

16   Colt Police Positive .32 caliber revolver; a Glock 10

17   millimeter semiautomatic; a Ruger 9 millimeter

18   semiautomatic pistol; an HR Model 22LR revolver; a Star

19   Interarms .40 caliber semiautomatic pistol; a Leinad

20   .380 semiautomatic pistol; a Sturm, Ruger rifle with

21   Tasco scope, .223 caliber; an Action Arms UZI

22   9 millimeter rifle/machine gun; a Professional Ordinance

23   rifle, 5.56 millimeter caliber; an MFG unknown rifle

24   with scope and bi-pod -- I take it that's one of the

25   things that goes down that you use to steady it for

*SOS INTERPRETING, LTD*
*(713) 693-3241*



CASE No:                  M2-02-0005

TARGET No:                830-352-9132

EXHIBIT No:               N-036

CALL NUMBER:              0381

OUTGOING No:              210-887-9473

SUBSCRIBER:               **JESSE S. RAMIREZ**

LOCATION:                 **PERFORMANCE TINT & DETAIL**

                          **602 EVEREST ST.**

                          **SAN ANTONIO, TEXAS**

DATE:                     **SEPTEMBER 4, 2002**

TIME:                     **10:25:12**

DURATION:                 **00:09:21**

MONITOR:                  **OLGA  RAMIREZ**

TRANSCRIBER:              **LILIANA  RANGEL**

LANGUAGE:                 **SPANISH**

PARTICIPANTS:             **REYNALDO HERNANDEZ, a.k.a  NANO,
                          NALDO, REY**

                          **RENE CAMPOS, a.k.a. ROBERT**

**\*\*NOTE\*\* INITIAL  INTERCEPTION OF THIS CONVERSATION IDENTIFIED
INTERCEPTEE AS "JESSE". REFERENCE CALL #91, ON TARGET TELEPHONE 210-
347-0830, WHERE INTERCEPTEE IDENTIFIES HIMSELF AS "RENE".  BASED ON
VOICE COMPARISON OF BOTH CALLS INTERCEPTEE OF THIS CALL IS
IDENTIFIED AS "RENE".**

*Case No:*  M2-02-0005                    *Exhibit No:*  N-036c0381 (LR) / (OR)

FILED

FEB 2 0 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

3   UNITED STATES OF AMERICA,              )    Docket No. SA-02-CR-00621
                                           )
4              Plaintiff                   )
                                           )
5   VERSUS                                 )    San Antonio, Texas
                                           )    January 20, 2004
6   JESSE SALAZAR RAMIREZ,                 )
                                           )
7              Defendant.                  )
    _____)

8

9

10

11

12

13  Defendant's Motions to Suppress, to Dismiss and for Franks
    Hearing.
14
                BEFORE THE HONORABLE EDWARD C. PRADO
15            (SITTING AS) UNITED STATES DISTRICT JUDGE

16

17

18

19

22

23

24

25

ORIGINAL

452·

16

1   gather, or afterwards?

2           MR. CONTRERAS:  No, Your Honor.

3           THE COURT:  Okay.  I'll let you respond, Mr. Scharff,

4   to that, or do you wish to respond to that?  That is, I guess,

5   the key misrepresentation that is alleged for our Franks

6   hearing and the Government concedes that there was some

7   information that was not truthful.  And their position is that

8   they were not aware that it was not Mr. Salazar Ramirez, that

9   it was not an intentional falsity, they thought it was him.

10          Do you want to respond, or how do you want to do

11  this, Mr. Scharff?

12          MR. SCHARFF:  Well, since my client's really more

13  intimately familiar and has had all the time in the world to

14  go over all these documents, if he could just make one quick

15  response on my behalf, I would appreciate it.

16          THE COURT:  Go ahead.

17          DEFENDANT RAMIREZ:  Your Honor, Mr. Contreras just

18  stated that they knew on September 26th that they identified

19  me by the one phone call.

20          THE COURT:  He didn't say that.

21          DEFENDANT RAMIREZ:  Well, when did you-all know it

22  was me on the September 26th phone call?

23          THE COURT:  Address all your comments to the Court,

24  please.

25          DEFENDANT RAMIREZ:  Okay.

1          THE COURT:  I believe that the representation was
2   that sometime in October after the wiretap had closed the
3   Government realized its mistake that it was not you.  The
4   representation was made to the Court that it was you in
5   affidavit submitted to the Court on August 21st and 26th and
6   September 13th, three different occasions that representation
7   on that one conversation was made to the Court.  And then
8   after the wiretaps closed and they started looking at the
9   conversations closer sometime in mid-October, they realized
10  that it wasn't you.

11         DEFENDANT RAMIREZ:  Well, isn't it the prosecutor's
12  duty to go back and correct -- I mean that's a pretty big
13  mistake, we're talking about people's lives here.

14         And on this Call 91 for 210-347-0830, the disk is
15  here, it will show you the exact date and I'm sure that these
16  people have to go ahead and check in with their supervisors,
17  which then relay that message over to the agents or whoever's
18  in charge of the wiretaps, whoever's overseeing all the people
19  that are listening to that stuff.

20         And, you know, that's just been my whole thing.  I
21  feel that they knew who it was before.  They knew that and
22  they did nothing to correct that.  And I've read in the
23  books -- I'm a layman to the law still, but I've read in the
24  books that it's the prosecutor's duty to know everything
25  that's involved in his case and if there's any big mistakes


U.S. Department of Justice

United States Attorney
Western District of Texas



---

*Joey Contreras*
*Assistant United States Attorney*
*Drug Unit*

*601 NW Loop 410 Suite 600*
*San Antonio, Texas 782 6-5512*

*(210)384-7014*
*Direct number:(210) 384-7006*
*Fax :(210) 384-7028*

January 17, 2003

Mr. Roland Garcia
Attorney at Law
800 Dolorosa, Suite 101
San Antonio, Texas 78207

Re: *United States v. Jesse Salazar Ramirez (3), SA-02CR621EP*

Dear Roland,

Enclosed is a draft proposed plea agreement. It calls for a sentence of fourteen years. I received confirmation today that two of the firearms seized from the Palma location in Eagle Pass were in fact fully automatic. As you are aware, a conviction on a weapons offense involving a fully automatic weapon would result in a mandatory consecutive thirty year sentence. The agreement I have enclosed does not contain forfeiture language but any plea would require that the Defendant agree to forfeiture of all property seized thus far.

The evidence against Mr. Salazar Ramirez is overwhelming. While it is true that Mr. Salazar Ramirez made it clear very early that he wished to cooperate and that a trial against him would not be necessary, it is also true that he has not been completely truthful at all de-briefings. Please call me so we can discuss disposition of this case. Thanks.

Sincerely,

JOHNNY SUTTON
United States Attorney

By:

Joey Contreras
Assistant United States Attorney
(210) 384-7006

FILED AH #5

FEB 0 3 2003

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEPUTY CLERK

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF ~~TEXAS~~
2              SAN ANTONIO DIVISION

3

4   UNITED STATES OF AMERICA,      *    No. SA-02-CR-621(3)
                                   *
        Plaintiff,                 *
5                                  *
    VS.                            *
6                                  *    San Antonio, Texas
                                   *    December 30, 2002
    JESSE SALAZAR RAMIREZ,         *
7                                  *
        Defendant.                 *
8                                  *
    *  *  *  *  *  *  *  *  *  *  *  *

9

10                    Detention Hearing
       BEFORE THE HONORABLE JOHN W. PRIMOMO
11            UNITED STATES MAGISTRATE

12

13  APPEARANCES:

14  For the Government         MR. JOEY CONTRERAS
                               Assistant United States Attorney
15                             601 N.W. Loop 410, Suite 600
                               San Antonio, Texas  78216
16

17  For the Defendant          MR. ROLANDO GARCIA
                               800 Dolorosa, Suite 101
18                             San Antonio, Texas  78207

19

20  Court Recorder             M. Oakes

21  Transcribed by             Ruth Ann Hausman
                               2900 Norfolk Drive
22                             Austin, Texas  78745

23

24

25  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.


165-

4

1   from a person known as Samuel Trevino.  That cash was related
2   to -- found to be cash proceeds of the Castillon organization.
3          On December 6th, 2001, a Ford Explorer was stopped as
4   it crossed into the United States from Eagle Pass.
5   Twenty-four kilograms of cocaine were seized from a false
6   compartment in that Ford Explorer.  It was driven by Lidia De
7   Alba.  Subsequent investigation indicated that that was
8   cocaine being distributed by this organization.
9          The truck was registered to a co-conspirator who's
10  been indicted and his name is Reynaldo Hernandez and it was
11  found that he had bought the Ford Explorer from co-defendant
12  Rene Campos, who has also been indicted.  There were phone
13  numbers found in the Ford Explorer handwritten of Alejandro
14  Noe Castillon, both his cell and home phone numbers.
15         On December 7th, 2001, a Jose G. Soto was indicted in
16  connection with the seizure of five kilograms of cocaine in
17  San Antonio.  Subsequent investigation revealed that that
18  cocaine was being distributed by Soto and he had received it
19  from the defendant before the Court, Jesse Salazar Ramirez.
20         Jesse Salazar Ramirez became one of the persons to be
21  focused on in the course of this investigation as his name
22  came up.  It was learned that he lived here in San Antonio and
23  had a sort of like a detail, I guess a stereo type shop off of
24  Basse Road and that he lived in the Hollywood, Hollywood Park
25  part of the city.  The investigation was ongoing.

5

1   On June 14th, 2002, DEA agents went to the Bexar
2  County District Attorney's Office and a Bexar County state
3  district judge and obtained authorization to begin
4  wire-tapping phones connected to this organization.  As those
5  calls were intercepted and analyzed, a pattern was determined
6  in which Mr. Castillon, Alejandro Noe Castillon, would direct
7  drivers to drive loads of cocaine north to the Chicago area
8  and return with cash.  The numerous phone calls, discussion of
9  numerous kilograms of cocaine and the return of large
10  quantities of cash.

11   As a result of those interceptions in which Mr.
12  Castillon was heard discussing this distribution with a couple
13  of his, well, drivers, those being Jose Garza-Del Rio and
14  Hector Del Rio-Rodriguez, a discussion of kilograms of cocaine
15  being transported, a traffic stop was conducted of both these
16  two gentlemen, Mr. Jose Del Rio and Hector Del Rio, and 19
17  kilograms of cocaine were seized from their vehicle.  In their
18  vehicle was a very elaborate compartment that agents would --
19  it would have taken a long, long time to figure out how to get
20  the compartment opened.  It's something like you had to turn
21  on the lights and blinkers and various other things to open
22  the compartment.  My point being that it was a sophisticated
23  compartment in that vehicle.

24   Those two persons were arrested on state charges.
25  They made $100,000 bonds each.  Upon their release they

6

promptly fled to Mexico and have not been seen since.  We have
indicted them in the same indictment that the defendant, Mr.
Salazar Ramirez, is named in.

On August 21st, 2002, Federal District Judge Prado
authorized DEA agents to begin intercepting cell telephones
connected to this organization.  Numerous, and I mean hundreds
and hundreds and hundreds of phone calls were intercepted in
which conversations clearly referring to drug, cocaine
distribution were intercepted.

As these calls came in, they were analyzed and a
pattern emerged in which it was determined that cocaine, large
kilo quantities of cocaine, would be smuggled from Mexico into
the United States via Eagle Pass, Texas.  The cocaine would
then be stashed or stored in Eagle Pass for a time.  It was
determined that there were several stash houses in the Eagle
Pass area maintained by this organization.

From there it would be stored and when cocaine needed
to be moved to the San Antonio area and on to further
distribution to points north, a driver identified as Reynaldo
Hernandez, who has been indicted also, was called by Mr.
Castillon or co-defendant Rene Campos and told to head to San
Antonio.  Surveillance began on Mr. Hernandez in August 2002,
the same month that the interceptions began.  He was put under
surveillance.  Cameras, surreptitious cameras were set up on
various locations in Eagle Pass, including Mr. Castillon's

9

1    August 28th, the same thing, we see Mr. Salazar

2  Ramirez show up.  Again, he drives a Ford -- was driving a

3  Ford Mustang at that time.  He drives up in a Ford Mustang,

4  lets somebody out of his vehicle who enters Apartment 401.

5  Mr. Salazar Ramirez stays outside of the apartment for a short

6  while, makes some phone calls on a cell phone, and then leave.

7    Late on August 28th, after agents had observed this,

8  a decision was made to go and knock on the door of 401 and

9  basically see who answers the door and see what they have to

10  say about what's going on there.

11    The agents entered the apartment because it was

12  believed evidence was being destroyed.  They obtained consent

13  to search the apartment, they entered it.  It was a classic

14  stash house, very little furniture, very little of anything

15  that -- very little of anything and pretty high dollar --

16  pretty nice town home.  There was basically just a couch and a

17  TV and it was pretty barren.  And there was a safe inside

18  there.

19    There was a huge quantity of drug paraphernalia.  I'm

20  talking about electronic money counters, electronic heat

21  sealers, which are used to seal cocaine and cash.  There was

22  cocaine out in the open, personal use amounts of cocaine out

23  in the open on kitchen counters.  Numerous packages of sealing

24  material, those plastic bags that are used in the heat sealer.

25  And inside a safe in the location 55 kilograms of cocaine were

12

1  Rabago-Figeroa.

2        November 7th, 2002, agents still intercepting and
3  conducting basically around-the-clock surveillance of the
4  parties again observe Rene Campos meeting with someone and
5  handing that person something.  That person who Campos had
6  handed something turned out to be a Charles Cruz, who has been
7  indicted.  Agents began following Charles Cruz.  Apparently he
8  burned surveillance or observed the agents following him.  A
9  high-speed chase ensued and Mr. Cruz eventually crashed his
10 vehicle.  Four kilograms of cocaine were eventually seized in
11 connection with that.

12       At that point the decision was made to go ahead and
13 start arresting these persons because they felt that the
14 investigation could not be kept covert much longer.  The
15 defendants, the 15 persons who are named in the indictment who
16 were not already in custody were then arrested.  And in
17 connection with this case, approximately 38 firearms were
18 seized from the various locations where these co-defendants
19 and co-conspirators were arrested, including a number of
20 firearms from the defendant, Mr. Salazar Ramirez's, residence.

21       When Rene Campos was arrested on November 8th in the
22 Eagle Pass area, he was found to be in possession of a couple
23 of kilograms, numerous assault rifles and handguns.  At least
24 two of those assault rifles are fully automatic machine guns
25 which, if these defendants were found guilty of, will result

Rangel - Cross by Contreras                                    29

1  A    As far as that I can't tell you, I don't --

2  Q    It wasn't very much, though, was it?

3  A    I have no idea.

4  Q    You have no idea?

5  A    No, I --

6  Q    Well, you are familiar with his work and what he does when

7  he's at work or during the day, right, when he was --

8  A    Yes.

9  Q    -- before he was in jail?

10 A    Yes.

11 Q    And you were in the court when I was explaining to the

12 Court some of the evidence we have against your husband,

13 right?

14 A    Yes.

15 Q    And you heard, did you not, that on July 1st two persons

16 were arrested with 19 kilograms of cocaine connected to this

17 organization?

18 A    Yes, I heard that.

19 Q    The two Del Rios, you heard that?

20 A    Yes, I heard that.

21 Q    Can you explain why you-all's phone number was listed in

22 the possession of both those guys?

23 A    No, sir, I don't know those people.  I can't tell you

24 that.

25 Q    Okay.  And do you know anyone at Apartment No. 401 at the

1   Ramirez should be detained, I have not heard any proof this

2   morning, Your Honor, that he either is a risk flight or that

3   he's a danger to the community. I think the evidence that we

4   submitted to the Court illuminated the facts surrounding Mr.

5   Ramirez's character, physical and mental condition, obvious

6   family ties, extensive family ties; employment, hard working

7   since a kid, owns his own business, supports the families of

8   seven employees. Ten years was the last time he got in

9   trouble, 1992, misdemeanor, granted deferred adjudication.

10          I just don't see, in reviewing the determinant

11  factors as outlined by the Legislature, Judge, I just don't

12  see where or how the Government has established either one of

13  those points.

14          THE COURT: Thank you, Mr. Garcia. Mr. Contreras,

15  anything else?

16          MR. CONTRERAS: I just jogged my memory, something I

17  should have brought up to the Court. I recall that Judge

18  Prado authorized interception beginning in August and on

19  August 28th is when the seizure occurred. At that time we

20  were intercepting, monitoring two telephones, cell phones.

21  Both those telephones were in the name of the defendant. He

22  had subscribed to them and obtained them. I just thought the

23  Court would like to know.

24          That's all we have.

25          THE COURT: The Court finds, based upon the evidence

1  that's been presented as well as the law that applies, that
2  the defendant should be detained as a risk of flight.  There
3  is the presumption established by the indictment that no
4  conditions of release will reasonably assure his appearance in
5  court.

6           Based upon the evidence, the Court finds that Mr.
7  Ramirez had a significant part in a large cocaine distribution
8  conspiracy and that there is a strong likelihood that he will
9  be convicted in this case.  If he is convicted, he faces a
10  minimum of ten years in prison on the drug counts, or at least
11  on the first drug count.  He also faces a mandatory
12  consecutive sentence of 30 years if he's found guilty of
13  possession of a machine gun in relation to drug trafficking
14  crimes.  So he's looking at a minimum of 40 years in jail
15  without the possibility of probation or parole.

16           He has significant financial assets which are not
17  attributable to the work that he does in his shop.  And while
18  he certainly has strong family ties, I do not believe his
19  family would be able to deter him from fleeing in this case.
20  And for these reasons the Court finds the defendant will be
21  detained.

22           Court's in recess.
23       **(End of proceedings.)**
24
25

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 18

| 1. Program Code | 2. Cross File | Related Files | 3. File No. M2-02-0005 | 4. G-DEP Identifier YNC1A |
|---|---|---|---|---|
| 5. By: I/A Patricia Horton At: San Antonio D.O. San Antonio, TX | ☒ M1-02-0021 ☐ ☐ ☐ ☐ | | 6. File Title ▆▆▆▆▆▆▆▆▆▆ | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | ☐ | | 8. Date Prepared 07/14/02 | |
| 9. Other Officers: | | | | |

10. Report Re: Analysis of miscellaneous papers and business cards seized from Jose GARZA-Zaragoza at the time of his arrest on 07/01/02.

### SYNOPSIS

On 07/01/02, based in information provided by a confidential source (CS), Special Agents from the San Antonio District Office and Texas State Narcotics Investigators seized approximately 26 kilograms of cocaine and arrested 2 individuals. The source of supply (SOS) of the cocaine had been identified as Alejandro Noe CASTILLON. CASTILLON had been previously identified as the SOS of cocaine for the Salvador SIXTOS Jr. cocaine trafficking organization.

### TAILS

1. Reference is made to all ROI's under this case number and file title. Special reference is made to the ROI dated 07/07/02 by SA A.B. Castaneda concerning the arrest of Hector DEL RIO-Rodriguez and Jose GARZA-Zaragoza.

2. On 07/01/02, information provided by a CS resulted in the traffic stop of a 1997 Chrysler 4 door LHS, bearing TX License #P47 YRY. The driver of the vehicle was identified as Hector DEL RIO-Rodriguez and the passenger as Jose GARZA-Zaragoza. A search of the vehicle resulted in the seizure of approximately 26 kilograms of cocaine. DEL RIO and GARZA were then arrested. The following is an analysis of all documents and business cards and any notations as they appeared on these documents seized from GARZA at the time of his arrest.

| 11. Distribution: Division HFDIU District DOM, OS, OSA, OSB Other NDBC, NIAM, SARI | 12. Signature (Agent) Patricia Horton | 13. Date 7/15/02 |
|---|---|---|
| | 14. Approved (Name and Title) Douglas S. Davis Intell Group Supervisor | 15. Date 7/15/02 |

DEA Form - 6
(Jul. 1996)
pah
1 - Prosecutor

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No.<br>M2-02-00██ | 2. G-DEP Identifier<br>YNC1A |
|---|---|---|
| | 3. File Title<br>████████████████ | |

4.
Page   16   of   18

| 5. Program Code | 6. Date Prepared<br>07/14/02 |
|---|---|

BB.   Handwritten on torn piece of blue paper

    **Yesy RAMIRES**

    210 385 6815

    3000

    879646

DEA databases indicate that telephone number 210-385-6815 is subscribed to by Jesse RAMIREZ-Salazar, 602 Everest St., San Antonio, TX.  This telephone number was mentioned in telephone subscriber reports under this case number, MW-01-0070 (Roman MOLINA – Cocaine and methamphetamine related case) and M2-00-0090 (Amy Fabiola VILLARREAL).

Jesse RAMIREZ-Salazar is of record under **NADDIS 4894158**.  The Remarks section indicates that RAMIREZ is the head of a cocaine and methamphetamine trafficking organization which purchases multi-kilogram quantities on a monthly basis (05/00, M2-00-0051, Jesse RAMIREZ).

**Handwritten of back of paper

    **214 366 3542**

C.   Handwritten on back of receipt stub

    **214-228-8130**
    **CHAPARRO**

INDEXING

**GARZA-Zaragoza, Jose – NADDIS Pending.**
Physical description:   white male, 5'09" tall, 160 pounds, brown eyes
                        Black hair.
DOB:   01/06/73

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

561

Att. #7

Could Not Find IN My
Records, But Does exist

ATK # 8

1          UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3    UNITED STATES OF AMERICA,      )
                                    )
4         Plaintiff,                )
                                    )
5            vs.                    )   SA:02-CR-621
                                    )
6    JESSE SALAZAR RAMIREZ,         )   San Antonio, Texas
                                    )   July 22, 2004
7         Defendant.                )
     - - - - - - - - - - - - - - - - - - -

8

9              TRANSCRIPT OF SENTENCING HEARING
           BEFORE THE HONORABLE EDWARD C. PRADO
10              UNITED STATES DISTRICT JUDGE

11   A P P E A R A N C E S:

12   FOR THE PLAINTIFF:                   ORIGINAL

13       United States Attorney's Office
         Mr. Joey Contreras
14       Ms. Diana Cruz-Zapata
         601 N.W. Loop 410, Suite 600
15       San Antonio, Texas 78216

16   FOR THE DEFENDANT:

17       Mr. Alex J. Scharff
         Attorney at Law
18       222 Main Plaza
         San Antonio, Texas 78205
19
20   COURT REPORTER:

21       Karl H. Myers, CSR, RMR, CRR
         Official Court Reporter
22       655 E. Durango Blvd., Suite 315
         San Antonio, Texas 78206
23       Telephone:  (210) 212-8114
         Email:  karlcsr@sbcglobal.net

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25

557

1    needs to put that time to, so there is no reason for him.  I

2    want to go alone.

3         I have submitted some motions that I would like the

4    Court to honor, and I have more on the way.  I would like to

5    call back government witnesses, other people that Alex Scharff

6    didn't call at the trial, that I gave him a big list of about

7    60 people.  He only called about 13, and I would like to ask

8    the Court to give me some time to prepare so I can mitigate

9    and bring evidence as Williams versus New York, 69-SET-1079

10   outlines and guarantees me the right, my due process right

11   guarantees me.

12        And I just want to make sure that all of these lies

13   that are put in this PSI report that Ms. Olivarri has --

14   hasn't even investigated into are proven that they are lies,

15   and I just want to exercise my right to do that.

16        And Mr. Scharff is in total disagreement with me and

17   says I am just going to piss you off.  And I said, I am sorry.

18   This is my right, Alex, and either you are with me or you are

19   not and, apparently, he is not with me, so there is no need

20   for him to be here.

21        But I want the Court to know that I want a chance to

22   mitigate with the government's own witnesses.  I want to look

23   back over some material for discovery that I know that the

24   government hasn't given me all of it.

25        I have asked for in camera inspection of this

1    he didn't have the power to do subpoenas and to issue motions

2    while I was still listed as his attorney of record.

3              The clerk just summarily throws pro se motions aside

4    when there is an attorney of record.  So I think my advice to

5    the Court -- and I could still be standby counsel.  We can

6    have a hybrid representation, if you want, but Mr. Ramirez

7    wants to be his own attorney and he wants to issue his own

8    subpoenas and file his own motions and have the Court address

9    the issues that he wants to be addressed, if that helps the

10   Court.

11             THE COURT:  Okay.  Has he had an opportunity to

12   review the report?

13             MR. SCHARFF:  I have mailed him a copy, yes.

14             THE COURT:  You have seen the report?

15             THE DEFENDANT:  Yes.

16             THE COURT:  You mentioned it.  You have seen it?

17             THE DEFENDANT:  It is all lies.  It is evident Ms.

18   Olivarri did not do her job, that she just wrote down the

19   evidence and the words that Joey Contreras wanted her to write

20   down, and it is in their own DEA-6 reports and the suppression

21   hearing transcripts, trial transcripts, and I want an

22   opportunity to get all of that stuff so I can mitigate what

23   they said about me in this PSI report that -- so they can try

24   to justify a life sentence, which is just ridiculous.

25             THE COURT:  Okay.  Let me ask the government, with

```
 1    or --

 2              MR. CONTRERAS:  Your Honor, I think that would be

 3    erroneous to allow him to respond --

 4              THE COURT:  I will let him -- was it addressed in

 5    your written --

 6              MR. SCHARFF:  It was, Your Honor.

 7              THE COURT:  So I have the written objections, and I

 8    will take that into consideration.

 9              Before we get to the PSI, Mr. Salazar Ramirez,

10    before we get to that, what motions do you have?  What are you

11    requesting of the Court at this juncture?

12              THE DEFENDANT:  I would like first the motions that

13    I filed with the Court.

14              THE COURT:  Let's take them one at a time.  What are

15    those motions?

16              THE DEFENDANT:  I filed a motion that is on the

17    docket sheet under 524, oral motion by Jesse Salazar Ramirez

18    for government to comply with discovery order issued in

19    December 2002.  I want my motion to, of course, withdraw Alex

20    Scharff.

21              I want the motion to order the probation officer to

22    do an actual investigation into the actual facts that are

23    out -- that Williams and New York -- versus New York outlines,

24    that it must be determined by facts and not some made-up

25    stories by the prosecution.
```

```
 1    wrongfully.

 2             I also want a motion to order a new James hearing

 3    and let me show the evidence that should have been shown.  Due

 4    to you not granting my James and Franks hearing, without

 5    reading the evidence first, I would like to go ahead and have

 6    another James and Franks hearing, so I can use that at

 7    sentencing to mitigate.

 8             I want to impanel the jury back, subpoena them, so I

 9    can prove some things that I want proven.  I have a memorandum

10    in support of a downward departure that Alex Scharff never

11    thought about doing.  I want DEA agents back.  I want Esteban

12    Garza back.  I want Jose Soto back.  I want Reynaldo

13    Hernandez.

14             These are the people that Joey told the PSI lady

15    here that I was the supervisor over, that I gave them orders

16    and stuff, and that is totally false.  In trial testimony, I

17    never even talked to any of these guys.  How could I be a

18    supervisor?

19             And, once again, if she would have done her job and

20    asked for the actual reports, we would have known a long time

21    ago that that was false.

22             I also want to call the ladies that listened to the

23    actual phone taps on September 26, 2002.  I want the ladies or

24    the persons that listened to call number 91 from 210-347-0830,

25    the cell phone number that was tapped.
```

1        I also want -- what is that?

2        (Mr. Scharff and the defendant conferring.)

3        And the reason I want that stuff is because it will

4   show that the government knew that what they put in that

5   affidavit and what they told to the grand jury was false, and

6   they knew that before they went to the grand jury with it,

7   because the transcripts, when they were transcribed, when they

8   were given to the agents themselves.

9        There is a lot more stuff that I know that I want.

10  I want Judge Primomo, I want Magistrate Nowak here.  They are

11  fact witnesses to the lies that were told by these agents, and

12  the author Joey right here of this affidavit that was used in

13  support of probable cause for my arrest.  Well, actually, I

14  was arrested before that even came out.

15       I want to call the Hollywood Park Police Department.

16  I want to call -- I mean, there is just so much more stuff

17  that I want, and I want to know if you can give me some more

18  time, and I will send in motions for the rest of this stuff

19  that I want.

20       And, you know, it is important for me to go ahead

21  and put this down on the record, and this is something I am

22  asking you, please, to please allow me the opportunity to do

23  this stuff.

24       Please do not deny me my due process right, like I

25  felt I was denied at trial to prepare for my defense at the

1    little objection thing here that I have written up.

2              THE COURT:  Okay.

3              THE DEFENDANT:  Objections to PSI report.  Rule 32C

4    of post conviction procedures outlines that a PSI must be

5    done.  Rule 32-C-1-A says that the probation officer must

6    conduct an investigation and that it must be submitted to the

7    Court before it imposes sentence.

8              Ms. Olivarri's lame attempt to do what she is

9    obligated to and that her incompetence and inability and

10   unwilling to do so has prejudiced -- has produced a report

11   that does not adhere to those rules.

12             Rule 32-C-2 says that she must interview me as well,

13   yet at our initial meeting, all she was worried about was

14   taking my personal info about my family, school, work and

15   physical descriptions and ailments.

16             She totally refused to hear and see the reports that

17   would show that what Joey and the agents were going to tell

18   her were lies.  When I expressed to her about how I felt and

19   how I would like to show her the truth so that she could make

20   the right decision as to putting a factual basis in the

21   report, since she is supposed to be doing an investigation,

22   she replied that it was not necessary.

23             She told me that she is fair and that she would --

24   assured me that she would not -- that she would investigate

25   thoroughly and only put facts in the report, and that my

1    concerns about her just going over to Joey and writing down

2    whatever he wants her to use in this report, which are lies,

3    would not happen.

4         I really believed Ms. Olivarr. and felt that she was

5    sincere, since she is supposed to be a neutral and unbiased

6    person in this thing, but soon found out that she had lied as

7    well, and that she had prepared this report contrary to how

8    she had advised me, assured me of how she would do it.

9         Rule 32 outlines that they must give the report 35

10   days before sentencing, unless I have waived it.  Well, I have

11   not waived the right.  I didn't get my report; this was

12   written before the report came to me, which was, I was going

13   to be sentenced on the 8th and it was only like two weeks,

14   like ten days.  I just received -- received it June 28, 2004,

15   which would not leave me the 14-day requirement as Rule 32-F-1

16   says I am allowed to make any objections to, which I do not

17   think will be -- even allow me time to comply with Rule

18   32-F-1, for I am doing it myself and I don't have access to a

19   copy machine, so that I can comply with the Rule 32-F-2.

20        Then I know that one -- that once our objections are

21   made, we definitely won't have time to even meet Ms. Olivarri

22   to comply with Rule 32-F-3, much less even think about Rule

23   32-G, which are a clear violation of my due process right and

24   the very rules Joey, Ms. Olivarri and this Court are under

25   oath to comply with.

1    but there is a conflict among the circuits.  But for the

2    purposes of this sentence, the Court is obligated to follow

3    the law of the Circuit and finds that the sentencing

4    guidelines are constitutional.

5            I will sentence to Mr. Jesse Salazar Ramirez to the

6    Bureau of Prisons for a term of life on Counts 1, 4 and 6 and

7    a term of 20 years on Count 14.  These terms are to run

8    concurrently.  In Counts 1, 4, 6, the statutory minimum

9    mandatory penalty is ten years and the statutory maximum

10   penalty is life.  In Count 14, the maximum penalty is 20

11   years, as I said, because of the guidelines, because of --

12   well, the guidelines, but the sentence is within the

13   guidelines.

14           Should the guidelines later be found

15   unconstitutional, then the Court has the discretion to give

16   whatever sentence it thinks is appropriate without any

17   dictates by any guidelines.

18           Should that occur in this case and a determination

19   be made by the Supreme Court or some other higher authority

20   that these guidelines are unconstitutional, then the Court is

21   left to give whatever sentence it deems appropriate within the

22   statutory punishment called for by the Court, by the statute.

23           In that event, should the guidelines be held

24   unconstitutional, the sentence of the Court will be life on

25   Counts 1, 4, 6, and a term of 20 years on Count 14, to run

1    concurrently.

2         There shall be a $100 special assessment on each

3    count, for a total of $400. I don't know if the matter of the

4    forfeiture is still around. I thought maybe it had been taken

5    care of, but if not, there is the forfeiture of $32,500 and

6    several vehicles.

7         To the extent that Mr. Ramirez has any ownership in

8    these vehicles, any claim to ownership of these vehicles by

9    Mr. Ramirez is forfeited, and the judgment will reflect more

10   specifically, but there is a black Ford Mustang, a black

11   Harley Davidson, a white BMW, a Rolex watch, and a 14-carat

12   gold diamond rosary.

13        Upon release from imprisonment, he will be placed on

14   supervised release for a term of five years on Count 1, 4 and

15   6, and 3 years in Count 14, all to run concurrently. While on

16   supervised release, he will comply with the standard

17   conditions of supervised release adopted by the Court.

18        He will abstain from the use of any alcohol or other

19   intoxicants.

20        Mr. Ramirez, we have discussed this before. You

21   have a right to appeal. You have ten days in which to give

22   notice. I will ask Mr. Scharff as his last responsibility as

23   your lawyer to discuss this with you and go ahead and give

24   notice of appeal in your behalf, and then have you go to the

25   magistrate for appointment of counsel to represent you on

ATT # 9

7004 2510 0004 2934 2256

April 13,2005

Johnny Sutton/ AUSA
Assistant United States Attorney's Office
601 N.W. Loop 410 Ste. 600
San Antonio, Tx 78216

Mr. Johnny Sutton,

        I am writing this letter under title 5 § 552a in regards to the information
that your office has about me. That is false and known to be false. By your
entire office. Namely, David Shearer who sat at the debriefing of "Jose Soto"
on June 6th,2002 5 mos before the known false statements about me were used
to justify my already unlawful arrest, Joey Contreras one of the authors of
the affidavit that contained these already known false statements, Mrs. Cruz
who along with Joey used them at trial to obtain my wrongful conviction. Not
to mention, every single other AUSA that is in you office and you yourself.
"The office of the AUSA is the attorney for the govt. . If one of the AUSA's
knew of the false information, then all of them are suppose to know about it".
There is no excuse for not correcting it. At this time, I am going to demand
this office under title 5 § 552(d)(2) which gives me the right. to comply with
title 5 § 552(d)(2) and inform me within 10 days in writing. That this office
is going to make the corrctions to all of these lies under title 5 § 552(d)(2)
(B)(i) and if you and your office do not want to correct them. Then , notify
me as title 5 § 552(d)(2)(B)(ii) requires you to do. I am going to request
that the statement about me giving Rene Campos the 5 kilos to give to Jose
Sotobe excised from the affidavit that supported probable cause. That the other
false statement about Jose saying that he did multi Kilo transactions with
me at my business be corrected. That Jose told the DEA and AUSA on Dec 7th,
2001 all of this stuff about me be corrected. That the govt. believed he was
credible about what he said about this defendant "me" because it was already
known to be false. DEA-6 report of Jose Soto June 6th, June 26 and the July
debriefing of Jose in 2002. That on August 28,2002 at 8:42 pm. Jesse drove
up in a white mustang and dropped off Jose Angel Garcie- Arguello this is also
a lie and not only your agents know this , but Joey does as well. Also, that
I had drove off with Rene Campos from my businesson Sept. 26,2002. To a residence
off of White Rock needs to be corrected and that Rene or I called Castillon
and told him that we were being followed by somebody "law enforcement". Not
only do I want all of these lies in the affidavit that showed my involvement
for  proble cause. But, also the statements that are in the affidavits for Title
3 intercepts that were used before and at the grand jury proceeding to indict
me. All of these lies affected me adversly. I also want the lies that Joey
used at my bond hearing to get me denied bond corrected. Most of them are the
same as the ones above and others that he made up along the way. He knows which
ones they are. This iformation "lies" contained in an agency's files is capable
of being verified , then, under (e)(5) and (g)(1)(C) of the Act, the agency
must take reasonable steps to maintain the accuracy of the information to assure
fairness to the individual. If the agency wilfully or intentionally fails to
maintain its records in that way and, as a result, it makes a determination
adverse to an individual , then it will be liable to that person for money
damages. Not only has this info affected me adversly, in getting me convivted.
But it has been used by the United States Probation Office and its officers.
Namely, Mrs. Olivari and other officers .

In their report to the court . Which Judge Prado relied upon to justify these 3 life and 1 twenty year sentences. But, the BOI has used it in its decision to classify and desnigate me in a USP facility. Which, if it were corrected. I would not have been convicted to begin with, I would not have been given 3 life sentences and I would not have been classified and designated to a USP. Therefor, I ask you and your office to correct all of the false and material statements that were used for my unlawful arrest, my indictment, my bond being denied, for Judge Prado to rely upon in order to give me 3 life and 1 twenty year sentence and for the BOP to use to classify and designate me. I ask this under title **5 § 552a  Privacy Act. and under Sellers v Bureau of Prisons 959 F2d 307(D.C. cir 1992).**

                                        **Respectfully**



**U.S. Department of Justice**

United States Attorney
Western District of Texas A++.# 10

---

*601 NW Loop 410 STE 600*
*San Antonio, Texas 78216*

April 19, 2005

Jesse Ramirez
Reg. No. 31805-180
USP Beaumont
P.O Box 26030
Beaumont, TX 77720

RE:    Request for correction of records pursuant to the Privacy Act

Dear Sir/Madam:

In accordance with 28 C.F.R. §16, Appendix I, all requests for corrections of records pursuant to the Privacy Act of Department of Justice offices, divisions or agencies (except for a few exceptions) should be directed to the Department of Justice for processing and handling in line with other requests as received. The proper office for requests for correction of records pursuant to the Privacy Act of United States Attorney Offices is:

Executive Office for U.S. Attorneys
BICN Building
Room 7300
600 E. Street, N.W.
Washington, D.C. 20530

ATTN:  FOIA/PA Unit

This office does not have the authority to respond directly to requests for correction of records under the Privacy Act. We are, therefore, forwarding your request to the Executive Office for United States Attorneys for processing in accordance with the regulations. If you have any questions on the request, please direct correspondence to that office.

Very truly yours,

**JOHNNY SUTTON**
United States Attorney

By:    *Denise H. Swain*

DENISE H. SWAIN
Paralegal Specialist

cc:   Executive Office for U.S. Attorneys
       **ATTN: FOIA/PA Unit**
       BICN Bldg., Room 7300
       600 E. Street, N.W.
       Washington, D.C. 20530


       AUSA David Shearer
       AUSA Joey Contreras

AH #11

June 6, 2005

To Whom It May Concern,

        I am writing this letter to follow up on a Privacy Act Request. That I
had sent to the AUSA Office of Johnny Sutton. Attached will be a copy of their
response and a copy of the request. I had not heard anything and was under
the impression that I would have heard something. At least, a letter informing
me that your office had received my request. I will also be sending the 2
DEA-6 reports and a pretrial hearing transcript of the govt. "DEA and AUSA
Joey Contreras" acknowledging that they had in fact used known false
statements that were used to obtain my indictment. Yet, not a single one of
them lifted a finger to go back and correct them. The DEA-6 reports, will
prove that the statements used to show my involvement and support of probable
cause. Were in fact, Known to be false by AUSA David Shearer, the rest of AUSA
attorneys office of Johnny Sutton, namely Joey Contreras, AUSA Cruz, the DEA
office in San Antonio,TX, namely A.B. CAsteneda "case agent" who sat in on the
debriefings as well as AUSA David Shearer and knew these statements that were
material, to be false. A whole 5 months before they used them in the affidavit
that supported probable cause. Ultimately, they were caught in their lies and
had to come up with some new ones. My conviction of 3 life sentences and a 20
year sentence. Were based off false, perjured, suborned perjury and all of the
other unlawful tactics used by the DEA and AUSA attorneys office of Johnny
Sutton. I will send in other documentation to prove all of their lies that
helped them obtain my conviction.  If it is requested by your office. You
might have to read a little bit. The transcript is lenghty. But it is all in
black and white. The DEA-6 reports speak for themselves. I will also send a
copy of the actual affidavit used to support probable cause. Everything that I
will highlight, will be lies. That were all known to everyone mentioned above.
I was denied my right to show this stuff at trial and my lawyer was
ineffective for not trying to submit it as evidence. Not to mention Judge
Prado was not going to let the Govt. lose  this highly publicized case that
ended up in the death and cold blooded murder of a little 14 year old girl,
Ashley Villarreal. At the hands of the DEA, AUSA's office of Johnny Sutton and
Judge Prado. Who were all instrumental in aiding and abbetting, conspiring
with and participating with the "DEA" to cover up all of their unlawful
tactics and lies to Federal Magistrates and Federal Distric Judges and one
Federal Circuit. Just so that they could obtain all of our convictions, get
away with cold blooded murder, and to continue to use all of this unlawfully
obtained evidence to convict other people. Not to mention, getting out of the
liability of a 60 million dollar lawsuit from the family of Ashley Villarreal.
You can see just the tip of the iceberg. Why the DEA anD AUSA's office of
Johnny Sutton does not want to correct **all** of their known lies that were used
from the start to finish of this case "**Operation Alacran Nov. 8, 2002**". I only
hope that this office is not as well unwilling to correct all of this wrong
information "lies" that has already affected the lives of many families
adversely. I thank you for any and all assistance in this matter. I would
greatly appreciate any kind of response from your office.

                7004 2510 0000 6590 6614                    Respectfully


                                                           Jesse Ramirez

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to: ATTN FOIA/PA
Executive office For U.S. Attorneys
B(CN Bldg, Rm 7300 600 E. Stanthu
Washington, DC, 20530

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____ ☐ Agent
☐ Addressee

B. Received by ( *Printed Name* )    C. Date of Delivery
JUN 3 0

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered    ☒ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)    ☐ Yes

2. Article Number
(Transfer from service label)  7004 2510 0040 6590 660 4

PS Form 3811, August 2001    Domestic Return Receipt    102595-02-M-0835

AH.#12

Executive Office for U.S. Attorney's
BICN Building, room 7300
600 E. Street, NW
Washington, D.C. 20530    7007 0220 0004 4914 1498

Re: For status on Privacy Act request. That this office received
on or about the 30th of June 2005 cert. mail # 7004 2510 0000
6590 6614 received by I believe it says Ernest L. Parker.

Attn: FOIA/PA Unit,

     I am requesting to be given a status report. On my Privacy
Act request that I made to this govt. agency on April 13,2005
sent cert. mail # 7004 2510 0004 2934 2256(refer to **exhibit #
1**). On or about the 19th of April 2005. The AUSA's office in San
Antonio, Texas. Sent me a letter informing me that their office
was not the office that corrects this information. And that, they
forwarded my request to this office (refer to **exhibit # 2**). As
is already stated above.This office did infact receive this Privacy
Act request and on or about the 30th of June 2005(please refer
to **exhibit # 3**). This office did infact receive my June 6,2005
letter. Wherein I requested a status report, update or an acknow-
ledgement. Stating that this office was in the process of complying
with the Privacy Act and their duties under the Privacy Act/**Imbler
v Patchman 424 U.S. 409(1976)**. It has been well over **2 years** since
this office has received this Privacy Act request. Due to the
fact that this agency has willfully and intentionally failed.
To maintain accurate records in their files on me. This agency
is now liable to me for damages/injuries 5 § 552a(g)(1)(A). I
ask at this time under the FOIA/Privacy Act. That this office
forward me a **copy** of the initial Privacy Act request(i.e. the
request that the AUSA's office in San Antonio forwarded to this
office), a copy of my June 6,2005 letter to this office requesting
a status report and acknowledgement of receipt and any documents
that were attached as exhibits to my request. Plus any reports
from this office in regards to any investigation. That may have
been conducted in regards to my Privacy Act Request.

Dated: 8-10-07                    Respectfully

My Copy
Gave To Sapp/Mail Room    Jesse Ramirez # 31805-180
on 8-13-07, 7:30 Am

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Executive Office For U.S. Attorneys
BICN Building, Room 7300, 600 E. Street NW
Washington, D.C. 20530
Privacy Act Unit

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent ☐ Addressee

B. Received by (Printed Name)    Date of Delivery
AUG _ _ 2007

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☐ C.O.D.
☐ Insured Mail

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)   7007 0220 0004 4914 1498

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL U

| Postage | $ .58 |
| Certified Fee | 2.65 |
| Return Receipt Fee (Endorsement Required) | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $5.38 |

Sent To
Executive Office U.S. Attorneys
Street, Apt. No.; or PO Box No. BICN Bldg, Room 7300, 600 E. Street NW
City, State, ZIP+4 Washington, D.C. 20530

7007 0220 0004 4914 1498

PS Form 3800, August 2006    See Reverse for Instructions

ATT.#13

Jose,     *Cent # 7005 1160 0000 1339 8882*     8-20-07

All of this is just icing on the cake. I would like to remind you of what your duties are under **Title 28 § 515 "Authority for legal proceedings; commissions oath, and salary for special attorneys."** This statute among others gives you the powers to prosecute anyone and even a bologna sandwich. Now in regards to the **Fraudulent** claim[s] you made in your fax to Mrs. DeVille and other BOP officials. You are fully aware that the crime[s] that have occured. Are crimes against Alexis, Alyssa and I(e.g. our rightful property has been stolen from us through the Fraud that Jessica, Lori Charles, Mrs. Reyes, Steve Aycock, Teh Bauerleins, others and you have committed/perpetrated). As you are already aware **Conversion** is an unlawful/criminal act. Wherein you are more than aware that (1) Jessica Renee Rangel were and still are common law married, (2) Under Texas Law (28 § 1652 mandates that Federal Courts to rely on in civil matters) Jessica and I are commonlaw married and as such (3) Texas FAmily Law requires my consent and signature on the sale of our **Homestead**( this is the main reason why you all were not able to seize the house as you all threatened me in doing), nor could Jessica have ever **Encumbered** our **Homestead** as she did in taking out a loan against the Homestead, (4) Her conduct is infact criminal as it constitutes **Theft** under Texas and Federal Law, (5) The only way she could have made it all work. As she was fully aware that I was against her selling/encumbering our **Homestead**. Was through the known **FRAUD** that she committed in misrepresenting this and other material facts(i.e. that our homestead was already under a legaland binding contract and this property was actually the property of the girls). You are well aware that **FRAUD** is a criminal offense and since the Fraud/Theft were over a ½ million dollars(330K for our homestead and 209K for the house she bought illegally). Her crimes are 1st Degree Felonies and Felonies under Federal Law. Furthermore, this Conversion, Fraud, Theft and etc. Constitute a **Conspiracy Against Rights 18 § 241.** Namely, a conspiracy against our 5th, 4th, 14th and 1st amend. rights. NOw that you have involved yourself in aiding and abbetting and conspiring with the above mentioned people. To deprive Alexis, Alyssa and I of what is rigthfully ours. The only people who have committed crimes are the people mentioned above. You know the law, yet you have failed to uphold it and prosecute these people. The conspiracy against my rights is still ongoing. Why haven't you charged and prosecuted these people for the crimes that they committed in your district/authority. You know that I have exercised my legal and lawful remedies. In attempting to regain what is rightfully Alexis's, Alyssa's and mine. It was a no brainer that you and Jessica would join forces/together to protect yourselves from criminal prosecution. And for the crimes that you both have committed against the girls and I. HOw is it going to look. When these people see that you aided and abetted/conspired with these criminals? When you have a **duty** to prosecute them for this Conversion/Fraud and Theft of property. The evidence/documentation that you will need to initiate these prosecutions. Is already in your possession and has been for sometime now. Jessica was so sure that by befriending you through her boyfriend/and conspiring with you. She would be immune from her criminal conduct. This retaliation on your part is all the better. Proof now that you are trying to cover up your criminal conduct and keep it from coming out. Being an Accessory After the Fact is criminal as well. I really don't want you to lift one finger. You are just a predictable as Jessica is. Especially when your demons will not let you rest and forget about what you have done illegally. But, I am forced to ask you to initiate prosecutions against these people for their criminal conduct. And on behalf of Alexis Nicole Ramirez, Alyssa Marie Ramirez and myself. Since the girls are wholly ignorant to what their mother and others have done to them(i.e.stolen what was **all** rightfully theirs). And since I am currenlty im-- prisoned unlawfully and unable to do it well my self.

Pg 1

Secondly, I would like to bring to your attention other criminal conduct and the danger that the girls are currently being put in. This has to do with Jesscia being **molested** by her father/Arthur Rangel for many years. As you are fully aware, that molesting a little girls is a criminal act in Texas and in your jurisdition/district(i.e. a violation of **18 § 1169**). Further. you are "local law enforcement agency" and have a duty under the statute to initiate an investigation and prosecute Arthur Rangel for his crimes on his daughter. Also, you should be aware at the very least. Since it is your job to know. That there is **no** statue of limitation on a crime against a child(18 § 3283). The next time you meet/speak with Jessica. Ask her if her father molested her and sonce what age. Next, ask her if she allows the girls to be around this sick monster by themselves(i.e. Jesscia, Alexis adn Alyssa). If she tells you the truth, it would surprise me. But if she decides tolie and try to cover her criminal/and **Negligent** conduct. There are many witnesses, pictures and evidence. That she is infact lying if she says no. But any case, her allowing my girls to be around this man/Arthur Rangel. Is the exact definition of **Neglect** under Texas Family Code Annotated 2006 Edition **§ 261.001(4)(A), (B)(i), (iv) and (v).** My daughters have no idea that they are being led right into the lions den. To Jessica, it is ok for a Daddy to put his penis in his daughters mount/little girls mouth. As is evident by the fact[s]. That she has failed to have him prosecuted for his criminal acts. And instead, loves her Daddy Art sooo much. That she will even allow her daughters to be around him(e.g. go to his little ranch and see hi shorses, invite him over to fix her electrical problems, plan ski trips with him, allow the girls to stand in a wedding with him and etc). You have a duty to protect my daughters. Since Jessica, her mother, brother and other family members of Jessica's have failed to do what is right. These are the type of people you should be prosecuting. These sick monsters that prey on little kids. How many other kids do you think he has molested? There is no telling and it could be hundreds. All Jessica has to do is walk out of the room for **one** second and he's got my girls. Or take the girls the long way around the trail on his horse. Really, I don't want you to do anything. As your failure to do what is rights. Will only help support what I will be proving in the courtroom. Ask Jessica to give you a copy of the letter that I sent to her Daddy Art and that upset her. Ask her to show you his response to my letter that he mailed to me at Beaumont. Oh what am I saying. you probably have this in your possession already. Yet, you have failed to do your duty again. I still must ask you to conduct an investigation, file charges against Arthur Rangel, prosecute him to the fullest. Also file charges against Jesscia, her mother, brother and other family members of hers. For their failure to file charges against Arthur Rangel and for **Neglecting** my daughters. Wherein, she allows them to be place in a situation where there is a risk of sbstantial physical, mental harm and a substantial risk of sexual conduct **harmful to them**. All eyes are on you.

Lastly, I want you to correct **all** of the **false/inaccurate** information that is in the Criminal Complaint, that was told to the Grand Jury, that was said in my Bond Hearing, in pre-trial hearings, at trial and at sentencing. Also I ask that you initiate criminal charges against the DEA agents, AUSA Shearer, the rest of the AUSA's including yourself in Johnny Suttons Office and others. For arresting me in violation of my 4th amend. right, for teh use of known false statements about me in the Criminal Complaint that was used to justify my already unlawful arrest(i.e. violations of Title 18 § 1001, 18 § 241, 18 § 1621, 18 § 1622, **18 § 1623**), for my unlawful **Kidnapping** (i.e. when DEA agents and others pulled me over on NOv. 8th,2002, arrested me unlafully and then took me over to DEA headquarters and hid me out. Til they went and used the known false statements in the Complaint) a violayion of **18 § 1201,**

for lying to federal magistrates, district court judges and circuit court judges
as well. In the Titlt III affidavits, complaints for arrest warrant of Jose
Angel Garcia Arguello, for lying to the Grand Jury 18 § 1623 and other criminal
acts that occurred through the pre-trial, trial and sentencing phases of my
manufactured criminal conspiracy. MOreso, all of the false/inaccurate info
inthe PSR. That you gave knowingly to Mrs. Olivari and the U.S.P.O. I also
request that you then initiate prosecutions against everyone that was involved
in these criminal acts(i.e conspiracy against rights and property's). Further,
I ask that you also initiate prosecutions. Against the federal Magistrate Judges
that conspired withthese criminals, aided and abetted them and violated the
Seperation of Powers Act to do so. I also ask that you initiate the same against
all of the Federal and Circuit Court Judges. Who aided and abetted, conspired
with and violated the Seperation of Powers Act. In order to assist all these
criminals intheir criminal conduct to cover up their criminal conduct and to
cover up the cold blooded killing o fAshley Villarreal. I ask that you charge
them under 18 § 1951, 18 § 1952, 18 § 1956,18 § 1957, 18 § 1951, 18 § 1961,
18 § 1962, 18 §1963 and etc. I ask that you also invoke 18 § 1964 to remedy
their criminal conduct. But lastly and more important. Since **Death** resulted
from their criminal cunduct. I ask that you ask for no less than **life** and the
**Death Penalty** . As punishment for their crime and for Ashley Villarreal. Honestly,
I hope you fail to do all of this. As it will only support what I will prove
in trial and to these people. The ball is still in your possession. What are
you going to do Jose? Whatever it is, you may be a little too late. Keep on
having your coconspirators here at the BOP retaliate against me. Tell them
to lock me up for some trumped up false/fraudulent charge, put me on diesel
therapy, shakedown my cell, confiscate all of my legal documents and whatever
else you and they can think of. It is just going to support what I will prove
at trial and to these people/the public. All eyes are on you. There is nothing
else for me to do as you have left me no choice but to keep fighting this legal
battle with you. It is comforting to know, that it is finally coming to an
end and fixing to pay off. I want you to call up here and ask to talk to me.
Better yet, I ask that you come visit me one time and before we do our battle
in the courtroom. I have a few things that I would like to ask you and tell
you to your face. The way **MEN** talk about things.

Respectfully

Jesse Ramirez

Dated:8-20-07

cc: District Court
    nice friends

P.S. Tell your tag team team mate Prado. That we will see each other in the
courtroom sooner than he thinks. Only this time, it will be different. Also
that he has no one else to blame but **YOU.**

I swear under penalty of perjury the foregoing is true
And correct, To the best of my knowledge and the documentation
I have to prove it

8-20-07

pg 3

**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Freedom of Information Privacy Staff*
*600 E Street, N.W., Suite 500 Bicentennial Building*
*Washington, DC 20530-0001*
*(202) 616-6757   FAX   616-6478   (www.usdoj.gov/usao)*

AH #14

Requester: __Jesse Ramirez_____    Request Number:___08-1329_____

Subject of Request:__**Self (correction of criminal file)**_____    ____ __ ___

Dear Requester:                                                    MAY  -9 2008

　　　　Your recent request for records from the Executive Office for United States Attorneys
(EOUSA) has been received. Before the Executive Office can begin processing your request, it
is necessary for you to correct one or more deficiencies. Please comply with the paragraphs
checked below:

1.　　[  ] A requester must provide a notarized example of his/her signature or a certification of
identity under penalty of perjury. This insures that information pertaining to an individual is
released only to that person. A form is enclosed for your use.

2.　　[  ] The files and records of United States Attorneys are maintained in over one hundred separate
offices throughout the United States. Please identify the specific United States Attorney's
office(s) where you believe records may be located. This would be primarily the district(s) in
which a prosecution or litigation occurred.

3.　　[  ] To insure that records are properly identified, provide subject's full name, current address,
and date and place of birth.

4.　　[ **X** ] Your request for amendment of records pertaining to yourself is denied. The criminal case
files maintained by the United States Attorneys' Offices are exempt from the amendment-of-
records provisions of Privacy Act. See 28 C.F.R.§ 16.81(a)(4).

5.　　[  ] Please note that your original letter was split into separate files ("requests"), for processing
purposes, based on the nature of what you sought. Each file was given a separate Request
Number (listed below), for which you will receive a separate response:

_____ - _


　　　　By making a FOIA/PA request, you agree to pay fees up to $25, as stated in 28 C.F.R.
§ 16.3(c), unless you request a waiver of fees (according to requirements in 28 C.F.R. §
16.11(k)). Indigency does not constitute a basis for a fee waiver. Please note that pursuant to 28
C.F.R. § 16.11, we are required to charge fees for time used to search for the documents you have
requested and for duplication of all pages released to you. Normally, search time is charged at a
rate of $28 the expected fees (or you have narrowed your request to reduce fees) and we have

processed your request, we will require payment for the accumulated charges before we release any documents to you (in excess of 100 free pages). Without such payment, your request file will be closed without further action.

Once you have corrected the above deficiencies, please submit a new request for the documents. This is a final determination and your request for information has been closed. When we have received your new, corrected request, we will open a new file for you. **Please send your new, corrected request to the address above.**

This is the final action on this above-numbered request. You may appeal this decision on this request by writing within 60 days from the date of this letter to the **Office of Information and Privacy, United States Department of Justice, 1425 New York Avenue, Suite 11050, Washington, D.C. 20530-0001.** Both the letter and envelope should be marked "FOIA Appeal." If you are dissatisfied with the results of any such administrative appeal, judicial review may thereafter be available in U.S. District Court, 28 C.F.R. §16.9.

Sincerely,

William G. Stewart II
Assistant Director

[  ] Enclosure(s)

AH #15

U.S. Dept. of Justice
Exec. Office for U.S. Attorneys
FOIA/Department
600 E. Street, N.W. Ste. 7300
Washington, D.C. 20530

RE: Request # **08-1329** and the correction of request.

Assistant Director,                    7007 2680 0001 2627 4213

   I am in receipt of your response to my request. I did receive this on
or about the 14th of May 2008. I am fully aware that these "official court"
documents are exempt from being corrected/amended. However, it can be "noted"
that this information is infact inaccurate/**false**. So that this inaccurate/**false**
information is **not** relied upon and does not effect me adversely anylonger.
Therefore I ask that this agency "NOTE" in its file[s] and give notice to
**all** the other agencies. That this information is infact inaccurate/**false**
and is not to be relied upon anylonger. Lastly,I would like proof (i.e.
actual documents that have been redacted of this inaccurate/**false** information)
that this has been noted and is not to be relied upon anylonger. So that,
I could maintain my personal. With accurate/truthful information as well.

Respectfully

Jesse Ramirez # 31805-180                    dated: 5/3/08



BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) Mr. McGehee/ Ms. Hanks  Unit Team | DATE: 8/1/06 | |
|---|---|---|
| FROM: Jesse Ramirez | REGISTER NO.: 3    18 | |
| WORK ASSIGNMENT: Law Library/ Clerk | UNIT: C/A | |

SUBJECT: (Briefly state your question or concern and the solu     you are requesting.
Continue on back, if necessary.  Your failure to be specific      v result in no action being
taken.  If necessary, you will be interviewed in order to suc    s fully respond to your
request.)

I am writing this request. To notify you all of "Inaccurate    ri ation" in your files

that is affecting me adversly. Namely, the information that     a l have in the "Sentence

Monitoring Computation Data" and all of the information. Th       n my PSR report. It has

come to my attention. That you all must correct all of this      s  information. That is

affecting me adversely and that is capable of being verified    l rs **v Bureau of Prisons**

**959 F2d 307 (D.C. Cir 1992) and Operations Memorandun** of Ma    1 ,1993. It was further

stated, that you all are liable for money damages. If you a     r ot maintain records with

accurate information. This information is indeed affecting      v rsely and is capable of

being verified with little diligence. I would like for you       o treat this as your notice

for me filing a **Sellers Complaint.** I do appreciate and and     s istance in correcting

this incorrect information. Respectfully,

(Do not write below this line)

DISPOSITION:

GAVE TO McGehee In the presence oF Cruz.
ON 8/01/06 at 3:42 pm

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)          This form repl    BP-148.070 dated Oct 86
                                               and BP-S148.07   A R 94

AT-#17

BP-S148.055  **INMATE REQUEST TO STAFF** CDFRM
SEP 99

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) Mr. Batcho / Ms. Banks Unit Team 2nd req. | DATE: 8/11/06 |
|---|---|
| FROM: Jesse Ramirez | REGISTER NO.: 31391-18 |
| WORK ASSIGNMENT: Law Library/Clerk | UNIT: C/A |

SUBJECT: (Briefly state your question or concern and the solu... you are requesting.
Continue on back, if necessary.  Your failure to be specific ... result in no action being
taken.  If necessary, you will be interviewed in order to suc... fully respond to your
request.)

I am submitting this 2nd request/notice and in regards to my ... e a **Complaint**. Asking my team
to correct all of the **inaccurate/false** information in my BOP ... , what is, affecting me and w
will continue to affect me adversely. Under **Operations Memoran...** f March 15,1993. Unit
team is not only responsible for "maintaining all records... s th **accuracy**, relevence,
timeliness and completeness as reasonably necessary to assur ... r ess to the individual
"**me**" in the determination" **5 USC § 552a(e)(5)**. But, they are ... sponsible and liable
for not doing so. When damages are sustained by the individu... t ess that a $10000.00
as well as litigation costs and attorneys **5 USC § 552a(g)(4)** ... mitted my **1st Cop-Out**
to Mr.Batcho on 8/01/06 at 3:42 pm and in the presence of, c... l Cruz and I have not
heard back formally from either. So, this is my second attem... vice to get this resolved
due to dispose of this important matter. In a diplomatic way

Jesse D M Ramirez / Ramirez 8/11/06 10:57a
(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form repl... BP-148.070 dated Oct 86
and BP-S148.0... PR 94

# DOCUMENTATION OF INFORMAL RESOLUTION ATTEMPT

Bureau of Prisons Program Statement No. 1330.13, <u>Administrative Remedy Program</u>, (December 22, 1995), requires, in most cases, that inmates attempt informal resolution of grievances prior to filing a formal written complaint. This form shall be used to document your efforts towards informally resolving your grievance.

Inmate Name: **RAMIREZ, JESSE**     Reg. No.: **31805-180**     Unit: **CA**

Specific Complaint and Requested Relief: I am complaining about Unit Team Manager McGehee and Case Worker Hanks. I have submitted 2 Cop-Out and requesting under **Seller's v BOP** "Sellers Complaint" to have them correct the **false/incorrect** info that is **affecting me adversely.** This information is able of being verified and corrected. Please See Attachment.........

Efforts Made By Inmate To Informally Resolve Grievance (be specific): I have submitted 2 Cop-Outs and have spoken to Mr. McGehee about it. On a few different ocassions, and have not been able to speak to Ms. Hanks about it. As I **rarely** ever see her in the Unit. The responses that I have gotten from Mr.McGehee. Are that pretty much have to wait on them and whenever they get to it, they get to it.

Counselor's Comments: _____

_____

_____

_____

_____

_____     _____
Correctional Counselor's Review / Date     Unit Manager's Review / Date

DATE GIVEN TO INMATE: 08-14-2006
DATE RECEIVED FROM INMATE: _____

Gave to Cruz 8-15-06
11:09 Am

Spoke to Mrs. Hanks on 9-15-06 in the morning. Yet, she still does not understand.

The case law is pretty clear on this type of situation and in regards that. They **have** to make sure that the information that they are relying upon. To have me **classified** and **designated.** Needs to be **accurate/true.** This information that they have in their Sentence Computation Data sheet. Is not only incorrect/ false. But it is **horribly** so and it is the only reason. Why, I am imprisoned to begin with. This failure on the part of Mr. McGehee and Ms. Hanks is indeed actionable and they are liable. It is not my intentions to seek any monetary judgement against them. I just want/need this false/incorrect info corrected and as soon as possible.

Respectfully

## DOCUMENTATION OF INFORMAL RESOLUTION ATTEMPT

Bureau of Prisons Program Statement No. 1330.13, <u>Administrative Remedy Program</u>, (December 22, 1995), requires, in most cases, that inmates attempt informal resolution of grievances prior to filing a formal written complaint.  This form shall be used to document your efforts towards informally resolving your grievance.

Inmate Name: <u>RAMIREZ, JESSE</u>    Reg. No.:    <u>31805-180</u>    Unit: <u>CA</u>

Specific Complaint and Requested Relief: <u>On 8/15/06 at 4:30 pm. I was called to</u>

<u>the back office by counselor Cruz. He told me that Ms. Hanks wanted to speak</u>

<u>with me. I proceeded to go to the back offices and speak to her. Upon arriving</u>

<u>at the back office. I was immediately talked to in a loud, **rude** voice and was</u>

<u>being chastised. As all of this stuff was coming from Ms. Hanks. See Attachment</u>

Efforts Made By Inmate To Informally Resolve Grievance (be specific): <u>I would like</u>

<u>a formal apology and for her to correct the **false/inaccurate** info in my file.</u>

<u>I would also like her to be punished/reprimanded for her insubornation.</u>

Counselor's Comments: _____

_____

_____

_____

_____

_____      _____
Correctional Counselor's Review / Date        Unit Manager's Review / Date

DATE GIVEN TO INMATE: 08-14-2006
DATE RECEIVED FROM INMATE: _____

Gave to Cruz 8:18 pm on 8-15-06

I told her that there was no need to be talking to me like that. As I had just
sat down and had not disrespected her one bit. She continued to yell at me
and told me that. I needed to give her all the info. So that she could get
it corrected. I told her that I told Unit Team Manager. That when she was ready
all she had to do was tell me and that. I would give her all the necessary
documentation. She continued to yell at me and I told her again. That she did
not have to talk to me like that. She told me that, that is how she talked
and that I was **nobody** to tell her how to talk. That she was going to talk to
me how she wanted. I proceeded to get up and walk out of her office and telling
her not to worry about anything. That I had something for the way she was talking
to me(i.e. This BP-8 and whatever administration remedy there is available).
As I proceeded to walk out of the office and down the hall. She continued to
yell at me and tell me to come back. So that she could tell me what's up. It
was very unprofessional for her to talk to anyone like that. if Ms. Hanks is
mad at the fact that I wrote her up. For not answering my 2 previous Cop-Out's.
Then she needs to answer me/them in a timely manner and respectful one as well.
I will not tolerate her berating me infront of counselor Cruz or anyone else.
If need be, I will outline all of the regulations that she has broken and in
reference to her Professional Conduct and Responsibilities.

Respectfully

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

Att. #20

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | Jesse Ramirez | 31805-180 | C/A | USP/Beaumont |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A- INMATE REQUEST** – It has been more than 20 days from the time that I have sent in my informal resolution BP-8. I have not heard one word on this at all. Under CFR § 542.18. At the institutional level. I should have received a response in 20 days and if I haven't. Then I could treat it as a denial at this level. Under P.S. 1330.13(8)(b) pg 6. I can bypass the informal resoultion and request a Formal Resolution BP-9. I have requested a 9 and am going to proceed tothe next level. I spoke with Case Worker Hanks on 9/15/06 in the morning. We discussed the **Sellers** issue at hand. But, she does not understand its progeny. First off, under Sellers. PSI reports are exempt from requests of amendment 28 CFR §§ 16.51(c) and 16.97 (a); **Deters v U.S. Parole Comm.** 85 F3d 655, 658 n2(D.C. 1996). However, my case is unlike Deters. Where Deters could **not** ascertain/prove the truth. I am able to prove the truth and in Black and White. Ms. Hanks has been given some of the documentation "DEA-6 reports and Trial Transcripts). I am in the process of forwarding her more proof documentation. To prove that I am telling the truth and that the information inthe PSI is **false**. In short, my case is a "**Typical**" case. My allegations of false information in the PSI. Is easily ascertainable and capable of being verified **Sellers v BOP** 959 F2d 307(D.C. 1991). I do not care, if the probation office. Does or does not. Correct this **false/inaccurate** info in their PSI. I care that this **false/inacurate** info. Is the reason/basis for me being imprisoned to 3 life sentences to begin with. As Ms. Hanks has relayed to me "If the Probation Office does not correct it.

| 9/18/06 | (please see attachment......) | *[signature]* |
|---|---|---|
| DATE | | SIGNATURE OF REQUESTER |

**Part B- RESPONSE**

At 11:02 A.m. Mr. McGehee at main line. Told me to slide this under the door of Counselor Cruz. At 12:07pm. I did as McGehee requested me to do.

| | |
|---|---|
| DATE | WARDEN OR REGIONAL DIRECTOR |

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

| ORIGINAL: RETURN TO INMATE | CASE NUMBER: _____ |
|---|---|
| | CASE NUMBER: _____ |

**Part C- RECEIPT**

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|

SUBJECT: _____

| | |
|---|---|
| DATE | RECIPIENT'S SIGNATURE (STAFF MEMBER) |

BP-229(13)
APRIL 1982

Then we don't have to take it out of your fileand we will continue. To use
this info against you. Whether it affects you adversly or not. It is only up
to the Probation Office to correct it". I had told her, that at sentencing.
I contested and objected to all of this known false information and the transcript
will reflect. That the probabition officer, AUSA's, and even Judge Prado. Knew,
that the information was false. It is clear, that she does not understand.
Exactly what are her duties and responsibilities are and under **5 U.S.C. 552.**
Her lack of effort to address this **false/challenged** information before she
relies on it again. Does not satisfy the Privacy Act. By her just merely noting
this disputed info in my file. I am fixing to come up for another evaluation
"Team"soon. Due to the recent points change. She is once again going to rely
upon this **false** information. I therefor ask, that this formal resolution. Be
give the utmost and expedient attention. So that, I may be able to exhaust
my Administration Remedy and proceed with the next available remedy 5 § 552(a)
**(g)(1).**

Respectfully,

Jesse Ramirez

October 4,2006

Ms. Hanks,

I am taking this opportunity. To just send you this correspondence. In the wake of Mr. McGehee's advice. It is clearly evident, that not only do you not have an understanding of Sellers and its progeny. But Mr. McGehee's ignorance of Sellers. Has clearly shown through as well. It is probably best, that you take his advice and disregard your duties. Under the Privacy Act 5 § 552(a) and Selelrs. There is no reason to continue this game of you alls. It is **not** my duty. To do your job for you. All that I am required to do. Is point out and make you **all** aware. That there is **inaccurate/false** information. That is is my PSI, BOP files and that. This **false/inaccurate** information. Is infact affecting me adversely. I was trying to be nice. By assisting you in the discharge of your duties. However and since it is your choice. To rely upon Mr. McGehee's erroneous and ignorant. Reliance and interpretation of Sellers and the Privacy Act. I am just going to inform you and bring to your attention. That **all of** the information. That you "the BOP" have been relying upon. Is infact **false /inaccurate**. The information in Defendants Relevant Conduct paragraph number: 12, 13, 14, 15, 18, 20, 21, 28, 44, 45, 49, 50 and the entire preponderance of the evidence findings. That Judge Prado intenionally and erroneously relied upon. Are also and infact **false/inacurrate**. There is no evidence that was adduced at trial. That would even support a finding of me being a supervisor or manager. Therefore, there would be no way/basis that Prado could say "Since I feel that you were a supervisor/manager. You had to have known about the 1,445 kilos of cocaine that were sold and for this reason. I am going to put the entire amount of cocaine on you". But most important, there is no consiracy at all. There is no way that I could be punished to prison. For a crime "conspiracy" that **never** happened or existed to begin with and for a crime. That the govt. created with the use of known false statements. Which this created crime from known false statemments. Is the basis of this 841(b)(1)(A) conspiracy. If the crime never happened and doesn't exist to this day. Then there is no way, that they could base a conspiracy off of it.

Furthermore and as I have stated. My case is the "TYPICAL" case under Sellers and the Privacy Act 5 § 552(a). All of this can be verified and as soon. As I exhaust the administrative remedies. I will prove this and whole liable.

Gave to Mrs. Hanks at Chain Line at 11:16 Am

Mr. McGehee, You, Satcher, Hawkins and the entire agency of the BOP. For inten-
ionally and willfully failing to maintain accurate files and records. **Seller's
v Bureau of Prisons 959 F2d 307.** I am going to attach a BOP Memorandum. That
was sent out in 1993 and that points out. Exactly what your duites are under
Seller's and the Privacy Act. <u>If it is your will, to continue to listen to
the ignorance of Mr. McGehee.</u> Then <u>know, that you are failing to uphold your
duties.</u> I then ask you, to continue to ignore my request and your duties. So
that I can proceed with this civil suit and win a money damages judgement against
all of you all. It does not make one difference to me. If you do your job or
not. I am going to rely upon every single lawful/legal remedy. That is available
to me. To make sure, that this is corrected and that I am handsomely compensated.
For the injuries and damages. That I have incurred/received and for any future
injuries and damages. I am also going to cite some more cases. That I will
advise you to read and understand. So that, you can make an informed decision.
In deciding to discharge your duties or not to discharge them. **Toolasprashad
v BOP 286 F3d 576(D.C. 2002); Stone vUnion Corp. 371 F3d 1305(11th 2004); Risley
v BOP 108 F3d 1396(D.C. 1997); White v Probation Office 148 F3d 1124(D.C. 1998);
Deters v Parole Com'n 85 F3d 655(D.C. 1996)** and there are many others. Believe
me Ms. Hanks. I have done my homework well and I know exactly what the law
says. I ask you please. Do not let your ignorance be your downfall. Your advisor,
Mr. McGehee. Is wrong and listening to him. Will make you liable personally.
I hope that you take this advice and inform yourself. Of what the law and Privacy
Act really says. I do expect you all to correct this **false/inaccurate** information.
That has been and is still affecting me adversely. Thank you for any assistance
and consideration. In this most important matter.

                                        Sincerely

                                        Jesse Ramirez

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JESSE RAMIREZ** | § | |
| | § | |
| | § | |
| v. | § | **Case Number 1:07CV02226** |
| | § | |
| | § | |
| **DEPARTMENT OF JUSTICE, ET AL** | § | |

## DECLARATION OF JAN HANKS

In accordance with the provisions of 28 U.S.C. § 1746, I, Jan Hanks, make the following

unsworn declaration, under penalty of perjury, pertinent to the above-styled and numbered cause:

1.    I am presently employed with the U.S. Department of Justice as a Case Manager

with the Federal Bureau of Prisons (BOP). I am assigned to the United States Penitentiary in

Beaumont, Texas (USP Beaumont), where I have been employed since 1996. As part of the

normal course of my duties, I have access to inmate records maintained by the BOP in the

ordinary course of business. Included among these records are various documentation

maintained in inmate Central Files, which includes Pre-Sentence Investigation Reports (PSI).

2.    The statements I make hereinafter are made on the basis of my review of the official

files and records of the BOP, my own personal knowledge, or information acquired by me

through the performance of my official duties. I am familiar with the process and procedures

used by the BOP to verify contents of PSI's or to attempt a correction of records containing

information alleged to be inaccurate.

3.    I reside in Texas and have lived here for 38 years. I do not own any property and do

Page 1 of 4

not conduct business in Washington, D.C. I was last present in Washington, D.C. approximately

eight years ago on TDY unrelated to this case..

4.    I have reviewed the complaint filed by Mr. Ramirez in this case. I understand that

he alleges the BOP and BOP staff, including myself, have refused to correct inaccurate

information located in his PSI when he was housed at USP Beaumont.

5.    As a Case manager, one of my duties is to assist inmates when they claim there are

inaccurate records maintained by the BOP that are relied upon by the BOP.

6.    According to BOP policy, which is outlined in Program Statement 5800.11, inmates

may challenge the accuracy of information located in his Central File, which would include a

PSI. In order to assert a challenge, policy requires the inmate to "provide staff with sufficient

information in support of a challenge." If an inmate submits this required information, then staff

will then take "reasonable steps" to ensure the information is correct.

7.    In the past, when inmates have provided me specific information regarding an

alleged inaccuracy in a PSI, I have attempted on numerous occasions to resolve the inaccuracy

with the United States Probation Office. Per policy, however, the inmate must provide me with

sufficiently detailed information to allow me to draft a specific letter to the originating agency

responsible for generating the document detailing the alleged inaccuracy. Where possible,

supporting documentation is always helpful. A general statement, such as "my PSI is wrong," is

not specific enough to warrant a written letter to the United States Probation Office or sentencing

court.

8.    I remember Mr. Ramirez claiming to me that his PSI was inaccurate. He entered my

office approximately sometime around September or October 2006 and stated that he was

  
sentenced illegally by the Judge. He also stated that the United States Probation Department used the wrong guidelines to sentence him. I probed Ramirez to explain to me with more specific detail how his sentence was illegal, or which specific guideline was inappropriately used. Instead of providing this detail, he merely handed me stack of papers that was approximately two inches thick with no specific inaccuracies tagged for my reference. No supporting documentation or any more detail was provided to me.

9.      I explained to Ramirez that in order for me to contact his sentencing court or the Probation Office, I would need more detail as to what, specifically, was inaccurate; i.e., what paragraph of the PSI, what Guideline should not apply, etc. I also gave him a recent example of an inmate that challenged an alleged inaccuracy in his PSI, which resulted in me contacting the United States Probation Office. In this case, as explained to Ramirez, the inmate pointed me to the alleged inaccuracy in his PSI, stated how he thought it should be changed and provided me with supporting documentation.

10.     Despite my attempts to obtain more specific information from Ramirez, he left my office angry. Although he stated he would come back with more specific information, he never addressed this matter with me again. Nor did I receive written communication from Ramirez on this issue. After this encounter, Ramirez filed administrative remedies through the BOP stating I, and the BOP, intentionally refused to assist him in correcting records.

11.     I deny any allegation of wrongdoing, as I have responded to Ramirez's issues in a good faith effort to resolve his concerns.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 12 day of May, 2008.

Page 3 of 4

Jan Hanks

These are the reasons why the BOP/ and USP/Beaumont Staff. Should not rely on the **false/erroneous** information in the PSI Report. This information is infact **false/erroneous** and is affecting me adversely. Because, USP/Beaumont Staff is relying it on this false/erroneous information. To Classify and Designate me to a USP and to being sentenced to prison.

**(12).** In defendants Relevant Conduct paragraph (12). The govt. knowingly and intentionally. Relayed this **false** information to U.S. Probation Officer Mrs. Olivari. I was not a Facilitator for Alejandro Castillon's Organization. I sold them cars, trucks, guns and etc. In a lawful and legal manner. It was adduced at trial. That none of my acts/conduct. Had violated any Texas State Law or Federal Law. None of the guns that were sold to Castillon. Were ever reported stolen. It is not against the law State of Federal. To sell anyone over the age of 18 a firearm. Likewise, it is not against the law to sell cars, trucks, Rolex watches, deer feeders, and to refer a lawyer to anyone. Who is in need of legal representation. The testimony by govt. witnesses (i.e. Dea Agents, IRS Agents, and others). Further support my contentions and statements. Furthermore, there are DEA-6 reports to support what I am saying as well. These are in the possession of the AUSA and DEA agents.

**(13).** In defendants Relevant Conduct paragraph (13). The govt. has given Mrs. Olivari more known **false** information. I **never** used false information to obtain cell phones. I didn't have to use false information. The govt. has infact **changed /altered** this evidence. The govt. themselves, seized the phone bills and information. That proved they are lying and knowingly. This evidence was entered in as evidence at trial. The unlawfully seized phone bills from this company. Do infact have **all** of my **correct** information. The problem was, that when the govt. had asked and obtained Title III Interception authorization. I had already disconnected this particular phone and dropped service on it. They were mad at that fact and subsequently. Altered the information in **their** reports and evidence. So that they could draw a better picture of my guilt. This information is capable of being verified. With them falsely stating that I had used false information to obtain these phones. It makes it seem, that I have something to hide and that I am culpable. This phone was obtained from Hawk Cellular in San Antonio and if the records were pulled from this company. It would show, that the infromation in their files/records. Is my correct information and that. The person[s] who were issued this number. That **used** to be issued to me. Are the people who used the Bullard, Tx and New York address. In order to obtain this number. I am going to attach as **exhibit # 1.** Documentation of this false information of

*Missing "2" other Documents Before these*

which. The Staff at USP/Beaumont is relying upon and is ultimately. Affecting
me , my classification and designation adversely.

(14). In defendants Relevant Conduct paragraph (14). The govt. once again relayed
known false information to U.S Probation Officer Mrs. Olivari. This false info-
rmation, consists of the govt. saying. That I held a Supervisory Position and
for this. Judge Prado intentionally and erroneously. Relied upon this false
information. To say, that "since you were a supervisor manager. I feel that
you had to know and were involved in the possession and distribution. Of **1,445
kilos** of cocaine. Which inturn, has pushed me over level 38 and made me eligable
for a life sentence. Which my sentence, is the reason[s]. Why I am designated
to a USP and have to do 8  years behind a USP wall. Before I can go to a medium
or low. Where at the very least, is where I should be at. But most importantly,
these erroneous findings of Prado. Are the sole reason[s] why I am sentenced
to prison to begin with. The evidence adduced at trial. Does not support this
false information and enhancement. I am going to attach as **exhibit # 2.** All
of the evidence that was adduced at trial and will prove. That this information
is indeed false and that the govt. relayed it to the Probation Officer. Knowingly,
intentionally and so that.The Bureau of Prisons, could and would rely on it.
In order to Justify my life sentences, and to classify and designate me to
a USP. This will consist of DEA-6 reports, trial testimony, sentencing transcript
and etc. Incidently, this erroneous drug amount and finding. Is affecting adversely,
by pushing me over the 10,000 gm, 10 kilo, or 22 lb drug amount. Found in Program
Statement 5100.07 Appendix B, Page 1. Whereby, this Greater Severity rating.
Is the reason why I have a Public Safety Factor and am being prevented. From
going to a Medium and or Low. But once again, this drug amount from this conspiracy
that was **manufactured** with the use of known false statements and erroneous
5 kilos. Is the sole reason, for me being sentenced. To any prison sentence
at all.

AO 91 (Rev. 5/85) Criminal Complaint

*11-8-02*

*Clerk, U. S. District Court*
*Western District of Texas*

*by*

*Deputy*

# United States District Court

WESTERN **DISTRICT OF** TEXAS

UNITED STATES OF AMERICA

**V.**

ALEJANDRO NOE CASTILLON, ~~ET AL~~ *Rene Campos*
*Charles Cruz          Salvador Castillon*
*Edward Scot Lopez      Reynaldo Hernandez*
*Jesse Salazar Ramirez   Lori Ann Hernandez*
(Name and Address of Defendant) *Hector Del Rio - Rodriquez*
                    *Jose Zamagora Garza-Del Rio*

## CRIMINAL COMPLAINT

CASE NUMBER:  SA 02-570M

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____ August 28, 2002 _____ in _____ Bexar _____ county, in the

_____ Western _____ District of _____ Texas _____ defendant(s) did, (Track Statutory Language of Offense)

conspire to distribute and possess with intent to distribute more than five kilograms of cocaine

in violation of Title _____ 21 _____ United States Code, Section(s) _____ 841(a)(1) and 846 _____.

I further state that I am a(n) _____ Special Agent, D.E.A. _____ and that this complaint is based on the following

Official Title

facts:

SEE ATTACHMENT A

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

11-08-2002                                    at        San Antonio, Texas
Date                                                    City and State

NANCY STEIN NOWAK, UNITED STATES
MAGISTRATE JUDGE
_____                    _____
Name & Title of Judicial Officer                     Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

000001

**ATTACHMENT A**

OVERVIEW

Affiant is a Special Agent with the Drug Enforcement Administration (DEA). Affiant is presently assigned to an investigation code-named Operation Alacran and is personally familiar with all of the facts in this affidavit. The details of the investigation are as follows:

In September 2001, a confidential informant provided information to D.E.A. agents that identified Alejandro Noe Castillon as a cocaine trafficker who headed an organization that smuggled cocaine from Eagle Pass to San Antonio, and on to Dallas, Missouri, Wisconsin, and Illinois. "Operation Alacran" was initiated as a investigation focusing on this drug organization.

On December 6, 2001, Border Patrol agents stopped a Ford Explorer driven by Lidia E. De Alba, at the Eagle Pass checkpoint. Approximately twenty-four kilograms of cocaine were seized from a false compartment in the gas tank. De Alba was interviewed and said that she had been asked to drive the Explorer to San Antonio by her boyfriend Reynaldo Hernandez. Reynaldo Hernandez is the registered owner of the Explorer. A receipt found in the Explorer showed that Rene Campos had sold the Explorer to Hernandez. Agents also recovered handwritten notes with the name of Alejandro Noe Castillon and Castillon's cell and home telephone numbers.

On December 7, 2001, undercover D.E.A. agents posing as cocaine buyers, bought five kilograms of cocaine from someone who was arrested and identified his source as Jose G. Soto. Soto was lured into meeting the agents to pick up the payment for the cocaine and was arrested. Soto was interviewed and identified his source of supply as Rene Campos. Soto said that Campos got his supply of cocaine from Jesse Salazar Ramirez. At the time that Soto was arrested attempting to pick up payment for the cocaine, he was driving a vehicle registered to Alejandro Noe Castillon, and had left his own vehicle at the business of Jesse Salazar Ramirez.

On June 14, 2002, a state wire interception was begun on a telephone used by Castillon. The interceptions showed a pattern of smuggling to Missouri and Chicago, and return trips with cash proceeds. On July 1, 2002, Castillon was intercepted speaking to Jose Zaragoza Garza-Del Rio and Hector Del Rio-Rodriguez about nineteen kilograms that Garza-Del Rio and Del Rio-Rodriguez were transporting. As a result of this interception, local police in San Antonio stopped Garza-Del Rio and Del Rio-Rodriguez as they drove a vehicle; nineteen kilograms of cocaine were seized. Garza-Del Rio and Del Rio-Rodriguez were arrested on state drug charges, released on bail, and promptly fled to Mexico. During the state interception, Castillon was intercepted numerous times discussing the distribution of cocaine and the collection of cash proceeds.

On August 21, 2002, a United States District Court for the Western District of Texas authorized interception of cellular phones associated with the Castillon organization. Since that date, authorization for seven cellular telephones used by this organization has been granted at various times from August 21 to the present. Affiant has reviewed transcripts of the calls intercepted and a pattern of calls was identified. Alejandro Noe Castillon or Rene Campos would direct Reynaldo Hernandez to make a trip to San Antonio. Hernandez would drive to San Antonio, making calls to Castillon, Rene Campos, and his wife, Lori Ann Hernandez, as he traveled. When he arrived in San Antonio he would call Rene Campos and let him know he had arrived.

On August 26-27, 2002, Reynaldo Hernandez, Alejandro Noe Castillon, and Rene Campos

1

made a series of calls to each other that indicated that Hernandez was transporting eighteen kilograms of cocaine from Eagle Pass to San Antonio on August 27. Hernandez was observed by agents as he traveled from Eagle Pass to San Antonio on August 27. Hernandez and Lori Ann Hernandez spoke several times as he was traveling. During one call Lori Ann asked Reynaldo if he had sprayed to hide the odor. She also asked if he had used the "red" one. Hernandez was under surveillance and was observed as he pulled his pickup into a garage at the Roanoke Apartments, Apartment 401, 7930 Roanoke, San Antonio, Texas, at about 9:00 PM. Jesse Salazar Ramirez was observed arriving at and entering the apartment at about 9:55 PM. Rene Campos was also observed arriving at the location.

On August 28, 2002, intercepted calls indicated that Reynaldo Hernandez was transporting cocaine to San Antonio. On August 28, agents observed Jesse Salazar Ramirez arrive at the Roanoke location and drop off Jose Garcia-Arguello at Apartment 401. Later that day, agents saw Reynaldo Hernandez drive a pickup from Eagle Pass to the Roanoke location. Rene Campos then arrived at the apartment and Reynaldo Hernandez was heard making a call to Lori Ann Hernandez telling her that they were going to put the "thing" in the house. Rene Campos and Reynaldo Hernandez then drove away from the location, leaving the pickup in the garage.

A short time after Campos and Hernandez left the Roanoke apartment, police officers obtained written permission to search the apartment from the sole occupant of the apartment, Jose Garcia-Arguello. The officers recovered an electronic money counter, several vacuum sealers, drug ledgers, fifty-five kilograms of cocaine, and four assault rifles in the apartment. A search of the pickup truck Reynaldo Hernandez had driven from Eagle Pass and parked in the garage, revealed a red bottle of deodorizer.

On September 17, 2002, Alejandro Noe Castillon was intercepted asking "Martha" if "Chava" was finished with the count. A short time later Alejandro Noe Castillon was intercepted telling his brother, Salvador Castillon-Saucedo (Chava) to go to Mexico. Local Eagle Pass were asked to conduct a stop of a car Chava was driving and a consensual search resulted in the seizure of approximately $201,000.

Interceptions between Lori Ann Castillon and Alejandro Noe Castillon indicate that on September 28, 2002, Reynaldo Hernandez and Lori Ann Hernandez drove a load of cocaine from Eagle Pass to San Antonio.

On October 1, 2002, Alejandro Noe Castillon was intercepted directing Reynaldo Hernandez to go to San Antonio and meet with Rene Campos. Surveillance units observed Hernandez leave his house in Eagle Pass and drive to San Antonio. During the trip, Hernandez was intercepted asking Alejandro Noe Castillon if there was any problem with meeting Rene Campos in Seguin. Hernandez then called Campos and asked Campos to meet him at Hernandez' sister's house in Seguin. Hernandez drove near his sister's house and waited. Hernandez was picked up by his sister's husband who drove him to the husband's house in Seguin. Rene Campos arrived at the residence, met with Hernandez, and left a short time later. Rene Campos was followed by agents and a traffic stop was conducted in which Campos was positively identified. As Hernandez drove back to Eagle Pass, on October 2, 2002, he was overheard talking to Lori Ann Hernandez. The conversation indicated that Hernandez was transporting something small. A traffic stop was conducted in Eagle Pass and $83,260 was seized from Hernandez' car. Hernandez claimed he knew nothing about the money and was released.

2

000003

On October 28, 2002, surveillance of Alejandro Noe Castillon's Eagle Pass home showed a large pickup truck there. Previous conversations had been intercepted in which Castillon and Estbeban G. Garza, Jr, a/k/a "Charro," has discussed buying a new pickup. This pickup seemed to match their description of it. Garza was followed as he drove the pickup from Eagle Pass to San Antonio. A state trooper stopped the truck in Frio County. A consensual search revealed approximately ten kilograms of cocaine hidden under the back seat.

On October 31, 2002, agents observed Rene Campos meet with someone in a parking lot. The agents followed the person with whom Campos had met to at 1139 Highland, in San Antonio, Texas. Agents went to 1139 Highland and Rene Cota answered the door and gave agents consent to search the residence. Ramiro Rabago-Figeroa was also present at the house and he gave consent to search also. The agents found approximately two kilograms of cocaine, a pound of methamphetamine, and an ounce of heroin in the house.

## THE DEFENDANTS

### ALEJANDRO NOE CASTILLON

This Defendant has been intercepted numerous times discussing cocaine shipments. The Defendant was intercepted as he directed Reynaldo Hernandez to transport shipments of cocaine from Eagle Pass to Texas on three occasions in August 2002. The Defendant was observed meeting with Reynaldo Hernandez shortly after Hernandez arrived in San Antonio on August 28, outside the organization stash house at Apartment 401 of the Roanoke Apartment. The apartment was searched a short time later and fifty-five kilograms of cocaine were seized.

### RENE CAMPOS

This Defendant was intercepted assisting Reynaldo Hernandez make three trips from Eagle Pass to San Antonio in August, 2002. Affiant read the translated transcripts of the calls and heard Hernandez and this Defendant speak as Hernandez arrived in San Antonio. Hernandez would instruct this Defendant to open the gate or let him in. Agents observed that the stash house at the Roanoke apartments was protected by a gate that required the entry of code to enter the apartment complex. Upon entering the complex and approaching Apartment 401, the garage door to the apartment was be opened by someone in the apartment. This Defendant allowed Hernandez to enter the complex and then the garage with the vehicle loaded with cocaine. Agents also observed Hernandez meeting with ~~Hernandez, Jesse Salazar Ramirez, and Alejandro Noe Castillon~~ Campos outside of Apartment 401 shortly before the apartment was searched and fifty-five kilograms of cocaine were recovered.

### JESSE SALAZAR RAMIREZ

On August 27, 2002, in the evening, agents intercepted calls between Reynaldo Hernandez and Rene Campos as Hernandez traveled from Eagle Pass to San Antonio. Hernandez kept Campos informed of Hernandez' location and called Campos to say that he had arrived at the Roanoke stash house. Hernandez was observed by agents when he arrived at the stash house at approximately 9:00 PM. Hernandez parked his pickup in the garage to Apartment 401. Hernandez and Campos were seen leaving in the same pickup at about 9:15 PM. This Defendant was observed by agents as he

3

arrived at the stash at about 9:55 PM in the Defendant's white Ford Mustang. The Defendant then entered Apartment 401. Alejandro Noe Castillon was intercepted as he called Reynaldo Hernandez and Rene Campos at about 10:03 PM. Castillon asked Campos if Campos was ready and Campos replied yes. Hernandez and Campos returned to Apartment at approximately 10:15 PM and went inside. At 10:40 PM Hernandez and Campos were seen putting something into the cab of the pickup and driving off together in the pickup. This Defendant drove from the location in the Mustang at the same time as Hernandez and Campos.

On August 28, 2002, at about 8:16 PM, agents intercepted a call between Reynaldo Hernandez and Alejandro Noe Castillon in which Hernandez told Castillon that Hernandez was on his way from Eagle Pass to San Antonio. At about 8:42 PM, agents observed this Defendant drive up to Apartment 401 of the Roanoke Apartments in his Mustang. The Defendant parked in front of the garage of Apartment 401. Jose Garcia-Arguello, who was a passenger in the Mustang, got out to the Mustang and entered Apartment 401 through the front door. The Defendant then got out of the Mustang and was seen talking on his cell phone. The Defendant then got back into his Mustang and drove away. Reynaldo Hernandez arrived at the apartment at approximately 11:05 PM and called Rene Campos to ask that someone let him in the apartment. At about 12:37 AM police entered Apartment 401 and subsequently seized about fifty-five kilograms of cocaine.

On September 26, 2002, at about 2:00 PM Castillon was intercepted as he called Campos and told Campos to gather everything he had and bring it to Castillon. Based on a review of the hundreds of intercepted calls, Affiant believes this was a reference to cash drug proceeds. Agents had previously determined this Defendant was the operator of some sort of business located on Basse Road in San Antonio. Agents were watching the Basse business when Castillon called Campos on September 26. Shortly after the call, agents observed Rene Campos and the Defendant drive away from the Basse business and drive to a residence at 1326 Whiterock in San Antonio. Campos and the Defendant were then intercepted stating that they were being followed by police. Either Campos or the Defendant then followed an agent's vehicle away from the location and surveillance ended.

Agents have interviewed someone who was arrested in connection with the seizure of several kilograms of cocaine. This informant provided a great deal of information regarding drug trafficking which proved to be correct. The informant stated that he personally conducted multi-kilogram cocaine transactions with this Defendant at the Defendant's business in San Antonio. The information provided by this informant about this Defendant seems credible to Affiant because it is consistent with the information developed independent of the informant by the investigators on this case.

## SALVADOR CASTILLON

This Defendant is the brother of Alejandro Noe Castillon. This Defendant has intercepted numerous times discussing cocaine and cash shipments with Alejandro Noe Castillon throughout the federally authorized interception. On September 17, 2002, this Defendant was intercepted discussing the Defendant's counting of money; the Defendant was talking to Alejandro Noe Castillon. The Defendant told Alejandro Noe Castillon to come over so the Defendant could leave. Later that evening the Defendant was observed by agents as he drove from a location in Eagle Pass that is associated with this organization. Local police stopped the Defendant's vehicle and $201,852 was seized from the Defendant's vehicle. Alejandro Noe Castillon was intercepted stating that the

4

cash was bound for Mexico and that it had been seized.

## REYNALDO HERNANDEZ

This Defendant was intercepted as he discussed his transporting shipments of cocaine from Eagle Pass to San Antonio on August 27 and 28, 2002. Surveillance was conducted and the Defendant was observed as he drove from Eagle Pass. The Defendant was intercepted as he discussed the possibility of being followed by police. The Defendant was observed conducting counter-surveillance "heat runs" in his vehicle. (Heat runs are erratic driving measures commonly taken by those transporting drugs by vehicle. Examples of heat runs are sudden and inexplicable acceleration/deceleration, repeated U-turns, driving into commercial parking lots and stopping for short periods of time, and suddenly pulling the vehicle to the side of the road.). The Defendant was observed driving a load vehicle on August 28, 2002 from Eagle Pass to San Antonio. The Defendant drove to the stash house at the Roanoke Apartments. The stash house in Apartment 401 was under surveillance at this time and was searched a short time later; fifty-five kilograms were seized from the apartment. The Defendant was intercepted after the seizure discussing his filing a false report to distance himself from the vehicle that was used to transport the cocaine and was seized by police on August 28.

## LORI ANN HERNANDEZ

This Defendant is the wife of Reynaldo Hernandez. During the trips that Reynaldo Hernandez made from Eagle Pass to San Antonio during August, 2002, Reynaldo Hernandez maintained contain with this Defendant by telephone; these calls were intercepted. Reynaldo Hernandez kept the Defendant posted on his progress. The Defendant was intercepted telling Reynaldo Hernandez to watch out for police. During the August 27, 2002 trip the Defendant was intercepted asking Reynaldo Hernandez if he had used a deodorizer for the trip. The Defendant asked if he had used the "red" one. On August 28, 2002, an organization stash house in San Antonio was searched and fifty-five kilograms of cocaine were seized. The vehicle that agents had observed the Defendant transport the cocaine to San Antonio was also searched. A red bottle of deodorizer was recovered in the vehicle. Affiant knows that drug traffickers often use various deodorants to mask the smell of drugs and to thwart drug-sniffing dogs.

After the seizure of fifty-five kilograms of cocaine on August 28, 2002, and after the seizure of $83,260 from Reynaldo Hernandez on October 2, 2002, Reynaldo Hernandez was intercepted telling this Defendant about the seizures. On both occasions the Defendant reacted in a way that suggested she knew about the existence of the contraband before it was seized by police.

## HECTOR DEL RIO-RODRIGUEZ
## JOSE ZARAGOZA GARZA-DEL RIO

On June 14, 2002, a state wire interception was begun on two telephones used by Salvador Sixtos, Jr. and Alejandro Noe Castillon. The interceptions showed a pattern of smuggling to Missouri and Chicago, and return trips with cash proceeds. On July 1, 2002, Castillon was intercepted speaking to Jose Zaragoza Garza-Del Rio and Hector Del Rio-Rodriguez about nineteen kilograms that Garza-Del Rio and Del Rio-Rodriguez were transporting. As a result of this interception, San Antonio police stopped Garza-Del Rio and Del Rio-Rodriguez as they drove a

5

vehicle; nineteen kilograms of cocaine were seized from their vehicle. Garza-Del Rio and Del Rio-Rodriguez were arrested on state drug charges, released on bail, and promptly fled to Mexico.

## EDWARD SCOT LOPEZ

This Defendant has been intercepted discussing drug transactions with Rene Campos. In these intercepted conversations the two make references to Alejandro Noe Castillon and the drug-related instructions issued by Castillon. On November 4, 2002, Campos relayed instructions from Alejandro Noe Castillon to this Defendant that directed this Defendant to make a drug-related trip to Dallas. Affiant is aware that Dallas is a major destination for cocaine distribution for this organization.

The investigation has revealed that the Castillon organization has a stash house located at 3315 Sueno in Eagle Pass, Texas. Agents have conducted near constant surveillance of this location for several weeks and there is no doubt that this is a stash house based on traffic that takes place there and the presence there of individuals who are known to be associated criminally with this organization. A recent interview of a known co-conspirator by agents confirmed that this location is used as a stash house. On October 14, 2002, agents observed this Defendant at the Sueno stash house. The Defendant was seen working on the trunk lining to a Cadillac parked in the front yard of 3315 Sueno. The Defendant then drove away from the location in the Cadillac in a northerly direction. Agents conducting surveillance of the Cadillac lost sight of the Cadillac as it traveled north.

## CHARLES CRUZ

On November 7, 2002, agents observed this Defendant meet with Rene Campos in San Antonio, Texas. Rene Campos was seen handing a package to the Defendant. The Defendant then drove off and agents followed him. The Defendant began to flee from agents at a high rate of speed and a chase followed. The Defendant crashed his vehicle into a tree and his vehicle was partially disabled. The Defendant was ultimately captured several miles from the crash. A kilogram of cocaine was recovered from the crash site, which is a very rural area. The Defendant's vehicle had a hidden compartment that had been opened. The cocaine was contained in packaging identical to other kilograms of cocaine seized from the Castillon organization. A cell phone was recovered from the Defendant's car that had the same phone number that had been in contact with Rene Campos several minutes before the Defendant met with Campos. The two were intercepted discussing the meeting observed by agents.

Wherefore based on the foregoing facts and my training and experience, I submit that probable cause exists to believe the above named individuals have committed the offense of Conspiracy to Distribute Cocaine over 5 Kilograms.

Sworn to subscribed to me on November 8, 2002

6

000007

Prepared Nov 8, 2006

AFFIDAVIT

~~ATTACHMENT A~~

~~OVERVIEW~~

Affiant is a Special Agent with the Drug Enforcement Administration (DEA). Affiant is presently assigned to an investigation code-named Operation Alacran and is personally familiar with all of the facts in this affidavit. The details of the investigation are as follows:

In September 2001, a confidential informant provided information to D.E.A. agents that identified Alejandro Noe Castillon as a cocaine trafficker who headed an organization that smuggled cocaine from Eagle Pass to San Antonio, and on to Dallas, Missouri, Wisconsin, and Illinois. "Operation Alacran" was initiated as a investigation focusing on this drug organization.

On December 6, 2001, Border Patrol agents stopped a Ford Explorer driven by Lidia E. De Alba, at the Eagle Pass checkpoint. Approximately twenty-four kilograms of cocaine were seized from a false compartment in the gas tank. De Alba was interviewed and said that she had been asked to drive the Explorer to San Antonio by her boyfriend Reynaldo Hernandez. Reynaldo Hernandez is the registered owner of the Explorer. A receipt found in the Explorer showed that Rene Campos had sold the Explorer to Hernandez. Agents also recovered handwritten notes with the name of Alejandro Noe Castillon and Castillon's cell and home telephone numbers.

On December 7, 2001, undercover D.E.A. agents posing as cocaine buyers, bought five kilograms of cocaine from someone who was arrested and identified his source as Jose G. Soto. Soto was lured into meeting the agents to pick up the payment for the cocaine and was arrested. Soto was interviewed and identified his source of supply as Rene Campos. Soto said that Campos got his supply of cocaine from Jesse Salazar Ramirez. At the time that Soto was arrested attempting to pick up payment for the cocaine, he was driving a vehicle registered to Alejandro Noe Castillon, and had left his own vehicle at the business of Jesse Salazar Ramirez.

On June 14, 2002, a state wire interception was begun on a telephone used by Castillon. The interceptions showed a pattern of smuggling to Missouri and Chicago, and return trips with cash proceeds. On July 1, 2002, Castillon was intercepted speaking to Jose Zaragoza Garza-Del Rio and Hector Del Rio-Rodriguez about nineteen kilograms that Garza-Del Rio and Del Rio-Rodriguez were transporting. As a result of this interception, local police in San Antonio stopped Garza-Del Rio and Del Rio-Rodriguez as they drove a vehicle; nineteen kilograms of cocaine were seized. Garza-Del Rio and Del Rio-Rodriguez were arrested on state drug charges, released on bail, and promptly fled to Mexico. During the state interception, Castillon was intercepted numerous times discussing the distribution of cocaine and the collection of cash proceeds.

On August 21, 2002, a United States District Court for the Western District of Texas authorized interception of cellular phones associated with the Castillon organization. Since that date, authorization for seven cellular telephones used by this organization has been granted at various times from August 21 to the present. Affiant has reviewed transcripts of the calls intercepted and a pattern of calls was identified. Alejandro Noe Castillon or Rene Campos would direct Reynaldo Hernandez to make a trip to San Antonio. Hernandez would drive to San Antonio, making calls to Castillon, Rene Campos, and his wife, Lori Ann Hernandez, as he traveled. When he arrived in San Antonio he would call Rene Campos and let him know he had arrived.

On August 26-27, 2002, Reynaldo Hernandez, Alejandro Noe Castillon, and Rene Campos

1

01

made a series of calls to each other that indicated that Hernandez was transporting eighteen kilograms of cocaine from Eagle Pass to San Antonio on August 27. Hernandez was observed by agents as he traveled from Eagle Pass to San Antonio on August 27. Hernandez and Lori Ann Hernandez spoke several times as he was traveling. During one call Lori Ann asked Reynaldo if he had sprayed to hide the odor. She also asked if he had used the "red" one. Hernandez was under surveillance and was observed as he pulled his pickup into a garage at the Roanoke Apartments, Apartment 401, 7930 Roanoke, San Antonio, Texas, at about 9:00 PM. Jesse Salazar Ramirez was observed arriving at and entering the apartment at about 9:55 PM. Rene Campos was also observed arriving at the location.

On August 28, 2002, intercepted calls indicated that Reynaldo Hernandez was transporting cocaine to San Antonio. On August 28, agents observed Jesse Salazar Ramirez arrive at the Roanoke location and drop off Jose Garcia-Arguello at Apartment 401. Later that day, agents saw Reynaldo Hernandez drive a pickup from Eagle Pass to the Roanoke location. Rene Campos then arrived at the apartment and Reynaldo Hernandez was heard making a call to Lori Ann Hernandez telling her that they were going to put the "thing" in the house. Rene Campos and Reynaldo Hernandez then drove away from the location, leaving the pickup in the garage.

A short time after Campos and Hernandez left the Roanoke apartment, police officers obtained written permission to search the apartment from the sole occupant of the apartment, Jose Garcia-Arguello. The officers recovered an electronic money counter, several vacuum sealers, drug ledgers, fifty-five kilograms of cocaine, and four assault rifles in the apartment. A search of the pickup truck Reynaldo Hernandez had driven from Eagle Pass and parked in the garage, revealed a red bottle of deodorizer.

On September 17, 2002, Alejandro Noe Castillon was intercepted asking "Martha" if "Chava" was finished with the count. A short time later Alejandro Noe Castillon was intercepted telling his brother, Salvador Castillon-Saucedo (Chava) to go to Mexico. Local Eagle Pass were asked to conduct a stop of a car Chava was driving and a consensual search resulted in the seizure of approximately $201,000.

Interceptions between Lori Ann Castillon and Alejandro Noe Castillon indicate that on September 28, 2002, Reynaldo Hernandez and Lori Ann Hernandez drove a load of cocaine from Eagle Pass to San Antonio.

On October 1, 2002, Alejandro Noe Castillon was intercepted directing Reynaldo Hernandez to go to San Antonio and meet with Rene Campos. Surveillance units observed Hernandez leave his house in Eagle Pass and drive to San Antonio. During the trip, Hernandez was intercepted asking Alejandro Noe Castillon if there was any problem with meeting Rene Campos in Seguin. Hernandez then called Campos and asked Campos to meet him at Hernandez' sister's house in Seguin. Hernandez drove near his sister's house and waited. Hernandez was picked up by his sister's husband who drove him to the husband's house in Seguin. Rene Campos arrived at the residence, met with Hernandez, and left a short time later. Rene Campos was followed by agents and a traffic stop was conducted in which Campos was positively identified. As Hernandez drove back to Eagle Pass, on October 2, 2002, he was overheard talking to Lori Ann Hernandez. The conversation indicated that Hernandez was transporting something small. A traffic stop was conducted in Eagle Pass and $83,260 was seized from Hernandez' car. Hernandez claimed he knew nothing about the money and was released.

2

On October 28, 2002, surveillance of Alejandro Noe Castillon's Eagle Pass home showed a large pickup truck there. Previous conversations had been intercepted in which Castillon and Estbeban G. Garza, Jr., a/k/a "Charro," has discussed buying a new pickup. This pickup seemed to match their description of it. Garza was followed as he drove the pickup from Eagle Pass to San Antonio. A state trooper stopped the truck in Frio County. A consensual search revealed approximately ten kilograms of cocaine hidden under the back seat.

On October 31, 2002, agents observed Rene Campos meet with someone in a parking lot. The agents followed the person with whom Campos had met to a: 1139 Highland, in San Antonio, Texas. Agents went to 1139 Highland and Rene Cota answered the door and gave agents consent to search the residence. Ramiro Rabago-Figeroa was also present at the house and he gave consent to search also. The agents found approximately two kilograms of cocaine, a pound of methamphetamine, and an ounce of heroin in the house.

## THE DEFENDANTS

### ALEJANDRO NOE CASTILLON:

This Defendant has been intercepted numerous times discussing cocaine shipments. The Defendant was intercepted as he directed Reynaldo Hernandez to transport shipments of cocaine from Eagle Pass to Texas on three occasions in August 2002. The Defendant was observed meeting with Reynaldo Hernandez shortly after Hernandez arrived in San Antonio on August 28, outside the organization stash house at Apartment 401 of the Roanoke Apartment. The apartment was searched a short time later and fifty-five kilograms of cocaine were seized.

### RENE CAMPOS

This Defendant was intercepted assisting Reynaldo Hernandez make three trips from Eagle Pass to San Antonio in August, 2002. Affiant read the translated transcripts of the calls and heard Hernandez and this Defendant speak as Hernandez arrived in San Antonio. Hernandez would instruct this Defendant to open the gate or let him in. Agents observed that the stash house at the Roanoke apartments was protected by a gate that required the entry of code to enter the apartment complex. Upon entering the complex and approaching Apartment 401, the garage door to the apartment was be opened by someone in the apartment. This Defendant allowed Hernandez to enter the complex and then the garage with the vehicle loaded with cocaine. Agents also observed Hernandez meeting with ~~Hernandez, Jesse Salazar Ramirez, and Alejandro Noe Castillon~~ outside of Apartment 401 shortly before the apartment was searched and fifty-five kilograms of cocaine were recovered.

### JESSE SALAZAR RAMIREZ

On August 27, 2002, in the evening, agents intercepted calls between Reynaldo Hernandez and Rene Campos as Hernandez traveled from Eagle Pass to San Antonio. Hernandez kept Campos informed of Hernandez' location and called Campos to say that he had arrived at the Roanoke stash house. Hernandez was observed by agents when he arrived at the stash house at approximately 9:00 PM. Hernandez parked his pickup in the garage to Apartment 401. Hernandez and Campos were seen leaving in the same pickup at about 9:15 PM. This Defendant was observed by agents as he

3

arrived at the stash at about 9:55 PM in the Defendant's white Ford Mustang. The Defendant then entered Apartment 401. Alejandro Noe Castillon was intercepted as he called Reynaldo Hernandez and Rene Campos at about 10:03 PM. Castillon asked Campos if Campos was ready and Campos replied yes. Hernandez and Campos returned to Apartment at approximately 10:15 PM and went inside. At 10:40 PM Hernandez and Campos were seen putting something into the cab of the pickup and driving off together in the pickup. This Defendant drove from the location in the Mustang at the same time as Hernandez and Campos.

On August 28, 2002, at about 8:16 PM, agents intercepted a call between Reynaldo Hernandez and Alejandro Noe Castillon in which Hernandez told Castillon that Hernandez was on his way from Eagle Pass to San Antonio. At about 8:42 PM, agents observed this Defendant drive up to Apartment 401 of the Roanoke Apartments in his Mustang. The Defendant parked in front of the garage of Apartment 401. Jose Garcia-Arguello, who was a passenger in the Mustang, got out to the Mustang and entered Apartment 401 through the front door. The Defendant then got out of the Mustang and was seen talking on his cell phone. The Defendant then got back into his Mustang and drove away. Reynaldo Hernandez arrived at the apartment at approximately 11:05 PM and called Rene Campos to ask that someone let him in the apartment. At about 12:37 AM police entered Apartment 401 and subsequently seized about fifty-five kilograms of cocaine.

On September 26, 2002, at about 2:00 PM Castillon was intercepted as he called Campos and told Campos to gather everything he had and bring it to Castillon. Based on a review of the hundreds of intercepted calls, Affiant believes this was a reference to cash drug proceeds. Agents had previously determined this Defendant was the operator of some sort of business located on Basse Road in San Antonio. Agents were watching the Basse business when Castillon called Campos on September 26. Shortly after the call, agents observed Rene Campos and the Defendant drive away from the Basse business and drive to a residence at 1326 Whiterock in San Antonio. Campos and the Defendant were then intercepted stating that they were being followed by police. Either Campos or the Defendant then followed an agent's vehicle away from the location and surveillance ended.

Agents have interviewed someone who was arrested in connection with the seizure of several kilograms of cocaine. This informant provided a great deal of information regarding drug trafficking which proved to be correct. The informant stated that he personally conducted multi-kilogram cocaine transactions with this Defendant at the Defendant's business in San Antonio. The information provided by this informant about this Defendant seems credible to Affiant because it is consistent with the information developed independent of the informant by the investigators on this case.

## SALVADOR CASTILLON

This Defendant is the brother of Alejandro Noe Castillon. This Defendant has intercepted numerous times discussing cocaine and cash shipments with Alejandro Noe Castillon throughout the federally authorized interception. On September 17, 2002, this Defendant was intercepted discussing the Defendant's counting of money; the Defendant was talking to Alejandro Noe Castillon. The Defendant told Alejandro Noe Castillon to come over so the Defendant could leave. Later that evening the Defendant was observed by agents as he drove from a location in Eagle Pass that is associated with this organization. Local police stopped the Defendant's vehicle and $201,852 was seized from the Defendant's vehicle. Alejandro Noe Castillon was intercepted stating that the

4

cash was bound for Mexico and that it had been seized.

## REYNALDO HERNANDEZ

This Defendant was intercepted as he discussed his transporting shipments of cocaine from Eagle Pass to San Antonio on August 27 and 28, 2002. Surveillance was conducted and the Defendant was observed as he drove from Eagle Pass. The Defendant was intercepted as he discussed the possibility of being followed by police. The Defendant was observed conducting counter-surveillance "heat runs" in his vehicle. (Heat runs are erratic driving measures commonly taken by those transporting drugs by vehicle. Examples of heat runs are sudden and inexplicable acceleration/deceleration, repeated U-turns, driving into commercial parking lots and stopping for short periods of time, and suddenly pulling the vehicle to the side of the road.). The Defendant was observed driving a load vehicle on August 28, 2002 from Eagle Pass to San Antonio. The Defendant drove to the stash house at the Roanoke Apartments. The stash house in Apartment 401 was under surveillance at this time and was searched a short time later; fifty-five kilograms were seized from the apartment. The Defendant was intercepted after the seizure discussing his filing a false report to distance himself from the vehicle that was used to transport the cocaine and was seized by police on August 28.

## LORI ANN HERNANDEZ

This Defendant is the wife of Reynaldo Hernandez. During the trips that Reynaldo Hernandez made from Eagle Pass to San Antonio during August, 2002, Reynaldo Hernandez maintained contain with this Defendant by telephone; these calls were intercepted. Reynaldo Hernandez kept the Defendant posted on his progress. The Defendant was intercepted telling Reynaldo Hernandez to watch out for police. During the August 27, 2002 trip the Defendant was intercepted asking Reynaldo Hernandez if he had used a deodorizer for the trip. The Defendant asked if he had used the "red" one. On August 28, 2002, an organization stash house in San Antonio was searched and fifty-five kilograms of cocaine were seized. The vehicle that agents had observed the Defendant transport the cocaine to San Antonio was also searched. A red bottle of deodorizer was recovered in the vehicle. Affiant knows that drug traffickers often use various deodorants to mask the smell of drugs and to thwart drug-sniffing dogs.

After the seizure of fifty-five kilograms of cocaine on August 28, 2002, and after the seizure of $83,260 from Reynaldo Hernandez on October 2, 2002, Reynaldo Hernandez was intercepted telling this Defendant about the seizures. On both occasions the Defendant reacted in a way that suggested she knew about the existence of the contraband before it was seized by police.

## HECTOR DEL RIO-RODRIGUEZ
## JOSE ZARAGOZA GARZA-DEL RIO

On June 14, 2002, a state wire interception was begun on two telephones used by Salvador Sixtos, Jr. and Alejandro Noe Castillon. The interceptions showed a pattern of smuggling to Missouri and Chicago, and return trips with cash proceeds. On July 1, 2002, Castillon was intercepted speaking to Jose Zaragoza Garza-Del Rio and Hector Del Rio-Rodriguez about nineteen kilograms that Garza-Del Rio and Del Rio-Rodriguez were transporting. As a result of this interception, San Antonio police stopped Garza-Del Rio and Del Rio-Rodriguez as they drove a

5

vehicle; nineteen kilograms of cocaine were seized from their vehicle. Garza-Del Rio and Del Rio-Rodriguez were arrested on state drug charges, released on bail, and promptly fled to Mexico.

## EDWARD SCOT LOPEZ

This Defendant has been intercepted discussing drug transactions with Rene Campos. In these intercepted conversations the two make references to Alejandro Noe Castillon and the drug-related instructions issued by Castillon. On November 4, 2002, Campos relayed instructions from Alejandro Noe Castillon to this Defendant that directed this Defendant to make a drug-related trip to Dallas. Affiant is aware that Dallas is a major destination for cocaine distribution for this organization.

The investigation has revealed that the Castillon organization has a stash house located at 3315 Sueno in Eagle Pass, Texas. Agents have conducted near constant surveillance of this location for several weeks and there is no doubt that this is a stash house based on traffic that takes place there and the presence there of individuals who are known to be associated criminally with this organization. A recent interview of a known co-conspirator by agents confirmed that this location is used as a stash house. On October 14, 2002, agents observed this Defendant at the Sueno stash house. The Defendant was seen working on the trunk lining to a Cadillac parked in the front yard of 3315 Sueno. The Defendant then drove away from the location in the Cadillac in a northerly direction. Agents conducting surveillance of the Cadillac lost sight of the Cadillac as it traveled north.

## CHARLES CRUZ

On November 7, 2002, agents observed this Defendant meet with Rene Campos in San Antonio, Texas. Rene Campos was seen handing a package to the Defendant. The Defendant then drove off and agents followed him. The Defendant began to flee from agents at a high rate of speed and a chase followed. The Defendant crashed his vehicle into a tree and his vehicle was partially disabled. The Defendant was ultimately captured several miles from the crash. A kilogram of cocaine was recovered from the crash site, which is a very rural area. The Defendant's vehicle had a hidden compartment that had been opened. The cocaine was contained in packaging identical to other kilograms of cocaine seized from the Castillon organization. A cell phone was recovered from the Defendant's car that had the same phone number that had been in contact with Rene Campos several minutes before the Defendant met with Campos. The two were intercepted discussing the meeting observed by agents.

2003 MON 16:10 FAX 210 704 7351    ☒003

Turn To other Exhibits →

Doc# 20080280938

NAME OF BUSINESS

U SHOOT EM

1139 Basse Rd., #5

San Antonio, Tx 78212

CERTIFICATE OF
ASSUMED NAME

FILED IN THE OFFICE OF THE BEXAR
COUNTY CLERK THIS _____ DAY
OF _____ A.D., 20 ___
AT _____ O'CLOCK _____ M:

GERRY RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY: _____ DEPUTY

Doc# 20080280938
# Pages 1
01/07/2008 12:15:33 PM
Filed & Recorded in
Official Records of
BEXAR COUNTY
GERRY RICKHOFF
COUNTY CLERK
Fees $16.01

last 3 Documents, will show you the real name, location & Description
y business. All these people had to do was call "1411" info. Give the name
street my business is located on. And the would have given them the phone # and
of Address, That simple. But why when all the DEA has to do is cover up
mishaps. After all they are The DEA. "we can get away with anything.
wful Search & Seizures", That vidate our Constitutional Rights, Murdering 14 year
little Girls And other things, All Because no body wants to stand up to them.
n prove all of my Allegation I have made against them. I just need some Help. Its Hard
to from in Here, Cause, they won't give me a bond. I have never been in any real trouble
concealed hand gun license And my Class III Application is proof. They Just know
n throw a wrench in this case. And mess it all up for them. That's why
have me in here. And will not let me get Discovery And Grand Jury minutes.
use Help some body

56

高

Doc# 20020200938

## ASSUMED NAME CERTIFICATE

FOR AN UNINCORPORATED BUSINESS OR PROFESSION OTHER THAN A
LIMITED PARTNERSHIP, REGISTERED LIMITED LIABILITY PARTNERSHIP, OR LIMITED LIABILITY COMPANY

PURSUANT TO THE PROVISIONS OF CHAPTER 36, TITLE 4, BUSINESS AND COMMERCE CODE OF THE
STATE OF TEXAS, THE UNDERSIGNED CERTIFIES THE FOLLOWING:

1.  THE ASSUMED NAME AND ITS BUSINESS ADDRESS UNDER WHICH THE BUSINESS IS NOW OR IS TO BE
    CONDUCTED IS:

| ASSUMED NAME | BUSINESS ADDRESS |
|---|---|
| U SHOOT EM | 1137 Basse Rd. #5 |
|  | San Antonio, Tx 78212 |

2.  THE BUSINESS OR PROFESSIONAL SERVICE IS BEING OR WILL BE CONDUCTED OR RENDERED
    AS A:

    A. _X_ PROPRIETORSHIP    B. ____ SOLE PRACTITIONER    C. ____ PARTNERSHIP

    D. ____ REAL ESTATE INVESTMENT TRUST    E. ____ JOINT STOCK COMPANY

    F. ____ OTHER FORM OF UNINCORPORATED BUSINESS OR PROFESSIONAL ASSOCIATION
    OR ENTITY OTHER THAN LIMITED PARTNERSHIP, A LIMITED LIABILITY COMPANY OR REGISTERED
    LIMITED LIABILITY PARTNERSHIP (SPECIFY): _____

| REGISTRANT'S NAME(S) | RESIDENCE ADDRESS(ES) |
|---|---|
| Jesse Ralston Benitez | 444 Mustang Cir |
|  | San Antonio, Tx 78232 |
|  |  |
|  |  |
|  |  |

3.  THE PERIOD, NOT TO EXCEED TEN YEARS, DURING WHICH THE ASSUMED NAME WILL BE USED
    IS FROM THE DATE FILED WITH THE COUNTY CLERK.

    FEB 27 2002

IN TESTIMONY WHERE OF, ____ HAVE HEREUNTO SET ____ HAND (S) THIS THE ____ DAY
OF _____ A.D. 20 ____

SIGNATURE(S)

TDL#11414667 _____

STATE OF TEXAS                §
COUNTY OF BEXAR               §

BEFORE ME THE UNDERSIGNED AUTHORITY, ON THIS DAY PERSONALLY APPEARED
Jesse R. Benitez
KNOWN TO ME TO BE THE PERSON(S) WHOSE NAME(S) IS/ARE SUBSCRIBED TO THE FOREGOING
CERTIFICATE AND ACKNOWLEDGED TO ME THAT: ___ HE(Y) EXECUTED THE SAME FOR THE PURPOSE AND
CONSIDERATION THEREIN EXPRESSED.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS THE ____ DAY OF FEB 27 2002 ____ A.D. 20 ____

CORINE CASAS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 01-03-2004

NOTARY PUBLIC, STATE OF TEXAS
OR
GERRY RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY: _____
                    DEPUTY

NOTE:   A CERTIFICATE EXECUTED AND ACKNOWLEDGED BY AN ATTORNEY-IN-FACT SHALL INCLUDE A STATEMENT THAT
        THE ATTORNEY-IN-FACT HAS BEEN DULY AUTHORIZED IN WRITING BY HIS PRINCIPAL TO EXECUTE AND
        ACKNOWLEDGE THE SAME.
        Rev. Dec. '99

57

U.S. Department of Justice
Drug Enforcement Administration

*EXHIBIT "R" (?)*
*Other*
*Attachmt DEA 6 - report* →

## REPORT OF INVESTIGATION

Page 1 of 4

| 1. Program Code | 2. Cross File | Related Files | 3. File No. M2-02-0021 | 4. G-DEP Identifier WGC1D |
|---|---|---|---|---|
| 5. By: Cal Fowler At Group 3 San Antonio District Office | ☐ ☐ ☐ ☐ | | 6. File Title  SOTO, Jose | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | ☐ ☐ | | 8. Date Prepared 07/01/02 | |
| 9. Other Officers: S/A Joseph DuBois, A U S A David Shearer | | | | |
| 10. Report Re: Debriefing of Jose SOTO on 6-26-02 | | | | |

## 1. SYNOPSIS

On 6-26-02, TFO Cal Fowler, S/A Joe Dubois, and A U S A David Shearer debriefed Jose SOTO at the U S Marshals' Office in the presence of his attorney, Collis White.  During the debriefing, SOTO mentioned his involvement with Alejandro CASTILLON, Rene CAMPOS, and Jesse RAMIREZ.

## DETAILS

1.  On 6-26-02, Jose SOTO was debriefed in relation to his participation in the delivery of five kilograms of cocaine to Jaime MARTINS-Olvera on 12-7-01 at 7226 Blanco, San Antonio, Texas.

2.  SOTO said he had taken his black Ford truck to "Jesse", later identified as Jesse RAMIREZ-SALAZAR, at a detail shop on Everest, known to be 602 Everest, San Antonio, Texas, to have it cleaned after he had delivered five kilos of cocaine to MARTINS-Olvera earlier in the day.

3.  At the time of his arrest, SOTO was driving a 1992 Ford Thunderbird, Texas License N96 LFH.  This vehicle was registered to Alejandro CASTILLON, Eagle Pass, Texas, at the time of the arrest.  SOTO said he had borrowed this car from a friend and was in the process of buying it.  It has subsequently been transferred to Jesse RAMIREZ-SALAZAR, 344 Mustang Circle, San Antonio, Texas, on 5-30-02 and the plate changed to Texas R94 MKN.  This car was seized at the time of arrest and later released to SOTO's Step-Father, H Pete Sosa.

| 11. Distribution:  Division SARI, HFD  District  Other | 12. Signature (Agent)  Cal Fowler | 13. Date 7-4-02 |
|---|---|---|
| | 14. Approved (Name and Title)  Ken Peterson  Group Supervisor | 15. Date 07-18-2002 |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION *(Continuation)* | 1. File No. M2-0?-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| | 3. File Title  SOTO, Jose | |
| 4. | | |
| Page  2  of  4 | | |
| 5. Program Code | 6. Date Prepared 07/0?/02 | |

4.  SOTO said he had been in contact with Alejandro CASTILLON in Eagle
    Pass, Texas.  SOTO said he had been to CASTILLON's house in Eagle Pass
    several times before his arrest on 12-7-01.

5.  SOTO said CASTILLON never keeps any dope at his house, and has been
    told by CASTILLON that he has a large ranch in Mexico that he uses to
    launder money and appear to be legitimately in business.  SOTO said
    CASTILLON also owns some apartments in Eagle Pass, Texas, but did not
    know the location or name of the apartments.

6.  SOTO said Rene CAMPOS distributes cocaine for CASTILLON in San
    Antonio.  SOTO drew a map to show where CAMPOS lives.  TFO Fowler and
    S/A DuBois later found the house at 1641 W Summit, San Antonio, Texas.
    SOTO said CAMPOS lives with his Mother at this address.  SOTO said he
    had known CAMPOS for a long time from Eagle Pass.

7.  SOTO said CAMPOS drives a 1997 red Ford Pick Up truck.  A check of
    SAPD citation files shows CAMPOS driving a 1997 maroon Ford truck,
    Texas License 6MW S27, and a 2000 red Ford truck, Texas License 4FM
    Z47.

8.  SOTO said CAMPOS and Alejandro CASTILLON use Ford Explorers to move
    loads of cocaine from Eagle Pass to San Antonio.  The Explorers have
    compartments in the gas tanks, and SOTO said they can hold 30 to 60
    kilos per trip.  SOTO said the kilos were from Alejandro CASTILLON.

9.  SOTO said CAMPOS uses three Explorers, one white, one blue, and the
    other was an unknown color.  SOTO said one of the drivers was named
    "Chago" but did not know his full name.

10. SOTO said CAMPOS had an apartment on Babcock just North of Medical
    Drive, San Antonio, that he used to store the cocaine.  SOTO said
    noone lived in the apartment, it was for storage only.  SOTO thinks
    CAMPOS moved from the apartment after his (SOTO'S) arrest thinking
    SOTO would talk.

---

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| (Continuation) | 3. File Title  SOTO, Jose | |
| 4. | | |
| Page  3  of  4 | | |
| 5. Program Code | | 6. Date Prepared 07/11/02 |

11. SOTO said on the day of his arrest, 12-7-01, he had met Rene CAMPOS in the parking lot of the Blockbuster Video Store, Blanco and West Avenue, San Antonio, Texas, to get the five kilograms of cocaine.

12. SOTO said this meeting place was where he always met CAMPOS to pick up cocaine and deliver money to CAMPOS after the deals.  SOTO said his only customer for cocaine was Jaime MARTINS-Olvera, also arrested on 12-7-01.  SOTO had delivered one kilo per week to MARTINS-Olvera for the previous two months, and one kilo to him the day before the arrest.  SOTO said MARTINS-Olvera had always paid cash for the cocaine.  SOTO would then meet CAMPOS and deliver the money at the Blockbuster.  The current price per kilo to MARTINS-Olvera was $13,500.00.

13. SOTO said he was getting $100.00 per kilo from CAMPOS for each transaction.

14. SOTO said on his initial debriefing on 6-6-02, he was not telling the truth about his source.  SOTO said his original attorney, Eddie Garcia, knew Alejandro CASTILLON, and might tell CASTILLON he was cooperating.

15. SOTO said he knew that on the day prior to his arrest, 12-06-01, a female had been arrested at or near the Eagle Pass Checkpoint with 30 kilos of cocaine.  SOTO said that Eddie Garcia was also representing this female.  AUSA David Shearer found that on 12-6-01, Lidia DE ALBA had been arrested driving a white Ford Explorer containing 22 kilos of cocaine.  The investigating agents found a purchase agreement in the Explorer indicating Rene CAMPOS was purchasing the vehicle.

16. SOTO will be debriefed at a future date with more information.

INDEXING

1.  Rene CAMPOS                   NADDIS # 5375980

2.  Alejandro Noe CASTILLON   NADDIS # 5136210

| DEA Form     - 6a (Jul. 1996) | **DEA SENSITIVE** Drug Enforcement Administration |
|---|---|

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| (Continuation) | 3. File Title  SOTO, Jose | |
| 4. Page  4  of  4 | | |
| 5. Program Code | 6. Date Prepared 07/01/02 | |

3.  Jesse RAMIREZ-SALAZAR      NADDIS # 4894158

4.  Lidia Elena DE ALBA      NADDIS # 5310087.

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 7

| Program Code<br>SW-TXW-295-HID 100 | 2. Cross    Related Files<br>File | 3. File No.<br>M2-02-0005 | 4. G-DEP Identifier<br>YNC1A |
|---|---|---|---|
| 5. By: G/S Doug Davis | ☒ M2-02-0021 | 6. File Title ▓▓▓▓▓▓▓▓▓ | |
| At: San Antonio DO | ☒ MD-02-0030 | | |
| | ☐ | | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | ☐<br>☐ | 8. Date Prepared<br>07/22/02 | |
| 9. Other Officers: S/A A.B. Castaneda, TFO Cal Fowler | | | |
| 10. Report Re: Debriefing of Jose Guadalupe SOTO on 7/16/02 | | | |

### SYNOPSIS

On 12/7/01, Jose Guadalupe SOTO was arrested by members of the San Antonio
DO agents for his involvement in the delivery of five (5) kilogram of
cocaine to a DEA undercover agent (M2-02-0021). On 7/16/2002, SOTO was
debriefed about his involvement in this transaction and his involvement
with the Alejandro CASTILLON drug trafficking organization.

### DETAILS

1.  Reference is directed to all reports of investigation under this case
file name and number.  Special reference is directed to a report of
investigation (ROI) dated 7/1/02 by TFO Cal Fowler which outlines the
arrest and initial debriefing of Jose Guadalupe SOTO during the delivery
of five (5) kilograms of cocaine to a DEA undercover agent on 12/7/01.

2.  On 7/16/02 & 9/24/02, TFO Cal Fowler, S/A A.B. Castaneda, G/S Doug
Davis and Asst. United States Attorney David Shearer debriefed Jose SOTO
in the presence of his Attorney, Collis White about his involvement in the
Alejandro CASTILLON drug trafficking organization.

3.  According to SOTO, he was introduced to Alejandro CASTILLON and Jesse
RAMIREZ by Ricardo ENRIQUEZ approximately two years ago.  RAMIREZ owns an
auto window Tinting and Detail shop in San Antonio, TX which is located at
602 Everest Street, San Antonio, Texas.  SOTO said CASTILLON is from Eagle
Pass, TX and owns three Ranches in Mexico.  One of these ranches is

| 11. Distribution:<br>Division Houston FD, DIU<br><br>District OSA, OSB<br><br>Other SARI | 12. Signature (Agent)<br>Doug Davis | 13. Date<br>9/30/02 |
|---|---|---|
| | 14. Approved (Name and Title)<br>Javier F. Pena<br>ASAC | 15. Date<br>10/3/02 |

EA Form    - 6
ul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

1 - Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. M2-0?-0005 | 2. G-DEP Identifier YNC1A |
|---|---|---|
| (Continuation) | 3. File Title ▇▇▇▇▇▇▇▇ | |
| 4. | | |
| Page 2 of 7 | | |
| 5. Program Code SW-TXW-295-HID 100 | 6. Date Prepared 07/2?/02 | |

located in Guerrero, Coahilla, Mexico and is named "LAS PALAMAS". SOTO claimed CASTILLON's brother "Chava" LNU, who has one hand takes care of CASTILLON's ranches in Mexico.

4.  SOTO claimed he learned that CASTILLON and RAMIREZ were involved in cocaine trafficking while assisting CASTILLON with small tasks. CASTILLON later asked SOTO to transport cocaine to San Antonio for him. In addition, CASTILLON told SOTO that RAMIREZ owed CASTILLON money for drugs that RAMIREZ had purchased from him. SOTO delivered one kilogram of cocaine from CASTILLON to RAMIREZ and observed CAMPOS deliver several kilograms of cocaine to RAMIREZ at the PERFORMANCE TINT & DETAIL SHOP located on Everest Street. RAMIREZ gave SOTO a cellular telephone 210-573-8103 so he could stay in touch with RAMIREZ.

5.  According to SOTO, during April of 2001, he needed money for his truck payment and agreed to transport cocaine to San Antonio for CASTILLON. SOTO claimed between approximately April and July of 2001, he made approximately eight (8) trips from Eagle Pass to San Antonio TX in which he transported cocaine to an apartment located at Formosa & Flores Street in San Antonio, TX. SOTO learned from CAMPOS that the stash apartment was rented in Ricardo ENRIQUEZ name. On SOTO's first trip he met CASTILLON and Rene CAMPOS in Eagle Pass, TX. SOTO and CAMPOS drove to CASTILLON's rental house which is close to Route 577 and the Border Patrol Office in Eagle Pass. Upon arrival at the stash location CAMPOS had a key to the rental house and they entered followed by CASTILLON. SOTO and CAMPOS removed five (5) kilograms of cocaine from a closet in the house and placed it behind the front seat of SOTO's pickup truck and SOTO and CAMPOS drove to the apartment located at Formosa and Flores in San Antonio. SOTO claimed the apartment is located in Section #3 of the complex and the apartment is the first apartment on the left corner. They stashed the cocaine in the central air conditioning unit in the apartment. SOTO was later paid $500.00 by CASTILLON for transporting the cocaine. SOTO claimed CAMPOS sold the cocaine in San Antonio.

6.  On the second trip SOTO called CASTILLON who told SOTO he had kilograms of cocaine in Eagle Pass and asked SOTO to transport them to San Antonio. SOTO drove alone to Eagle Pass to the stash house and met CASTILLON. There was only one kilogram of cocaine which SOTO transported

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

AUSA

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| (Continuation) | M2-02-0005 | YNC1A |
| | 3. File Title | |
| 4. | ▮▮▮▮▮ | |
| Page  3  of  7 | | |
| 5. Program Code | | |
| SW-TXW-295-HID 100 | 6. Date Prepared | |
| | 07/22/02 | |

back to the stash apartment located at Formosa and Flores. Upon arrival
SOTO called CAMPOS who met SOTO at the apartment located at Formosa and
Flores where they stashed the cocaine in the central air conditioning
unit.

7.  According to SOTO, CASTILLON had him transport five (5) kilograms of
cocaine on four additional occasions in the same manner as previously
mentioned. On one of these trips he drove the cocaine in CASTILLON's
green Ford pick up truck.  SOTO claimed that one kilogram of cocaine was
missing from the stash house in San Antonio and CASTILLON accused SOTO of
stealing it.  SOTO denied the allegation and told CASTILLON that he quit
and for CASTILLON to stay away from him.

8.  SOTO claimed he was at the apartment located at Formosa and Flores
sometime between April and May of 2001, and assisted CAMPOS in counting
and vacuum sealing of over $300,000.00 in U.S. currency.  The currency was
vacuum sealed in $10,000.00 packets.  The currency was transported to
Eagle Pass or Mexico to CASTILLON.

9.  Allegedly, SOTO received a telephone call from CASTILLON who said that
he found out who had taken the kilogram of cocaine.  CASTILLON asked SOTO
to come back to work.  SOTO agreed and continued to take 1-5 kilograms
from Eagle Pass to San Antonio.

10.  Around June of 2001, Rene CAMPOS rented a new stash apartment near
Medical Drive in San Antonio.  SOTO was selling kilogram amounts of
cocaine in the San Antonio area which he received from CAMPOS.  In
addition, SOTO was given a key to the new stash location and would assist
CAMPOS count and seal money for shipment to CASTILLON.  According to SOTO,
he observed large amounts of currency in the apartment on several
occasions.  SOTO claimed the drugs and money were kept in a gun safe
inside of the apartment which also contained several guns to include an
AK-47.

11.  During the fall of 2001, CASTILLON called SOTO and accused him of
stealing $27,000.00 from the stash apartment.  SOTO denied the allegation
and CAMPOS took the keys to the apartment away from SOTO.  CASTILLON told
SOTO he had to pay back this amount by transporting cocaine to Chicago for

DEA Form      - 6a
Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| (Continuation) | M2-02-0005 | YNC1A |
| | 3. File Title ▓▓▓▓▓▓▓▓▓▓ | |

| 4. | |
|---|---|
| Page 4 of 7 | |
| 5. Program Code | 6. Date Prepared |
| SW-TXW-295-HID 100 | 07/22/02 |

him. SOTO later learned that the $27,000.00 was located in "CHAGO's"
(Identified as Reynaldo HERNANDEZ) house by his wife and returned to
CASTILLON.

12. On December 1, 2001, SOTO received a call from CASTILLON, who told
him to come to the apartment near Medical Drive. SOTO arrived at the
apartment and told SOTO and "CHAGO" to drive two white Ford Explorers
which contained 20 kilograms each in the gas tanks to Chicago. SOTO
followed "CHAGO" and they departed for Chicago. SOTO said they had to
stop for gas often because of the cocaine in the gas tanks. SOTO and
"CHAGO" stayed over night in different motels just across the Oklahoma
State line. SOTO spent the night at a Motel 6 and "CHAGO" was in a
different motel at the same exit. SOTO claimed he called CASTILLON from
Oklahoma, Missouri and the Chicago area during this trip. Upon arrival in
the Chicago area they registered at the Hampton Inn by the airport off of
IH-55. SOTO rented his room in his name and paid cash for the room.
"CHAGO" told SOTO to leave the keys to the Explorer inside. SOTO claimed
"CHAGO" and an unidentified person took the Explorers to an unknown
location and removed the cocaine. The Explorer that SOTO drove broke down
and "CHAGO" called CASTILLON who told SOTO to leave it with the people who
got the cocaine. "CHAGO" told SOTO not to say anything to anybody about
the transaction. SOTO rode back to San Antonio with "CHAGO" who stopped
somewhere in Kansas to spend the night. On December 5, 2001, "CHAGO"
dropped SOTO off at his residence.

13. According to SOTO, "CHAGO" was supposed to bring 30 kilograms of
cocaine to San Antonio from Eagle Pass the next day. SOTO learned from
CAMPOS that CASTILLON had 30 kilograms of cocaine seized at the checkpoint
in Eagle Pass, TX on December 6, 2001. (Note: On 12/6/01 Lidia Elena De
ALBA was arrested by U.S. Border Patrol Agents after the discovery of
approximately 24 kilograms were located in the gas tank of a white Ford
Explorer Texas Registration L28GZC, registered to Reynaldo HERNANDEZ, 1641
W.Summit, San Antonio, Texas MD-02-0030).

14. On December 7, 2001, SOTO was arrested for the delivery of 5
kilograms of cocaine to a DEA undercover agent (see synopsis section
above). After the delivery of cocaine to the undercover agent
surveillance was led by SOTO to PERFORMANCE TINT & DETAIL SHOP, 602

| DEA Form     - 6a | | |
|---|---|---|
| (Jul. 1996) | | |

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

AUSA

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| (Continuation) | M2-02-0005 | YNC1A |
| | 3. File Title | |

| 4. | | |
|---|---|---|
| Page 5 of 7 | | |
| 5. Program Code | 6. Date Prepared | |
| SW-TXW-295-HID 100 | 07/22/02 | |

Everest. SOTO said he was having his truck detailed when he received a
call to pick up the money for the cocaine he had delivered. When SOTO
returned he was arrested driving a Ford Thunder Bird which was registered
to CASTILLON. SOTO stated that CASTILLON had given him the Thunder Bird
to have repaired and painted so that they could use it. Agents returned
to PERFORMANCE TINT & DETAIL and spoke with RAMIREZ about SOTO's truck
which was seized. At the time agents were unaware of RAMIREZ' involvement
with CASTILLON.

15. According to SOTO, RAMIREZ called CASTILLON about SOTO's arrest for
drug trafficking. The next day Attorney Eddie GARCIA visited SOTO at The
Wackenhut Detention Center and told SOTO that RAMIREZ had called him to
represent SOTO and had paid GARCIA $15,000.00 to do so. GARCIA said he
would do the best he could to get him out of jail and told him to keep his
mouth shut. GARCIA said DEA people do not want to talk to him and are not
interested in him.

16. SOTO claimed he called a friend from Wackenhut who made a three party
call to RAMIREZ at PERFORMANCE TINT & DETAIL SHOP and spoke with RAMIREZ.
RAMIREZ told SOTO that Eddie GARCIA was a good attorney and would fix it
for SOTO. RAMIREZ advised SOTO that he would take care of his payment to
GARCIA.

17. SOTO said he observed several markings on the kilograms of cocaine to
include a fish, M for Motorola and a scorpion. SOTO was present in
CASTILLON's stash apartment in Eagle Pass and assisted CASTILLON, CAMPOS
and Roberto LNU cut the cocaine with vitamins and lactose. SOTO claimed
he puchased 20 bottles of the cut from the GNC Health Food Store located
in the North Star Mall in San Antonio on several occasions. SOTO said
they would mix three (3) kilograms of cocaine with the cut and make (5)
kilograms out of it. SOTO said the cut cocaine was sold in San Antonio
and the pure cocaine would be transported to Chicago. According to SOTO,
CASTILLON sells numerous kilograms of cocaine to a subject in San Antonio
by the name of Gabriel LNU. A review of the case data base revealed a
Gabriel Christopher GARCIA, 7200 S. Presa Street, Apt. 1702 and 3315
Stephen Foster, San Antonio, Texas, Texas DL#19181865, Social Security
#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. In addition, GARCIA is the subscriber to Verizon Cellular

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

-1 - Prosecutor

AUSA

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION *(Continuation)* | 1. File No. M2-02-0005 | 2. G-DEP Identifier YNC1A |
|---|---|---|
| | 3. File Title ████████████ | |

| 4. Page 6 of 7 | |
|---|---|
| 5. Program Code SW-TXW-295-HID 100 | 6. Date Prepared 07/22/02 |

telephone numbers 210-347-0827 and 210-347-0830 and these phone are utilized by ~~CASTILLON and RAMIREZ.~~

18. At the time of SOTO's arrest he had cellular telephone number 210-573-8103 in his possession. After debriefing SOTO it was learned that SOTO received the telephone from Jesse RAMIREZ. SOTO in the presence of his attorney, gave permission to retrieve the phone list from the telephone seized from him at the time of his arrest. The following is a list of names and telephone numbers retrieved from SOTO's cellular telephone:

| | | | | | |
|---|---|---|---|---|---|
| 1. | Palomo | 830-325-2651 | 13. | Mingo | 872-6723 |
| 2. | Jac | 830-352-0830 | 14. | Chag | 214-921-9290 |
| 3. | Cha | 382-1634 | 15. | Mecan | 921-9290 |
| 4. | Gil | 274-4590 | 16. | | 830-757-3315 |
| 5. | Jo | 382-3070 | 17. | | 316-2082 |
| 6. | GGA | 535-6554 | 18. | RRR | 325-7927 |
| 7. | J | 889-5885 | 19. | | 210-771-2844 |
| 8. | JE | 826-4633 | 20. | | 923-9239 |
| 9. | Blank | | 21. | | 832-594-6258 |
| 10. | TA | 210-385-6815 | 22. | G | 722-8191 |
| 11. | Palomo | 923-4969 | 23. | Comp | 573-4741 |
| 12. | P Cha | 210-382-1511 | 24. | Jac | 708-870-4040 |

INDEXING

1. Jose Guadalupe SOTO, Naddis #5310655
2. Alejandro CASTILLON, Naddis #5136210
3. Jesse RAMIREZ, Naddis #4894158
4. Ricardo ENRIQUEZ, Naddis #5316745
5. "Chava" LNU, brother of Alejandro CASTILLON, Naddis negative
6. PERFORMANCE TINT & DETAIL SHOP, Naddis pending
7. Rene CAMPOS, Naddis #5375980
8. Reynaldo HERNANDEZ, AKA "CHAGO", Naddis #5310078
9. Lidia Elena De ALBA, Naddis #5310087
10. Eddie GARCIA, Naddis negative, Attorney hired by Jesse Ramirez
11. Roberto LNU, Naddis negative

DA Form - 6a
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | 1. File No.<br>M2-02-0005 | 2. G-DEP Identifier<br>YNC1A |
|---|---|---|---|
| *(Continuation)* | | 3. File Title | |
| 4.<br>Page  7  of  7 | | | |
| 5. Program Code<br>SW-TXW-295-HID 100 | | 6. Date Prepared<br>07/22/02 | |

12. Gabriel C. GARCIA, Naddis Negative, H/M, DOB: 8/02/80, 7200 S. Presa, Apt. 1702, San Antonio, TX, TX DL#19181865, Social Security #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.

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | | | Page 1 of 2 |
|---|---|---|---|---|
| 1. Program Code | 2. Cross File | Related Files | 3. File No. M2-02-0021 | 4. G-DEP Identifier WGC1D |
| 5. By: Frank Perez, TFO At: San Antonio, Texas | | | 6. File Title SOTO, Jose Guadalupe | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 12/21/01 | |
| 9. Other Officers: | | | | |

10. Report Re: Arrests of Jaime MARTINS-Olvera and Jose Guadalupe SOTO; Acquisition of Exhibit #N-3.

**SYNOPSIS**

On 12-07-01, Task Force I-San Antonio District Office conducted an investigation into the illegal drug-trafficking activities of Jose Guadalupe SOTO and Jaime MARTINS-Olvera, which concluded in their arrests for conspiracy to distribute approximately 5 kilograms of cocaine.

**DETAILS**

1. Reference is made to DEA-6, written to this case file by TFO Cal Fowler, dated: 12-11-01, regarding the surveillance/arrest of Jaime MARTINS-Olvera and Jose Guadalupe SOTO, as well as DEA-6s, also written to this case file by S/A Jaime Garza, dated: 12-10-01 and 12-11-01, regarding negotiations with Jaime MARTINS-Olvera.

2. On 12-03-01 and 12-07-01, S/A Garza (acting in an undercover capacity) negotiated with MARTINS-Olvera for the delivery of approximately 5 kilograms of cocaine (see DEA-6s by S/A Garza, dated: 12-10-01 and 12-11-01 for details).

3. On 12-07-01, S/A Garza agreed to meet with MARTINS-Olvera at a local wash-a-teria parking lot located at Sahara and San Pedro, San Antonio, Texas and consumated the pre-arranged delivery.

4. After viewing the cocaine, S/A Garza gave the pre-determined arrest signal, thus effecting MARTINS-Olvera's arrest.

5. Immediately after the arrest by S/A Denise Stone and TFO Frank Perez, MARTINS-Olvera was advised of his rights as per the Miranda warning by TFO Perez at approximately 3:00 p.m.

| 11. Distribution: Division Houston District San Antonio Other EPIC, SARI | 12. Signature (Agent) Frank Perez, TFO | 13. Date 12-21-01 |
|---|---|---|
| | 14. Approved (Name and Title) Joe Dubois Acting Group Supervisor | 15. Date |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Department of Justice
Enforcement Administration

| **REPORT OF INVESTIGATION** | 1. File No. M2-02-0021 | 2. G-DEP Identifier WGC1D |
|---|---|---|
| *(Continuation)* | 3. File Title SOTO, Jose Guadalupe | |
| 2 of 2 | | |
| gram Code | 6. Date Prepared 12/21/01 | |

After acknowledging his constitutional rights to both S/A Stone and
TFO Perez, S/A Stone asked "what was in the truck", to which MARTINS-
Olvera responded "just the 5 keys".
When S/A Stone asked "what keys", MARTINS-Olvera replied "he didn't
know".
During this interview, MARTINS-Olvera expressed a desire to cooperate
fully and to assist in effecting the arrest of his cocaine source.
TFO Fowler was made aware of MARTINS-Olvera's statements and further
discussions were carried out at the San Antonio District Office.
At approximately 5:00 p.m., MARTINS-Olvera, S/A Garza, and TFO Perez
returned to MARTINS-Olvera's apartment complex parking lot, to await
the delivery of 5 additional kilograms of cocaine from the source.
While waiting inside MARTINS-Olvera's pickup, two cellular telephone
conversations to #210/573-8103 were recorded on to one cassette tape,
which was later labeled as Exhibit #N-3. These conversations were
between MARTINS-Olvera and his cocaine source, Jose Guadalupe SOTO.
At approximately 5:40 p.m., SOTO arrived in a grey Ford Thunderbird
(rather than in the black Ford pickup as claimed during the recorded
conversations) and parked next to MARTINS-Olvera's pickup.
At this time, SOTO was arrested for conspiracy to distribute
approximately 5 kilograms of cocaine and transported to the San
Antonio District Office for processing.

**TODY OF EVIDENCE**

Exhibit #N-3=is an original cassette tape, which contains two
recordings of conversations between Jaime MARTINS-Olvera and Jose
Guadalupe SOTO on 12-07-01.  TFO Frank Perez maintained custody of
Exhibit #N-3 until it was turned over to the San Antonio District
Office Non-Drug Evidence Custodian for safekeeping.

**DEXING**

MARTINS-Olvera, Jaime=NADDIS #2862937.
SOTO, Jose Guadalupe=NADDIS Pending.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice                    Regional Administ.   Remedy Appeal

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

From: ___Ramirez, Jesse Salazar_____ __31805-180___ __C/A__ __USP/Beaumont__
          LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.         UNIT         INSTITUTION

**Part A—REASON FOR APPEAL** –It is clearly evident, that Warden Outlaw has failed to do any type of investigation at all. I never attempted to provide staff with the information. That did suppoert my claims. I did, give and show this information. To Ms. Hanks and when we were in her office. I personally showed, read and she is fully aware of this inaccurate information. The reason why I toook it back. Is because, Mr. NcGehee and Ms. Hanks. Havegrossly misinterpreted the Privacy act, Sellers and their duties under both. It is clear that they are wholly ignorant and are unwilling to take the time and understand. Exactly, what their duties are. I have not failed to provide staff with sufficient information in support of the challenged information. Staff is the one who is misunderstanding what their actually duties are. It doesn't matter to them,if the information is corrected or not. As they have told me, "if the Probation Office does not correct the allegedly false/inaccurate information. We are still going to rely upon it and we can". This is what was relayed to me. Through both Mr. McGehee and Ms Hanks. They have both told me, that they have no control over correcting this inaccurate information. That is affecting me adversely. This is contrary to both the Privacy Act and Sellers. Staff cannot hearly **note** that the information is inaccurate. They **must** maintain accurate information. That is contained in an inmates file. They have both proven tome. That they are not going to stop relying upon it. If the Probation Office fails to correct it. This is what my complaint is all about. There is **no doubt** in my mind. That I can and will prove. That **all** of the information,

___10/19/06___    PLEASE   SEE   ATTACHMENT                            
     DATE                                                   SIGNATURE OF REQUESTER

**Part B—RESPONSE**

                         7001 0020 0004 5955 3811
                 cert.# 7001 0020 0004 5955 3811

_____                          _____
    DATE                                      REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                   CASE NUMBER: _____

**Part C—RECEIPT**

                                        CASE NUMBER: _____

Return to: _____
         LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

SUBJECT: _____

_____

USP LVN    DATE          Previous editions not usable        SIGNATURE, RECIPIENT OF REGIONAL APPEAL        BP-230(13)
                                                                       APRIL 1982

that is in my PSI Report. Is inaccurate and false. Therefore, USP/Beaumont Staff. Will not be able to rely upon any of it. The basis for my complaint, is not only that the information is false/inaccurate. But that USP/Beaumont staff is not only ignorant of the Privacy Act, Sellers and their duties under both. But that they are going to be unwilling to correct it themselves or to quit relying upon it. If, the Probation Office refuses or fails to correct the inaccurate information. I am going to attach a letter that was given to Ms. Hanks and on October 4,2006 at MainLine at 11:26 am. This letter clearly shows that I have made her aware of the inaccurate information. The U.S. Probation Office Ms. Olivari is fully aware of this false information as well. Wherein, I proved it all to her in my sentencing hearing. This is all in black and white. I have complied with P.S. 5800.11 by notifying Ms. Hanks of the inaccurate information, I have given her the documentation to prove it. I personally gave it to her and in her hand. While we were in her office. All she did was put it in my file. She failed to correct then and their and when she had this information in her hands/possession. This proves that she has failed to uphold her duties as per the Privacy Act and Sellers. The Warden concedes to this in his response. What difference does it matter if I resubmit this information to Ms. Hanks or Mr. McGehee. Their actions or inactions I should say. Have spoken for themselves. The review should have been conducted. The minute/second that I gave them this information to begin with. The Warden then states, that it is the decision of the U.S. Probation Office as to what steps are taken to rectify the inaccuracies. Since Ms.Hanks and Mr. McGehee have both failed to correct this inaccurate information themselves. I ask that they both relay to the Probation Office. The portions of the PSI Report, that I have notified to them. That contain this false/inaccurate information. Please refer to the informal resolution, the formal resolution, this BP-9 and the letter that I gave to Ms. Hanks. If there are any questions. As to the exact parts that I am alleging. That are false/inaccurate. There is no need to resubmit this infor back to Hanks and McGehee. As they are not going to review this themselves and they will just put it in my file. Which has already been proven. The DEA-6 reports, criminal complaints and transcripts. That were given to them the first time. More than proves that the information is infact false/inaccurate. Due to their inability to discharge their duites. I therefore request an appeal from this decision. I also request, that since this Regional Director G. Maldonade. Is just as ignorant, unwilling, and unable to discharge his own duties. That he deny me any and all relief. So that, I may go to the next available remedy and exhaust it. So that, I can then file my civil lawsuit  and collect damages.For the injury/damages that I have and am suffering. They have all had an opportunity to do as they are under duty to do. They have failed to do as such.

Respectfully

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office A    ministrative Remedy Appeal**

7001 0320 0004 5955 3590

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attach-ments must be submitted with this appeal.

| From: Ramirez, Jesse | 31805-180 | C/A | USP/Beaumont |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A — REASON FOR APPEAL** - It is clearly evident.That none of these people have done a proper investigation and have listened. To what they are saying intheir very own responses. It is a proven fact, that I had personally handed and went over the inaccurate information. With Ms. Hanks in her office. She personally saw the DEA-6 reports and etc. That support what I am telling these people. Upon me forwarding this documentation to Ms. Hanks. She quickly put this documentation in my file. She had this information for over a week. Where she could have already commenced her duties. Under the Privacy Act, and Sellers. She failed, and subsequently. I asked her for the documentation back. Her actions were the same actions. That the Parole Board took in Sellers. They merely noted the inaccurate information and stuck in in Seller's file. This is clearly a violation of the Privacy ACt and Seller's. I have not failed to provide this information to ms. Hanks and staff. It is they, who have failed to fulfill their duties. When I provided this information to them. Me taking it back. Has nothing to do with what they all should have done to begin with and the very second.That I provided this documentation to them. It is clear, that I have done my part under the Privacy Act and Seller's. Therefore, I ask once again. To please expedite the denial of this appeal. So that I may proceed with my civil remedies.

P.S. This inmate has provide staff with such information. Staff did review the alleged error's. However, staff failed to take the reasonable steps to correct it.

| 11/08/06 | CERT# 7001 0320 0004 5955 3590 | |
|---|---|---|
| DATE | | SIGNATURE OF REQUESTER |

**Part B—RESPONSE**

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage P

| Postage | $ 1.11 |
|---|---|
| Certified Fee | 2.40 |
| Return Receipt Fee (Endorsement Required) | 1.85 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.36 |

Sent To BOP/Adminstration Remedy Section
Street, Apt.
or PO Box No. 320 First St., N.W
City, State, ZIP+4 Washington, D.C., 20534

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
BOP/Adminstration Remedy Section
320 First St., N.W.
Washington, D.C. 20534

2. Article Number
(Transfer from service label)  7001 0320 0004 5955 3590

PS Form 3811, August 2001    Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X S. Johnson    ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
S. Johnson    11/13/06

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered    ☒ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

102595-02-M-1840

## AFFIDAVIT OF JESSE RAMIREZ IN REGARDS TO
## RECEIVING DEFENDANTS MOTIONS

My name is Jesse Ramirez. I am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct. I do swear under penalty of perjury 28 § 1746.

**1)** I do swear that I received Defendants Motion to Dismiss and or Summary Judgements on June 6,2008 in the evening after 9:00pm. Which under the rules was deemed served.

**2)** This motion was served a whole 5 days **after** the submission date of the motion to dismiss and or summary judgement. Which the submission date was May 31,2008.

I do swear under penalty that this is true and correct to the best of my knowledge.

dated: 6/25/08

Jesse Ramirez
# 31805-180

1.

 

**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Freedom of Information & Privacy Staff*
*600 E Street, N.W., Suite 7300, Bicentennial Building*
*Washington, DC 20530-0001*
*(202) 616-6757 FAX 616-6478 (www.usdoj.gov/usao)*

Requester:  Jesse Ramirez                    Request Number: 08-400
Subject of Request:  Self (Letters)/TXW

Dear Requester:                                                JUN 20 2008

     Your request for records under the Freedom of Information Act/Privacy Act has been processed. This letter constitutes a reply from the Executive Office for United States Attorneys, the official record-keeper for all records located in this office and the various United States Attorneys' Offices. To provide you the greatest degree of access authorized by the Freedom of Information Act and the Privacy Act, we have considered your request in light of the provisions of both statutes.

     The records you seek are located in a Privacy Act system of records that, in accordance with regulations promulgated by the Attorney General, is exempt from the access provisions of the Privacy Act. 28 CFR § 16.81. We have also processed your request under the Freedom of Information Act and are making all records required to be released, or considered appropriate for release as a matter of discretion, available to you. The enclosed material, consisting of 56 pages, is being provided to you without excision. With regard to that portion of your request seeking access to "copies of any and all inter office memorandums," the District has advised that a search of its files did not locate any responsive records.

     With respect to your request that EOUSA provide you with certified copies of any responsive letter, the FOIA requires only that agencies make their records available to requesters, and not that agencies provide certified copies of their records to requesters. See 5 U.S.C. § 552(a)(3)(A).

     This is the final action on this above-numbered request. You may appeal this decision on this request by writing within 60 days from the date of this letter to the **Office of Information and Privacy, United States Department of Justice, 1425 New York Avenue, Suite 11050, Washington, D.C. 20530-0001**. Both the letter and envelope should be marked "FOIA Appeal." If you are dissatisfied with the results of any such administrative appeal, judicial review may thereafter be available in U.S. District Court, 28 C.F.R. § 16.9.

Sincerely,

*Karen M. Finnegan for*

William G. Stewart II
Assistant Director

Enclosure(s)

### AFFIDAVIT OF JESSE RAMIREZ IN REGARDS TO THE
### ACTUAL DAMAGES HE AS RECEIVED AS THE DIRECT
### OF DEFENDANTS WILLFUL FAILURE TO ADHERE TO
### THE PRIVACY ACT AND P.S. 5800.11

My name is Jesse Ramirez. I am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are ture and correct. I do swear under penalty of perjury 28 § 1746.

1) I Jesse Ramirez do swear that as the direct result/proximate cause of Defendants willful failure to adhere to the mandates of the Privacy Act "ab initio",(i.e. since as early as June 6,2002 and Nov. 8,2002) and Deters 85 F3d 657.

2) I have suffered severe adverse affects and actual damages. Wherein I have been unlawfully/illegally seized and stripped of one of my most basic and fundamental rights under the 4th amendments. I have been unlawfully stripped of my protections under the 5th amendment and my right to Life, Liberty and Property. As a result of these two constitutional violations. I have and still suffer from sleepless nights, severe anxiety, I have lost at least 40 pounds, severe mental and emotional trauma and etc.

3) I have also and as the direct result/proximate cause of Defendants willful failure to adhere to the mandates of the Privacy Act "ab intio". Suffered and still suffer mentally and emotionally. The loss of my personal wealth (i.e. my properties, by 2 business', all of my trucks, all of my cars, all of my monies, all of my guns, all of my tools, I have lost on all of the hard work, blood sweat and tears I put into building my business' and personal wealth. I have lost my FAMILY'S home/my homestead.

4) I have also suffered and still suffer from the loss of my extended FAMILY. Those being my brothers, sisters, aunts, uncles, cousins, nieces, nephews, friend and my Maria (my mother Maria Ramirez). I have felt a pain so deep in my heart and have suffered/still suffer from severe emotional and mental trauma. At the loss of our bonds, love and kinship. I have lost sleep, and felt like I was going out of my mind at these losses.

5) But more so, I have loss my immediate FAMILY as well. I have lost my Sugar (Jessica R. Rangel/common-law wife), I Have lost my Princess (Alexis Nicole Ramirez/1st born daughter) and I have lost my Chiquita (Alyssa Marie Ramirez/my 2nd born daughter). I have suffered and still suffer from a "broken heart". I have felt a pain like no other at the loss of my FAMILY. I have cried and still cry for them as men cry, I have and still do suffer from sleepless nights and this past Fathers day. I woke up early in the morning just thinking if my babies still remember me and if they knew I was their Daddy. I received "no" Fathers Day card whatsoever from them. I have no communication with them, they do not write me and we are not allowed to communicate telephonically. I had to and still do endure a pain so sever in my heart. While I was pushing my FAMILY away from me and living this life of prison with me. I refused to allow my FAMILY to live this life with me.

6) It tore me up inside and broke me mentally and emotionally. While I was telling Jessica ugly things in letters and over the phone. So that she could get mad at me and not feel guilty. About getting on with her and the girls life. I had to push them away and allow them to live a better life than this one with me. I still get sick to my stomach, when I think that other men have held my Sugar and my little girls have called other men Daddy. Our FAMILY will **never** ever be the same and a FAMILY again. It is rumored that Jessica R. Rangel (my common-law wife) has gotten or is fixing to get married.

1.

All of this/these "actual damages", adverse affects and injuries. Are infact the direct result of Defendants willful failure to maintain accurate records against me and then them willfully/intentionally relying upon this inaccurate and false information. I am **NOTHING** without my FAMILY and would rather die in these prison gray walls. Than to be free and live my life knowing. That we could and would never be a FAMILY again. I am sick to my stomach just writing this stuff in this affidavit. I lastly state, that my FAMILY is **"priceless"** and no one can put a dollar amount on my FAMILY. The $250 million plus award I am asking for. Is not even a peanut of what my FAMILY is worth . I am letting Defendants off lightly. I ask Defendants to state how much their Families are worth and to state it on the record or in an affidavit. I ask that Defendants attorneys (all 3 of them) to state on the record. What the dollar amount of value of their Family is.

7) I have also suffered severe physical pain (i.e. constepation, muscle loss, severe headaches, and etc.) along with mental and emotional trauma as well. When BOP officials left myself and the rest of the inmate population. To drown and die at USP/Beaumont. When Hurricane Rita made downfall in September of 2005 and despite the fact. That it was ordered to evacuate the entire population. We were locked in cells, with no runnign water, no toilet, and left there for weeks in 3rd world country conditions. I have heard grown men screaming, yelling and begging to be let out of their cells. Trying to escape the horrid conditions and heat. I have heard men beg for their lives. Not knowing if the water was going to come into our cells and flood them. I have been designated to two of the most dangerous brutal prisons in the BOP. I have had to suffer watching men butcher each other and then suffer the week and month long lockdowns as the result.

8) All because BOP staff failed to verify the challenged information that I challenged in my PSI report. And after I afforded them the necessary/specific information. That I am required to give them. Their failure to adhere to 5800.11 of their own Program Statement. Has resulted in an adverse determination to leave me classified and designated to these two infamous United States Penitentiary's. Had BOP staff not failed to verify this inaccurate information and then contact the USPO. They would have seen that what I was telling them is true and that the information was infact inaccurate/false. Once the USPO determined it was such and replied to them in writing. The BOP would have had to "note" it in their files. That the information they relied upon to classify and designate me to these USP's. Has been discredited and should not be relied upon in any future determinations of my classification. These "actual damages" that I have received since being designated to these prisons. Is the direct result/proximate cause of BOP staff's failure to adhere to P.S. 5800.11.


I do swear under penalty of perjury that this is true and correct.

dated: 6/25/08

_____
Jesse Ramirez # 31805-180



### AFFIDAVIT BY JESSE RAMIREZ "SUMMARY JUDGEMENT PROOF"
### SWEARING THAT THERE ARE MATERIAL FACT ISSUES AND
### THAT WOULD PREVENT SUMMARY JUDGEMENT

My name is Jesse Ramirez. I am competent to make this affidavit. The facts stated in this affidavit are within my knowledge and are true and correct. I do swear under penalty of perjury 28 § 1746.

**1)** I do swear that the morning that I was unlawfully arrested on Nov. 8,2002 at 5:30am. It was told to me by Javier Pena head of SADO (DEA's office in San Antonio, Tx). That I was being arrested for Possesion and Distribution of 5 kilos of cocaine.  The same 5 kilos that Jose Soto was arrested with on Dec. 7,2001 and for being the, "SOURCE" of those 5 kilos. As the record proves (Att. # 1 pg 3 thru pg 18 ¶ 27 and supporting exhibits). I was "not the source of the 5 kilos he was arrested with on that date after all". The record also proves that he was not telling the truth about his source. Because he was scared for his life and the life of his family. That he infact recanted these inaccurate/false statements 20 days later and 5 months before AUSA/Contreras, DEA agents and Defendant agency's. Willfully maintained this information in their records, 5 months before they willfully relied upon this information, 5 months before they willfully "disseminated" it to Magistrate Nowak, 5 months before they willfully "disseminated" it to a Federal Grand Jury and etc. In complete violation of the mandates of the Privacy Act. And during the course of these willful and intentional violations of the Privacy Act and Deters 85 F3d at 657. Did infact engage in conduct that was "greater than gross negligence". The record (Att. # 1 all of it and supporting documents) did willfully engage in criminal/unlawful conduct. I swear that becuase of these violations of the Privacy ACt. I have been severely aggrieved and have suffered sever actual damages(i.e. the loss of my freedom, the loss of my protections under the 4th and 5th amend, the loss of my personal wealth, the loss of my business', the loss of my real properties, and the loss of my FAMILY). This proves that there does exist "material fact issues" that would prevent summary judgement.

**2)** I do swear that in Nov. of 2002. That AUSA Contreras, DEA agents Castaneda and Stallings. Did tell me, that they were fully aware that the only interception that I was recorded on. Was for the bond of two individuals and that was legal and lawful. However, that if I did not agree to accept a deal from them and agree to testify falsely against anyone of my codefendants. That they were going to tell Magistrate Primomo that it was in reference to drug trafficking and me exercising a supervisory role, so that Primomo would deny me bond. They also told me that If  I did not agree t to do this for them. That they were going to tell the jury and Judge Prado that is was inreference to drug trafficking and me exercising a supervisory role, so that the jury could convict me and Prado could rely upon this and other inaccurate/false information to justify giving me life. This information that was subsequently "disseminated" to Magistrate Primomo, the jury and Prado. Was infact inaccurate/false and in complete violation of the Privacy Act and Deters 85 F3d at 657.

**3)** I do swear that during these "threat sessions" in Nov. of 2002. I did tell AUSA Contreras, DEA agents Castaneda and Stallings. That **all** of this information inthe Criminal Complaint and that they relied upon to get me dragged into this B.S.. Was all **Lies** (i.e. inaccurate and false information) and was fixing to destroy my life and my FAMILY"S LIFE.They **all** acknowledged that it was **Lies** (i.e. inaccurte/false information) and that they had made some "BIG MISTAKES" with me. But that they could not just let me go. That it was something way bigger than me. That they were predisposed to give me a "great

deal" and that. Depending on how well I **"Lied"** (i.e. testified falsely for them). That there was a great possibility that I would do **very** little time if any. I ask this Judge to review all of (Att. # 1 and supporting exhibits of DEA agent Stalling). So that this Judge can see how he admitted in the Jan 2004 Pre-Trial hearing. That "he/they" made mistakes with me and that he misspoke about me.

    **4)** I do swear that after the September 17,2003 pre-trial hearing. Wherein I told judge Prado in open court. That the govt. lied about me (i.e. willfully used the inaccurate/false information that they maintained in their records agianst me) and that their own records (e.g. DEA-6 reports and statements) proved this. My lawyer, Jorge Aristotelidis told me. That they **all** knew (e.g. AUSA Contreras, DEA agents Castaneda, Stallings and even Judge Prado) knew that they had lied about me (i.e. used known inaccurate/false information about me) and used (i.e. disseminated) inaccurate/false information against me. In order to justify my unlawful arrest, to show my involvement in the Criminal Complaint, to get Magistrate Nowak to sign off on the void arrest warrants and to get me indicted and etcetera. He begged me to take a deal staring at 5 years and probably ending up with about 18 months on a Misprison of Felon charge. That they (i.e. **all** of them Contreras, Castaneda, Stallings and Prado) were going to convict me at whatever the cost. That they didn't care if they used these lies and more lies (i.e. inaccurate/false info) to destroy my life and my Families life.

    I told him to go get fucked! That I will **never** accept responsibility for something that I didn't do and especially when they **all** know it is lies (i.e. inaccurate/false information). He told me that "they are going to get you, they are going to get you". I told him that they were going to have to get me then. Because I am a **man**. I will never accept resposibility for these lies, lie for them about another man and lay down for them. He told me, what if I get you "time served" and you go home tomorrow . You will have to agree to Misprison of Felon, forfeit what they took from you, you could **never** ask for "DISCOVER" **ever** again. But that I would go home tomorrow. I told him "Fuck You, Fuck All of them (Contreras, Castaneda, Stallings, and Judge Prado) that my principles, integrity and honor of a man do **not** have a price. That I will never **forfeit** them and not even for my Freedom! That they're **all** going to have to line up all of Wackenhut to lie about me at trial and I am going to make them use these lies to convict me. I told him to go fuck himself and to get off of my mother fucking case". This proves that they all willfully violated themandates of the Privacy Act, willfully/intentionally and **ab initio**. I have inturn been (1) severely aggrieved; (2) the agency's failed to maintain records accurately; (3) their (AUSA Contreras, DEA agent CAstaneda, Stallings, Magistrate Nowak, the Grand Jury and etc. etc.) relied upon all this inaccurate/false information that was/is infact the proximate cause of these many and severe adverse determinations and; (4) the agency's did infact act willfully and intentionally and **ab inition** (i.e. 5 months before June 6,2002, my unlawful arrest.

    These sworn statements do prove that "Material Fact Issues" do exist. In accord with the  (4) elements of the Privacy Act. Which do infact prevent Summary Judgment. I swear under penalty of perjury that this is true and correct.

dated: 6/2u/08

                           Jesse Ramirez # 31805-180

**AFFIDAVIT BY JESSE RAMIREZ VERIFYING THAT THESE EXHIBITS
AND ATTACHMENTS ARE ORIGINAL COPIES OF THE DOCUMENTS OR
EXHIBITS IN MY POSSESSION AND CONTROL**

My name is Jesse Ramirez. I am competent to make this affidavit. The facts
stated in this affidavit are within my person knowledge and are true and correct.
I do swear under penalty of perjury 28 § 1746.

    **1)** I am in possession and control. Of these exhibits and attachments.
That I am relying upon and in order to support my position/prove my burden
beyond a reasonable doubt.

    **2)** These copies that I have made. Are original copies of the documents
or exhibits that are in my possession and control. This is to verify their
authenticity.

I swear under penalty of perjury that this is true and correct.

dated: 1/25/08

Jesse Ramirez # 31805-180



## AFFIDAVIT BY JESSE RAMIREZ IN RESPONSE TO
## JAN HANKS DECLARATION

Comes now Jesse Ramirez and in accordance with 28 U.S.C. 1746 does swear under penalty of perjury. That the statements made herein are true and correct:

1) I am Jesse Ramirez/Plaintiff and am the person. Who is bringing forth thsi Privacy Act suit. I am personally privy to the facts of this case and will support my statements with documentation. I am also competent.

2) I initiated the Administrative Remedy Process (i.e. Inmate Request Forms) on or about August 1,2006. Wherein I submitted to Team Members (Inmate Requests To Staff" forms. This has already been made part of the record and is (Att.# 16).

3) Upon Team Members receiving this "Cop-Out". They informed me that they had no duty to adhere to or respond to this request. Which is why I submitted a 2nd "Cop-Out" or about August 11,2006 at about 10:57am and gave this to Unit Team Leader McGehee at mainline. I have already made this part of the record and is (Att. # 17). At which time, Unit Team Leader McGehee stated to me. That they (Himself, Case Manager J. Hanks and Counselor Cruz) did not have to adhere or respond to this Sellers Complaint/Privacy Act Request. As they were not required to do anything.

4) Which is why I had to initiate the Administrative Remedy Process (i.e. the BP-8, BP-9 and etc). I also attempted to get Jan Hanks to discharge her duties under P.S. 5800.11. However she stated, that she was not familiar with this Sellers Complaint/Privacy Act Request. But to her understanding from Unit Leader McGehee. They had no duty to entertain these Complaints or Requests. And that since they had no duty whatsoever. They were going to continue to rely upon this inaccurate/false information. in my file.

5) I then submitted to Counselor Cruz a BP-8 on August 15,2006 at about 11:09 am. This Informal Resolution (BP-8) has already been made part of the record and is (Att. # 18).

6) Later on, on this same day and at about 4:30 pm. Counsleor Cruz informed me that Case Manager Hanks wanted to talk to me in regards to the BP-8. That I had submitted against her and Unit Leader McGehee. Upon entering her office and coming into view of Jan Hanks. She immediately began to verbally assault me (e.g. talk to me in a real rude and loud voice).

-1-

7) It was clearly evident that she was mad at me. For filing the BP-8 on her and Unit Leader McGehee. She was making rude/loud requests for documentation and in regards to my SEllers Complaint/Privacy Act Request. I told her that she did not have to talk to me in that tone of voice. She told me that she needed the information, that supported my Complaint and Requests. But that this is how she talks and I was no one to tell her how to talk. At that time, I got up and told her. That I have something (e.g. another BP-8 on her unprofessional conduct) for the way she was talking to me. I proceeded to walk out of her office and walk down the hall. Wherein she continued to yell at me. I immediately asked Counsleor Cruz to give me a BP-8. So that I could write her up for her unprofessional conduct.

8) Counselor Cruz did afford me a BP-8 and I did write up Jan Hanks. I gave this BP-8 to Counsleor Cruz on the same date August 15,2006 at about 8:18pm. I have already made this part of the record and is (Att. # 19).

9) On or about September 15,2006 and in the morning. I spoke with Jan Hanks and provided her with about [35 documents and a detailed explanation of the specific inaccurate/false parts of the PSI] that I was challenging. Please refer to (Att. # 20) in support of this September 15,2006 meeting. Jan Hanks did tell me at this time, that she was not familiar with nor understood a Sellers Complain/Privacy Act Request. I told her this was more that enough documentation than she needed. If she needed more, to just ask me. Jan Hanks did **not** even bother looking at the documents I had just handed her and tried to explain them to her. She merely took them from me and placed them in my file. The exact same thing, that the the Parole Board did to Sellers. And continued about her every day chores.

10) On or about SEptember 18,2006. I submitted a BP-9 to team members. So that, they could forward it to the Wards. Due to their(Unit Team Members) willful failure to adhere to 5800.11. I have already made this BP-9 part of the record and is (Att. # 20). I attempted to give this BP-9 to Unit Leader McGehee at maninline at about 11:02 am. But he "refused" to accept it and told me to slide it up under Counselor Cruz's door. At about 12:07 pm on September 18,2006, I did just as he told me to do. Please refer to the handwritten notes at the bottom of (Att. # 20).

11) I would like to point out, that by this time. Team members and including Jan Hanks. had infact "willfully/intentionally" failed to adhere to their duties under 5800.11 see **Brown v BOP 498 F.Supp.2d at 302-03 [2]n. 6(D.C. 2007)**. Which in accord with this courts own decision. I am able to bring forth

this Privacy Act claim. My case is distinguishable from Brown. Wherein, I never wrote a letter to the USPO and the record clearly proves. That neither did Team Members and even after. I supplied them with the necessary documentation and a detailed explanation. And the record also proves, that "no other" BOP official contacted the USPO in accord with 5800.11.

12) I would also like to point out and rebut Jan Hank's willful fraudulent and bad faith declaration. Jan Hanks was telling me the entire time. That she had no idea of what a Sellers Complant/Privacy Act Request was. Which is why she was not discharging her duties. Moreso, Jan Hanks and the other team members position on this situation. Was that they did not have to do anything about what I was complaining about. And that I just had to do what I had to do (i.e. file this lawsuit).

13) Further and (1) Jan Hanks never probed me for an explanation and a detailed outline of it. Nor did she ever show any interest in discharging her duties in accord with P.S. 5800.11. She was totally unreceptive to me trying to explain these documents that I gave to her. And when I did give them to her she just placed them in my file. Please refer to what is already part of the record as (Att. # 21 October 4,2006 letter to Jan Hanks). Why would I write Jan Hanks this letter, if she was doing everything she falsely stated in her declaration?

14) I also state that (2) I never handed Jan Hanks a "2" inch thick stack of papers and with no explanation. I handed her about [35] documents with a detailed and specific outline of the challenged information. I ask that you also refer to (Att. # 21 October 4,2006 Letter). This letter points out which parts of the PSI I was challenging. I have made these actual documents I gave to her part of the record and they are (Att. # 23). Had Jan Hanks taken the time to actually  review these documents and the very moment I handed her them (on September 15,2006). She would have been able to discharge her duties in accord with P.S. 5800.11. But instead, she just placed them in my file. Relying solely on Unit Leader McGehee advice to not worry about this Sellers Complaint/Privacy ACt REquest. Please refer to (Att. # 21).

15) I state that (3) Jan Hanks **never** afforded me a "recent example" of an inmate challenging his PSI. I was the "only" inmate who was filing this Sellers Complaint/Privacy Act Requests. And the only other inmates who were filing these Complints/Requests. Were inmates that I was assisting or filing these Complaints/Requests for personally. I prepared one for an inmate at Beaumont. Who's team members were the above mentioned. It is a fact, that

-3-

when these same team members received his complaint. The immediately discharged their duties in accord with 5800.11. But was only because they knew thay had already made the errors (i.e. failure to contact the USPO in accord with 5800.11). That would allow me to file this lawsuit and did not want others to be able to do the same. They knew that I was going to file this suit and they were scared. I ask that Jan Hanks afford this court with the "Actual Example and the Name of the Inmate who had Correctly Filed This Sellers Complaint". I can almost guarantee this court 100% that it was one I either prepared or assisted in preparing.

16) I also state as (4) that Jan Hanks never attempted to obtain more specific information from me. The record already proves that she was afforded this specific information of or about September 15,2006 refer to (Att. # 20) and on October 4,2006 refer to (Att. # 21and 23). She was never interested inthis information when I gave it to her originally. Why would she even attempt to obtain this from me?

17) I also state as (5) that I never got upset with Mrs. Hanks. The record does prove, that she was the one mad/angry with me refer to (Att. # 19). If you review (Att. # 21) you'll see that I was trying to help Jan Hanks in the discharge of her duties. If I was angry with her, I would have never tried to help her. There was no reason for me to be mad/angry at Jan Hanks.

18) I state as (6) that I told Mrs. hanks that if she needed anything else. That I would fulfill her requests as soon as possible. I was preparing other documents in the event that she requested them and to give to her. But what she had been originally given. Was more that enough, adequate and specifically detailed. In order to assist her in complying with P.S. 5800.11 and contact the USPO. But as the record clearly proves she and other team members willfully failed to adhere to their duties. In accord with BOP Program Statement 5800.11. Infact, Jan Hanks did refuse to assist me in my Sellers Complant/Privacy Act Request. She has infact committed perjury (18 § 1621), fraud (18 § 1001) and submitted this declaration in "bad faith". Therefore. I ask that this court "strike" the objectionable/false parts of her declaration and impose anyother sanction under the rules of Civil Procedure. This court deems necessary/just.

I do swear under penalty of perjury that the herein is true and correct to the best of my memory.

executed this day: 6 / 26 / 08

Jesse Ramirez

-4-